# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **NORFOLK COUNTY RETIREMENT SYSTEM, et al., Individually and on Behalf of All Others Similarly Situated,** | ) ) ) | **No. 1:07-cv-07014** |
| | ) | **CLASS ACTION** |
| **Plaintiffs,** | ) ) | **Judge Gettleman** |
| **vs.** | ) ) | **Magistrate Judge Nolan** |
| **DANIEL C. USTIAN, et al.,** | ) ) | |
| **Defendants.** | ) ) ) | |

## PLAINTIFFS' CORRECTED OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................................ 4

    A.  Navistar *Admits* that It Engaged in a Massive Accounting Fraud ................... 4

    B.  Navistar *Admits* that the Scheme was Deliberate ................................................ 6

    C.  Navistar *Admits* Its Internal Controls Were Deficient ...................................... 7

    D.  The Slow Revelation of Defendants' Fraud ........................................................ 8

III.  LEGAL STANDARDS .................................................................................................... 9

IV.  THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ...................... 10

    A.  The *Dura* Decision .............................................................................................. 11

    B.  Plaintiffs' Loss Causation Allegations ............................................................. 14

    C.  *Dura* Does Not Define How Loss Causation Must Be Pled .............................. 15

        1.  The Materialization of the Risk Approach ............................................. 15

        2.  The Fraud-on-the-Market Theory ........................................................... 17

    D.  *Dura* Does Not Require a Fact-for-Fact Corrective Disclosure ....................... 18

    E.  Navistar's Stock Price Timely Reacted to the Partial Revelations of the Truth ........................................................................................................... 23

    F.  Navistar's Stock Price Dropped Significantly ................................................. 25

V.  PLAINTIFFS' ALLEGATIONS RAISE A STRONG INFERENCE OF SCIENTER .......................................................................................................... 28

    A.  The Legal Standard for Scienter ....................................................................... 28

    B.  A Strong Inference Exists That the Defendants Knew or Recklessly Ignored That Their Statements Were False and Misleading ........................... 30

        1.  Navistar Defendants ................................................................................ 30

        2.  Deloitte .................................................................................................... 34

    C.  The Magnitude of the Restatement Supports an Inference of Scienter ......... 37

    D.  The Existence of Red Flags Support a Strong Inference of Scienter ............. 39

i

      E.       **Defendants Had the Motive and Opportunity to Perpetrate Fraud** ...............**42**

      F.       **Defendants' "Non-Culpable Explanations" Are Not Compelling** ...................**44**

            1.       **Navistar Defendants**.................................................................**44**

            2.       **Deloitte** ........................................................................**45**

      G.      **Scienter Can Be Imputed to Navistar** .....................................................**47**

**VI.**      **CONCLUSION** ...................................................................................................**48**

# TABLE OF AUTHORITIES

## CASES

*Asher v. Baxter Int'l, Inc.*,
  No. 02 CV 5608, 2006 U.S. Dist. LEXIS 4821 (N.D. Ill. Feb. 7, 2006) .........................21

*Blau v. Harrison*,
  No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) ..............................................9

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) ...................................................................................12, 15

*Carley Capital Group v. Deloitte & Touche, L.L.P.*,
  27 F. Supp. 2d 1324 (N.D. Ga. 1998) ..............................................................................42

*Carlson v. Xerox Corp.*,
  392 F. Supp. 2d 267 (D. Conn. 2005) .......................................................................35, 41

*Caterpillar v. Great Am. Ins. Co.*,
  62 F.3d 955 (7th Cir. 1995) ...............................................................................................47

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 815 (N.D. Ill. 2000) ................................................................................37

*Cosmas v. Hassett*,
  886 F.2d 8 (2d Cir. 1989) ..................................................................................................42

*DiLeo v. Ernst & Young*,
  901 F. 2d 624 (7th Cir. 1990) ...........................................................................................43

*DSAM Global Value Fund v. Altris Software, Inc.*,
  288 F.3d 385 (9th Cir. 2002) .............................................................................................34

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ("*Dura*") ................................................................................ *passim*

*Fidel v. Farley*,
  392 F.3d 220 (6th Cir. 2004) .............................................................................................34

*Freeland v. Iridium World Commc'ns, Ltd.*,
  233 F.R.D. 40 (D.D.C. 2006).............................................................................................21

*Frymire-Brinati v. KPMG Peat Marwick*,
  2 F.3d 183 (7th Cir. 1993) .................................................................................................43

*Garfield v. NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) ........................................................................................39

*Goldberg v. Household Bank, F.S.B.*,
   890 F.2d 965 (7th Cir. 1989) ........................................................27

*In re AFC Enter., Inc. Sec. Litig.*,
   348 F. Supp. 2d 1363 (N.D. Ga. 2004) ....................................................32, 43

*In re Apollo Group, Inc. Sec. Litig.*,
   509 F. Supp. 2d 837 (D. Ariz. 2007) ......................................................27, 28

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................30, 39

*In re Bally Total Fitness Sec. Litig.*,
   No. 04C3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ............................................32

*In re Bradley Pharms., Inc. Sec. Litig.*,
   421 F. Supp. 2d 822 (D.N.J. 2006) .............................................14, 17, 18, 19

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   No. 07 Civ. 5867 (PAC), 2008 U.S. Dist. LEXIS 63567 (S.D.N.Y. Aug. 20,
   2008) ........................................................................................13

*In re Credit Suisse-AOL Sec. Litig.*,
   465 F. Supp. 2d 34 (D. Mass. 2006) ......................................................27, 28

*In re Eagle Bldg. Techs., Inc. Sec. Litig.*,
   319 F. Supp. 2d 1318 (S.D. Fla. 2004) .........................................................36

*In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*,
   298 F. Supp. 2d 544 (E.D. Tex. 2004).........................................................21

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
   439 F. Supp. 2d 692 (S.D. Tex. 2006) .........................................................22

*In re First Merchants Acceptance Corp. Sec. Litig.*,
   No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760 (N.D. Ill. Nov. 4, 1998) ..........................37

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) ..............................................................28

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
   Civil Action No. 5-03-MD-1530 (TJW), 2004 U.S. Dist. LEXIS 26488 (E.D.
   Tex. June 10, 2004).......................................................................30

*In re Gilead Scis. Sec. Litig.*,
   No. 06-16185, 2008 U.S. App. LEXIS 17076 (9th Cir. Aug. 11, 2008) ...............13, 23, 24

*In re Health Mgmt., Inc. Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997) ...........................................................41

*In re Initial Pub. Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008)..............................................................................42

*In re JP Morgan Chase & Co. Sec. Litig.*,
    No. 06C4674, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) ..........................42

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006) .........................39

*In re Lernout & Hauspie Sec. Litig.*,
    230 F. Supp. 2d 152 (D. Mass. 2002) ...............................................................................41

*In re Loewen Group Inc. Sec. Litig.*,
    395 F. Supp. 2d 211 (E.D. Pa. 2005) ................................................................................19

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................................42

*In re MicroStrategy*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ....................................................................... *passim*

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ....................................................................... *passim*

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    51 F. Supp. 2d 290 (S.D.N.Y. 1999).........................................................................37, 38

*In re Paincare Holdings Sec. Litig.*,
    541 F. Supp. 2d 1283 (M.D. Fla. 2008).....................................................................37, 38

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005).......................................................................16, 22

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)..............................................................................42

*In re Sears, Roebuck & Co.*,
    291 F. Supp. 2d 722 (N.D. Ill. 2003) ...............................................................................39

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006) .......................................................................13, 26

*In re Spiegel, Inc. Sec. Litig.*,
    382 F. Supp. 2d 989 (N.D. Ill. 2004) ...............................................................................30

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)............................................................................................43

*In re Telxon Corp. Sec. Litig.*,
    No. 5:98-CV-2876, 2000 U.S. Dist. LEXIS 20192 (N.D. Ohio Sept. 29, 2000)...............10

*In re Tommy Hilfiger Sec. Litig.*,
No. 04-civ-7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. Jul. 20, 2007).......................17

*In re Transcrypt Int'l Sec. Litig.*,
No. 4:98 CV 3099, 1999 U.S. Dist. LEXIS 17540 (D. Neb. Nov. 4, 1999)...............37, 38

*In re Triton Energy Ltd. Sec. Litig.*,
No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920 (E.D. Tex. Mar. 30, 2001) ...................30

*In re Winstar Commc'ns.*,
No. 01CV3014 (GBD), 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 27,
2006) ...........................................................................................................................19

*In re Worldcom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)..............................................................................47

*Katz v. Image Innovations Holdings, Inc.*,
546 F. Supp. 2d 269 (S.D.N.Y. 2008)..............................................................................36

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
No. 02 C 5893, 2006 U.S. Dist. LEXIS 36603 (N.D. Ill. Apr. 24, 2006).........................12

*Lewin v. Lipper Convertibles, L.P.*,
No. 03 CV 1117, 2004 U.S. Dist. LEXIS 8484 (S.D.N.Y. May 13, 2004) ................37, 38

*Lewis v. Straka*,
535 F. Supp. 2d 926 (E.D. Wis. 2008)..............................................................................37

*Makor Issues & Rights, Ltd. v. Tellabs*, *Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................ *passim*

*Miller v. Material Scis. Corp.*,
9 F. Supp. 2d 925 (N.D. Ill. 1998) ...................................................................................38

*Neitzke v. Williams*,
490 U.S. 319 (1989)..........................................................................................................10

*Ong v. Sears, Roebuck & Co.*,
459 F. Supp. 2d 729 (N.D. Ill. 2006) .........................................................................12, 26

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001) ............................................................................37, 38

*Ray v. Citigroup Global Mkts.*,
482 F.3d 991 (7th Cir. 2007) ....................................................................................15, 18

*Rehm v. Eagle Fin. Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) ...............................................................30, 32, 37, 39

*Reiger v. Price Waterhouse Coopers LLP*,
    117 F. Supp. 2d 1003 (S.D. Cal. 2000)............................................................34, 39

*Retsky Family Ltd. P'ship v. PriceWaterhouse LLP*,
    No. 97C 7694, 1998 U.S. Dist. LEXIS 17459 (N.D. Ill. Oct. 21, 1998) ..........................46

*Riggs Partners, LLC v. Hub Group, Inc.*,
    No. 02 C 1188, 2002 U.S. Dist. LEXIS 20649 (N.D. Ill. Oct. 25, 2002) ........................38

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)................................................................................37

*Ryan v. Flowserve Corp.*,
    444 F. Supp. 2d 718 (N.D. Tex. 2006) .........................................................19

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. 2007) ..................................................... *passim*

*SEC v. Koenig*,
    No. 02-C-2180, 2007 U.S. Dist. LEXIS 26088 (N.D. Ill. Apr. 5, 2007)..........................10

*Selbst v. McDonald's Corp.*,
    No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093 (N.D. Ill., Sept. 21, 2005)................32, 39

*South Ferry LP, #2 v. Killinger*,
    No. 06-35511; D.C. No. CV-04-01599-JCC (9th Cir. Sept. 9, 2008) ............................31

*Steiner v. MedQuist Inc.*,
    No. 04-5487, 2006 U.S. Dist. LEXIS 71952 (D.N.J. Sept. 29, 2006) ........................10, 27

*Sunstrand Corp. v. Sun Chem. Corp.*,
    553 F.2d 1033 (7th Cir. 1977) .........................................................................28

*Swack v. Credit Suisse First Boston*,
    383 F. Supp. 2d 223 (D. Mass. 2004) ...............................................19, 25, 26

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)..............................................................................47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. ___, 127 S. Ct. 2499 (2007)................................................... *passim*

*Walker v. Nat'l Recovery, Inc.*,
    200 F.3d 500 (7th Cir. 1999) ............................................................................10

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78j(b) ...............................................................................................................10

15 U.S.C. §78u-4(b)(2) ......................................................................................................34

15 U.S.C. §578u-4(e) ...........................................................................................................2

Federal Rule of Civil Procedure

    Rule 8(a) ....................................................................................................................2, 13

    Rule 8(a)(2) ............................................................................................................11, 12

    Rule 9(b) ................................................................................................................10, 13

    Rule 12(b)(6) ............................................................................................. *passim*

17 C.F.R. §240.10b-5 ........................................................................................................10

## I.       INTRODUCTION

This case involves an accounting fraud perpetrated by Navistar International Corp. ("Navistar" or the "Company"), its top executives (the "Navistar Defendants"), and its outside auditor, Deloitte & Touche LLP ("Deloitte") in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act (the "PSLRA"). The Consolidated Class Action Complaint ("Complaint") filed by Lead Plaintiffs Norfolk County Retirement System and Plumbers Local Union No. 519 Pension Trust ("Plaintiffs") details a pervasive fraud orchestrated by the Navistar Defendants and Deloitte – a fraud which touched upon almost every line item on the income statements and balance sheets issued by Navistar from at least fiscal year 2002 through the third quarter of 2005 and resulted in a restatement (the "Restatement") on the magnitude of billions of dollars. The Complaint further explains how these Defendants were motivated to commit fraud so that Navistar could meet market expectations and portray a picture of financial health and profitability, rather than four straight years of losses.

Given the breadth and scope of the fraud, Navistar's Audit Committee conducted an investigation and concluded there had been "intentional misconduct used to improve the financial result[s] of specific business segments." Due to this misconduct, Navistar's Controller and Principal Accounting Officer, Defendant Marc Schwetschenau, and others involved in the fraud were reassigned and Deloitte was replaced as Navistar's outside auditor. Consequently, investors who bought shares during the Class Period suffered massive losses.

Predictably, the Navistar Defendants and Deloitte have moved to dismiss the Complaint, ignoring these (and other) inconvenient facts. (Navistar Defendants' Brief hereinafter referred to as "Mem. __"; Deloitte's Brief hereinafter referred to as Deloitte Mem. __"). Perhaps recognizing the futility of their legal arguments, the Navistar Defendants employ a novel tactic to poison the Court against the case. They suggest that they should be absolved from all liability for securities fraud

because, subsequent to the February 14, 2003 through July 17, 2006 class period (the "Class Period"), Navistar's stock enjoyed a significant price recovery – going so far as to argue that Plaintiffs would have profited if they sold their stock in May 2008. Of course, what a corporate defendant's stock price does more than 90 days after the close of a class period is irrelevant under the PSLRA. 15 U.S.C. §578u-4(e). Using this tortured logic, one would have to conclude that Tyco, a poster-child for corporate malfeasance in this decade, did not engage in securities fraud because its stock price tripled in the two years following the end of the class period in that lawsuit. Instead, Tyco settled the securities fraud lawsuit for almost $3 billion. Needless to say, the Navistar Defendants' position is absurd.

The various legal arguments in support of dismissal fare no better. The majority of the Navistar Defendants' brief is spent arguing that the Complaint fails to adequately plead loss causation. As the Navistar Defendants concede, the standard for pleading loss causation is governed by the U.S. Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ("*Dura*"). But rather than analyze the Complaint's loss causation allegations under the flexible, Federal Rule of Civil Procedure 8(a) standard established in *Dura*, the Navistar Defendants advocate a far more onerous test that focuses more on what Plaintiffs must ***prove*** instead of plead. At bottom, while the Navistar Defendants may factually disagree with Plaintiffs' loss causation theory, they cannot claim, at this stage of the proceedings, that they did not receive notice, or lack an understanding, of that theory. Because Plaintiffs' loss causation allegations – which include a series of partial disclosures covering a seven-month period that revealed the truth about Navistar's fraudulent accounting – satisfy *Dura*, the Navistar Defendants' motion to dismiss should be denied on that basis.

The Navistar Defendants' attacks on the Complaint's scienter allegations are similarly unpersuasive. The U.S. Supreme Court recently addressed the pleading standards for scienter in

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ___, 127 S. Ct. 2499 (2007) ("*Tellabs*"). In *Tellabs*, the Supreme Court instructed courts to consider complaints in their entirety and "whether *all* the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." The Complaint is replete with allegations that, viewed collectively, adequately allege scienter. Those allegations include: (1) the sheer size of the Restatement; (2) the simple nature of the accounting errors that led to the Restatement; (3) the finding of "intentional misconduct;" and (4) Class Period statements made by Defendants demonstrating knowledge of Navistar's accounting irregularities and incapacities. The Navistar Defendants' efforts to refute these well-pled allegations or cobble together "competing inferences" that are not grounded in the allegations of the Complaint should be disregarded.

Not surprisingly, Deloitte attempts to distance itself from the Navistar Defendants by arguing that the Complaint does not adequately plead that Deloitte acted with scienter. Given the pervasive nature and size of the Restatement, Deloitte's argument rings hollow. The Complaint sets forth specific, facts that Deloitte was aware of at the time of its audits and which it deliberately or recklessly ignored. As reflected by Deloitte's substantial fees, an earlier SEC inquiry into Navistar's accounting practices and Navistar's startlingly deficient corporate accounting and audit staff, the unmistakable conclusion is that the Complaint more than sufficiently alleges Deloitte acted with scienter.

Accordingly, for all of the reasons discussed more fully below, the motions to dismiss filed by the Navistar Defendants and Deloitte should be denied.[1]

---

[1] Plaintiffs maintain that all claims are adequately pled. If, however, the Court finds otherwise, Plaintiffs respectfully request that they be given leave to amend.

## II.    STATEMENT OF FACTS

### A.    Navistar *Admits* that It Engaged in a Massive Accounting Fraud

Navistar had been unprofitable since 2001 and suffered a $536 million loss in 2002, the largest in the Company's history.  ¶6.[2]  As a result, Defendants[3] were under intense pressure to return Navistar to profitability.  Knowing that they could not meet their forecasts legitimately, Defendants engaged in an elaborate scheme to grossly inflate Navistar's reported financial results. ¶8.  In fact, this case involves an accounting fraud so widespread and systemic that it affected every line item on Navistar's income statement and virtually every line item on the Company's balance sheets from at least fiscal year 2002 through the third quarter of 2005.  ¶306.

The Company's own Restatement – filed on December 10, 2007, two years after its Form 10-K for fiscal year ended October 31, 2005 was due – confirms this fact.[4]  For example, in the Restatement, the Company admitted that:

- For the year ended October 31, 2003, the previously reported net loss of $21 million was increased to a net loss of $333 million, a 1,485% misstatement.  ¶¶302-303.

- For the year ended October 31, 2004, the effect of the Restatement was to reduce previously reported net income of $247 million to a loss of $44 million, a 118% misstatement.  ¶¶302-303.

- For the first three quarters of 2005, the previously reported net profit of $135 million

---

[2]    References herein to "¶___" are to the Complaint, filed on May 8, 2008 [DE 68].

[3]    The Individual Defendants each served as senior officers of the Company during the Class Period. Defendant Ustian is and was Navistar's Chief Executive Officer and, on December 10, 2003, was elected chairman of the Company's Board of Directors.  ¶32. Defendant Lannert was the Company's Chief Financial Officer.  ¶33. Defendant Schwetschenau was Senior Vice President, Controller, and the principal accounting officer of Navistar.  ¶34.  Deloitte served as the Company's "independent" auditors. ¶37.  As set forth in the Complaint, each of the Defendants played an integral part in the Company's fraudulent practices.

[4]    The Restatement issued in December 2007 followed an earlier restatement of the Company's financials issued in February 2005.  Then, Navistar restated both its own and Navistar Financial's results for fiscal years 2002, 2003, and the first three quarters of 2004 (the "2004 Restatement").  In addition, the 2004 Restatement disclosed material weaknesses in the Company's internal and disclosure controls, as well as the Company's misapplication of GAAP.  ¶405.

was reduced to $61 million, a 45% misstatement. ¶303.

- Previously reported stockholders' equity as of October 31, 2004 and 2003 have been reduced by **$2.4 billion and $2.0 billion**, respectively, as a result of the restatement adjustments. Thus, the positive shareholders' equity of $292 million and $531 million as reported, were actually negative shareholders' deficits of $1.8 billion and $1.85 billion in 2003 and 2004, respectively. ¶¶302-303, 305.

In addition, the Company admitted in the Restatement that its income misstatements were widespread, affecting almost every aspect of Navistar's operations. Specifically, the Company admitted in the Restatement that it overstated income in each of the following areas:

- Product warranty – $190 million.

- Employee benefits arrangements – $176 million.

- Restructuring activities – $106 million.

- Leases – $71 million.

- Liabilities related to contingencies – $71 million.

- Vendor rebates and tooling costs – $30 million.

- Consolidation accounting – $25 million.

- Revenue recognition – $16 million.

*See* ¶¶307, 328-381. This massive Restatement of the Company's financials stands in stark contrast to Defendants' repeated misrepresentations during the Class Period, as detailed in the Complaint, about the adequacy of Navistar's system of internal controls and accounting standards.

In furtherance of this scheme, Deloitte rendered unqualified audit opinions on Navistar's 2003 and 2004 annual consolidated financial statements, falsely represented that it had conducted its audits of Navistar in accordance with Generally Accepted Auditing Standards ("GAAS"), and certified that those financial statements were presented fairly and in conformity with Generally Accepted Accounting Principles ("GAAP"). Deloitte rendered its unqualified audit opinions despite the myriad GAAP violations resulting in **billions** of dollars in misstatements. ¶¶426-428; 494-496.

On April 6, 2006, Deloitte was "dismissed" as Navistar's outside auditor and replaced by KPMG LLP. ¶39.

**B.    Navistar *Admits* that the Scheme was Deliberate**

The Company admitted in an October 25, 2007 press release that the fraudulently inflated financial statements were a direct result of "intentional misconduct." ¶¶294, 308. Then, in the Restatement, the Company further admitted that:

> The Audit Committee's extensive investigation identified various accounting errors, ***instances of intentional misconduct*** and certain weaknesses in our internal controls. The Audit Committee's investigation found that we did not have the organizational accounting expertise during 2003 through 2005 to effectively determine whether our financial statements were accurate. The investigation found that we did not have such expertise because we did not adequately support and invest in accounting functions, did not sufficiently develop our own expertise in technical accounting, and as a result, we relied more heavily than appropriate on our outside auditor. The investigation also found that during the financial restatement period, this environment of weak internal controls and under-supported accounting functions allowed accounting errors to occur, ***some of which arose from certain instances of intentional misconduct to improve the financial results of specific business segments***.

*See* ¶309.

The Restatement also revealed that Navistar, "as part of [its] commitment to strengthening [its] overall internal controls over financial reporting," had replaced Defendants Lannert and Schwetschenau. ¶310. Almost two years earlier, in January 2006, Deloitte informed Navistar's Audit Committee that they "were no longer willing to rely on the representations of" Defendant Schwetschenau and would "be unable to continue [its] audit unless [Schwetschenau] no longer served in a direct or oversight role in accounting or financial reporting or as an officer of the Company or any of its subsidiaries." ¶264.

### C. Navistar *Admits* Its Internal Controls Were Deficient

In addition to finding "intentional" misconduct, the Company admitted in the Restatement that its internal controls were deficient throughout the Class Period. Specifically, the Company admitted in the Restatement to at least 15 material weaknesses in its internal controls, including:

- "We did not have a sufficient number of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP as it relates to accounting for receivable securitization transactions. This resulted in inadequate segregation of duties and insufficient review of the information pertaining to securitization accounting."

- "As of October 31, 2005, management was unsuccessful in establishing an adequately strong consciousness regarding the consistent application of ethics across all areas of the company and the importance of internal controls over financial reporting, including adherence to GAAP. As identified by the Board of Directors' independent investigation, certain members of management and other employees, in place at that time, were involved in instances of intentional misconduct . . . ."

- "We did not have a formalized process for monitoring, updating, disseminating, and implementing GAAP-compliant accounting processes and procedures."

- "Our internal audit department was not an effective monitoring control over financial reporting."

- "We did not maintain effective controls to ensure adequate segregation of duties."

- "We did not maintain effective controls over the period end close process."

- "We did not maintain effective controls over the preparation, support, review and approval of journal entries. Specifically, effective controls were not in place to verify that journal entries were prepared with sufficient supporting documentation . . . ."

- "We did not maintain effective controls over our inventory accounting process."

*See* ¶402.

These widespread internal control deficiencies were corroborated by former Company insiders, including a senior auditor in Navistar's Corporate Audit department, a financial analyst, and a customer relations manager. These witnesses described how Navistar's corporate audit team was woefully understaffed, the corporate controller's organization lacked sufficient knowledge on

accounting issues, and how Navistar accountants inappropriately consulted with Deloitte personnel for advice on how to apply various accounting standards, in violation of ethical rules. ¶¶317-320. In addition, the former customer relations manager, who worked closely with Defendant Ustian, characterized Navistar's failure to disclose the underlying manufacturing and product quality problems and resulting increases in product warranty expenses of $190 million as a "colossal cover-up." ¶¶336-344.

Despite these profound deficiencies in Navistar's internal controls, Deloitte provided unqualified audit opinions on Navistar's 2003 and 2004 annual consolidated financial statements. To that end, Deloitte deliberately or recklessly ignored significant and obvious red flags of Navistar's specific GAAP violations, including the Company's 2004 Restatement and Navistar management's regular guidance to investors and analysts that reflected aggressive and unwarranted optimism. ¶¶433-493. In addition, Deloitte worked closely with Navistar employees, and at Navistar's offices, providing the accounting firm with access to and knowledge of the Company's confidential financial information. ¶¶317-320. For these reasons, and given the magnitude and scope of the Restatement and Deloitte's financial stake in its relationship with Navistar, Deloitte knew or recklessly disregarded that its audits were not conducted in accordance with GAAS, that Navistar's financial statements materially misstated the Company's true financial position, and that the financial statements did not conform with GAAP. ¶¶425-27.

### D. The Slow Revelation of Defendants' Fraud

Defendants did not reveal the truth of their widespread fraud at once, but instead trickled information into the market over a seven-month period, starting on December 14, 2005. On that date, Navistar disclosed that it had postponed a scheduled meeting with securities analysts and shareholders because the Company's external audit for fiscal year 2005 was not complete. ¶502. Then, after the close of the financial markets on January 17, 2006, Navistar announced that the filing

- 8 -

of its Form 10-K for 2005 would be further delayed as a result of continuing unresolved accounting items. ¶503. Additional partial corrective disclosures followed on February 3, 2006 and, on May 30, 2006, Bear Stearns downgraded Navistar and highlighted the Company's outstanding accounting problems. ¶¶504-505. On June 2, 2006, the Company issued a press release announcing its plan to file its 2006 Form 10-K by mid-January 2007, disclosing that Navistar had conducted an investigation into "the propriety of accounting and auditing confirmation matters relating to vendor rebates." ¶506. Finally, during trading on July 17, 2006, Moody's announced it would withdraw its ratings of Navistar's debt, revealing to investors the severity of Navistar's accounting problems and the resulting credit rating implications. ¶507. All told, from the day prior to the first corrective disclosure – December 13, 2005 – to the day after the last corrective disclosure – July 17, 2006 – Navistar common shares dropped significantly, falling $9.33 or 30%, as investors incorporated the information correcting Defendants' prior false and misleading statements. ¶509.

## III.   LEGAL STANDARDS

In considering Defendants' motions to dismiss, this Court must presume that the allegations of the Complaint are true and read the Complaint as a whole, not in the piecemeal fashion Defendants suggest. *Tellabs,* 127 S. Ct. at 2509 ("[F]aced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true [and] consider the complaint in its entirety.").[5] A motion to dismiss tests "the legal sufficiency of a complaint, not the merits of the case." *Blau v. Harrison*, No. 04 C 6592, 2006 WL 850959, at *4 (N.D. Ill. Mar. 24, 2006). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual

---

[5]     Citations, internal quotations, and footnotes are omitted, and emphasis is added, unless otherwise noted.

allegations." *Walker v. Nat'l Recovery, Inc.*, 200 F.3d 500, 503 (7th Cir. 1999) (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

Under §10(b) of the Securities Exchange Act of 1933 ("Exchange Act") and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. Although Rule 9(b) and the PSLRA require a plaintiff to plead with particularity, their requirements are not intended to serve as a bar to a viable §10(b) claim. *Steiner v. MedQuist Inc.*, No. 04-5487, 2006 U.S. Dist. LEXIS 71952, at *81 (D.N.J. Sept. 29, 2006) ("[A]lthough Rule 9(b) and the PSLRA were designed to erect barriers to frivolous strike suits, they were not intended to make meritorious claims impossible to bring."). As set forth below, Plaintiffs have adequately pled a claim for securities fraud.[6]

## IV. THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

Recognizing that they cannot escape the inconvenient facts that the massive Restatement resulted from, *inter alia*, numerous "instances of intentional misconduct" and a "lack of proper accounting knowledge," the Navistar Defendants devote the bulk of their Brief to a laborious factual deconstruction of Plaintiffs' loss causation allegations. From this painstaking analysis, however, two significant truths emerge: (1) the Navistar Defendants received adequate notice of Plaintiffs' theories of loss causation; and (2) they simply do not agree with those theories. But a factual disagreement with Plaintiffs' allegations cannot form the basis of a Rule 12(b)(6) dismissal,

---

[6]     In light of the Restatement, Defendants are not in a position to dispute the many false statements and omissions of material fact in this case. They only challenge scienter and causation. *See*, *e.g.*, *SEC v. Koenig*, No. 02-C-2180, 2007 U.S. Dist. LEXIS 26088, at *8 (N.D. Ill. Apr. 5, 2007) ("A GAAP violation is presumptively a false or misleading statement of material fact under Rule 10b-5."); *In re Telxon Corp. Sec. Litig.*, No. 5:98-CV-2876, 2000 U.S. Dist. LEXIS 20192, at*44-*45 (N.D. Ohio Sept. 29, 2000) (finding defendant "admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to this litigation.").

particularly in light of the modest loss causation pleading standards established in *Dura* and related Seventh Circuit precedent. The Navistar Defendants' efforts to distort this law and the relevant facts should be rejected.

Indeed, the Navistar Defendants' entire loss causation attack is based on a faulty premise – that Plaintiffs must **prove** loss causation at the motion to dismiss stage. In fact, citing *Dura*, their argument begins with the proclamation that Plaintiffs bear "the burden of proving" loss causation and "[t]he Consolidated Complaint is devoid of alleged facts that meet this burden." Mem. 15. This, of course, is not the law. While *Dura* reaffirms that a securities plaintiff must prove loss causation to ultimately succeed on a §10(b) claim, it also establishes a loss causation pleading standard that is not nearly as onerous as the Navistar Defendants make it out to be.

A.      The *Dura* Decision

A plaintiff bringing a §10(b) claim must allege loss causation, which is "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. As instructed by the U.S. Supreme Court, this requires a plaintiff to do nothing more than "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347. Importantly, the Court rejected any heightened pleading standard for loss causation, assuming that the "ordinary pleading rules" of Federal Rule of Civil Procedure 8(a)(2) provide a "simple test" which should not "impose a great burden upon a plaintiff." *Id.* at 346-47. The *Dura* plaintiffs' complaint "fail[ed] this simple test," however, because allegations of an "artificially inflated purchase price" alone were insufficient to show "a relevant economic loss" and "the complaint nowhere else provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation" at issue. *Id.* at 347.

Following the *Dura* decision, courts within this Circuit have expressly recognized that *Dura* did not alter or otherwise modify existing Seventh Circuit standards for pleading loss causation. *See, e.g.*, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2006 U.S. Dist. LEXIS 36603, at *10 (N.D. Ill. Apr. 24, 2006) ("Thus, *Dura* did not change the controlling law in [the Seventh] circuit."); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 965 (S.D. Ind. 2007) ("Other federal courts have agreed that *Dura Pharmaceuticals* left much of the prior Seventh Circuit law intact."). To that end, the flexible pleading standard set forth in *Dura* is entirely consistent with prior Seventh Circuit law:

> This requirement of loss causation . . . ought not place unrealistic burdens on the plaintiff at the initial pleading stage. It does not require, for instance, that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant. Such a burden would be far more stringent than the common law tort requirement upon which the requirement is based and would impose a burden on the plaintiff specifically forbidden by our case law. Nor does the requirement of pleading loss causation require that the plaintiff allege that it could not have suffered the same damage under other circumstances. Rather, the requirement is straightforward: The plaintiff must allege that it was in fact injured by the misstatement or omission of which it complains.

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997).

And, just as in pre-*Dura* cases like *Caremark*, subsequent decisions have reaffirmed that a plaintiff need only satisfy Rule 8(a)(2) in order to sufficiently allege loss causation. *See, e.g.*, *Schleicher*, 529 F. Supp. 2d at 967 ("Even after *Dura Pharmaceuticals*, the PSLRA's heightened particularity requirement does not extend to the pleading of the elements of economic loss and proximate causation."); *Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742 (N.D. Ill. 2006) ("As an initial matter, this court concludes that, to the extent Defendants suggest that *Dura* imposed stricter fact-pleading requirements for the economic loss and causation elements of an action under §10(b), Defendants are mistaken.") As the Ninth Circuit recently recognized:

> [A] district court ruling on a motion to dismiss is not sitting as a trier of fact. It is true that the court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences. But so long as the plaintiff alleges facts to

support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds. A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

***There is no exception to this rule for the element of loss causation.*** The Third Circuit has stated that loss causation becomes most critical at the proof stage, and has cited scholarly authority stating that it is normally inappropriate to rule on loss causation at the pleading stage. Similarly, the Second Circuit has held that loss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.

We agree. So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate. This is not a probability requirement[,] it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of loss causation.

*In re Gilead Scis. Sec. Litig.*, No. 06-16185, 2008 U.S. App. LEXIS 17076, at *22-*23 (9th Cir. Aug. 11, 2008); *In re Bristol Myers Squibb Co. Sec. Litig.*, No. 07 Civ. 5867 (PAC), 2008 U.S. Dist. LEXIS 63567, at *38-*39 (S.D.N.Y. Aug. 20, 2008) ("Allegations of loss causation, however, are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Rather, courts in this district have made it clear that if the complaint connects the Defendants' fraud with Plaintiffs' purported loss within the 'short and plain statement' standard of Rule 8(a), then that is all that is necessary at this stage of the litigation.").

Indeed, the Navistar Defendants cannot defeat the Complaint by contending that their version of the facts (and related inferences) is the only correct one.[7]  *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 713 (S.D. Tex. 2006) ("Defendants['] fact-based argument disputes the allegations in

---

[7]     The Navistar Defendants have apparently misread the Complaint.  While the "Loss Causation" section of the Complaint discusses, by way of example, six specific partial disclosures of the truth, it expressly incorporates by reference numerous other partial disclosures described in, among other places, the "Truth Begins to Emerge" section.  ¶499 ("The discussion of the following disclosures and market impacts incorporates by reference the complete discussion of these events above.").  Thus, Plaintiffs' loss causation allegations were, in no way, limited to six partial disclosures.  And the Navistar Defendants long-winded and careless efforts to chastise Plaintiffs for purportedly "ignoring" these other partial disclosures (Mem. 29-32) are without merit.

the Complaint and, therefore, requires a fact-specific inquiry at the summary judgment or trial stage. But such an argument is not appropriately made at this stage on a Rule 12(b)(6) motion to dismiss.").

### B.     Plaintiffs' Loss Causation Allegations

Plaintiffs' loss causations allegations amply satisfy *Dura*'s "simple test."  As described below, the Complaint alleges that, over a seven-month period, Navistar slowly leaked out information – tempered, in large part, by positive spin – concerning significant accounting issues negatively impacting the Company.  It describes how numerous market participants reacted adversely to the Company's progressively worsening disclosures.  And it details the effect of these disclosures on Navistar's stock price.  Nothing more is required at this stage of the proceedings.

More specifically, the Complaint details numerous partial disclosures of the "truth" concerning Navistar's fraudulent accounting made by the Navistar Defendants and others, in including:  (1) the postponement of an earnings conference call with analysts; (2) a delay in filing the Company's 2005 Form 10-K; (3) a potential default of the Company's revolving credit facility; (4) the possibility of a restatement; (5) a restatement of nearly three years of the Company's financial statements; (6) a potential ratings withdrawal by a leading ratings service; and (7) the actual withdrawal of the Company's ratings due to the prolonged failure to file current financial information and the identification of errors in prior financial statements.  This series of partial disclosures – each of which imparted increasingly troubling information about the Company – are more than sufficient to satisfy the flexible pleading standards established in *Dura*.  *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) ("Guided by a pragmatic understanding of *Dura*, the Court concludes that Plaintiffs have adequately pled loss causation. The revelation of the 'truth' about the Deconamine sale did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events.").

### C.   *Dura* Does Not Define How Loss Causation Must Be Pled

The crux of the Navistar Defendants' loss causation challenge is that Plaintiffs' allegations fail to satisfy some purported three-factor test established in *Dura*.  In fact, they expressly state that "the Consolidated Complaint must [but fails to] plead three things – (1) a 'significant' drop in the price of Navistar's stock, (2) 'promptly' after (3) 'the truth' about the deception becomes known." Mem. 15.  But *Dura* does not espouse such a rigid test or, for that matter, establish any specific test at all.

In fact, although it requires Plaintiffs to provide the Navistar Defendants with "some indication" of their loss causation theory, *Dura* does not, in any way, mandate the manner in which loss causation must be pled.  To that end, following *Dura*, the Seventh Circuit has recognized at least three ways in which loss causation may be established:

> The first is sometimes called the 'materialization of risk' standard. *Caremark* takes that approach, requiring the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries. The second approach is the 'fraud-on-the-market' scenario, which the Supreme Court discussed in *Dura*. Under that theory, plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception. Finally, *Bastian* suggests that loss causation might be shown if a broker falsely assures the plaintiff that a particular investment is 'risk-free.'

*Ray v. Citigroup Global Mkts.*, 482 F.3d 991, 995 (7th Cir. 2007).

### 1.   The Materialization of the Risk Approach

"Under the materialization of the risk approach, a plaintiff must show that the defendant exposed him to an undisclosed risk that subsequently materialized and that the materialization of this risk resulted in the complained of loss." *Schleicher*, 529 F. Supp. 2d at 966.  This approach provides "a method of showing loss causation without having to show the typical drop in stock price following a *mea culpa* announcement by the company." *Id.*  Moreover, under this approach, loss causation may be properly alleged even though "the truth about matters that plaintiffs allege were

concealed or misrepresented [may] not come out publicly until months after the end of the Class Period." *Id.* at 967.

*In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278 (S.D.N.Y. 2005), is on point. There, Parmalat's external auditor, Deloitte Italy, certified that Parmalat's financial statements fairly presented the company's financial health. *Id*. at 306. The audit reports, however, concealed Parmalat's "massive undisclosed debt" and the fact that the company was unable to service that debt. *Id*. at 307. "The concealed risk materialized when Parmalat suffered a liquidity crisis . . . and was unable to pay bonds as they came due." *Id*. The fact that "the true extent of the fraud was not revealed to the public until . . . after the close of the Class Period – [was] immaterial where, as here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value." *Id*.

As described above, Plaintiffs' allegations clearly satisfy the materialization of the risk approach to loss causation. Plaintiffs allege that, through years of fraudulent accounting and related audits involving almost every line item on Navistar's financial statements, the Navistar Defendants misrepresented the true financial condition of the Company and failed to disclose that Navistar's financial statements did not conform to GAAP and that the audits of those financial statements did not comply with GAAS. This created a risk that the financial statements would have to not only be restated, but re-audited in their entirety. That risk, which was clearly known to the Navistar Defendants, first began to materialize, and caused stock price declines, on December 14, 2005, when the Company postponed its earnings call due to issues with its 2005 external audit, and continued throughout early-to-mid-2006 as the Navistar Defendants announced that the Company's financial statements would be delayed and ultimately restated. The complete extent of the fraud – the $677 million overstatement of net income and overstatement of stockholders' equity by billions of

dollars – was not known until the re-audit was completed and the results announced long after the end of the Class Period, on December 10, 2007. ¶296.

Thus, these facts demonstrate that "the materialization of risks that were not disclosed caused a decline in the value of [Navistar's] stock." *Schleicher*, 529 F. Supp. 2d at 967. The fact that, nearly two years later, the Company finally revealed the depth and breadth of the Restatement does not signify that loss causation has not been properly pled since "[t]he stock had long since hit bottom before the alleged misrepresentations became known." *Id.* As such, Plaintiffs' allegations withstand scrutiny under the materialization of the risk approach, particularly at the motion to dismiss stage.

### 2. The Fraud-on-the-Market Theory

Plaintiffs also sufficiently plead loss causation under the "fraud-on-the-market" theory discussed in *Dura*. Under this theory, "[t]he typical PSLRA plaintiff shows loss causation by first showing that a company's stock price was artificially inflated when fraudulently rosy information was released to the public, and by then showing that a drop in the stock price followed shortly after the truthful bad news was released to the market." *Schleicher*, 529 F. Supp. 2d at 966; *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 538 (N.D. Ill. 2007) ("Since *Dura*, courts in this district and elsewhere, including this court, have found loss causation satisfied, at least at the pleading stage, by allegations that the plaintiff bought securities at a price artificially inflated by a defendant's misrepresentations, and that the price dropped once the truth was revealed."). As noted above, the truth may be revealed through a series of partial disclosures. *In re Bradley Pharms.*, 421 F. Supp. 2d at 828-29; *In re Tommy Hilfiger Sec. Litig.*, No. 04-civ-7678, 2007 U.S. Dist. LEXIS 55088, at *8 (S.D.N.Y. Jul. 20, 2007) (in concluding that plaintiff pled loss causation, court noted that "the truth here was revealed not in a neat and tidy single disclosure, but occurred through a series of disclosing events.").

Plaintiffs allege that, throughout the Class Period, the Navistar Defendants repeatedly issued material misrepresentations, which had the effect of artificially inflating Navistar's stock price and which allowed Navistar to meet market expectations. Beginning on December 14, 2005 and continuing through to the end of the Class Period, this artificial inflation was dissipated as the Navistar Defendants gradually revealed the information regarding the Company's serious accounting problems. Indeed, with these partial disclosures, the Complaint describes how the market reacted to the disclosure and how it negatively impacted Navistar's stock price. Plaintiffs' allegations satisfy the "fraud-on-the-market" approach to pleading loss causation discussed in *Dura* and approved in *Ray*. *In re Motorola*, 505 F. Supp. 2d at 546 ("[I]f a plaintiff shows, as Lead Plaintiff claims to have done here, that significant aspects of the still-concealed fraud in fact provided the catalyst for an anticipated failure to meet earnings forecasts, then the share price decline following an earnings warning might indeed dissipate the fraudulent price inflation; in such circumstances, there is no good reason why the earnings warning should not serve as a disclosure in which 'the relevant truth begins to leak out.'").

### D. *Dura* Does Not Require a Fact-for-Fact Corrective Disclosure

Despite conceding that they received adequate notice of Plaintiffs' loss causation allegations, the Navistar Defendants attack six (but not all) of the partial disclosures, claiming that those disclosures are not sufficient loss causation events because there was no revelation of "the very facts about which the defendant[s] lied." Mem. 18. In other words, they contend that Plaintiffs failed to allege "a corrective disclosure," which "reveals new information about the 'truth' of the alleged fraud." *Id.* Numerous courts, however, have rejected the same type of "rigid and dogmatic" interpretation of *Dura* advocated by the Navistar Defendants here. *See*, *e.g.*, *In re Bradley Pharms.*, 421 F. Supp. 2d at 828.

Indeed, contrary to the Navistar Defendants' suggestions, *Dura* does not even require that a defendant issue a *corrective* disclosure, let alone issue one that expressly and fully reveals every aspect of the alleged fraudulent scheme at a single time. *See*, *e.g.*, *In re Motorola Sec. Litig.*, 505 F. Supp. 2d at 544 ("This court does not read *Dura* to imply that a plaintiff cannot satisfy loss causation without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline."); *In re Loewen Group Inc. Sec. Litig.*, 395 F. Supp. 2d 211, 218 (E.D. Pa. 2005) ("[L]oss causation does not require a corrective disclosure followed by a decline in price."); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 243, 244 (D. Mass. 2004) (Applying a "more nuanced analysis" to loss causation allegations, district court rejected "a standard that would simply assume the market can only correct after an overt curative disclosure." Rather, there is "the possibility that the market learned the truth gradually, and in advance of the defendant's eventual disclosure" because "[t]he reality is that stock prices sometimes self-correct in advance of the final overt disclosure.").

In fact, "*Dura* did not address what type of events or disclosures may reveal the truth. Nor did *Dura* explain how specific such disclosure must be." *In re Bradley Pharms.*, 421 F. Supp. 2d at 828; *In re Winstar Commc'ns.*, No. 01CV3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *45 (S.D.N.Y. Feb. 27, 2006) ("The [*Dura*] Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality."). Thus, while it suggested that a plaintiff needed to allege in "some fashion" how the "truth became known," the "*Dura* court did not endorse or address [the Navistar Defendants'] proposed 'fact-for-fact' method of pleading loss causation." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 725, 727 (N.D. Tex. 2006) (noting that this "fact-for-fact" method means that "loss causation must be pled in an almost formulaic manner requiring the plaintiff to plead that the

- 19 -

alleged curative disclosure of the 'truth' that resulted in the plaintiff's losses revealed each material fact allegedly misrepresented or omitted.").

Judge Pallmeyer's summary judgment decision in *In re Motorola* is particularly instructive. There, defendants argued that, for loss causation purposes, "a corrective disclosure must at a minimum identify which prior representation is called into question, and must further reveal to the market the falsity of that representation." 505 F. Supp. 2d at 539. Rejecting this "strict interpretation," the court noted:

> Although Defendants cite to *Dura* as supporting their strict interpretation of a 'corrective disclosure' requirement for loss causation, this court does not read that decision to impose the requirements Defendants urge. Significantly, the Court in *Dura* did not use the term 'corrective disclosure.'
>
> \*       \*       \*
>
> The Court did not, however, indicate what form a disclosure must take, how completely it should reveal previously misrepresented or concealed information, or how specifically it must refer to that information. Rather than speaking in terms of a single event in which all is revealed, the *Dura* court referred to a hypothetical loss that might occur 'after the truth makes its way into the market,' and the lack of any such loss if the investor sells 'before the relevant truth begins to leak out.' This language suggests that a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity.

*Id.* at 540.

Adopting a "flexible approach" that is "more functional than facial," the court recognized that:

> a disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions. . . . As a practical matter, however, the truth that a misrepresentation or omission conceals can make its way into the market, resulting in dissipation of a fraudulently inflated share price, long before a company issues a formal 'corrective' announcement, and by a variety of other ways. . . . Precluding a plaintiff from establishing loss causation merely because of the absence of the kind of explicit corrective disclosure that Defendants would require, where the market in fact learned and absorbed the relevant truth anyway, seems unduly harsh.

- 20 -

*Id.* at 543-44; *see also Asher v. Baxter Int'l, Inc.*, No. 02 CV 5608, 2006 U.S. Dist. LEXIS 4821, at *23-*24 (N.D. Ill. Feb. 7, 2006) ("If Baxter had not lied about its internal state of affairs and its ability for growth, the disappointing second-quarter results would not have had such a negative impact on the share price. Thus, the alleged lies were responsible for the price drop following the July 18, 2002 second-quarter earnings announcement, and plaintiffs have satisfied their burden of pleading loss causation at this stage of the litigation.").

Judge Pallmeyer's extensive analysis makes perfect sense. Requiring a mirror-image, corrective disclosure as the only means of pleading loss causation would enable wrongdoers to minimize or eliminate exposure simply by refusing to admit, or otherwise delaying the disclosure of, fraudulent conduct. *In re Motorola*, 505 F. Supp. 2d at 544 ("Defendants' proposed rule would provide an expedient mechanism for wrongdoers to avoid securities fraud liability."); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."). This point was illustrated in *In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*, 298 F. Supp. 2d 544 (E.D. Tex. 2004):

> EDS argues that a plaintiff can never adequately plead a cause of action so long as a defendant does not admit that its fraudulent activity caused the alleged harm. The Court does not accept Defendants' argument. ***Defendants cannot escape liability for fraud simply by not admitting the fraud.***

*Id.* at 560-61.

Based on the reasoning of these (and other) authorities, the Navistar Defendants' insistence that they should be absolved from liability because they did not admit the existence of the alleged fraud until after the Class Period is unavailing. In compliance with *Dura*, the Complaint explains how the truth about Navistar's accounting improprieties became known through a series of partial disclosures, which revealed to the market, and which the market understood to mean, that there were serious problems affecting the Company. As described above, more than disclosing mere "bad

- 21 -

news," these partial disclosures revealed, chronologically over a period of six months, a series of increasingly disturbing events, starting with the postponement of an earnings conference call with analysts[8] and ending with a withdrawal of the Company's ratings due to the prolonged failure to file current financial information and the identification of errors in prior financial statements.[9] And the Complaint explains specifically how market participants reacted to these disclosures. That the Navistar Defendants did not reveal the full extent of the Restatement or intentional misconduct causing the Restatement until well after the Class Period does not negate the causal connection between the misrepresentations and the loss adequately pled in the Complaint. *In re Parmalat*, 375 F. Supp. 2d at 307 ("That the true extent the fraud was not revealed to the public until February - after Parmalat shares were worthless and after the close of the Class Period - is immaterial where, as

---

[8]    The Navistar Defendants claim, for example, that the December 14, 2005 postponement of its analyst conference did not reveal any "truth" concerning the alleged fraud. Mem. 18-20. However, the reasonable inference drawn from this announcement is that the market perceived the accounting problems reflected in the Company's 2004 Restatement had not been resolved and were continuing to plague the Company. To be sure, Bear Stearns expressed skepticism regarding the earnings delay, noting that Navistar's "new securitization accounting problems may have played a major role. . . [and] that [Navistar's] accounting systems have been strained. . . . We expect market skepticism to remain high on the name due to cont'd earnings delays." ¶234.

[9]    The Navistar Defendants further contend that certain of the partial disclosures are immaterial because they relayed information that was already known to the market. Mem. 23-24. Not true. For example, the February 3, 2006 partial disclosures revealed that: (1) certain bondholders notified the Company that it was in default due to the failure to timely file its 2005 Form 10-K and that, as a result, the Company risked a default under its revolving credit facility; and (2) Moody's downgraded its rating of Navistar due to the uncertainty surrounding the delayed 2005 10-K filing. Although these disclosures referred to prior news concerning the delayed 2005 10-K filing, they imparted new information about potential liquidity issues impacting the Company, which the market understood to be a significant problem. Similarly, the May 30, 2006 report by Bear Stearns provided new and independent analysis relating to *its* downgraded rating of Navistar common stock due to, *inter alia*, "low accounting visibility" related to accounting concerns raised by Deloitte and potentially illegal conduct undertaken by Navistar personnel. In this regard, a third party's analysis of previously disclosed information can undoubtedly be a loss causation event. *See In re Motorola*, 505 F.Supp. 2d at 555-57 (holding that a Bloomberg article analyzing a prior disclosure by Motorola could be considered a loss causation event); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 439 F. Supp. 2d 692, 701 (S.D. Tex. 2006) ("[B]esides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud through a number of sources: e.g., from whistleblowers, analysts' questioning of financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.").

here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline in shareholder and bondholder value.").

### E. Navistar's Stock Price Timely Reacted to the Partial Revelations of the Truth

Defendants also argue that Plaintiffs' loss causation allegations are lacking because they do not allege a "prompt" drop in the stock price after the truth was revealed. Mem. 16-17. In doing so, Defendants only challenge the timeliness of the drop in Navistar stock's price following *two* of the partial disclosures alleged by Plaintiffs—the disclosures on January 17, 2008 through January 19, 2008 and the June 2, 2008 disclosure. Mem. 21-22, 26-27. Defendants' position is that, since the Company's stock did not experience an immediate drop following these disclosures, there could be no compensable loss.

The Navistar Defendants again read *Dura* much too narrowly as the Supreme Court did not impose the immediate stock drop requirement that they advocate. In fact, *Dura* provides no specific time limitations for measuring the impact of a revelatory disclosure, and instead suggests that the plaintiff's economic loss may occur over time as the "relevant truth begins to leak out" or "after the truth makes its way into the market place." *Dura*, 544 U.S. at 343-46. In this regard, a temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not defeat loss causation, particularly where the market may not fully appreciate the significance of the facts that are revealed. *In re Gilead Scis.*, 2008 U.S. App. LEXIS 17076, at *24.

The Ninth Circuit's recent decision in *Gilead* is instructive. There, the district court dismissed the complaint on loss causation grounds, due to its "concern about the elapse of time between the public issuance of the Warning Letter and the drop in price." *Id.* at *23. In other words, the district court refused to make "the unreasonable inference that a public revelation on August 8 *caused* a price drop *three months later* on October 28." *Id.* at *21. The Ninth Circuit rejected such rigidity: "[a] limited temporal gap between the time a misrepresentation is publicly revealed and the

- 23 -

subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible." *Id.* at *24. Instead, engaging in a "fact-specific inquiry," the Ninth Circuit held that, while "the public failed to appreciate [the] significance" of the August Warning Letter at the time "because it did not contain enough information to significantly undermine" prior misrepresentations, the market later understood its significance in October when the company disclosed less-than-expected revenues that, according to the complaint, were plausibly caused by the issues raised in the Warning Letter. *Id.* at *24-*25.

Likewise, in *In re Motorola*, Judge Pallmeyer rejected the defendants' arguments that there could be no loss causation where information contained in the company's March 30th proxy statement did not cause a stock price reaction until April 6th when such information was highlighted in a Bloomberg article. 505 F. Supp. 2d at 554-57. In so holding, Judge Pallmeyer recognized that the March 30th disclosure of adverse news could not have caused an "immediate" stock price reaction since it was "buried" in the disclosure and thus was not "obvious" to a reasonable investor at the time. *Id.* at 554-56. Judge Pallmeyer concluded that "the most reasonable inference is that the price decline on April 6 [after the Bloomberg article] was caused by facts . . . which had been disclosed on March 30, but had not yet been incorporated into Motorola's share price because of the manner in which they had been revealed. *Id.* at 557.

Here, on the two occasions challenged by Defendants, the temporal gap between the partial disclosures of the truth and the drop in the Company's stock price was far less significant than in *Gilead* and *Motorola*. For instance, on January 17, 2006, the Company announced that the filing of its Form 10-K for 2005 would be delayed as a result of continuing unresolved accounting items. ¶503. Thereafter, between January 17th and January 19th (after the market closed), Moody's, S&P, and Fitch put Navistar's credit ratings on negative credit watch. *Id.* The combination of these contemporaneous disclosures revealed to the market the severity of the Company's accounting

problems and the implications that this, along with its inability to issue audited financial statements and make timely SEC filings, would have would have on its credit ratings. *Id.* Thus, the full significance of the Company's delayed filing of its Form 10-K became apparent to the market when coupled with credit ratings agency reports over this three-day period. As a result, while the Company's stock price decline may not have been immediate, it occurred promptly after the final news came out on January 20, 2006, when the market could appreciate its significance. ¶503.

Moreover, the Friday, June 2, 2006 disclosure that the Company had conducted an investigation into "the propriety of accounting and auditing confirmation matters related to vendor rebates" promptly caused the Company's stock to drop on Monday, June 5, 2006. ¶506. Although the initial drop was small, the stock price continued to fall as the news worked its way into the market. The resulting 3.18% drop by June 5th was clearly related to the Company's June 2nd announcement, and the "promptness" of the drop is not undermined by the intervening weekend.

## F. Navistar's Stock Price Dropped Significantly

Pointing to Navistar's stock price movement during the Class Period, the Navistar Defendants finally assert that Plaintiffs have not adequately alleged loss causation because the stock price did not react significantly or, in some cases, negatively, in response to the partial disclosure. At the motion to dismiss stage, however, this is a non-starter. "An ambivalent market response" to allegedly false statements "is not a basis for dismissal" where the plaintiff alleged that "the stock price was, at least on some of the dates and at least in part, affected by" the defendants' misrepresentations. *Swack*, 383 F. Supp. 2d at 242.

In *Swack*, the defendants challenged loss causation at the pleading stage by arguing certain misstatements "had little or no discernible effect on the stock price" (*i.e.*, on different occasions, the stock price increased, decreased or remain the same in response to the defendant's public statements), and that, even "when the conflicts were disclosed, no further decline occurred." *Id.* at

239-40. In rejecting this challenge to loss causation based on "the history of stock price movements," the district court noted:

> Stock prices rise and fall for combinations of many different reasons. Defendants' conduct could have tempered a drop in price that would otherwise have occurred, or resulted in a greater increase than the stock would otherwise have enjoyed, absent the deceptive analyst reports. The question for Rule 12(b)(6) purposes is whether Swack must now plead the specific mechanisms by which this occurred, or whether that can await a later stage of the litigation, when she has had a chance to develop expert testimony.
>
>         *      *      *
>
> Evidence that the stock price changed in particular ways on particular days in a manner apparently inconsistent with a plaintiff's theory is powerful evidence. But it is just that -- evidence. At this stage, my task is to examine the formal sufficiency of the pleadings, not to determine whether there is evidence sufficient to support a jury verdict in plaintiff's favor.

*Id.* at 240-42.

Post-*Dura* decisions are in accord. In *In re Seite*, 447 F. Supp. 2d 693 at 711, a defendant argued that "Plaintiff cannot adequately plead loss causation, because Seitel's stock price increased when it announced the restatement and did not decline in any meaningful way until it announced disappointing revenues for the first quarter of 2002." In rejecting this argument, the district court recognized that "the Supreme Court [in *Dura*] did not adopt the argument that a plaintiff must show that the stock price declined due to a specific corrective disclosure or financial restatement." *Id.*

Here, Navistar's stock price movements throughout the Class Period were invariably caused by many factors.[10] For instance, the Complaint alleges that Navistar tempered drops in the stock

---

[10] The Navistar Defendants boldly claim that Navistar's stock price decline during the Class Period "can be attributed to events causally unrelated to the alleged 'corrective disclosures.'" Mem. 28-29. However, they conveniently fail to discuss any other factor that might have caused Navistar's stock price to decline during this period. Regardless, at the motion to dismiss stage, a plaintiff is not required to rule out all the other factors that contributed to a security's lower price in order to plead loss causation. *Ong*, 459 F. Supp. 2d at 748 ("The court declines to read into [*Dura*] a holding that a plaintiff can only allege causation by ruling out all other factors that may have contributed to a security's lower resale price.").

price with other positive news about the Company's operations or positive "spin" regarding the revelation of adverse news. *See Steiner*, 2006 U.S. Dist. LEXIS 71952, at *67 (holding that where negative disclosures were offset by positive news masking the negative effect on the stock price, loss causation was not defeated); *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966 (7th Cir. 1989) ("Yet a firm that lies about some assets cannot defeat liability by showing that other parts of its business did better than expected, counterbalancing the loss.").

In any event, "isolating the myriad causal factors that affect the stock price is a factual question that should be decided at trial, with the help of qualified experts. It is not an issue appropriate for a motion to dismiss." *In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 55 (D. Mass. 2006); *Schleicher*, 529 F. Supp. 2d at 968 ("At later stages of the case, loss causation is likely to present a very complex problem, as a factual matter. Plaintiffs have alleged fraud with respect to eight major topics in a host of public filings and statements over sixteen months. During those same sixteen months, many other *disclosed* factors clearly contributed to the further erosion of Conseco share prices. At the pleading stage of the case, however, plaintiffs have alleged enough in the second amended complaint to survive a motion to dismiss on this basis."); *In re Motorola*, 505 F. Supp. 2d at 557 ("Lead Plaintiff does not bear the burden, for purposes of this motion, of 'isolating' the causal effect of Telsim news from all other factors that may have contributed to a particular price decline. Nor can Defendants prevail on summary judgment by arguing that the May 15, 2001 price decline was insignificant and that investors thus suffered no economic loss. . . . [A] disagreement between experts thus creates a dispute of fact inappropriate for resolution on summary judgment.").[11]

---

[11]    Indeed, expert testimony on the impact of stock price movements would require the use of an event study. *In re Apollo Group, Inc. Sec. Litig.*, 509 F. Supp. 2d 837, 844 (D. Ariz. 2007) ("The tool most often used by experts to isolate the economic losses caused by the alleged fraud is the 'event study.'"). "An event study is a statistical regression analysis that examines the effect of an event on a dependant variable, such as a corporation's stock price." *Id.* "For securities-fraud purposes, the 'event' analyzed is the disclosure of the

Lastly, the Company's stock price fluctuations should be considered in the context of the stock price's general trajectory during the Class Period. *In re Credit Suisse-AOL*, 465 F. Supp. 2d at 55. From the day prior to the first corrective disclosure made by the Navistar Defendants to the day after the last corrective disclosure, the price of Navistar common stock declined by $9.33 or *30%*. ¶509. This drop was unquestionably material, and caused Plaintiffs and the Class to suffer damages. The stock's considerable downward trajectory during the period of partial disclosures evidences the market's negative reaction as it learned of Defendants' fraud. *Id.*[12]

## V.  PLAINTIFFS' ALLEGATIONS RAISE A STRONG INFERENCE OF SCIENTER

### A.  The Legal Standard for Scienter[13]

Both the Navistar Defendants and Deloitte wrongly argue that the Complaint fails to adequately plead scienter. As recently set forth by the Supreme Court, under the "strong inference" of scienter standard set forth in the PSLRA, scienter allegations of a Section 10(b) claim will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 127 S. Ct.

---

alleged fraud to the market." *Id. In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 169 (S.D.N.Y. 2007) ("In reaching his conclusions, [the expert] employed what is commonly termed as an event study. In the majority of applications, the focus of an event study is the effect of an event on the price of a particular class of securities of the firm, most often common equity.").

[12]    Moreover, the Navistar Defendants' attempt to portray the Company's stock price as falling from the very beginning of the Class Period is belied by the facts. Attached as **Exhibit 1** is a Navistar stock chart for the Class Period demonstrating that, contrary to Defendants' characterization, Navistar's stock steadily climbed before the series of negative revelations. Moreover, the chart also refutes any suggestion that Navistar stock movement can be explained by general market conditions.

[13]    In the Seventh Circuit, a plaintiff can adequately plead scienter by alleging that a defendant made material misstatements knowingly or recklessly. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (hereunder, "*Makor II*"); *Sunstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977). This "recklessness" standard is satisfied when, as here, Defendants make a highly unreasonable omission or misrepresentation, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *Id.*

at 2510. Thus, if the inferences properly drawn from the facts are in "equipoise," (*id*. at 2510, 2514), the allegations will survive a 12(b)(6) motion. In *Tellabs,* the Court reiterated the established principle that when "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id*. at 2509.

The Court went on to say that "courts must consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 127 S. Ct. at 2509. Indeed, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id*. at 2511.

This "holistic" approach, as Justice Ginsburg characterized it  no longer permits courts to ignore any factual allegations that could support scienter simply because, standing alone, that fact would not suffice to meet the requisite strong inference of scienter; rather, each such fact must be given some weight, and all facts are evaluated together to determine whether the totality of the facts alleged gives rise to a strong inference of scienter. Defendants pay lip service to *Tellabs* by citing to it talismanically, but then proceed to ignore its clear holding that an analysis of scienter is holistic in nature.[14] For the reasons further detailed herein, Plaintiffs' allegations adequately establish Defendants' scienter.

---

[14] Indeed, after the Supreme Court remanded *Tellabs* for consideration of the scienter allegations under these new criteria, the Seventh Circuit found that Plaintiffs' scienter allegations were "cogent" and "in conformity with the requirements of the" PSLRA. *Makor II*, 513 F.3d at 712  .

**B.** **A Strong Inference Exists That the Defendants Knew or Recklessly Ignored That Their Statements Were False and Misleading**

**1.** **Navistar Defendants**

Accepting the facts in the Complaint as true, it is difficult to imagine how the Navistar Defendants did not have actual knowledge of the vast accounting manipulations that resulted in the Company's "intentionally" misstated Class Period financials and its results of operations by an order of magnitude in the billions of dollars.[15]  *See, e.g.*, ¶3.  *See also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1020 (N.D. Ill. 2004) (finding a strong inference of scienter where defendants missed an understatement of $3 billion in debt and an overstatement of $240 million in revenue because "the more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.") (quoting *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997)).  Ultimately, Navistar Company was forced to restate its Class Period financial statements,[16] an occurrence only appropriate under applicable accounting conventions where material misstatements exist.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004).

That the Navistar Defendants' Class Period statements were knowingly false or grossly reckless when made is demonstrated by the existence of numerous indicia of scienter, including: (1)

---

[15]  Since a company acts through its officers whom have the authority to act on its behalf, a finding of scienter against the Individual Defendants is sufficient to establish the scienter of Navistar.  *Makor II*, 513 F.3d at 708.  However, as further detailed below, the scienter of a company may exist even absent a finding of scienter as to any individual officer defendant.  *Id.* at 710.

[16]  Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circumstances surrounding the restatement.  *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, Civil Action No. 5-03-MD-1530 (TJW), MDL-1530, 2004 U.S. Dist. LEXIS 26488, at *115 (E.D. Tex. June 10, 2004); *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *11 (E.D. Tex. Mar. 30, 2001).

the Restatement was the product of "intentional misconduct"[17] (¶¶13, 294, 308, 309, 403) where the Company's financial results were manipulated to give the appearance of profitability that did not exist (¶¶6, 20, 59, 309); (2) Defendants' misstatements related to sixteen separate accounting areas (¶308) all of which impacted Navistar's income directly (¶¶312, 329, 345, 351, 356, 361, 367, 372, 377, 383, 388, 394, 398); (3) the sheer magnitude and nature of the fraud they perpetrated (¶¶5-7, 9, 419-20); (4) the existence of numerous warning signs (*i.e.*, red flags) that were present during the Class Period (¶405(A)-(K)); (5) the Individual Defendants were the senior management of the Company and had principal responsibility for ensuring compliance with GAAP (¶¶36, 314, 404-05); (6) the Individual Defendants certified the Company's financial statements as being accurate as well as the sufficiency of its internal control and disclosures policies (¶¶72, 81, 91, 110, 111, 125, 126, 135-36, 145-46, 181-83, 205, 213, 228, 313, 407, 409), where the Individual Defendants knew of the Company's accounting inadequacies and material weaknesses in the Company's internal controls and disclosure policies (¶¶314-15, 404); (7) the Individual Defendants' own Class Period statements demonstrated their knowledge of the Company's accounting irregularities and incapacities prior to the 2005 Restatement[18] (¶¶407(A)-(G), 408), and (8) an earlier SEC investigation that resulted in the

---

[17]    It is also highly significant that Defendant Schwetschenau was removed as the principal accounting officer where, in January 2006, the Company's auditor informed that it could not rely on his representations and that he should not oversee Company accounting or financial reporting functions.  ¶¶14, 258, 264, 310, 321.

[18]    Indeed, these Defendants made specific statements on topics later falling within the purview of the Restatement that demonstrate (unless recklessly ignored) their knowledge and familiarity (*i.e.*, scienter) with accounting irregularities that were later revealed to have been "intentionally" manipulated.  For example, the Individual Defendants were keenly aware of the Company's pension benefits accounting (¶¶75, 76, 140), its warranty reserves (¶96), its inventory levels (¶219), the currency of Company SEC filings and implemented accounting changes (¶208), that the Company undertook "expensive reviews" and was GAAP compliant (¶219), and that the Company had adequate resources and controls to issue accurate financials (¶208). Considered holistically with the other indicia herein detailed, Defendants' scienter is evident. *See, e.g., South Ferry LP, #2 v. Killinger*, No. 06-35511; D.C. No. CV-04-01599-JCC, at *3, *8 (9th Cir. Sept. 9, 2008) (attached hereto as **Exhibit 2**) (noting that the district court concluded that "Defendants' knowledge. . .can be

2004 Restatement for accounting irregularities that continued on (¶¶405(E)-(G), 438-39). Furthermore, the Individual Defendants were motivated to engage in their accounting manipulations in order to cover up the failure of their promised return to profitability (¶¶20, 49-59), and receive incentive compensation that was pegged to the Company's success (¶421).

Based on the foregoing, the Complaint provides an incredible level of detail as to exactly how and why the Navistar Defendants knew or were grossly reckless in not knowing the falsity of their Class Period statements. As such, the threshold established in *Tellabs* is easily met.[19] *See, e.g. Schleicher*, 529 F. Supp. 2d 959; *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093 (N.D. Ill., Sept. 21, 2005).

Moreover, the Navistar Defendants' contention that GAAP violations alone do not establish scienter is flawed in that it ignores the enormity of the violations themselves that are buttressed by the myriad factual allegations demonstrating fraud. *See, e.g.*, *Rehm*, 954 F. Supp. at 1255; *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *71 ("[A]lthough not enough when standing alone, violations of GAAP "may buttress other facts supporting a finding of scienter."); *In re AFC Enter., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1372 (N.D. Ga. 2004) ("Where the number, size, timing, nature,

---

inferred because of the nature of the statements they were making. . ." and approving of a finding of scienter where "it would be 'absurd' to suggest that management was without knowledge of the matter.").

[19]     Defendants' scant legal authority is dwarfed by cases sustaining scienter allegations where, as here, the presence of numerous indicia of scienter exists. Critically absent from Defendants' authority (but not here), are company admissions that the misstatements were the product of "intentional misconduct." This fact, when coupled with all the other indicia of scienter, demonstrates the adequacy of Plaintiffs' scienter allegations and renders Defendants' authority wholly inapposite. By way of example, Defendants' reliance on *In re Bally Total Fitness Sec. Litig.*, No. o4C3530, etc. 2006 WL 3714708 (N.D. Ill. July 12, 2006) is completely misplaced where the restatement at issue in that case actually inured to the company's benefit for one of the two years at issue. Moreover, the *Bally* court rejected an inference of scienter on the company's vague conclusion that senior management fostered a culture of "aggressive accounting." Of course, an admission of aggressive accounting is far different than Navistar's admission that the Restatement was the product of intentional misconduct (*i.e.*, fraud). Defendants' other authority fare no better when the facts of those cases are measured against the indicia of scienter present here.

frequency, and context of the GAAP violations. . .are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").

Here, the Navistar Defendants' GAAP violations were monumental and widespread. For instance, Plaintiffs allege that Navistar reported income that was materially overstated as a result of GAAP violations related to: (1) product warranty accounting (¶¶329-344); (2) employee benefit arrangements (¶¶345-349); (3) restructuring activities (¶¶350-354); (4) accounting for leases (¶¶355-359); (5) accounting for liabilities related to contingencies (¶¶360-365); (6) vendor rebates and tooling costs (¶¶366- 370); consolidation accounting (¶¶371-375); (7) revenue recognition (¶¶376-381); (8) account reconciliations and timing of expense or income recognition (¶¶382-386); (9) accounting for property and equipment (¶¶387-392); (10) accounting for functional currency designations (¶¶393-396); and (11) accounting for derivative instruments (¶¶397-401). Collectively, these violations of GAAP necessitated a Restatement for the 2003 and 2004 fiscal years and the first three quarters of fiscal 2005 to correct intentional manipulations that resulted in the overstatement of net income by $677 million and stockholders' equity by billions. ¶¶6-7. Accordingly, when combined with the other indicia of scienter, Plaintiffs' allegations of false and misleading financial reporting and GAAP violations are sufficient.

### 2. Deloitte[20]

The Complaint alleges that *at the time of its audits*, Deloitte was aware of specific, suspicious facts and circumstances and that it "deliberately or recklessly" ignored them. Despite this awareness, and contrary to the requirements of GAAS and GAAP, Deloitte rendered unqualified audit opinions on Navistar's financial statements that misstated the Company's true financial condition by an order of magnitude in the billions of dollars. ¶¶17-19, 425-427, 494, 496. The Complaint details manipulations in ten discrete areas in Navistar's financial statements, coupled with specific, suspicious facts relating to each of these ten areas of which Deloitte was aware at the time of its audits, and which Deloitte "deliberately or recklessly ignored." *Id.* ¶¶456-493.

While the entirety of these allegations is detailed above, several examples are illustrative. With regard to the $190 million overstatement of income in the area of product warranty costs, the Complaint alleges Deloitte was aware of and "deliberately or recklessly ignored" the following specific, suspicious facts:

- unsupported reductions to product warranty estimates;
- the magnitude of the reductions to the product warranty estimates;
- inappropriate cost accounting models and methodologies;
- the positive impact on Navistar's reported financial position and results of operations; and
- future product warranty costs is a recognized area of financial manipulation.

---

[20] Deloitte is wrong that the standard for pleading scienter is "especially stringent" where auditors are concerned. Deloitte Mem. 5. The Seventh Circuit has never imposed different pleading standards for auditors for the simple reason that the PLSRA itself does not single out auditors, and requires only that a complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *see also In re MicroStrategy*, 115 F. Supp. 2d 620, 650 (E.D. Va. 2000) ("The PSLRA's pleading requirements do not distinguish between corporate defendants and accountants."). Of the cases Deloitte relies on, *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004), is an outlier as no other Circuit Court of Appeals has cited *Fidel* on this point. With regard to *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007–08 (S.D. Cal. 2000), when the Ninth Circuit affirmed *Reiger*, it conspicuously failed to adopt the proposition that auditors should be treated differently under the PLSRA. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002). In any event, the Complaint here meets even the most stringent pleading standard conceivable under the PLSRA.

¶¶9, 456, 457- 459. [21]

Similarly, Navistar's income was overstated by $176 million in the area of employee benefit arrangements. ¶9. The Complaint alleges Deloitte was aware of and "deliberately or recklessly ignored" the following specific, suspicious facts in the area of employee benefit arrangements:

- an SEC informal inquiry in the same area and the resulting prior restatement;
- an unsupported adjustment to benchmark indices;
- changes to accounting estimates, including changes to existing methodology;
- the failure to document properly the application of the methodology used;
- the magnitude of the impact of the changes in the estimates and methodology;
- the scope and magnitude of the 2002 corporate restructuring;
- the "pay as you go" payments to certain retirees that had been made over 20 years without ever recognizing a pension liability;
- the positive impact on Navistar's reported financial position and results of operations; and
- employee benefit plans is a recognized area of financial statement manipulation.

*Id.* ¶¶9, 456, 460-463. The Complaint also alleges specific, suspicious facts known to Deloitte at the time of its audits for each of the other eight discrete areas of the Navistar financial statements at issue: restructuring activities (¶¶464-466), leases (¶¶467-469), liabilities for loss contingencies (¶¶470-473), vendor rebates and retooling costs (¶¶474-477), consolidation accounting (¶¶478-482), revenue recognition (¶¶483-486), property and equipment (¶¶487-490), and securitization of financial instruments (¶¶491-493).

It is simply not true, as Deloitte contends, that Plaintiffs' allegations are based on a theory of

---

[21] The allegations that certain areas of the financial statements are recognized areas of manipulation are based in part on Audit Risk Alerts published by the American Institute of Certified Public Accountants ("AICPA"). Deloitte insists Plaintiffs are "[w]holly frivolous" to suggest it had an obligation to heed Audit Risk Alerts that warn auditors about recognized areas of accounting fraud. Deloitte Mem. 10, n.2. Deloitte points to the obvious – that the Alerts do not advise that *Navistar* specifically was engaging in fraud. The AICPA Audit Risk Alerts are not intended, however, to tell auditors that a particular client is or might be committing fraud. Instead, they warn generally about trends in accounting fraud. Thus, Audit Risk Alerts have been found to contribute to an inference of scienter when ignored by an auditor. *Microstrategy*, 115 F. Supp. 2d at 654; *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 288-89 (D. Conn. 2005) (drawing inference of scienter from allegation KPMG disregarded AICPA Audit Risk Alert).

"fraud by hindsight." That is because the claims against Deloitte do not rest on allegations "that later disclosed information would have been discovered earlier if the auditor had not violated GAAS." *In re Eagle Bldg. Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1329 (S.D. Fla. 2004) (distinguishing allegations of fraud by hindsight). Rather, the Complaint alleges specific, suspicious facts that "should have been investigated" by Deloitte for the very reason that they *were* "available at the time [Deloitte] was auditing." *Id*. Thus, Plaintiffs do not claim, for example, that had Deloitte not violated GAAS, it would have discovered Navistar's unsupported reductions to the product warranty estimates or the changes to the existing methodology Navistar used to estimate the liability for employee benefit arrangements. Instead, the Complaint alleges Navistar's estimates and methodologies were available to Deloitte at the time of the audits and that Deloitte "deliberately or recklessly ignored" and failed to investigate them.[22] ¶¶456, 457-459, 460-463. Such allegations do not amount to fraud by hindsight. *See*, *e.g.*, *Katz v. Image Innovations Holdings, Inc.*, 546 F. Supp. 2d 269, 275 (S.D.N.Y. 2008).

Plaintiffs also allege Deloitte was aware at the time of its audits of other specific, suspicious facts it ignored whose impact extended to the financial statements as a whole. For example, Deloitte "knew that Navistar's accounting personnel lacked the necessary expertise in technical accounting matters applicable to its financial statements." ¶441. Deloitte also knew at the time of its audits that:

> Navistar failed to follow the most basic and necessary of accounting procedures. For example, it did not consistently perform account reconciliations or ensure that account balances were complete and accurate. Intercompany accounts were not properly reconciled. Journal entries were made without sufficient supporting documentation. Transactions were recorded in the wrong amounts, to the wrong

---

[22] In the event Deloitte claims it did not see the Navistar estimates and methodologies, that would simply confirm that Deloitte's audits were no audits at all. ¶¶19, 494. *See In re Eagle Bldg. Techs.*, 319 F. Supp. 2d at 1327-28.

accounts, in the wrong periods, or could not be supported. There were classification errors in the financial reporting process involving the manner in which certain account balances were transferred from Navistar's accounting books and records to the income statement and balance sheet. These failures were all either immediately apparent to Deloitte as Navistar's auditor, or Deloitte deliberately or recklessly ignored them.

*Id.* ¶442. Finally, Plaintiffs allege that "Navistar did not have the necessary expertise in technical accounting matters applicable to its own financial statements, and as a result relied heavily on Deloitte. Deloitte knew Navistar was relying on Deloitte in this way in preparing the financial statements, yet Deloitte nonetheless continued to act as auditor with respect to those same financial statements [even though it lacked the independence required by AU §220.02]." *Id.* ¶451. *See also, e.g.*, ¶¶17, 433-437, 440, 443-446, 452-455 (detailing other specific facts known to Deloitte at the time of its audits).

### C.  The Magnitude of the Restatement Supports an Inference of Scienter

The vast majority of courts hold that pervasive, simple accounting errors and a massive restatement "weigh[ ] heavily in favor of a finding of reckless disregard." *See Rehm*, 954 F. Supp. at 1256. It is simply a matter of common sense and logic – particularly given the special expertise of accounting firms – that the less complex the rules violated, the greater the magnitude of the irregularities, and the more frequent the violations, the stronger is the inference that conscious fraud or recklessness is the explanation for the auditor's role in the violations. *MicroStrategy*, 115 F. Supp. 2d at 634-36 and 652.[23] As this Court has explained, "the magnitude and nature of accounting

---

[23] *See also, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283 (M.D. Fla. 2008); *Lewis v. Straka*, 535 F. Supp. 2d 926, 930 (E.D. Wis. 2008); *Schleicher*, 529 F. Supp. 2d at 971; *Lewin v. Lipper Convertibles, L.P.*, No. 03 CV 1117, 2004 U.S. Dist. LEXIS 8484, at *5 (S.D.N.Y. May 13, 2004); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 609 (D.N.J. 2001); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 825 (N.D. Ill. 2000); *In re Transcrypt Int'l Sec. Litig.*, No. 4:98 CV 3099, 1999 U.S. Dist. LEXIS 17540, at *25-*27 (D. Neb. Nov. 4, 1999); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294–96 (S.D.N.Y. 1999); *In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760, at *32-*33 (N.D. Ill. Nov. 4, 1998).

errors may belie a defendant's claim that it was unaware of any improprieties." *Riggs Partners, LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 U.S. Dist. LEXIS 20649, at *17 (N.D. Ill. Oct. 25, 2002).[24]

The accounting errors here were of the most basic sort. Reconciliations were not consistently performed to ensure that account balances were complete and accurate; intercompany accounts were not properly reconciled; journal entries were made without sufficient supporting documentation; transactions were recorded in the wrong amounts, to the wrong accounts, in the wrong periods, or could not be supported; and certain account balances were transferred inaccurately from Navistar's accounting books and records to the income statement and balance sheet. ¶442. *See, e.g.*, *Microstrategy*, 115 F. Supp. 2d at 652 (involving "violation of relatively straightforward accounting principles"); *Transcrypt*, 1999 U.S. Dist. LEXIS 17540, at *28 (errors that "should be clearly obvious to even a beginning accountant"). *Cf. Miller v. Material Scis. Corp.*, 9 F. Supp. 2d 925, 928 (N.D. Ill. 1998) (controller's "manipulation of the books was obvious").

The magnitude of the accounting errors and subsequent Restatement by Navistar was also massive, involving billions of dollars. *See, e.g., Paincare,* 541 F. Supp. 2d at 1283 ($36 million in restatements); *Oxford*, 51 F. Supp. 2d at 295 (GAAP/GAAS violations in the "hundreds of millions of dollars"). The accounting errors were pervasive, affecting every line item but one on Navistar's financial statements over a course of years. ¶2; *see also Microstrategy*, 115 F. Supp. 2d at 636 (noting "pervasiveness and repetitiveness" of GAAP violations); *Lewin*, 2004 U.S. Dist. LEXIS 8484, at *5; *P. Schoenfeld*, 142 F. Supp. 2d at 609 ("numerous – even hundreds – of unsupported entries"); *Oxford*, 51 F. Supp. 2d at 294 (auditor "recklessly disregarded, or outright ignored, blatant

---

[24] In *Riggs*, the Court held, unsurprisingly, that "accounting minutiae at a partially-owned subsidiary" were "not so egregious as to merit a strong inference of scienter." 2002 U.S. Dist. LEXIS 20649, at *15, *30. In contrast, the accounting errors in Navistar's financials that led to a Restatement hardly compare to the "minutiae" at issue in *Riggs*.

evidence of [ ] extreme accounting irregularities" ). These allegations "weigh[ ] heavily in favor of a finding of reckless disregard" for both the Navistar Defendants and Deloitte. *Rehm*, 954 F. Supp. at 1256.[25]

### D. The Existence of Red Flags Support a Strong Inference of Scienter

The Complaint describes how Defendants Ustian and Lannert, as CEO and CFO of the Company, certified that Navistar's quarterly and annual financial statements were correct pursuant to SOX.[26] ¶¶72, 81, 91, 110, 111, 125, 126, 135-36, 145-46, 181-83, 205, 213, 228, 313, 407, 409. Certifying the Company's Class Period financials in the face of numerous red flags that demonstrated the falsity of the financials provides further evidence of scienter. *See, e.g.*, *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *45-*51 (D. Or. Jan. 3, 2006); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) ("This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.").

Such "red flags" included, among other things: (1) the Company was required to complete the 2004 Restatement related to its failure to comply with GAAP; (2) the Individual Defendants

---

[25]    Deloitte relies heavily on *Reiger*, where the court emphasized there was no "ubiquitous failure to follow basic audit procedures." 117 F. Supp. 2d at 1012 n.7. Here, in contrast, Deloitte's failure to follow the most basic audit procedures was pervasive. ¶¶447-455.

[26]    Defendants' positions as CEO, CFO, and principal accounting officer (Schwetschenau) further support their scienter. *See Atlas Air Worldwide Holding*, 324 F. Supp. 2d. at 489-90 ("Knowledge of the falsity of a company's financial statements can be imputed to key officers."); *In re Sears, Roebuck & Co.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'"); *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *63 ("'High-level managers . . . may be presumed to have been aware of problems' at their company.' Such a presumption is particularly strong where the specific problem facing the company: (1) affects 'a significant source of income' or a 'core [business] operation'; or (2) would be 'readily recognized by an outsider.'").

knew about the GAAP violations addressed in the Restatement during prior periods; (3) Defendants were aware of Navistar's internal control weaknesses by way of the 2004 Restatement; (4) inadequate accounting personnel and capability resulted in the Restatement, delays in SEC filings, and adjustments to correct previously released earnings results; (5) on October 21, 2004 the Individual Defendants received an SEC request to produce documents related to Company accounting practices with respect to postretirement benefit plans; (6) on February 9, 2005 the Defendants learned that the SEC was looking into the 2004 Restatement and that on March 17, 2005 that the SEC inquiry had been formalized; (7) on March 18, 2005 an analyst reported on Navistar's financial reporting and control problems noting, "To us, the delay of F1Q…,combined with the loss of control over reportedly relevant financial data, suggests that both the financial systems and controls are weak"; (8) the delays in the Company's SEC filings caused the Company to default on loan and debt securities covenants, which negatively impacted its credit ratings; (9) Defendants acknowledge in each SEC filing from March 14, 2003 through September 10, 2004 that Navistar was still in the process of formalizing and documenting its internal control policies and procedures; and (10) Defendants acknowledged in each Form 10-Q during fiscal year 2005 that the Company's internal controls were not adequate. *See* ¶405(A) – (K).

There were numerous additional red flags that were known (or should have been known) by Deloitte had it not "deliberately or recklessly ignored" them.[27]   ¶¶456-493.  Instead of following

---

[27]     An additional red flag alleged in the Complaint to which Deloitte does not muster a response is Navistar's widely-publicized corporate restructuring, which was designed "to convince investors, analysts, and the market that it would return to profitability after several years of losses."   ¶¶20, 51-59. A contemporaneous AICPA Audit Risk Alert warned auditors to play close attention to audit clients who display an "obsession with meeting earnings targets and expectations." ¶444.  The Alert's warning should have taken on particular significance in light of Navistar's ongoing corporate restructuring, just the type of event that can turn a firm's unremarkable desire for strong earnings into a specific red flag. *See MicroStrategy*, 115 F. Supp. 2d at 647-48.

*Tellabs* and assessing these allegations "holistically," Deloitte breaks them apart and argues that

each warning sign, considered in isolation, is devoid of probative value. Deloitte's analysis is as

wrong as its conclusion: each warning sign *is* probative of scienter, and when considered together,

they raise a strong inference of scienter.

For example, Deloitte tries to brush aside Plaintiffs' allegations regarding the earlier SEC

inquiry into Navistar's earlier accounting practices and the resulting 2004 Restatement.[28] It asserts

the SEC inquiry at most "gave D&T actual knowledge of ***accusations*** of fraud, not fraud itself."

Deloitte Mem. 11 (emphasis in original). This misses the point. Plaintiffs allege Deloitte acted at

least recklessly in failing to follow-up on the SEC inquiry, ***not*** that the inquiry itself establishes

Deloitte's knowledge of fraud. ¶463. Allegations that an auditor "failed to exercise heightened

scrutiny in response" to an SEC inquiry routinely support an inference of scienter. *In re Health*

*Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997). *See also, e.g.*, *Carlson*, 392 F.

Supp. 2d at 290; *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 168 (D. Mass. 2002)

("informal SEC inquiry . . . would give a reasonable auditor palpitations.").

Additionally, Deloitte denies any inference of scienter based on its knowledge that Navistar's

accounting and audit staff were woefully inadequate and lacked expertise.[29] It argues that even if it

knew of Navistar's weak accounting infrastructure, "there is absolutely nothing in the complaint . . .

identifying additional audit procedures that D&T purportedly knew (or recklessly disregarded) it

---

[28]    In October 2004, the SEC made an informal inquiry into Navistar's pension and post-retirement benefit accounting practices. ¶438. Rather than investigating, Deloitte turned a blind eye and shortly thereafter rendered an unqualified audit opinion. *Id.* Navistar's manipulations in this area resulted in misstatements of $176 million. *Id.*; ¶9.

[29]    Although Deloitte contends Plaintiffs' allegations concerning Navistar's accounting and audit staff deficiencies are made solely on the basis of a confidential witness, Deloitte Mem. 12, they are also supported by disclosures made by Navistar itself that it was not staffed with "a sufficient number of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP." ¶¶402, 441.

needed to perform but did not." Deloitte Mem. 13. A complaint, however, need not identify every specific audit procedure an auditor failed to undertake in order to state a §10(b) claim. The Complaint *does* identify in detail Deloitte's GAAS violations and the specific, suspicious facts and many other warning signs and red flags that Deloitte ignored. ¶¶443-446, 447-455, 456-493. Allegations concerning specific audit procedures undertaken by Deloitte "are peculiarly within Deloitte's knowledge, and thus are not required at the pleading stage." *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004).[30]

When considered "holistically" as *Tellabs* requires, the red flags that were either known to or recklessly ignored by the Navistar Defendants and Deloitte, add up to a strong inference of scienter.

### E. Defendants Had the Motive and Opportunity to Perpetrate Fraud

"To survive a motion to dismiss, plaintiffs are not required to show that defendants had any special motive to commit fraud." *Schleicher*, 529 F. Supp. 2d at 972; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000) ("A motive for fraud, such as personal gain, is not a required element of scienter or of fraud in general"), citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989); *In re JP Morgan Chase & Co. Sec. Litig.*, No. 06C4674, 2007 U.S. Dist. LEXIS 93877 *24-*25 (N.D. Ill. Dec. 18, 2007); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 295 (S.D.N.Y. 2008). However, Plaintiffs' allegations of the Navistar Defendants' motive and opportunity to meet consensus estimates and inflate the price of Navistar's stock contribute to a

---

[30]     Plaintiffs further allege that due to Navistar's inadequate accounting and audit staff, Deloitte "assisted in the preparation of the very financial statements that it audited by helping Navistar develop conclusions related to GAAP." ¶451. In doing so, Deloitte violated GAAS, which requires an auditor to possess "independence in mental attitude." ¶450 (citing SAS No. 1 at AU §150A.02 (A)). GAAS also requires "that an auditor 'be without bias with respect to the client otherwise he would lack that impartiality necessary for the dependability of his findings.'" ¶451 (citing SAS No. 1 at AU §220.02). A lack of independence raises a strong inference of auditor scienter. *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) (finding sufficient allegations of scienter against auditor alleged to have been involved in management decisions).

strong inference of scienter. *See* ¶¶6, 20, 49-59. *See also AFC Enter.*, 348 F. Supp. 2d at 1373 (evidence of motive and opportunity may contribute to an implication of an intent to defraud). In addition, the Individual Defendants were able to handsomely profit from their fraud by making it appear that performance measures were met thus enabling them to receive performance based compensation. ¶421. Had the Individual Defendants not perpetrated their fraud, they would not have received the incentive compensation. *Id.* This factor weighs heavily in favor of a scienter inference. ¶68; *see also Tellabs*, 127 S. Ct. at 2511 ("personal financial gain may weigh heavily in favor of a scienter inference").

Moreover, the Complaint further alleges that Deloitte was motivated by the substantial fees it earned from Navistar over the years, as well as its desire "to maintain the lucrative client relationship [with Navistar]." ¶428. Deloitte attacks these allegations, arguing that the Complaint does not allege the fees Deloitte earned were "material" and that "the desire to keep a client does not support an inference of scienter." Deloitte Mem. 10.

The first point ignores Plaintiffs' allegation that the fees were "significant," another word for material, which must be credited at this stage in the proceedings. *See Tellabs*, 127 S. Ct. at 2509. Deloitte's second point is based primarily on *DiLeo v. Ernst & Young*, 901 F. 2d 624 (7th Cir. 1990) (Easterbrook, J.). But, three years after *DiLeo*, the Seventh Circuit recognized that an auditor's "hope of enlarging the stream of revenues in future years" (only $25,000 in fees in that case) supports an inference of scienter. *See Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 191 (7th Cir. 1993) (Easterbrook, J.). *Accord In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 215 (1st Cir. 2005) ("We do not doubt that such a profit [from audit and consulting fees] could contribute to an auditor's decision to 'turn[ ] a blind eye,' to a corporation's misleading accounting.").

**F.**      **Defendants' "Non-Culpable Explanations" Are Not Compelling**

**1.**      **Navistar Defendants**

The Navistar Defendants offer five competing inferences from which they assert scienter cannot be established. Mem. 35-39. In so doing, however, they ignore that Plaintiffs' inferences of scienter need not trump theirs. *Tellabs* simply requires that Plaintiff's inferences be at least as cogent and compelling as Defendants' and in the instance of a "tie," Plaintiff prevails. *Tellabs*, 127 S. Ct. at 2511. Nevertheless, scrutiny of the Defendants' competing inferences reveals their infirmity. For example, the Individual Defendants' lack of Class Period stock sales (Mem. 35) is not a bar to scienter. *Tellabs*, 127 S. Ct. at 2511. In any event, the Individual Defendants did personally gain from their fraud. ¶421. Also, the Defendants' "disparate accounting irregularities" argument (Mem. 36) misses the point entirely. Indeed, not only do Defendants attempt to turn their massive and multifaceted fraud into some sort of scienter shield, but they ignore that the aggregate effect of accounting irregularities conveniently overstated Class Period income and allowed Navistar to beat consensus estimates. *See* ¶¶20, 49-58, 312, 329, 345, 351, 356, 361, 367, 372, 377, 383, 388, 394, 398. Further, it is disingenuous for Defendants to suggest that the Restatement was a mixed bag (Mem. 37) – both inuring to the benefit and detriment of the Company. Indeed, almost without exception, each accounting irregularity had the net impact of significantly overstating the Company's income. *See* ¶¶312, 329, 345, 351, 356, 361, 367, 372, 377, 383, 388, 394, 398. Defendants' attempt to slice and dice the Restatement to suggest that it is unrelated to Plaintiffs' theory of fraud is completely misstated and misleading in the face of overwhelming detail as to how Defendants' fraud resulted in the enormous Restatement of 2003 and 2004 fiscal financials as well as the first three quarters of fiscal 2005. Finally, Defendants' assertion that scienter is not established because they "launched an investigation" (Mem. 38) is misplaced. *See, e.g.*, *Makor II*, 513 F.3d at 710 (defendants "acknowledged their mistakes and disclosed the true situation. . .").

- 44 -

## 2. Deloitte

Deloitte's attempts to offer competing inferences to escape liability equally fail. On the very first page of its Brief, Deloitte says that "a host" of misstatements hurt rather than helped Navistar's reported performance, and that this is inconsistent with fraud. As just stated, the overall impact of accounting irregularities significantly overstated the Company's income. Nevertheless, Deloitte disingenuously argues that Navistar's reported revenues were understated by more than $100 million during 2003. Deloitte Mem. 1-2. Deloitte well knows, however, that revenue is different from income. The restatement of 2003 revenues was the necessary result of correcting massive manipulations in the area of revenue recognition and other areas in Navistar's financial statements. ¶9. When the understated costs and expenses associated with those manipulations are taken into account, Navistar's net income was *overstated* by $312 million in 2003, regardless of the serendipitous impact on revenues. *Id*.; ¶113(C).[31]

Similarly, Deloitte argues the bulk of the accounting manipulations occurred before fiscal year 2003, the first audit about which Plaintiffs complain. Deloitte Mem. 1, 3. Deloitte is just plain wrong. During the Class Period, Navistar overstated its net income by $677 million, or 188%, falsely reporting net income of $361 million, when it had actually sustained *losses* of $316 million.

---

[31]     Deloitte is no more candid about the remainder of the "host" of misstatements it says were to Navistar's detriment. Deloitte Mem. 3. The $20 million understatement of 2003 income in the area of revenue recognition was more than offset by the corresponding $43 million *overstatement* of income in the same area in 2004, resulting in a net overstatement of income of $23 million. ¶379. The $3 million understatement of 2003 and 2004 income in the area of functional currency designation was dwarfed by the corresponding $16 million *overstatement* of income in the same area in the first three quarters of 2005, resulting in a net overstatement of income of $13 million. *Id*.; ¶394. The $33 million understatement of income in 2003 and the first three quarters of 2005 in the area of unreconciled accounts/timing of income/expense recognition was offset by the corresponding $44 million *overstatement* of income in the same area in 2004, resulting in a net overstatement of income of $11 million. *Id*.; ¶383. Only in the area of derivative instruments for 2003 and 2004 does the anomaly exist that the understatement of income in one period was not offset by overstatements of income in the same area in other periods, resulting in a net understatement of $8 million. *Id*.; ¶398. Deloitte's efforts to slice and dice the numbers cannot obscure the fact that these errors grossly overstated Navistar's financial position.

¶¶5-6.  All of these manipulations took place in 2003 and later years.  In addition, the stockholder's

equity of Navistar was overstated at the fiscal years ended October 31, 2003, and 2004, by $2.0

billion and $2.4 billion, or by 701% and 449%, respectively.  ¶7.  All of these manipulations also

took place in 2003 and later years.  Deloitte apparently is referring to the fact that the accumulated

deficit on November 1, 2002, was also understated by $1.7 billion.  Yet, Deloitte surely knows that

the 2003 fiscal year *began* on November 1, 2002 and that its 2003 audit and certification of the 2003

financial statements included an attestation to the opening financial statement account balances on

that date.  Thus, Deloitte's 2003 audit fully encompassed the additional manipulations resulting in

the $1.7 billion overstatement of stockholder's equity at the beginning of the 2003 fiscal year.

Deloitte also implies that it raised the alarm on the fraud by insisting that certain Navistar

personnel could no longer be trusted and must be replaced. Deloitte Mem. 2.  But what Deloitte

neglects to mention is that it waited six months (from October 2005 to April 2006) to say this

publicly, and that, by that time, Deloitte was no longer Navistar's auditor.  ¶¶257, 264.  Deloitte's

behavior simply reflects one schemer pointing a finger at the other once it fears that the scheme is

beginning to fall apart.  *See Retsky Family Ltd. P'ship v. PriceWaterhouse LLP*, No. 97C 7694, 1998

U.S. Dist. LEXIS 17459, at*20, *28 (N.D. Ill. Oct. 21, 1998).

Finally, Deloitte suggests without any argument or analysis that its failures to comply with

GAAS and GAAP resulted from "inherent difficulties" in auditing.[32]  Deloitte Mem. 14.  *Makor II*

makes clear that is not enough; a court tasked with choosing between inferences must be given

competing inferences from which to choose.  513 F.3d at 709 ("no plausible story has yet been told

---

[32]     Rather than constituting a competing inference, Deloitte's conclusory statement that auditing is
difficult supports the Complaint's allegation that Deloitte's "audits" amounted to no audits at all.  ¶¶494-496.
Indeed, that Navistar described KPMG, Deloitte's replacement, as performing a "re-audit" confirms that
Deloitte conducted no audits at all.  ¶19.  In any event, Deloitte offers no explanation for why its audits of
Navistar were so difficult.

by the defendants that might dispel our incredulity"). In light of the strong inference of scienter put forth by Plaintiffs, it is little wonder Deloitte does not advance a non-culpable explanation, for no such theory could be squared with the facts. Plaintiffs have more than met the burden of putting forth allegations that give rise to a strong inference of scienter that is *at least as compelling* as competing inferences. *Tellabs*, 127 S. Ct. at 2510.

**G.     Scienter Can Be Imputed to Navistar**

As a corporation, Navistar's scienter is additionally established based on the cumulative knowledge of Navistar's employees, as well as the collective "intentional" practices of the Company, which are imputed to Navistar. A corporate defendant can have scienter regardless of the state of mind of any individual employee or agent. *See, e.g.*, *In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 497 (S.D.N.Y. 2005) (holding that "[t]o carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient."); *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008).

The Seventh Circuit has recognized the validity of the corporate scienter theory. *Caterpillar v. Great Am. Ins. Co.*, 62 F.3d 955, 962 (7th Cir. 1995) ("there are conceivable situations where the individual actors would not be liable but their corporate employer would be, for example where a case depends on the collective scienter of its employees or where defenses are available to individuals but not the corporation."). More recently, in *Makor II*, the Seventh Circuit held that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor II*, 513 F.3d at 710. The Court further found the inference of corporate scienter to be cogent, stating that "[b]ecause the alternative hypotheses – either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a

- 47 -

series of false statements – are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent." *Id.* at 711.

Here, Plaintiffs have demonstrated that the Individual Defendants (the senior-most executives of Navistar), through actual knowledge and/or severe recklessness, acted with scienter when they issued statements and omissions during the Class Period were materially false and misleading. In addition, Navistar's scienter can be imputed on the basis of the Company's collective knowledge and intent. The Company's corporate announcements during the Class Period regarding its financial condition and results were dramatically different than its true financial condition. Moreover, the Audit Committee's conclusion that intentional misconduct had occurred is a strong showing that Plaintiffs have raised a strong inference of Navistar's corporate scienter that is at least as compelling as any opposing inference.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.

Dated:  September 15, 2008.                    **ROBINSON CURLEY & CLAYTON, P.C.**

                                             /s/   Aleeza M. Strubel
                                             C. Philip Curley (ARDC No. 3124181)
                                             Fay Clayton (ARDC No. 3122905)
                                             Aleeza M. Strubel (ARDC No. 6278548)
                                             Michael J. O'Donnell (ARDC No. 6283656)
                                             300 South Wacker Drive, Suite 1700
                                             Chicago, Illinois 60606
                                             (312) 663-3100 – Telephone
                                             (312) 663-0303 – Facsimile

                                             *Liaison Counsel for Plaintiffs*

**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP**
Jack Reise (Admitted *Pro Hac Vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000 – Telephone
(561) 750-3364 – Facsimile

*Co-Lead Counsel for Plaintiffs*


**WOLF POPPER LLP**
Lester L. levy (Admitted *Pro Hac Vice*)
James A. Harrod (Admitted *Pro Hac Vice*)
E. Elizabeth Ferguson (Admitted *Pro Hac Vice*)
845 Third Avenue
New York, New York 10022
(212) 759-4600 – Telephone
(212) 486-2093 – Facsimile

*Co-Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

Laurence H. Levine
Maaike S. Almeida
LAW OFFICES OF LAURENCE H. LEVINE
190 South LaSalle Street, Suite 3120
Chicago, Illinois 60603
Telephone: (312) 291-7000
Facsimile: (312) 291-7015
laurence.levine@lhlevine.com
maaike.almeida.@lhlevine.com
        *Counsel for Defendants Daniel C. Ustian,*
        *Robert C. Lannert, Navistar International*
        *Corporation*

Sean M. Berkowitz
Cary R. Perlman
Mark S. Mester
Robin M. Hulshizer
Robert C. Levels
Matthew Lawrence Kutcher
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Sean.berkowitz@lw.com
Cary.perlman@lw.com
mark.mester@lw.com
robin.hulshizer@lw.com
robert.levels@lw.com
matthew.kutcher@lw.com
        *Counsel for Defendants Daniel C. Ustian,*
        *Robert C. Lannert, Navistar International*
        *Corporation*

Patrick S. Coffey
LOCKE LORD BISSELL & LIDDELL LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-0700
Facsimile: (312) 896-6702
pcoffey@lordbissell.com
        *Counsel for Defendant Mark T.*
        *Schwetschenau*

James E. Barz
Jonathan C. Medow
MAYER BROWN ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
jbarz@mayerbrownrowe.com
jmedow@mayerbrownrowe.com
        *Counsel for Defendant Deloitte & Touche*
        *USA LLP*

Jennifer W. Sprengel
Nyran Rose Pearson
CAFFERTY FAUCHER LLP
30 North LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Facsimile:  (312) 782-4485
jsprengel@caffertyfaucher.com
npearson@caffertyfaucher.com

**Service by United States First Class Mail to:**
Richard A. Maniskas
SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
rmaniskas@sbtklaw.com
        *Counsel for Kevin Memoli*

Date:  September 15, 2008                          /s/   Aleeza Strubel _____

- 1 -