UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM and BROCKTON CONTRIBUTORY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 07-cv-07014 |
| v. | ) ) ) | Judge Robert W. Gettleman |
| DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP, | ) ) ) ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendants. | ) | |

## DEFENDANT SCHWETSCHENAU'S ANSWER AND AFFIRMATIVE DEFENSES TO CONSOLIDATED CLASS ACTION COMPLAINT

Defendant MARK T. SCHWETSCHENAU ("Schwetschenau"), by his attorneys, Locke Lord Bissell & Liddell LLP, for his answer and affirmative defenses to the Consolidated Class Action Complaint of Lead Plaintiffs Norfolk County Retirement System and Plumbers' Local Union Number 519 Pension Trust ("Complaint"), states as follows:

As an initial point, Schwetschenau objects to the Complaint's repeated failure to distinguish between the alleged conduct of Schwetschenau and that of co-defendants Daniel C. Ustian, Robert C. Lannert, Navistar International Corporation, and Deloitte & Touche LLP, which failure unduly complicates preparation of a responsive pleading. Unless otherwise and specifically noted, Schwetschenau lacks knowledge or information sufficient either to admit or deny the truth of allegations concerning parties or entities other than himself. Schwetschenau

1

states that he is answering Plaintiffs' allegations on his own behalf only, even when Plaintiffs'

allegations refer to alleged conduct by Schwetschenau and other persons or entities.  If the

answer to any allegation is called into question, it should be considered denied.

Additionally, Schwetschenau's answers set forth below are limited to the alleged Class

Period of February 14, 2003 through July 17, 2006, unless otherwise specifically noted in a

particular answer.

## I.     NATURE OF THE ACTION

### A.     Overview of the Fraud

1.     This is a federal securities class action brought on behalf of purchasers of
Navistar securities from February 14, 2003, through July 17, 2006, inclusive (the "Class" and the
"Class Period").

**ANSWER:**     Schwetschenau admits only that this action is purportedly brought on

behalf of purchasers of Navistar securities during the alleged Class Period but denies the

remaining allegations in Paragraph 1 of the Complaint.  Answering further, Schwetschenau

denies that this case is properly maintainable as a class action, that class certification is proper

and that Plaintiffs are entitled to any relief on behalf of the alleged class.

2.     This case involves an egregious accounting fraud so widespread and systemic that
it affected every line item on the income statements and every line item except marketable
securities on the balance sheets issued by Navistar from at least fiscal year 2002 to 2005.  During
that time, Navistar, a manufacturer and distributor of third quarter trucks, buses, and diesel
engines, cooked its books in almost every conceivable way.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 2.

3.     On December 10, 2007, the Company filed (two years late) its Form 10-K for the
fiscal year ended October 31, 2005 (the "2005 10-K"), which detailed for the first time the
financial statements for 2003, 2004 and the first three results of a restatement and re-audit of
quarters of 2005 (the "2005 Restatement and Re-Audit" or "Restatement"), and admitted that
over a three year period Navistar had misstated its financial position and results of operations by
an order of magnitude in the billions of dollars.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3.

4.    Navistar's two year delay in disclosing its true financial condition was the result of both the complexity of the fraud and the need for the earlier misstated periods to be fully re-audited by KPMG LLP ("KPMG"), which in April 2006 replaced Defendant Deloitte & Touche LLP ("Deloitte") as Navistar's auditor.  The magnitude of the Company's accounting problems is also reflected by the fact that, as announced by Navistar, over 250 outside accountants and consultants were retained in connection with the 2005 Restatement and Re-audit of the 2003, 2004, and 2005 financial statements.  Navistar accrued accounting, audit, and other professional expenses of almost $300 million in connection with the 2005 Restatement and Re-audit.

**ANSWER:**    Schwetschenau admits that Navistar retained the auditing firm of KPMG in April 2006.  Schwetschenau denies the remaining allegations of Paragraph 4.

5.    The restated and re-audited financial results documented the following staggering reductions in net income (loss) for fiscal years 2003 and 2004 and the first three quarters of 2005 (in millions):

|  | As Originally Reported | As Restated | Difference | % Misstatement |
|---|---|---|---|---|
| 2003 | ($21) | ($333) | ($312) | 1,485% |
| 2004 | $247 | ($44) | ($291) | 118% |
| 2005 | $135 | $61 | ($74) | 45% |
| Total | $361 | ($316) | ($677) | 188% |

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5.

6.    Navistar had been unprofitable since 2001, and had suffered a loss of $536 million in 2002, the biggest loss in company history.  By reporting a loss of only $21 million in 2003, Navistar made it appear that its results of operations had improved by $515 million in a single year, whereas it has now been revealed that the Company actually suffered a $333 million loss in 2003, a misstatement of 1,485%.  Similarly, by reporting a profit of $247 million in 2004, Navistar avoided having to report its fourth consecutive year of losses, and made it appear that it had turned the corner and had become profitable, when it is now known that the Company had continued operating at a loss in 2004.  During the entire Class Period, Navistar overstated its net income by $677 million, or 188%, falsely reporting net income of $361 million, when it had actually sustained losses of $316 million.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 6.

7.    In addition, the stockholders' equity reported by Navistar at fiscal years ended October 31, 2003 and 2004, was revealed in December 2007 (in the 2005 10-K) to have been

overstated by $2.0 billion and $2.4 billion, or by 701% and 449%, respectively. Thus, the reported positive stockholders' equity of $292 million and $531 million, was actually a negative stockholders' deficit of $1.8 billion and $1.85 billion in 2003 and 2004 respectively. Similarly, the accumulated deficit on November 1, 2002, was revealed in December 2007 to have been $1.7 billion higher than reported, a misstatement of 231 %.

**ANSWER:**    Schwetschenau states that Navistar's financial reports speak for

themselves, denies any characterization of those reports, and denies the remaining allegations of

Paragraph 7.

8.    These massive overstatements of Class Period net income and stockholders' equity alone reflect that the misstatements were not the product of errors or honest mistakes, but rather an elaborate scheme to inflate Navistar's reported financial results.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 8.

9.    In addition to the magnitude of the misstatements, their nature also reflects intentional and knowing misconduct. The misstatements included violations of generally accepted accounting practices ("GAAP") in areas involving almost every aspect of Navistar's operations.[1] The following table summarizes the total cumulative overstatement of income, before tax, previously reported during fiscal years 2003 and 2004 and the first three quarters of 2005, by the principle areas of misstatement:

|  | (in millions) |
| --- | --- |
| Area of Misstatement | Amount of Misstatement |
| Product warranty | $190 |
| Employee benefit arrangements | $176 |
| Restructuring activities | $106 |
| Leases | $71 |
| Liabilities related to contingencies | $71 |
| Vendor rebates and tooling costs | $30 |
| Consolidation accounting | $25 |
| Revenue recognition | $16 |
| Functional currency designation | $13 |
| Unreconciled accounts and timing of Income/expense recognition | $11 |
| Property and equipment | $9 |
| Financial reporting reclassifications | $4 |

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standards ("GAAS"), AU § 411.02. SEC Regulation S-X [17 C.F.R. § 410.4-01(a)(1)] provides that financial statements that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements also comply with GAAP. 17 C.F.R. § 210.10-01.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 9, including footnote 1.

10.     Most of these areas of misstatement were particularly subject to manipulation due to Navistar's use of aggressive and improper assumptions and accounting estimates.  Navistar utilized undocumented and erroneous assumptions, made accounting estimates using suspect methodologies and procedures, and employed unwarranted and aggressive optimism.  The misstatements resulted in improvements to Navistar's reported financial results by consistently overstating income and understating expenses over a three year period, further reflecting that the misstatements were not coincidental, but were knowing and intentional.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 10.

11.     During the Class Period, Navistar's accounting procedures and policies were wanting in almost every respect.  The Company's undisclosed failures included:

- Consistent failure to perform account reconciliations or ensure that account balances were complete and accurate;

- Intercompany accounts that were not properly reconciled;

- Journal entries that were made without sufficient supporting documentation;

- Transactions that were recorded in the wrong amounts, to the wrong accounts, in the wrong periods, or could not be supported; and

- Classification errors in the financial reporting process that involved the manner in which account balances were transferred from Navistar's books and records to the income statement and balance sheet.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 11.

12.     As Navistar has now admitted, during the Class Period the Company also suffered from at least fifteen material internal control weaknesses, including a lack of sufficient accounting personnel, inadequate internal controls, and a lack of formalized accounting procedures and policies to ensure that its financial statements were prepared in conformity with GAAP.  As Navistar has also now admitted, these undisclosed material control weaknesses contributed directly to many of the misstatements, such as in the areas of employee benefit arrangements, product warranty, and revenue recognition.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 12.

13.     Navistar's Audit Committee initiated an investigation into the Company's financial statements in 2006.  That investigation culminated in 2007 with the disclosure that there had been "intentional misconduct used to improve the financial result[s] of specific business segments."

**ANSWER:**    Schwetschenau admits that in 2006 Navistar's Audit Committee initiated an investigation into Navistar's financial statements, but denies the remaining allegations of Paragraph 13.

14.    The accounting manipulations and misstatements of Navistar's Controller and Principal Accounting Officer, Defendant Mark T. Schwetschenau, are confirmed by the fact that on April 12, 2006, Navistar reassigned Schwetschenau after Deloitte (belatedly) informed the Company that it was "no longer wiling to rely on" his "representations."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 14.

15.    Among their materially false and misleading statements, in addition to the misstatements in the financial statements themselves, were Defendant's repeated misrepresentations about the adequacy of Navistar's system of internal controls, including the false certifications signed by Defendants Daniel C. Ustian and Robert C. Lannert in the Company's SEC filings during the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 15.

16.    In addition, during the Class Period each of the Individual Defendants spoke publicly to investors and securities analysts regarding the specific areas that were misstated, including employee benefit arrangements, product warranty, and restructuring activities.  Their false statements on these topics reflect their knowledge of or gross recklessness as to the manipulations in these areas and the material misstatements they caused in Navistar's financial statements.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 16.

17.    Deloitte, in knowing furtherance of fraud perpetrated by Navistar and the Individual Defendants, rendered unqualified audit opinions on the Navistar 2003 and 2004 annual consolidated financial statements, falsely represented that it had conducted its audits of Navistar in accordance with generally accepted auditing standards ("GAAS"), and certified that those financial statements "present fairly, in all material respects the financial position of Navistar ...  and the results of [its] operations ...  in conformity with" GAAP.  Deloitte knew or recklessly disregarded that its audits were *not* conducted in accordance with GAAS, that Navistar's financial statements *materially misstated* the Company's true financial position and results of operations and were misleading, and that the financial statements did *not* conform with GAAP.

**ANSWER:**    Schwetschenau admits that unqualified opinion letters from Deloitte were included in Navistar's Form 10-K filings for 2003 and 2004, states that those documents speak

for themselves, denies any characterizations of those documents, and denies the remaining

allegations of Paragraph 17.

      18.    Deloitte rendered its unqualified or "clean" audit opinions despite the many and obvious GAAP violations resulting in the billions of dollars in misstatements in Navistar's Class Period financial statements.  In addition, Deloitte deliberately or recklessly ignored: (1) warning signs that the financial statements did not present the financial position of Navistar and its results of operations in conformity with GAAP, including warning signs of management's motive and opportunity to misstate Navistar's financial statements; and (2) significant and obvious red flags of Navistar's specific GAAP violations.

      **ANSWER:**    Schwetschenau admits that unqualified opinion letters from Deloitte were

included in Navistar's Form 10-K filings for 2003 and 2004, states that those documents speak

for themselves, denies any characterizations of those documents, and denies the remaining

allegations of Paragraph 18.

      19.    Deloitte's departure from the standards required by GAAS were so extreme that the risk that Navistar's financial statements materially misstated the Company's true financial position and results of operations and were misleading was either known to Deloitte, or so obvious that Deloitte must have been aware of it.  That Deloitte's audits amounted to no audits at all is confirmed by the admission of Navistar on March 20, 2007, when KPMG replaced Deloitte as Navistar's auditor, that KPMG performed "a complete re-audit of 2003, 2004, and 2005."

      **ANSWER:**    Schwetschenau admits that Navistar retained the auditing firm of KPMG

and is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 19 and on that basis denies the same.

      20.    The Defendants were motivated to engage in their accounting manipulations and fraud by, among other reasons, the need to meet or exceed their own financial guidance and the expectations of securities analysts.  In 2000 and 2002 Navistar undertook massive restructuring activities to convince investors, analysts, and the market that it would return to profitability after several years of losses.  As a result, investors and analysts paid close attention to Navistar's reported financial results in 2003, 2004, and 2005.  Each quarter during those years, solely as a result of the accounting manipulations and fraud, Navistar, in fact, reported results that met or exceeded its own guidance and generally met the expectations of analysts.  As the following table shows, it is now known that Navistar's actual financial results were grossly overstated and that the Company would not have met or exceeded its guidance or the expectations of analysts without the accounting manipulations and fraud of the Defendants:

**Comparison of Diluted Earnings Per Share ("EPS") (loss) Guidance
and Consensus Estimates with Originally Reported and Restated EPS**

|  | Company Guidance | Consensus Estimates | Originally Reported Diluted EPS[2] | Restated Diluted EPS |
|---|---|---|---|---|
| **2003[3]** | ($0.66) to ($0.76) | ($0.70) | ($0.27)/($0.31) | **($4.86)** |
| **2004** | $2.95 | $3.03 | $3.20 | **($0.64)** |
| **Q1 2005** | $0.20 - $0.25 | $0.23 | $0.24 | **$0.10** |
| **Q2 2005** | $0.65 - $0.70 | $0.71 | $0.70 | **$0.22** |
| **Q3 2005** | $0.75 - $0.85 | $0.84 | $0.83 | **$0.52** |

     **ANSWER:**    Schwetschenau denies the allegations of Paragraph 20, including footnotes

2 and 3.

     21.    Even when troubling information was announced, such as a delay in making SEC filings, Navistar and the Individual Defendants made false and misleading statements to reassure and convince investors and analysts, that the Company was "fine" and that any potential accounting and financial uncertainties had been fully resolved.

     **ANSWER:**    Schwetschenau denies the allegations of Paragraph 21.

     22.    The financial misstatements and the substantive misrepresentations of the Defendants were made with actual knowledge or gross recklessness. Defendants knew or were grossly reckless in not knowing that the Company's financial results were routinely and materially overstated, that Navistar's financial statements did not conform with GAAP, and that Deloitte's audits of the Company's financial statements were not done in accordance with GAAS. In addition, Defendants' statements about the Company's accounting procedures and policies, and its system of internal controls were materially false and misleading.

     **ANSWER:**    Schwetschenau denies the allegations of Paragraph 22.

     23.    On December 14, 2005, Navistar was scheduled to release its fourth quarter 2005 financial results at an investor conference in New York. That day, however, Navistar announced it would not release its results and cancelled its investor conference. Navistar shares declined by $2.11, or 6.9%.

     **ANSWER:**    Schwetschenau admits that Navistar was scheduled to release its fourth

quarter 2005 financial results on December 14, 2005, states that Navistar's December 14, 2005

---

[2] Navistar did not provide restated results for the interim quarterly periods of 2003 and 2004.
[3] The fiscal 2003 EPS was originally reported as a $0.27 loss; the $0.31 EPS loss reflects the adjustments made as a result of the 2004 Restatement, as set forth in Navistar's 2004 10-K and discussed below.

press release speaks for itself, denies any characterizations of that document, and denies the

remaining allegations of Paragraph 23.

24.    From December 13, 2005, the day prior to the first corrective disclosure, when
Navistar common stock closed at $30.28 per share, to July 17, 2006, the day after the last
corrective disclosure when Navistar closed at $20.95, Navistar common stock declined by $9.33
the information revealing Defendants' prior false and misleading statements into Navistar's share
price per share, or 30%, owing to investors' incorporation of.

    **ANSWER:**    Schwetschenau denies the allegations of Paragraph 24.

## II.    JURISDICTION AND VENUE

25.    This Court has jurisdiction over this action pursuant to Section 27 of the
Securities Exchange Act of 1934 (the "Exchange Act"), 28 U.S.C. §§ 1331 and 1337.  The
claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§
78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.  the
1934 Act, 15 U.S.C.

    **ANSWER:**    Paragraph 25 contains legal conclusions to which no response is required.

To the extent an answer is required, Schwetschenau admits that this Court has jurisdiction to hear

actions brought pursuant to pursuant to Section 27 of the Securities Exchange Act of 1934 (the

"Exchange Act"), 28 U.S.C. §§ 1331 and 1337, and that Plaintiffs assert claims under Sections

10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. §

240.10b-5, but Schwetschenau denies that Plaintiffs are entitled to any relief thereunder.

26.    Venue is proper in this District pursuant to Section 27 of the 1934 Act, 15 U.S.C.
§ 78aa, and 28 U.S.C. § 1391(b), in that Navistar's principal place of business is located in this
district.

    **ANSWER:**    Paragraph 26 contains legal conclusions to which no response is required.

To the extent an answer is required, Schwetschenau denies the allegations of Paragraph 26.

27.    In connection with the wrongs alleged herein, Defendants used the
instrumentalities of interstate commerce, including the United States mails, interstate wire and
telephone facilities, and the facilities of the national securities markets.

    **ANSWER:**    Schwetschenau denies the allegations of Paragraph 27.

## III.    THE PARTIES

### A.    Lead Plaintiffs

28.    By Order dated March 18, 2008, the Court appointed Norfolk and Local 519 as lead plaintiffs in this action.

(A)    Lead Plaintiff Norfolk is a contributory retirement system for the benefit of the retired employees of forty governmental units in Norfolk County, Massachusetts and has approximately $450 million in assets.  Norfolk purchased shares of Navistar common stock on the open market during the Class Period and was damaged thereby.

(B)    Lead Plaintiff Local 519 purchased shares of Navistar common stock on the open market during the Class Period and was damaged thereby.

**ANSWER:**    Schwetschenau admits that this Court issued an order dated March 18,

2008, and states that the Court's order speaks for itself and denies any characterizations of that

order.  Schwetschenau denies that either Norfolk or Local 519 has been damaged and is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 28 and on that basis denies the same.

### B.    Additional Named Plaintiffs

29.    Plaintiffs Brockton Contributory Retirement System ("Brockton"), Electrical 103") and the NECA-IBEW Pension Fund ("Decatur Plan") purchased shares of Navistar common stock on the open market during the Class Period and were damaged thereby.

**ANSWER:**    Schwetschenau denies that the referenced Plaintiffs have been damaged

and is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 29 and on that basis denies the same.

### C.    The Navistar Defendants

30.    Defendant Navistar is a Delaware corporation with its principal place of business in Warrenville, Illinois.  Navistar was listed on the New York Stock Exchange ("NYSE") during the Class Period, and traded under the symbol "NAV," but was delisted and began trading on the over-the-counter market on February 14, 2007.  As of February 17, 2005, there were 69,963,758 shares of Navistar common stock outstanding.

**ANSWER:**    Schwetschenau admits that Navistar is a Delaware corporation with its

principal place of business in Warrenville, Illinois, and that Navistar was listed on the NYSE,

trading under the symbol "NAV," during the alleged Class Period.  Schwetschenau is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of Paragraph 30 and on that basis denies the same.

31.    At all times relevant hereto, Navistar used a fiscal year that ends on October 31.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 31.

32.    Defendant Daniel Ustian ("Ustian") is and was, during the Class Period, Chief
Executive Officer ("CEO") of Navistar.  On December 10,2003, Navistar announced that
Defendant Ustian had been elected as chairman of the Company's board of directors.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 32.

33.    Defendant Robert Lannert ("Lannert") was, during the Class Period, Chief
Financial Officer ("CFO") of Navistar.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 33.

34.    Defendant Mark T.  Schwetschenau ("Schwetschenau") was, during the Class
Period until on or about April 6, 2006, Senior Vice President, Controller, and the principle
accounting officer of Navistar.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 34.

35.    Defendants Ustian, Lannert and Schwetschenau may be referred to herein as the
"Individual Defendants."

**ANSWER:**    Schwetschenau states that Paragraph 35 contains no factual allegations as

to which a response is required.

36.    By virtue of their positions as officers of the Company, the Individual Defendants
had the authority and ability to and, in fact, controlled the contents of the Company's annual and
quarterly reports filed with the SEC, its proxy statements and press releases disseminated by
Navistar.  Further, the actions of the Individual Defendants during the Class Period caused the
material misstatements of the Company's financial condition as alleged and results, herein.  The
Individual Defendants were aware of the Company's publicly disseminated reports and press
releases alleged herein to be misleading prior to their issuance and had the ability and
opportunity to prevent their issuance, but failed to do so.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 36.

### D.    Deloitte & Touche LLP

37.    Defendant Deloitte & Touche LLP is a firm of certified public accountants with offices located nationwide, including Chicago, Illinois. Deloitte audited Navistar's materially false and misleading financial statements for the fiscal years ended October 31, 2003 and 2004, and issued materially false and misleading opinions on these financial statements. Additionally, Deloitte consented to the use of its unqualified opinion on Navistar's 2003 and 2004 financial statements in reports filed with the SEC and otherwise disseminated to the investing public during the Class Period. Deloitte participated in the scheme, plan, and common course of conduct as described herein.

**ANSWER:**    Schwetschenau admits the allegations of the first sentence of Paragraph 37

and denies the remaining allegations of Paragraph 37.

38.    Throughout the Class Period, while providing Navistar with public accounting and auditing services, Deloitte personnel were present at the Company's offices and had access to and knowledge of Navistar's confidential corporate, financial, and business information.

**ANSWER:**    Schwetschenau admits that Deloitte was Navistar's auditor during some of

the alleged Class Period and had access to certain of Navistar's confidential information and

denies the remaining allegations of Paragraph 38.

39.    On April 6, 2006, Deloitte was "dismissed" as Navistar's outside auditor. The Company retained KPMG LLP to act as its auditor and to re-audit the financial results for 2002 through 2005.

**ANSWER:**    Schwetschenau admits that Navistar retained the auditing firm of KPMG

in April 2006 and is without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations of Paragraph 39.

### E.    Defendants

40.    Navistar, Deloitte, and the Individual Defendants may be referred to collectively herein as "Defendants."

**ANSWER:**    Schwetschenau states that Paragraph 40 contains no factual allegations to

which a response is required.

41.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit upon purchasers of Navistar securities, by disseminating materially false and misleading statements and/or concealing material adverse

facts.  The scheme deceived the investing public regarding Navistar's business, present and the Company's securities, and future prospects, growth, operations and the intrinsic value of the Company's securities, and induced members of the Class to purchase Navistar common stock at artificially-inflated prices.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 41.

## IV.    BACKGROUND FACTS

### A.    Description of Navistar's Business & Operations

42.    Navistar operates primarily in the United States, Canada, Mexico and Brazil, in three industry segments: Truck, Engine, and Financial Services.  The majority of Navistar's business activities arise from its Truck and Engine segments.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 42.

43.    Navistar's Truck segment manufactures and distributes a line of diesel-powered Class 6 and 7 trucks, Class 8 heavy trucks and school buses in the common carrier, private carrier, government/service, leasing, construction, energy/petroleum, and student transportation markets in the United States, Canada, Mexico, and other selected export markets.  In addition, Navistar's Truck segment provides proprietary parts needed to support its truck and bus lines, as well as other standard truck and trailer aftermarket parts.  The Truck segment also includes various majority owned Navistar dealerships.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 43.

44.    Navistar's Engine segment designs and manufactures diesel engines for use in Navistar's Class 6 and 7 medium trucks, school buses and certain Class 8 heavy trucks, and for sale to original equipment manufacturers in the United States, Mexico and Brazil.  Navistar purports to be the leading supplier of mid-range diesel engines in the 160-325 horsepower range.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 44.

45.    Navistar's Financial Services segment provides retail, wholesale, and lease finance for new and used products sold by Navistar's Truck segment and its dealers within the United States and Mexico, as well as finances the Company's wholesale accounts and select new products produced retail accounts receivable.  Navistar also provides financing for sales of new products produced by other manufacturers regardless of whether the products were designed or sold for use with Navistar's truck products.  Navistar's financial services are provided through the company's principal subsidiary, Navistar Financial Corporation, or "NFC," as well as special purpose subsidiaries and foreign finance subsidiaries.

**ANSWER:**    Schwetschenau admits the allegations of Paragraph 45.

46.     Navistar Financial obtains the funds to provide financing to the Company's dealers and retail customers through sales of finance receivables, commercial paper, short and long-term bank borrowings and medium and long-term debt.

**ANSWER:**     Schwetschenau admits the allegations of Paragraph 46.

47.     In order to fund its business operations, Navistar Financial Corporation securitizes and sells receivables through special purpose wholly-owned subsidiaries.  These qualified special purpose entities (QSPEs) then issue securities to public and private investors.

**ANSWER:**     Schwetschenau admits the allegations of Paragraph 47.

48.     As a wholly owned subsidiary of Navistar, NFC's financial results are consolidated with and incorporated into Navistar's financial results and statements.  Because NFC issues registered securities in its own right it also files periodic reports with the SEC.

**ANSWER:**     Schwetschenau admits the allegations of Paragraph 48.

**B.     Navistar's Business Prior To The Class Period**

49.     In October 2002, the Company's stock price had reached a nearly ten year low – closing at $16.92 per share on October 17, 2002.  The stock price had fallen as Navistar reported net losses for the prior two years (2002 and 2001), and reported declining sales in 2000 and 2001, while reporting a meager 1% increase in sales in 2002.  Accordingly, the Company and the Individual Defendants were under great pressure to improve Navistar's operating results and stock price.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 49 and on that basis denies the same.

50.     The following graph reflects the price of Navistar common stock from January 1999 through December 2002:



**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 50 and on that basis denies the same.

51.     In light of the decline in Navistar's stock price in 1999 and 2000, beginning in
2000 there was great focus on the Company's need to restructure aspects of its business and to
reduce its cost structure, particularly in the area of retirement, employee benefits and supply
chain.  The Company had entered into a restructuring plan in 2000, laying off 1,900 workers,
streamlining the Company's line of trucks and truck manufacturing facilities, closing certain
operations, introducing high technology diesel engines, consolidating corporate operations, and
realigning and reducing the Company's dealers.  As of the beginning of the fiscal year ending
October 31, 2002, implementation of this 2000 Restructuring Plan had not succeeded in
significantly increasing the Company's operating income or share price.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 51 and on that basis denies the same.

52.     In response to these market pressures, Navistar announced several plans in the fall
of 2002 to increase income and control costs.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 52 and on that basis denies the same.

53.     As part of the restructuring plans, and in an attempt to return the Company to
profitability, on October 17, 2002, Navistar announced the closing of its Chatham, Ontario heavy

truck plant.  The closure was described as a "necessary step to address competitive market conditions" and part of the Company's overall plan to return to profitability:

> [President of Navistar's Truck group Steve] Keate noted that this action, along with others, better positions International to profitably serve its heavy truck business and contributes to the company's goal of profitability.  .  .

> * * *

> Robert C.  Lannert ...  noted that the 2003 plan... showed the company returning to modest profitability in 2003.

**ANSWER:**    Schwetschenau states that Navistar's October 17, 2002 announcement speaks for itself, denies any characterizations of that announcement, and denies the remaining allegations of Paragraph 53.

54.    On October 29, 2002, as a part of its restructuring efforts, Navistar announced that it would take a $456 million charge during the fourth quarter of 2002, which would complete its "transformation" and "improve profit opportunities."  The release also discussed how the Company would deliver significant cost savings:

> John R.  Horne, chairman and chief executive officer of Navistar, said the charge, of up to $456 million after tax, is driven by changes in the business' long-term cost structure that will lower the company's breakeven point, reduce fixed and variable costs and improve profit opportunities at any point in the business cycle.

> As a result of the transformation, Horne said the company is well positioned to outperform previous results, with a goal of .  ..  Profits in all businesses over the cycle.

> * * *

> According to Horne, the transformation should begin to be visible in fiscal 2003, with the company returning to modest profitability at industry retail sales volume for Class 6-8 trucks and school buses at approximately 8,500 units greater than in 2002.  He said that the company's ongoing program of continuous cost improvements is expected to deliver a $100 million net improvement in earnings before interest and taxes (EBIT) over 2002.

**ANSWER:**    Schwetschenau states that Navistar's October 29, 2002 release speaks for itself, denies any characterizations of that release, and denies the remaining allegations of Paragraph 54.

55.     The October 29, 2002 release also discussed how the Company would take a significant charge to earnings as a result of the increased liabilities due to a $350 million increase in the amount by which Navistar's pension plans were underfunded and that this charge would "absorb" the need for additional charges going forward:

> As a result of the decline in the stock market coupled with the decline in interest rates, the under- funded status of the various plans has increased.  Based on September 30, 2002 values, the company forecasts that the reduction of equity due to additional pension liability could be in the range of approximately $350 million after tax.

> "This charge reflects only a point-in-time view of the funded status of our pension plans and while the increase is significant, it is very manageable for Navistar," Lannert said.  "We have absorbed all funding and expense assumptions in our 2003 earnings forecast."

**ANSWER:**     Schwetschenau states that Navistar's October 29, 2002 release speaks for

itself, denies any characterizations of that release, and denies the remaining allegations of

Paragraph 55.

56.     The net effect of these efforts became known as the "2002 Plan of Restructuring," as described in Navistar's Form 10-K, Annual Report for Fiscal 2002, filed with the SEC on December 13, 2002:

> In October 2002, the company's board of directors approved a separate restructuring plan (2002 Plan of Restructuring) and the company incurred charges for restructuring, asset and inventory write-downs and other exit costs totaling $372 million.

> * * *

> 2002 Plan of Restructuring

> The following are the major restructuring, integration and cost reduction initiatives included in the 2002 Plan of Restructuring:

> > Closure of facilities and exit of certain activities including the Chatham, Ontario heavy truck assembly facility, the Springfield, Ohio body plant and a manufacturing production line within one of the company's plants

> > Offer of an early retirement program to certain union represented employees

> Completion of the launch of the [High Performance Vehicles ("HPV")] and [next generation technology diesel engines ("NGD")] product programs
>
> Pursuant to the 2002 Plan of Restructuring, 3,500 positions will be eliminated throughout the company.

**ANSWER:**    Schwetschenau admits that Navistar filed its 2002 Form 10-K with the

SEC, states that the document speaks for itself, denies any characterizations of that document,

and denies the remaining allegations of Paragraph 56.

57.    The goal of the 2002 Restructuring Plan was to reduce the Company's operating costs and enable it to report incrementally increasing net income.

**ANSWER:**    Schwetschenau admits that Navistar filed its 2002 Form 10-K with the

SEC, states that the document speaks for itself, denies any characterizations of that document,

and denies the remaining allegations of Paragraph 57.

58.    In addition to these cost cutting and efficiency measures, on December 11, 2002, Navistar announced that Defendant Ustian had been named as Chief Executive Officer, effective February 17, 2003, and that he would be responsible for shepherding the Company through a "transformation into a truly-world class company that will succeed regardless of future economic cycles":

> "I have worked with Dan for many years, and he is absolutely the right person to lead us into the future," (Navistar Chairman John) Horne said.  "His track record . . . convinces me that he will make the most of the company's many opportunities.  With Dan, we couldn't be better positioned to finish what we've started:  the transformation into a truly world-class company that will succeed regardless of future economic cycles."

**ANSWER:**    Schwetschenau states that Navistar's December 11, 2002 announcement

speaks for itself, denies any characterizations of that announcement, and denies the remaining

allegations of Paragraph 58.

59.    As subsequently revealed in 2005 and 2006 through announcements of the Company's 2005 Restatement and Re-audit, the restructuring and transformation were a failure. For example, after giving effect to the Restatement, the Company's reported results did reflect modest incremental increases in revenue in 2003 through the third quarter of 2005, it was unable to grow its income.  Rather than disclose these failures, Defendants, during the Class Period, engaged in a grossly reckless scheme to manipulate Navistar's financial results.  Many of the

subsequently restated financial statement items were manipulations that directly deflated the Company's costs and expenses – creating inflated income. Other manipulations directly increased the Company's net income. The net effect of these manipulations, as reflected in the Restatement, allowed Navistar to meet its own guidance and perform in line with, or exceed, the consensus estimates provided by securities analysts covering the Company.

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 59.

## V.    DEFENDANTS' CLASS PERIOD FALSE AND MISLEADING STATEMENTS AND THEIR IMPACT ON THE MARKET

60.    Each of the Defendants' statements and disclosures below, including Navistar's quarterly and annual earnings releases and SEC filings, are quoted or described as relevant to identify those statements that are materially false or misleading, or to put such statements in context.

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 60.

### A.    Fiscal Year 2003

### (i)    First Fiscal Quarter 2003 Results

61.    Before the market opened on February 14, 2003, the start of the Class Period, Navistar issued its first fiscal quarter 2003 earnings release. In this press release, Navistar disclosed that it had a "loss from continuing operations for the quarter ended January 31, 2003, total[ing] $98 million, or $1.47 per diluted share. . ." According to the press release, the diluted EPS loss, from continuing operations, was better than analyst consensus estimates,[4] which anticipated an EPS loss of $1.49; Navistar's results were in the middle of the guidance provided to investors in the Company's December 2, 2002 earnings release, providing for a diluted EPS loss of $1.45 to $1.55. The earnings release also disclosed sales and revenues for the quarter: "Consolidated sales and revenues from the company's manufacturing and financial services operations for the first quarter totaled $1.6 billion..." Navistar also informed investors that its earnings guidance for the second fiscal quarter of 2003 anticipated a loss of $0.25 to $0.30 per diluted share.

> **ANSWER:**    Schwetschenau states that Navistar's February 14, 2003 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 61, including footnote 4.

---

[4] Investopedia.com defines consensus estimates as follows:

A figure based on the combined estimates of the analysts covering a public company. Generally, analysts give a consensus for a company's earnings per share and revenue; these figures are most often made for the quarter, fiscal year and next fiscal year. The size of the company and the number of analysts covering it will dictate the size of the pool from which the estimate is derived.

62.    In reaction to the news that Navistar's earnings exceeded analyst expectations, Navistar's stock price increased from a close of $21.94 per share on February 13, 2003, to a close of $23.63 per share on February 14, 2003, a 7.7% increase.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 62 and on that basis denies the same.

63.    On March 14, 2003, Navistar issued its Form 10-Q for the quarter ending January 31, 2003 (the "Q1 2003 10-Q"). The Q1 2003 10-Q substantially repeated the operating results issued on February 14, 2003. The Q1 2003 10-Q also included disclosures concerning several of the items subject to the Restatement.

**ANSWER:**    Schwetschenau states that Navistar's Q1 2003 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

63.

64.    The Q1 2003 10-Q disclosed that the Financial Accounting Standards Board ("FASB") had issued a new pronouncement relating to consolidation accounting, specifically of variable interest entities ("VIEs"). Navistar maintained throughout the Class Period that this provision would not affect its accounting – as it had no VIEs that were subject to it. However, in the 2005 Restatement and Re-Audit the Company was forced to restate its accounting related to this provision, known as FASB Interpretation No. 46 ("FIN 46"), as the improper application of the Company's QSPEs did qualify for consolidation as VIEs. In the Q1 2003 10-Q Navistar falsely disclosed that the type of QSPEs used by NFC in its securitization transactions were outside the scope of this provision, and that it would not apply:

> In January 2003, the FASB issued Interpretation No. 46 (FIN 46), "Consolidation of certain of Variable Interest Entities." This interpretation addresses consolidation variable interest entities. Transferors to qualified special purpose entities (QSPEs) subject to the reporting requirements of FASB Statement No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," are excluded from the scope of requirements of this interpretation. The company currently sells receivables to entities meeting the requirements of QSPEs.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 64.

65.    As a result of the Company's poor performance in 2001 and 2002, investors and securities analysts were particularly interested in the Company's ability to reduce its costs through the restructuring plans discussed above. In Note H of the Q1 2003 10-Q, Navistar discussed its Restructuring and Other Non-recurring Charges and disclosed the elements of the charges incurred pursuant to the "2000 and 2002 Plans of Restructuring" which were designed to reduce the Company's overall cost structure. However, as revealed in the 2005 Restatement and Re-Audit, Defendants used the Plans of Restructuring to manipulate their financial results. The

2005 Restatement and Re-Audit required Navistar to reduce its previously reported net income by $106 million as a result of improper accounting for the Company's restructuring activities, including for not using "certain available information in estimating the costs to be incurred associated with terminating employees" and not reducing an "accrual for future lease payments on abandoned office space for the portion of the space that we continued to use for the remaining term of the lease."

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 65.

66.     The Q1 2003 10-Q made specific disclosures about such restructuring accruals, falsely specifying in particular a $12 million accrual made for severance and other benefits and a $1 million accrual for lease termination costs during the first fiscal quarter of 2003:

A description of the significant components of the 2000 and 2002 restructuring charges are as follows:

The 2000 Plan of Restructuring included the reduction of approximately 1,900 employees from the workforce, primarily in North America.  At October 31, 2002, the remaining $18 million balance of the total net charge of $75 million was adjusted as part of the $94 million charge for severance and benefits related to the 2002 restructuring charge.  Pursuant to the 2002 Plan of Restructuring, an additional 3,500 positions will be eliminated throughout the company, primarily in North America.  During the quarter ended January 31, 2003, approximately $12 million was paid for severance and other benefits to approximately 1,800 employees as a result of the two Plans of Restructuring.  The severance and other benefits balance represents costs related to future payments due to the company's contractual severance obligations.

Lease termination costs related to the 2000 Plan of Restructuring include future obligations under long-term non-cancelable lease agreements at facilities being vacated following workforce reductions.  This charge primarily consisted of the estimated lease costs, net of probable sublease income, associated with the cancellation of the company's corporate office lease at NBC Tower in Chicago, Illinois, which expires in 2010.  As of January 31, 2003, $9 million of the total net charge of $38 million has been incurred for lease termination costs, of which $1 million was incurred during the quarter.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 66.

67.     The 2005 Restatement and Re-Audit revealed that throughout the Class Period Defendants had improperly manipulated their product warranty reserves by: (1) reducing "estimates of product warranty cost by including expected future benefits of product improvements prior to such improvements becoming reasonably assured;" (2) routinely performing "repairs beyond the expressed terms of the warranty agreements" without accruing for such costs; and (3) reducing "estimate(s) of future warranty costs and related accruals" based on anticipated vendor rebates even though "such recoveries were not supported."  These improper product warranty manipulations resulted in the Company's warranty reserves and

expenses being grossly understated by $190 million over the Class Period, thus inflating Navistar's net income by the same amount.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 67.

68.    In Note K of the Q1 2003 10-Q, Navistar discussed its Product Warranty reserve, falsely representing that "(m)anagement believes that the warranty reserve is appropriate." Navistar disclosed a grossly understated product warranty reserve of $182 million. In describing how Product Warranty was accounted for, Navistar falsely stated that "management actively studies trends of warranty claims" to determine that the Company has adequate reserves and then included a table reflecting the Company's grossly understated warranty reserves:

> Provisions for estimated expenses related to product warranty are made at the time products are sold. These estimates are established using historical information about the nature, frequency and average cost of warranty claims. Management actively studies trends of warranty claims and takes action to improve vehicle quality and minimize warranty claims.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 68.

69.    The 2005 Restatement and Re-Audit revealed that throughout the Class Period Defendants had improperly manipulated their reserves for litigation, including asbestos claims, product liability claims and environmental liability (the Company refers to these in the Restatement as "Liabilities Related to Contingencies"). Defendants had improperly manipulated Navistar's reserves during the Class Period by "not accruing for settlement offers made," by using an "arbitrary" estimation process for establishing asbestos-related reserves and by failing to accrue for "unpaid losses and loss expense obligations associated with product liability." These improper manipulations of the Company's reserves for Liabilities Related to Contingencies resulted in the Company's net income being grossly overstated by $71 million over the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 69.

70.    In Note L of the Q1 2003 10-Q, Navistar disclosed the status of pending legal proceedings and falsely stated that none of the claims or proceedings were material to the Company:

> The company and its subsidiaries are subject to various claims arising in the ordinary course of business, and are parties to various legal proceedings that constitute ordinary routine litigation incidental to the business of the company and its subsidiaries. In the opinion of the company's management, none of these proceedings or claims is material to the business or the financial condition of the company.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 70.

71.    In connection with the 2005 Restatement and Re-Audit, the Company disclosed the existence of 15 separate material control weaknesses, many of which tied directly to the Company's accounting manipulations during the Class Period.  In the Controls and Procedures section of the Q1 2003 10-Q, Navistar's management disclosed its evaluation of the Company's disclosure controls and procedures, falsely noting that such controls were evaluated by Defendants Ustian and Lannert, who found them to be "adequate."  The disclosure further noted that the Company had not formalized or documented the control procedures:

> The company's principal executive officer and principal financial officer evaluated the company's disclosure controls and procedures. . .  Based on that evaluation . . . the company concluded that, as of the Evaluation Date, the disclosure controls and procedures in place at the company were adequate to ensure that information required to be disclosed by the company, including its consolidated subsidiaries, in reports that the company files or submits under the Exchange Act, is recorded, processed, summarized and reported on a timely basis in accordance with applicable rules and regulations... [T]he company *intends to formalize and document the procedures already in place and establish a disclosure committee.*  (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 71.

72.    The Q1 2003 10-Q was signed by Defendant Schwetschenau.  Both of Defendants Ustian and Lannert signed certifications of review and compliance pursuant Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which stated as follows in relevant part:

> 1.  I have reviewed this quarterly report on Form 10-Q of Navistar International Corporation;

> 2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

> 3.  Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

> 4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

> a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

* * *

5.  The registrant's other certifying officer and I have disclosed... any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

[Certifications signed by both Lannert and Ustian]

CERTIFICATION PURSUANT TO
18 U.S.C.  SECTION l350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I . . .  certify, pursuant to 18 U.S.C.ss.1350, as adopted pursuant to ss.906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

[Certifications signed by both Lannert and Ustian]

**ANSWER:**     Schwetschenau states that Navistar's Q1 2003 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

72.

### (ii)     Second Fiscal Quarter 2003 Results

73.     Before the market opened on May 15, 2003, Navistar issued its earnings release for the second fiscal quarter ended April 30, 2003.  Navistar "reported a loss from continuing operations of $12 million, equal to ($0.18) per diluted common share..."  According to the earnings release, this was less than the consensus EPS estimate of a $0.29 loss.  The loss was also lower than the Company's predicted guidance of an EPS loss of $0.25-0.30.  The earnings release disclosed Navistar's sales and revenues for the quarter:  "Consolidated sales and revenues from manufacturing and financial services operations for the second quarter 2003 totaled $1.9 billion, compared with the $1.7 billion reported in the second quarter of 2002."  Defendant Ustian also gave investors guidance for the third fiscal quarter of 2003:  "We still expect a third quarter profit in the range of 20 to 30 cents per share due to increased truck shipments, continued cost reductions and income from financial services."

**ANSWER:**     Schwetschenau states that Navistar's May 15, 2003 earnings release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 73.

74.     As with the Company's Restructuring Plans, investors and securities analysts were focused on Navistar's employee benefits expenses, particularly on Navistar's ability to control or reduce the payments needed to fund its defined contribution pension plans and health care plans.  With knowledge of this focus, Defendants manipulated their accounting for employee benefit plans by improperly applying discount rates and amortization periods.  These improper manipulations of Navistar's employee benefit expenses resulted in the Company's reported net income being overstated by $176 million over the Class Period.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 74.

75.     The May 15, 2003 earnings release included a discussion attributed to Defendant Ustian concerning changes in the accounting for how certain pension costs were amortized, noting that these changes would result in lower expenses in the future.  The following comments reflect Defendant Ustian's detailed understanding of the Company's pension accounting and were false and misleading in that any benefit from the "accounting change" to the amortization period of the Company's pension expense was the product of Defendants' improper accounting manipulations:

> Ustian noted that the company's manufacturing realignment initiatives and changing demographics of participants in the company's defined benefit pension plans required an accounting change on how certain pension costs are amortized. This change reduced pension expense for the second quarter.  Because of the accounting change, certain pension costs will be amortized over a longer period of time and will result in lower expenses on an ongoing basis.

> According to Ustian, the accounting change will significantly offset the increased annual pension expense arising from the decline in pension plan asset values experienced in the last half of 2002.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 75.

76.     Navistar also held its investor conference call on May 15, 2003 to discuss its earnings release, wherein Defendant Lannert falsely represented that Defendants' manipulation of the Company's pension amortization periods represented a "fundamental improvement" to Navistar's business:

> I will say a little bit about the accounting change for pension.  Because it is an accounting change, but it also represents a fundamental improvement in our business.  We've been telling you for some time now that we've discontinued the defined benefit pension plan.  .  .

> So we've now reached the situation where 90% of the participants in the existing defined benefit plans are inactive, and that requires us to change the accounting to amortize the unrecognized gains and losses over the life expectancy of the participants rather than the estimated working life of the participants.

So as a result of that post retirement expense was reduced by $10 million in the second quarter, and will be reduced by 20 million in the second half of the year, and that's an ongoing change now for the life of the plan.  So amortization has changed, and it won't go back the other way.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 76.

77.     In reaction to this earnings release and the news from the analyst conference call, Navistar's common stock rose from a close of $27.62 per share on May 14, 2003 to a close of $29.27 per share on May 15, 2003, or 5.97%.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 77 and on that basis denies the same.

78.     Various analysts noted that the lower-than-expected-losses came primarily from the reduced expense in the Company's defined benefit pension plan:

(A)     John E.  McGinty, Credit Suisse First Boston: "Navistar's second quarter was a loss of $0.18 a share, which was above expectations largely due to a reduction in pension expense tied to a required amortization of defined benefits costs over a longer period.  This improved earnings by about $0.10 a share."

(B)     Andrew Casey, Prudential Financial: "NAV reported 2Q03 loss of $0.18, which exceeded our expectation for a loss of $0.30 and consensus of a loss of $0.29.  The outperformance was mainly due to previously unannounced $0.10 lower pension costs."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 78 and on that basis denies the same.

79.     On June 13, 2003 Navistar issued its Form 10-Q for the quarter ended April 2003 (the "Q2 2003 10-Q").  The Q2 2003 10-Q substantially repeated the operating results issued on May 14, 2003.  The Q2 2003 also contained materially false and misleading disclosures concerning: FASB Interpretation No. 46; "Consolidation of Variable Interest Entities;" Restructuring and Other Non-Recurring Charges; the materiality of outstanding litigation; Product Warranty reserves; and Controls and Procedures that were substantially the same as those quoted above from the Q1 2003 10-Q.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 79.

80.     In Note A of the 2Q 2003 10-Q, Navistar discussed the change in the accounting policy for the Company's pension plans, specifically the change in amortization periods:

As a result of the 2002 Plan of Restructuring as further described in Note H, substantially all of the participants of the company's pension plans are inactive. Accordingly, effective February 1, 2003, cumulative unrecognized gains and

losses related to pension benefits are amortized over the remaining life
expectancy of the employees.

**ANSWER:**    Schwetschenau states that Navistar's Q2 2003 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

80.

81.    The Q2 2003 10-Q was signed by Defendant Schwetschenau.  Defendants Ustian
and Lannert both signed certifications of review and compliance pursuant Sections 302 and 906
of the Sarbanes-Oxley Act of 2002, that were substantially the same as those contained in the
Company's Q1 2003 10-Q, quoted above.

**ANSWER:**    Schwetschenau states that Navistar's Q2 2003 10-Q speaks for itself and

denies any characterizations of that document.

82.    Defendants' foregoing statements made during the fiscal second quarter of 2003
or concerning the Company's fiscal second quarter of 2003 financial results were materially false
and misleading, as follows:

(A)    Despite representations to the contrary, the Company's previously reported fiscal
second quarter of 2003 financial statements and results, including reported net income, EPS, and
shareholders' equity, were grossly and materially overstated in violation of GAAP, as those
audited financial statements required restatement;

(B)    Defendants' substantive disclosures, as set forth above, concerning the
Company's application of accounting policies and assumptions for accounting were materially
false and misleading in light of the Restatement, as follows:

i.  Defendants' statements concerning the Company's obligations under the
Company's employee benefit programs and the cost savings associated with those
obligations were materially false and misleading because Defendants used
improper assumptions in calculating those costs and  obligations;

ii.  Defendants' statements concerning the substance and financial impact of the
Company's restructuring activities, and in particular the expense reductions
associated with those restructuring activities, were materially false and misleading
because they failed to abide by the applicable GAAP provisions in accounting for
those plans;

iii.  Defendants' statements concerning the Company's Product Warranty policies
and reserves were materially false and misleading because they improperly
included expected future product improvements, failed to properly accrue for
costs associated with non-warranty repairs, and  accrued improperly for
anticipated vendor recoveries;

iv. Defendants' statements concerning the materiality of litigation and the adequacy of the Company's contingency reserves were materially false and misleading because Defendants had failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses;

v. Defendants' statements concerning the Company's consolidation accounting policies were materially false and misleading because, contrary to their statements that the Company had "no VIEs that were subject to consolidation under FIN 46," certain VIEs required consolidation on the Company's financial statements, which consolidation materially and adversely affected those financial statements;

(C)     Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy were materially false and misleading in light of the Restatement and the fifteen different material control weaknesses identified in connection with Navistar's re- audit of the 2003 financial statements; and

(D)     Defendants' substantive disclosures concerning the adequacy of the Company's internal controls were materially false and misleading in light of the fact that the Company had no formal written policy of internal controls.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 82.

**(iii)     Third Fiscal Quarter 2003 Results**

83.     On June 24, 2003, Bloomberg News published an article noting that during a plant tour of Navistar's Escobedo, Mexico factory, Defendant Lannert reiterated the guidance given to investors in the May 15, 2003 earnings release, noting that the Company was "sticking with a profit forecast of 20 cents to 30 cents a share for its third quarter." The article noted that Navistar had not "had a net profit for six straight quarters."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 83 and on that basis denies the same.

84.     Before the market opened on August 15, 2003, Navistar issued its earnings release for the third fiscal quarter ended July 31, 2003. In this earnings release Navistar "reported that it returned to profitability . . . it is on track to be solidly profitable in the fourth quarter." According to the earnings release, net income from continuing operations during the fiscal third quarter was $19 million, or $0.26 per diluted common share, $0.01 better than the mid-point in the Company's June 24, 2003 reiterated guidance. The earnings release further detailed the sales and revenue for the Company: "Consolidated sales and revenues from manufacturing and financial services operations for the third quarter totaled $1.9 billion..."

**ANSWER:**    Schwetschenau states that Navistar's August 15, 2003 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 84.

85.    Navistar's third fiscal quarter 2003 results exceeded analyst consensus estimate for EPS of $0.25.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 85 and on that basis denies the same.

86.    In the August 15, 2003 earnings release, Defendant Ustian reiterated the Company's goal of being profitable:

> "Our focus continues to be on improving our cost structure so that we can be the profitable at all points of the business cycle," Ustian said.  "We are pleased by the outstanding performance recorded in the third quarter by both our parts and service organization and our finance group.  We anticipate we will be solidly profitable in the fourth quarter, with diluted earnings of between $0.65 and $0.75 per share from continuing operations..."

**ANSWER:**    Schwetschenau states that Navistar's August 15, 2003 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 86.

87.    Navistar held an analyst conference call to discuss the earnings release on August 15, 2003.  On that call, in the context of providing fiscal 2004 earnings guidance, Defendant Ustian provided a detailed explanation as to how pension expense would continue to decline in 2004.  Defendant Ustian's comments reflect a detailed understanding of Navistar's pension accounting but were materially false and misleading as any cost benefits in the Company's Pension expense were the product of Defendants' accounting manipulations:

> Pension expense should begin to come down some in '04.  Number one, it will come down because of contributions.  I think it's likely to come down because I expect to exceed the actuarial assumptions for earnings for the plan.  In the first half of this year, we made six percent on the assets versus a nine percent forecast for earnings for the year, so whatever gain there is over the nine percent goes in the quarter and gets amortized over five years.  If we continued at the rate that we were earning in the first half of the year, you know, the excess earnings in the plant would be $100 million and that would get split over five years, or would be $20 million a year, offset by whatever year dropped off.  I haven't gone and looked at what five years back is in that, but net/net, I would expect some

reduction in pension expense, utilizing the labor in all of our plants more effectively.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 87.

88.    On August 18, 2003 Andrew Casey, an analyst with Prudential Financial, issued a report on Navistar maintaining his "Buy" rating with a target price of $54.00 per share. Mr. Casey noted that he believes "that the company is poised to significantly increase earnings in an improving truck market. . ."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 88 and on that basis denies the same.

89.    On September 12, 2003, Navistar issued its Form 10-Q for the quarter ended July 31, 2003 (the "Q3 2003 10-Q"). The Q3 2003 10-Q substantially repeated the operating results issued on August 15, 2003. The Q3 2003 10-Q also contained materially false and misleading substantive disclosures concerning FASB Interpretation No. 46, "Consolidation of Variable Interest Entities," Restructuring and Other Non-Recurring Charges, Product Warranty reserves, the materiality of outstanding litigation, and Navistar's Controls and Procedures, that were substantially the same as those quoted above from the Q1 2003 10-Q, and disclosures that were substantially the same as those from Note A of the Q2 2003 10-Q concerning the Company's pension costs and accounting quoted above.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 89.

90.    In Note R of the Q3 2003 10-Q, under the heading "Subsequent Events," Navistar disclosed that in September 2003, all the conditions established by its Board in May 2003 had been met and that the Chatham, Ontario truck plant would remain open. The Company disclosed that this would result in the future reversal of certain accrued expenses associated with that plant's planned closure.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2003 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

90.

91.    The Q3 2003 10-Q was signed by Defendant Schwetschenau. Defendants Ustian and Lannert both signed certifications of review and compliance pursuant Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, that were substantially the same as those contained in the Company's Q1 2003 10-Q, quoted above.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2003 10-Q speaks for itself and

denies any characterizations of that document.

92.    Defendants' foregoing statements made during the third fiscal quarter of 2003 or concerning the Company's third fiscal quarter of 2003 financial results were materially false and misleading for the same reasons Defendants' statements made during or concerning the second fiscal quarter of 2003 were materially false and misleading, as set forth above in paragraph 82.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 92.

### (iv)    Fourth Fiscal Quarter and 2003 Results

93.    On November 24, 2003, Andrew Casey, Prudential Financial analyst, issued a report on Navistar noting that he "expect(ed) NAV to report 4Q03E of $0.72 on a recurring basis, which is essentially consistent with consensus expectations of $0.71." Based on the cumulative EPS reported during the first three quarters of 2003, and the fourth quarter 2003 consensus EPS estimate of $0.71, the consensus estimate for Navistar's fiscal 2003 EPS was ($0.70).

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 93 and on that basis denies the same.

94.    In reaction to the Prudential Financial report on November 24, 2003, that Navistar's fourth fiscal quarter earnings should be in line with estimates, Navistar's common stock price increased from a closing price of $40.07 per share on November 23, 2003, to a closing price of $42.56 per share on November 24, 2003, or 6.21 %.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 94 and on that basis denies the same.

95.    Before the market opened on December 2, 2003, Navistar issued its fourth fiscal quarter earnings release for the quarter ended October 31, 2003. In this release, Navistar reported that "[e]arnings from continuing operations for the fourth quarter totaled $77 million, equal to $1.00 per diluted common share." This was better than the Company's previous earnings guidance for the quarter of $0.65 to $0.75 per share as given in the August 15, 2003 earnings release. Also, according to the earnings release, Navistar had revenues amounting to $2.0 billion for the fourth fiscal quarter 2003. For fiscal 2003, Navistar reported consolidated sales and revenues of $7.3 billion, and a net loss for 2003 of $18 million, or ($0.27) per diluted common share.

**ANSWER:**    Schwetschenau states that Navistar's December 2, 2003 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 95.

96.    Navistar also held its Earnings Conference Call on December 2, 2003 to discuss the fourth fiscal quarter 2003. During the call Defendant Lannert discussed the fact that the

Company accrued an additional $11 million into its warranty reserve: "We have strengthened warranty accruals, net $11 million, but we added some considerable amounts of money to warranty accruals and our financial results allowed us to do that in this quarter. You know, it just – **our warranty reserves are now pretty conservative**." (Emphasis added) Defendant Lannert further discussed the reserves in the question and answer session of the conference call when explaining where the expenses for the year were coming from:

> Well, you know, as you go forward in closing in any year, you look at all the reserves and what's appropriate and what isn't. As I said, we strengthened our reserves this year; they are appropriate. Deloitte is very comfortable with the level of reserves and we had the luxury of having enough earnings that we were able to do that at the same time as meet our guidance.

**ANSWER:** Schwetschenau states that Navistar's December 2, 2003 conference call speaks for itself, denies any characterizations of that call, and denies the remaining allegations of Paragraph 96.

97.     Defendant Lannert further clarified Navistar's EPS and truck sales volumes guidance for fiscal 2004, which was based on the levels set for incentive compensation payouts for Navistar executives: "So, the goals for the year, the normal payout for bonuses is right at $2 a share, $2.02 a share in earnings, and the maximum payout at the 304,500 volume level for industry volume is $2.58 a share."

**ANSWER:** Schwetschenau states that Navistar's December 2, 2003 conference call speaks for itself, denies any characterizations of that call, and denies the remaining allegations of Paragraph 97.

98.     Before the market opened on December 15, 2003, Navistar issued a press release announcing its plan to "double in size and become a solidly profitable $15 billion company by the end of the next industrial business cycle..." That release provided guidance of "a first quarter [fiscal 2004] loss of between ($0.40) and ($0.50) per diluted common share."

**ANSWER:** Schwetschenau states that Navistar's December 15, 2003 press release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 98.

**B.     The 2003 Form 10-K**

99.     On December 19, 2003, Navistar issued its 2003 Form 10-K for the fiscal year ended October 31, 2003 (the "2003 10-K"), which substantially reiterated the financial results disclosed on December 2, 2003 and included the Company's financial statements, as audited by

Deloitte, and also included Deloitte's unqualified audit opinion. The 2003 10-K was signed by each of the Individual Defendants. Importantly, the 2003 10-K included an income statement that was subsequently restated substantially, as set forth below (paragraph 113(C)).

**ANSWER:**     Schwetschenau states that Navistar's 2003 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 99.

100.     In the MD&A section of the 2003 10-K, Navistar discussed the results of its operations for the year, which included a discussion of the Company's retirement benefit expenses, other charges related to the Company's restructuring plans and noted a "continued focus on reducing expenses." These statements were false and misleading in that any expense reductions were the product of Defendants' improper manipulations of, *inter alia*, its accounting for employee benefits and restructuring charges:

> Postretirement benefits expense of $297 million in 2003 increased $69 million and $126 million over the $228 million and $171 million in 2002 and 2001, respectively. The increase is a result of higher pension and health care obligations combined with lower return on invested assets, as well as, higher amortization expense due to significant unrecognized actuarial losses in 2002 and 2001. These increases were partially offset by the effects of a required change in how certain cumulative gains and losses are amortized into income. **In fiscal 2003, due to the Plan of Restructuring initiatives substantially all of the participants in the company's pension plans became inactive. Accordingly, cumulative unrecognized gains and losses related to pension benefits will be amortized over the remaining life expectancy of the participants in the plans, 18 years in 2003. In 2002, amortization of unrecognized gains and losses was amortized over the future years of expected service of active employees of 12 years. The change in amortization period reduced pension expenses by $26 million in 2003. In 2003, amortization expense related to pensions was $70 million while the amortization for other benefit plans was $58 million.** The unrecognized actuarial net losses related to pension benefits were $1,281 million, $1,179 million and $752 million, respectively, as of October 3l, 2003, 2002 and 200l. Unrecognized net losses related to other benefits were $l,025 million, $l,019 million and $879 million, respectively, as of October 31, 2003, 2002 and 2001.

* * *

> Selling, general and administrative (SG&A) expense of $487 million in 2003 is 7% lower than the $521 million in 2002 and 10% lower than the $543 million reported in 2001. **The decrease in 2003 is due to continued focus on reducing expenses**.

(Emphasis Added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 100.

101.    In Note 10, "Other Liabilities," to the financial statements in the 2003 10-K, Navistar disclosed its major classifications of other liabilities, several of which were restated, notably, product liability and warranty, post retirement benefits, and restructuring and other non-recurring charges:

Major classifications of other liabilities at October 31 are as follows:

| Millions of dollars | 2003 | 2002 |
|---|---|---|
| Product liability and warranty | $   253 | $   273 |
| Employee incentive programs | 26 | 26 |
| Payroll, commissions and employee-related benefits | 63 | 79 |
| Postretirement benefits liability | 294 | 282 |
| Dealer reserves | 22 | 21 |
| Taxes | 235 | 206 |
| Sales and marketing | 56 | 41 |
| Long-term disability and workers' compensation | 52 | 48 |
| Environmental | 8 | 10 |
| Interest | 30 | 34 |
| Restructuring and other non-recurring charges | 157 | 296 |
| Other | 270 | 260 |
| Total other liabilities | 1,466 | 1,576 |
| Less current portion | (911) | (1,029) |
| Other long-term liabilities | $   555 | $   547 |

**ANSWER:**    Schwetschenau states that Navistar's 2003 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 101.

### (i)    Employee Benefit Arrangements

102.    In discussing the Company's Accounting Policies, Navistar explained in the MD&A section of the 2003 10-K how it established the discount rate used for its pension benefits. The following disclosure was materially false and misleading in that the Company acknowledged in the 2005 Restatement and Re-Audit that the changes noted below to the discount rate used were "not supported":

The company's approach to establishing the discount rate assumption reflects an investment strategy that effectively settles a portion of its pension liability by investing in a bond portfolio that generates monthly cash flows equal to the projected monthly benefits. This portion of the liability is weighted using a discount rate based on the October 31, 2003 effective yield on the dedicated bond investment portfolio. The remaining non-dedicated portion of the liability used the average of the October 31, 2003 yields on the Merrill Lynch Ten Year + High Quality Corporate Bond Index and Moody's AA Corporate Bond Index, both adjusted for an incremental yield of approximately 50 basis points that is achieved

by selecting bonds whose credit characteristics satisfy the quality requirements projected monthly benefits.  This portion of (e.g.  Aa3/AA- or better) but whose yields are slightly higher than the "normal" bonds that comprise the index.  For the other benefits, the discount rate is based on the Merrill Lynch Ten Year + High Quality Corporate Bond Index and Moody's AA Corporate Bond Index with a provision for an incremental yield.

**Based on this approach, at October 31, 2003, the company lowered the discount rate for pension plans to 6.2% from 7.2% at October 31, 2002.  The discount rate for the other benefits was lowered from 7.1% at October 31, 2002 to 6.6% at October 31, 2003.**
(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 102.

103.    In Note 2 to the financial statements within the 2003 10-K, Navistar discussed Postretirement Benefits, describing further what benefits were provided, and to whom.  Included in the discussion quoted below were the Company's pension expenses for 2003, which were grossly understated, and the assumptions for pension accruals, which were unsupportable:

The cost of postretirement benefits is segregated as a separate component on the Statement of Income and is as follows:

| Millions of dollars | 2003 | 2002 | 2001 |
|---|---|---|---|
| Pension expense | $ 113 | $  77 | $  46 |
| Health/life insurance | 184 | 151 | 125 |
| Total postretirement benefits expense | $ 297 | $ 228 | $ 171 |

\*                              \*                              \*

The weighted average rate assumptions used in determining expenses and benefit obligations were:

| | Pension Benefits | | | Other Benefits | | |
|---|---|---|---|---|---|---|
| | 2003 | 2002 | 2001 | 2003 | 2002 | 2001 |
| Discount rate used to determine present value of benefit obligation at end of year | 6.2% | 7.2% | 7.4% | 6.6% | 7.1% | 7.4% |
| Expected long-term rate of return on plan assets at beginning of year | 9.0% | 10.1% | 9.9% | 9.0% | 11.0% | 10.8% |
| Expected rate of increase in future compensation levels | 3.5% | 3.5% | 3.5% | N/A | N/A | N/A |

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 103.

    **(ii)    Liability Reserves and Contingencies**

104.    Under the "Item 3.  Legal Proceedings," section of the 2003 10-K, Navistar falsely represented that despite being subject to various legal claims, none will "have a material

adverse affect on the business or the financial condition of the [C]ompany" in light of "established reserves":

> The company and its subsidiaries are subject to various claims arising in the business, and are parties to various legal proceedings that constitute ordinary routine litigation incidental to the business of the company and its subsidiaries. The majority of these claims and proceedings relate to commercial, product liability and warranty matters. In the opinion of the company's management, the disposition of these proceedings and claims, after taking into account established reserves and the availability and limits of the company's insurance coverage, will not have a material adverse affect the business or the financial condition of the company.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 104.

105.    Under the Critical Accounting Policies heading of the MD&A section, Navistar explained how it established litigation and liability reserves. The following disclosure was materially false and misleading in that it is contradicted by the Company's acknowledgment in the 2005 Restatement and Re-Audit that, *inter alia*, it used an "arbitrary" process for determining reserves related to asbestos liabilities:

> The company is subject to product liability lawsuits and claims in the normal course of business. To the extent permitted under applicable law, the company maintains insurance to reduce the risk to the company. Most insurance coverage includes self-insured retention. The company records product liability reserves for the self-insured portion of any pending or threatened product liability actions. The reserve is based upon two estimates. First, management determines an appropriate case specific reserve based upon management's best judgment and the advice of legal counsel. These estimates are continually evaluated and adjusted based upon changes in facts or circumstances surrounding the case. Second, management obtains a third party actuarial analysis to determine the amount of additional reserve required to cover certain known claims and all incurred but not reported product liability issues. Based upon this process management believes that the product liability reserve is appropriate...

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 105.

### (iii)    Restructuring Charges

106.    The Company discussed in the MD&A section of the 2003 10-K the restructuring charges from the 2000 and 2002 Restructuring Plans. In this discussion, the Company falsely represented that the restructuring efforts "are expected to generate at least $70 million of annualized savings for the company, primarily from lower salary and benefit costs and plant operating," despite the fact that any reported cost savings were only the result of Defendants' improper accounting for its restructuring costs.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 106.

### (iv)    Leases

107.    In Note 14 to the financial statements in the 2003 10-K, Navistar discussed its leases, including its expenses for operating leases, which the Company acknowledged in the 2005 Restatement and Re-Audit were materially understated due to the Company's improper classification of operating leases as capital leases. The following disclosure falsely understates the proportion of the Company's leases that were capital leases:

> The majority of the company's lease payments are for operating leases. At October 31, 2003, future minimum lease payments under operating leases having lease terms in excess of one year, including the net lease payments accrued for in the restructuring and other non-recurring charges, are: 2004 - $107 million, 2005 $97 million, 2006 - $94 million, 2007 - $86 million, 2008 - $76 million and 2009 and thereafter - $57 million. Total operating lease expense was $131 million in 2003, $71 million in 2002 and $44 million in 2001. Income received from sublease rentals was $1 million in 2003 and $5 million in both 2002 and 2001.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 107.

### (v)    Product Warranty Issues

108.    In Note l4 to the financial statements in the 2003 10-K, Navistar discussed its methods for establishing product warranty reserves, which were grossly understated, as the Company was not reporting a significant portion of its actual warranty expenses, and included a table representing that the product warranty reserve of $173 million had declined by $12 million during fiscal 2003:

**Product Warranty**

> Provisions for estimated expenses related to product warranty are made at the time products are sold. These estimates are established using historical information about the nature, frequency and average cost of warranty claims. Management actively studies trends of warranty claims and takes action to improve vehicle quality and minimize warranty claims. Management believes that the warranty reserve is appropriate; however, actual claims incurred could differ from the original estimates, requiring adjustments to the reserve.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 108.

### (vi)    Disclosure and Internal Controls

109.    In Item 9A. "Controls and Procedures," the Company falsely represented that its disclosure controls were "effective" and "provide reasonable assurance that information required to be disclosed by the company, including its consolidated subsidiaries, in reports that the company files or submits under the Exchange Act is recorded, processed, summarized and reported on a timely basis in accordance with applicable rules and regulations..." Nonetheless, the Company disclosed that it lacked "formalized or documented" controls and procedures.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 109.

110.    Defendant Ustian and Defendant Lannert signed the Statement of Financial Reporting Responsibility in the 2003 10-K acknowledging that (i) the financial statements were presented in accordance with GAAP, (ii) management was responsible for the establishment and maintenance of the Company's internal controls, and (iii) these controls were adequate:

> Management of Navistar International Corporation and its subsidiaries is responsible for the preparation and for the integrity and objectivity of the accompanying financial statements and other financial information in this report. *The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America* and include amounts that are based on management's estimates and judgments.

> The accompanying financial statements have been audited by Deloitte & Touche LLP, independent auditors.  Management has made available to Deloitte & Touche LLP all the company's financial records and related data, as well as the minutes of the board of directors' meetings.  Management believes that all representations made to Deloitte & Touche LLP during its audit were valid and appropriate.  The system of internal controls, which provides for appropriate division of responsibility, is supported by written policies and procedures that are updated by management, as necessary.

> *Management is responsible for establishing and maintaining a system of internal controls* throughout its operations that provides reasonable assurance as to the integrity and reliability of the financial statements, the protection of assets from unauthorized use and the execution and recording of transactions in accordance with management's authorization.  *Management believes that the company's system of internal controls is adequate to accomplish these objectives.*

(Emphasis added)

**ANSWER:**    Schwetschenau states that Navistar's 2003 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 110.

111.    Defendants Ustian and Lannert also signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, inter alia, that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this report fairly presents in all material respects, the financial condition of the results of the Company."  These certifications were substantially the same as those contained in the Company's Q1 2003 10-Q, quoted above.

**ANSWER:**    Schwetschenau states that Navistar's 2003 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 111.

### (vii) Deloitte's Audit Opinion

112.    Defendant Deloitte signed the Independent Auditor's Report expressing an unqualified opinion that Navistar's financials were presented in accordance with GAAP and that Deloitte conducted an audit in conformity with GAAS:

> *We conducted our audits in accordance with auditing standards generally accepted in the United States of America.*  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such consolidated financial statements *present fairly, in all material respects, the financial position of Navistar International Corporation* and Consolidated Subsidiaries at October 31, 2003 and 2002, and the results of their operations and their cash flow for each of the three years in the period ended October 31, 2003, *in conformity with accounting principles generally accepted in the United States of America*.

(Emphasis added)

**ANSWER:**    Schwetschenau states that Deloitte's Independent Auditor's Report speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 112.

### C.    Falsity of Navistar's 2003 Disclosures

113.    Defendants' foregoing statements made during fiscal 2003 or concerning the Company's fiscal 2003 financial results were materially false and misleading, as follows:

(A)    Despite representations to the contrary, the Company's previously reported 2003 audited financial statements and results, including reported net income, EPS, and shareholders' equity, were grossly and materially overstated in violation of GAAP, as those audited financial statements required restatement;

(B)    Despite Defendant Deloitte's representations to the contrary, Navistar's 2003 audited financial statements were not audited in conformity with GAAS, as they required restatement;

(C)    The overstatements contained in Navistar's 2003 audited financial statements are innumerable.  Virtually every line of Navistar's audited 2003 income statement required

restatement, most notably that the Company's 2003 net income was overstated by $312 million. The 2005 10-K included a restated consolidated income statement for 2003, which the Defendants' 2003 results, as follows: reflected the falsity of the Defendants' 2003 results, as follows:

| | As Previously Reported | 2003 Restatement and Reclassification Adjustments | As Restated |
|---|---|---|---|
| **Sales and revenues** | | | |
| Sales of manufactured products, net | $ 7,282 | $ 86 | $ 7,368 |
| Finance revenue | 283 | 44 | 327 |
| Other income | 20 | (20) | — |
| Sales and revenues, net | 7,585 | 110 | 7,695 |
| **Costs and expenses** | | | |
| Cost of products sold | 6,370 | 300 | 6,670 |
| Selling, general and administrative expense | 597 | 306 | 903 |
| Postretirement benefits expense | 297 | (297) | — |
| Engineering and product development costs | 242 | 28 | 270 |
| Restructuring and program termination (credits) charges | (41) | 59 | 18 |
| Interest expense | 142 | 125 | 267 |
| Other expense (income), net | 27 | (91) | (64) |
| Total costs and expenses | 7,634 | 430 | 8,064 |
| Equity in income of non-consolidated affiliates | — | 53 | 53 |
| Income (loss) before income tax | (49) | (267) | (316) |
| Income tax expense | 32 | (49) | (17) |
| Income (loss) from discontinued operations | (4) | 4 | — |
| **Net loss** | $ (21) | $ (312) | $ (333) |
| **Basic loss per share** | $ (0.31) | $ (4.55) | $ (4.86) |
| **Diluted loss per share** | $ (0.31) | $ (4.55) | $ (4.86) |

(D)    Navistar's 2003 audited balance sheet and audited cash flow statement were also overstated as follows:

i.    The Restatement resulted in a $2.4 billion downward adjustment to Navistar's previously reported 2003 Stockholder's equity. The adjustment reduced the previously reported Stockholder's equity balance of $531 million to a deficit of $1.8 billion.

ii.    The Restatement resulted in a $26 million downward adjustment to the cash and cash equivalents originally reported in Navistar's consolidated statement of cash flows for 2003.

iii.    Navistar's 2003 audited financial statements were impacted by the Restatement,

which required adjustments owing to the following matters (discussed in detail in the "Nature of

the Restatement" section below), each of which corrected a previous overstatement of Navistar's

audited 2003 sales or income, before tax, (or both):

| Accounting Matter | Overstatement of Income | Overstatement of Sales |
|---|---|---|
| Employee Benefit Arrangements | $130 million | |
| Product Warranty | $26 million | |
| Leases | $31 million | |
| Consolidation Accounting | $2 million | $43 million |
| Vendor Rebates and Tooling Costs | $31 million | $13 million |
| Liabilities related to contingencies | $49 million | |
| Restructuring activities | $43 million | $3 million |
| Property and equipment | $8 million | |
| Unreconciled accounts and timing of income/expense recognition | | $20 million |
| Financial reporting reclassifications | $4 million | $21 million |

(E) Defendants' substantive disclosures, as set forth above, concerning the Company's application of accounting policies and assumptions for accounting were materially false and misleading in light of the Restatement, as follows:

    i.    Defendants' statements concerning the Company's obligations under the Company's employee benefit programs and the cost savings associated with those obligations were materially false and misleading because Defendants used improper assumptions in calculating those costs and obligations;

    ii.    Defendants' statements concerning the substance and financial impact of the Company's restructuring activities, and in particular the expense reductions associated with those restructuring activities, were materially false and misleading because they failed to abide by the applicable GAAP provisions in accounting for those plans;

    ii.    Defendants' statements concerning the Company's Product Warranty policies and reserves, including Defendant Lannert statements quoted above from the December 2, 2003 conference call, were materially false and misleading because they improperly included expected future product improvements, failed to properly accrue for costs associated with non-warranty repairs, and accrued improperly for anticipated vendor recoveries;

    iv.    Defendants' statements concerning the Company's lease accounting were materially false and misleading because they improperly applied sales accounting to lease transactions and improperly accounted for operating leases; and

v.    Defendants' statements concerning the materiality of litigation and the adequacy of the Company's contingency reserves were materially false and misleading because Defendants failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses;

(F)    Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy were materially false and misleading in light of the restatement and the fifteen different material control weaknesses identified in connection with Navistar's re-audit of the 2003 financial statements; and

(G)    Defendants' substantive disclosures concerning the adequacy of the Company's internal controls were materially false and misleading in light of the fact that the Company had no formal written policy of internal controls.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 113.

**D.    Fiscal Year 2004**

114.    On February 2, 2004, Fitch Ratings issued a report announcing that it was revising its Outlook for Navistar from Negative to Stable.  One of the reasons cited for this change was "the ongoing efforts of Navistar to reduce its cost structure."  Fitch noted "(p)ositive developments over the last year include continuing efforts to manage both the location and cost of the workforce, the agreements concluded regarding the Chatham Ont. Canada facility."  Many of the reductions in Navistar's cost structure noted by Fitch were the direct result of the Defendants' improper accounting manipulations, including the manipulation of the Company's retirement benefit obligations.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 114 and on that basis denies the same.

115.    On February 5, 2004, Deutsche Bank issued a report on Navistar and commented that the Company's plan to increase its profit margins was contingent upon successfully reducing post-retirement benefit expense.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 115 and on that basis denies the same.

**(i)    First Fiscal Quarter 2004 Results**

116.    On February 23, 2004, Navistar issued its first fiscal quarter 2004 earnings release.  According to the earnings release, the first quarter loss of $23 million, or $0.34 per diluted common share was better than had been expected.  The Company's EPS guidance for the first fiscal quarter of 2004 had been a loss of between $0.40 and $0.50 per share.  Consensus EPS estimates were for a loss of $0.45.  Commenting on these results, Defendant Ustian noted that "[e]ven after adjusting for the first quarter volume increase, operating income exceeded our

expectations." Defendant Ustian went on to say that the Company "expect(s) to be solidly profitable for the year through on-going execution of our operating plan, continued realization of variable and fixed cost reductions and quality improvements."

**ANSWER:**     Schwetschenau states that states that Navistar's February 23, 2004

earnings release speaks for itself, denies any characterizations of that document, and denies the

remaining allegations of Paragraph 116.

117.     Navistar also held its first fiscal quarter 2004 earnings call on February 23, 2004. In commenting on the first quarter results, Defendant Ustian noted that the Company was positioned for a strong year:  "The expectations in the market and the guidance that we gave was about 45 cents a share, and we came in at 34 cents.  We think that positions us well to have a strong second, third and fourth quarter, to be very profitable for the year."  During the February 23, 2004, conference call Defendant Lannert provided the following guidance for the second quarter:  "For the second quarter, our profit from continuing operations is targeted to be in the range of 45 to 55 cents a share."

**ANSWER:**     Schwetschenau states that Navistar's February 23, 2004 earnings call

speaks for itself, denies any characterizations of that call, and denies the remaining allegations of

Paragraph 117.

118.     On March 8, 2004, Navistar filed its Form 10-Q for first fiscal quarter of 2004, ended January 31, 2004 (the "Q1 2004 10-Q"), with the SEC.  The Form 10-Q was signed by Defendant Schwetschenau and substantially reiterated the financial results disclosed on February 23, 2004.

**ANSWER:**     Schwetschenau admits that Navistar filed its Q1 2004 10-Q with the SEC,

states that the document speaks for itself, and denies any characterizations of that document.

119.     The MD&A section of the Q1 2004 10-Q indicated that the significant reduction in expenses reported during the quarter was largely the result of "lower postretirement benefits the Company's restructuring plans.  These disclosures were materially false and misleading in that the lower postretirement benefit expense and any savings from the plans of restructuring were the product of Defendants' improper expense" and disclosed the anticipated effects of accounting manipulations:

> Total expenses decreased as a result of cost saving initiatives and lower postretirement benefits expense.  The decrease in postretirement benefits expense was attributable to lower amortization expense and an increase in the return on plan assets, partially offset by an increase in expense due to the change in the discount rate.

*      *      *

The initiatives for the Plans of Restructuring are expected to generate at least $70 million of annualized savings for the company, primarily from lower salary and benefit costs and plant operating costs.  The company will continue to realize these benefits in 2004 and beyond.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 119.

120.    The Q1 2004 10-Q falsely stated that FIN 46, the FASB pronouncement related to consolidation of VIEs, had no effect on the Company's accounting, because the Company had no interest in any VIEs "as defined within this interpretation."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 120.

121.    The Q 1 2004 10-Q included a disclosure regarding consolidation accounting in its "Summary of Accounting Policies," noting that "(t)he effects of transactions between the manufacturing and financial services operations have been eliminated to arrive at the consolidated totals."  Contrary to this materially false and misleading statement, in the 2005 Restatement and Re-Audit, Defendants acknowledged that during the Class Period Navistar's "intercompany accounts were not properly reconciled."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 121.

122.    In Note H of the Q1 2004 10-Q, Navistar discussed the Restructuring and Other Non-Recurring Charges.  The discussion, addressed, *inter alia*, the impact of the Company's decision in 2003 to keep the Chatham facility open and was significantly the same as the materially false and misleading statement quoted above from the 2003 10-K.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 122.

123.    In Note K of the Q1 2004 10-Q, Navistar discussed Product Warranty, noting that "[m]anagement believes that the warranty reserve is appropriate," and included a disclosure substantially the same as that quoted above from the 2003 10-K.

**ANSWER:**    Schwetschenau states that Navistar's Q1 2004 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

123.

124.    In the MD&A of the Q1 2004 10-Q, the Company discussed the status of pending legal proceedings, noting that one of the claims or proceedings are material, after "taking into account established reserves."  The Q1 2004 10-Q also contained false and misleading statements that were substantially similar to those quoted above from the 2003 10-K.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 124.

125.    Navistar's Q1 2004 10-Q also contained a materially false and misleading disclosure of management's assessment of disclosure controls and procedures, noting that both Defendant Ustian and Defendant Lannert found that these controls and procedures were adequate, even though they had not been formalized or committed to writing:

> The company's principal executive officer and principal financial officer, along with other management of the company, evaluated [and] concluded that, as of January 31, 2004, the disclosure controls and procedures in place at the company were…effective…[T]he company has established a disclosure committee and is in the process of formalizing and documenting the controls and procedures already in place.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 125.

126.    Finally, the Q1 2004 10-Q included certifications signed by Defendants Ustian and Lannert pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, *inter alia* that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this report fairly presents in all material respects, the financial condition of the results of the Company."  The text of these certifications was substantially the same as those quoted above from the Q1 2003 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q1 2004 10-Q speaks for itself and

denies any characterizations of that document.

127.    Defendants' foregoing statements made during the fiscal first quarter of 2004 or concerning the Company's fiscal first quarter of 2004 financial results were materially false and misleading, for the same reasons Defendants' statements made in 2003 on the same matters were materially false and misleading, as set forth above in paragraphs 82 and 113.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 127.

### (ii)    Second Fiscal Quarter of 2004 Results

128.    Before the market opened on May 20, 2004, Navistar issued its second fiscal quarter 2004 earnings release, reporting a profit for the three and six months ended April 30, 2004.  "The [C]ompany said it earned $41 million, equal to $0.54 per diluted common share, in the three months ended April 30, 2004."  This was at the very top end of the Company's previous guidance for second quarter earnings of $0.45-$0.55 per share and slightly below consensus estimates of $0.59 per share.

**ANSWER:**    Schwetschenau states that Navistar's May 20, 2004 earnings release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 128.

129.     In the May 20, 2004 earnings release, Navistar guided investors regarding the expected earnings for third fiscal quarter 2004: "the [C]ompany anticipates earnings for the quarter ended July 31, 2004, to be in the range of $0.60 to $0.70 per diluted common share."

**ANSWER:**     Schwetschenau states that Navistar's May 20, 2004 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 129.

130.     In reaction to the earnings release and the earnings call, analysts were impressed with Navistar's ability to report an improved (lower) operating cost, but expressed some concern about the guidance for the third quarter and the Company's failure to see an improvement in gross margin.  These comments put additional pressure on Defendants to continue to report increasing profit and decreasing costs, while forcing them to acknowledge that their performance in these areas would be closely scrutinized:

(A)     Credit Suisse First Boston, John McGinty, May 20, 2004 Report - "While [the earnings] numbers were solid, the problems arose in the guidance... [G]uidance for the third quarter was pegged at $0.60-0.70 a share compared to a consensus estimate of $0.99 a share." Mr. McGinty went on to comment on the earnings noting that "[o]verall, to achieve the earnings they did with this headwind speaks to a pretty impressive cost performance."

(B)     Prudential Financial, Andrew Casey, May 21, 2004 Report - "Given that a large portion of the investment thesis for NAV has been improved cost structure that should provide earnings leverage to improved volumes, the underperformance on the gross profit line was disappointing."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 130 and on that basis denies the same.

131.     Bear Stearns analyst Peter Nesvold, in a May 21, 2004 Report, also focused on the Company's margin and costs, noting that despite disappointing SG&A (selling, general and administrative expenses) "[o]ther overhead items were better than we expected."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 131 and on that basis denies the same.

132.     On June 9, 2004, Navistar filed its Form 10-Q for the quarter ended April 30, 2004 with the SEC (the "Q2 2004 10-Q").  This Form 10-Q was signed by Defendant Schwetschenau and substantially reiterated the financial results issued on May 20, 2004.

**ANSWER:**     Schwetschenau admits that Navistar filed its Q2 2004 10-Q with the SEC, states that the document speaks for itself and denies any characterizations of that document.

133.    The Q2 2004 10-Q, contained materially false and misleading statements that were substantially the same as those quoted above from the 2003 10-K or the Q1 2004 10-Q concerning consolidation accounting, the impact of FIN 46, product warranty reserves, "lower postretirement benefits expense," "Restructuring and Other Non-Recurring Charges," and the status of pending legal proceedings.

   **ANSWER:**    Schwetschenau denies the allegations of Paragraph 133.

134.    The MD&A section of the Q2 2004 10-Q highlighted the cost savings achieved due to "lower postretirement benefits expense."  The following statement was materially false and misleading as any reported cost savings were the product of Defendants' improper accounting manipulations: "The reduction in year to date total expenses continues to show the effects of our cost saving initiatives and lower postretirement benefits expense."

   **ANSWER:**    Schwetschenau denies the allegations of Paragraph 134.

135.    Navistar's Q2 2004 10-Q contained a disclosure of management's assessment of disclosure controls and procedures noting that both Defendant Ustian and Defendant Lannert found that these controls and procedures were adequate.  The disclosure was substantially the same as the disclosure contained in the Company's Q1 2004 10-Q, quoted above, and was materially false and misleading for the same reasons.

   **ANSWER:**    Schwetschenau denies the allegations of Paragraph 135.

136.    The Q2 2004 10-Q included certifications of review and compliance pursuant Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Ustian and Lannert, that were substantially the same as those contained in the Company's Q1 2003 10-Q, quoted.

   **ANSWER:**    Schwetschenau states that Navistar's Q2 2004 10-Q speaks for itself and

denies any characterizations of that document.

137.    Defendants' foregoing statements made during the fiscal second quarter of 2004 or concerning the Company's fiscal second quarter of 2004 financial results were materially false and misleading, for the same reasons Defendants' statements in 2003 and during the first fiscal quarter of 2004 were materially false and misleading, as set forth above in paragraphs 82 and 113.

   **ANSWER:**    Schwetschenau denies the allegations contained in Paragraph 137.

   **(iii)    Third Fiscal Quarter 2004 Results**

138.    On July 12, 2004, an interview with Defendant Ustian was published by the Wall Street Transcript.  In the interview, Defendant Ustian was questioned about Navistar's financial strength.  In answering the question, Defendant Ustian noted that post-retirement cost was Navistar's biggest challenge: "In our company, we have maybe $300 million of post-retirement

cost, and our competitors would have only about $20 million or $30 million. Our biggest challenge is to find ways to de that much better than others in order to overcome our huge post-retirement costs."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 138 and on that basis denies the same.

139.    Before the market opened on August 19, 2004, Navistar issued its third fiscal quarter earnings release. According to the press release Navistar "reported substantially improved earnings for its third fiscal quarter and said that based on the current outlook, earnings for the fiscal year ending October 31, 2004, are on track to meet or exceed $2.95 per diluted common share." Navistar reported net income for the third fiscal quarter of $56 million, or $0.73 per diluted common share. This reported net income was higher than the guidance the Company had previously given of $0.60 to $0.70 diluted EPS and better than analysts' consensus EPS estimates of $0.68.

**ANSWER:**    Schwetschenau states that Navistar's August 19, 2004 earnings release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 139.

140.    Navistar also held its earnings conference call on August 19, 2004. In the earnings call Defendant Lannert discussed guidance for fiscal 2004, specifically discussing post-retirement costs and the potential for the Company's pension to provide an income source that would offset retiree healthcare expenses:

> Regarding post-retirement costs going forward, our plans generally are aimed at turning current pension costs into a small profit over the next few years. I would expect that retiring healthcare costs will generally increase with healthcare inflation. But net net between pension and healthcare you could see stability in the numbers or maybe even a slight decrease in the numbers going forward...

**ANSWER:**    Schwetschenau states that Navistar's August 19, 2004 earning conference

call speaks for itself, denies any characterizations of that call, and denies the remaining

allegations of Paragraph 140.

141.    Defendants' manipulations of Navistar's post-retirement costs were clearly material to investors and securities analysts, and were perceived as critical to the Company's profitability and growth, as follows:

(A)    On August 20, 2004 Bear Stearns analyst Peter Nesvold issued a report on Navistar's third fiscal quarter earnings release. Nesvold attributed a significant portion of the Company's third fiscal quarter 2004 earnings to the reduced costs associated with the

Company's payments into employee benefit plans: "NAV's post-retirement expense was $0.15/share lower than we expected."

(B)    Credit Suisse First Boston analyst John McGinty also issued a report on August 20, 2004. The report noted that McGinty also believed that Navistar's lower employee benefit costs were a significant driver of the Company's earnings: "[B]elow the line savings are real and sustainable. The retiree benefit costs have come down from $293 million to $215 million – and will likely stay there."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of subparagraphs (A) and (B) of Paragraph 141 and on that basis denies the same. Schwetschenau denies the remaining allegations of Paragraph 141.

142.    On September 10, 2004, Navistar filed its Form 10-Q for the quarter ended July 31, 2004 with the SEC (the "Q3 2004 10-Q"). This Form 10-Q was signed by Defendant Schwetschenau and substantially reiterated the financial results issued on August 19, 2004.

**ANSWER:**    Schwetschenau admits that Navistar filed its Q3 2004 10-Q with the SEC, states that the document speaks for itself, and denies any characterizations of that document.

143.    The Q3 2004 10-Q contained materially false and misleading statements that were substantially similar to those quoted above from the 2003 10-K or the Q1 2004 10-Q concerning consolidation accounting, product warranty reserves, "Restructuring and Other Non-Recurring Charges," "postretirement benefits" and the status of pending legal proceedings.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 143.

144.    The MD&A section of the Q1 2004 10-Q highlighted the cost savings achieved due to "lower postretirement benefits expense": "[T]otal expenses continue to show the effects of our cost saving initiatives and lower postretirement benefits expense."

**ANSWER:**    Schwetschenau states that Navistar's Q1 2004 10-Q speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 144.

145.    Navistar's Q3 2004 10-Q contained a disclosure of management's assessment of disclosure controls and procedures, noting that both Defendant Ustian and Defendant Lannert found that these controls and procedures were adequate. The disclosure was substantially the same as the disclosure contained in the Company's Q1 2004 10-Q, quoted above.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2004 10-Q speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 145.

146.    The Q3 2004 10-Q included certifications of review and compliance pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, signed by Defendants Ustian and Lannert, that were substantially the same as those contained in the Company's Q1 2003 10-Q, quoted above.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2004 10-Q speaks for itself and denies any characterizations of that document.

### (iv)    Fourth Fiscal Quarter and :2004 Results

147.    On October 21, 2004, after the close of the financial markets, Navistar issued a Form 8-K announcing that it had received a request from the SEC regarding its pension fund accounting and stating that it would comply with the request.

**ANSWER:**    Schwetschenau states that Navistar's October 21, 2004 Form 8-K speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 147.

148.    Bear Stearns analyst Peter Nesvold issued a report on October 22, 2004 concerning Navistar's disclosure of the SEC request.  Nesvold wrote that "NAV is the sixth company (after GM, Ford, Boeing, Delphi, and Northwest) to disclose a request as part of the SEC's recent inquiry."  Based on Navistar's disclosures and Nesvold's analysis of other factors he concluded that none of Navistar's key pension accounting assumptions "feels aggressive."

**ANSWER:**    Schwetschenau without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 148 and on that basis denies the same.

149.    On December 6, 2004, Navistar issued a press release announcing that its earnings for the fiscal fourth quarter ended October 31, 2004 "are expected to be at least $148 million, equal to $1.88 per diluted common share."  The Company said that these "earnings should be the highest for any quarter in [C]ompany history as it returned to full-year profitability for the first time since 2000."  However, Navistar did not release any final numbers in this press release since those results were "pending the outcome of an anticipated adjustment from the application of certain accounting standards at the [C]ompany's finance subsidiary."  The Company's announced fourth quarter EPS of $1.88 was better than analysts' consensus EPS estimates of $1.80.  The Company's announced expected fiscal 2004 EPS of $3.07 was better than the Company's guidance of $2.95 (as revised upward on August 19, 2004) and better than then

existing analysts' consensus EPS estimates of $2.97. After the release of these results, but prior to the filing of the Company's 2004 10-K, consensus EPS estimates reached $3.03.

**ANSWER:**    Schwetschenau states that Navistar's December 6, 2004 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 149.

150.    The December 6, 2004 press release included the following statement concerning guidance for first fiscal quarter and full year 2005:

> Ustian said that earnings in 2005 should be in the range of at least $4.60 to $5.00 per diluted common share... Earnings for the three months ending January 31, 2005 ... should be in the area of $0.20 to $0.25 per diluted common share.

**ANSWER:**    Schwetschenau states that Navistar's December 6, 2004 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 150.

151.    Also in the December 6, 2004 press release, Navistar revealed that it was possible that it would restate its financial statements due to an accounting change by Navistar Financial related to retail note securitizations:

> It is anticipated that the re-interpretation of securitization accounting at Navistar Financial Corporation, the [C]ompany's finance subsidiary, will cause Navistar Financial to adjust its income for the periods 2002-2004. **The [C]ompany believes that the anticipated, positive adjustment to net income is likely to be immaterial to the parent company's financial statements...** As a result of Navistar Financial's planned adjustment, it is possible that Navistar International Corporation may restate its financial statements.

(Emphasis added)

**ANSWER:**    Schwetschenau states that Navistar's December 6, 2004 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 151.

152.    On December 6, 2004 Navistar held its earnings briefing and 2004 analyst and investor day. During the earnings conference call, Defendant Lannert discussed two components of warranty expense, the second being an increase in "the [warranty] expense in [the] truck [segment] in order to get ahead of any failures that might occur." Defendant Ustian then explained this component further in the question and answer portion of the briefing:

Typically, under practices in the industry, it's kind of a fixed stale attitude, and therefore, naturally with that is downtime. We have made a focus on uptime in our products with our customers. Now to do that, that means that we have to make an investment in the products that are out there that are suspect. So we may have a challenge - maybe it's 5 percent of the certain parts might be a challenge that we have seen, and we will go out there when they bring any truck in, whether it has proven that or not, we're going to fix it. In fact, in most cases we go out to the customer and say, bring it in. You get an oil change, we will change the component. So that's what is the short-term investment in that. Long-term, of course, it's a positive thing. Our customers have been very happy with that approach, and I think you can see a result on shares that have had a positive effect on it.

**ANSWER:**    Schwetschenau states that Navistar's December 6, 2004 earnings conference call speaks for itself, denies any characterizations of that call, and denies the remaining allegations of Paragraph 152.

153.    The statements in the preceding paragraph: (1) reflect that both Ustian and Lannert had a detailed understanding of the Company's Product Warranty problems; (ii) that they were aware of the impact that product problems (discussed in detail below) were having on the Company's actual warranty expense; and (iii) were materially false and misleading because they failed to disclose the existence of known product problems that were causing the Company's actual product warranty expenses to increase and misrepresented that the Company had properly reserved for product warranty expense, when Navistar was improperly manipulating its reported product warranty expenses.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 153.

154.    According to Bear Stearns analyst Peter Nesvold's December 7, 2004 report, there was a belief that "the delay in the [fiscal fourth quarter] report was due to NAV's auditors' decision Friday to more thoroughly review each past securitization in order to re-evaluate how much financial [services] income should be reported as gain-on-sale vs. on-going. Do not believe issues have arisen, but anticipate auditors will require NAV to report more income via gains on sale making EPS lumpier."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 154 and on that basis denies the same.

155.    Analysts were concerned about the failure of Navistar to increase the Company's margins and noted that the Company's warranty costs were a significant factor. Enskilda Securities published a report on December 7, 2004 stating that Navistar's "operating leverage was on the weak side. Despite sales growth of some 50% in the last fiscal quarter, Navistar's gross margin declined... The main reason is the increase in warranty costs." Defendants were

thus further on notice that their ability to control and reduce the Company's warranty costs would be a significant driver of the Company's perceived success.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of Paragraph 155 and on that basis denies the

same.

156.     As noted above, beginning on December 6, 2004, Navistar began to make a series of disclosures informing investors of the need for both Navistar Financial (NFC) and Navistar to restate their financial statements (the "2004 Restatement").  The financial effect of these restatement items would ultimately be insignificant, but in the process of announcing the 2004 Restatement Defendants falsely assured investors and securities analysts that Navistar's accounting problems had been fully resolved and that any accounting or internal control issues at the Company were limited to those uncovered in connection with the 2004 Restatement.  In light of the pervasive issues uncovered by, and the financial impact of the adjustments related to the 2005 Restatement and Re-Audit, these disclosures were materially false and misleading.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 156.

157.     On January 7, 2005, Navistar issued a press release announcing that it may be required to restate its financial statements and would "delay the filing of its Form 10-K for the fiscal year ended October 31, 2004, beyond the filing deadline of January 14, 2005:"

> Preliminary unaudited results for the 2004 fiscal year were announced December 6.  At that time, the company said final 2004 financial results would be announced following completion of an analysis of the application of certain accounting standards relating to the securitization of assets at the company's finance subsidiary, Navistar Financial Corporation.

> The primary nature of this analysis has not changed or expanded beyond what was announced in early December.  As previously disclosed, this analysis will cause Navistar Financial Corporation to adjust its financial statements for the periods 2002-2004, *As a result of Navistar Financial's planned adjustment, it is possible that Navistar International Corporation may restate its financial statements.*

> *     *     *

> As soon as practicable following the completion of its analysis the company will file the 2004 Form 10-K with the SEC, which the company anticipates will be on or about January 29, 2005.  Because of the delay in filing the Form 10-K, the company's annual meeting of shareowners, now scheduled for February 15, may be postponed to a later date.

> (Emphasis added)

**ANSWER:**    Schwetschenau states that Navistar's January 7, 2005 press release speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 157.

158.    On January 7, 2005, Bear Stearns analyst Peter Nesvold published a report
commenting that he would view "an expanded re-audit, or a significant restatement, as a material
negative."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 158 and on that basis denies the same.

159.    On January 20, 2005, Navistar issued a press release announcing that it would
reschedule its annual shareholders meeting to March 23, 2005 "to allow time for the [C]ompany
to complete its review of a previously announced audit."

**ANSWER:**    Schwetschenau states that Navistar's January 20, 2005 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 159.

160.    Before the market opened on January 31, 2005, Navistar issued a press release
announcing that it would not file its Form 10-K within the extended filing deadline (of January
29, 2005) and filed a Form 8-K, further explaining the reasons for the delay.  The January 31,
2005 8-K noted for the first time, that in addition to accounting restatements at NFC, that
Navistar had uncovered certain items in its previously issued financial statements that required
restatement:

> **[T]he company concluded on January 28, 2005 that a restatement of its
> financial statements for fiscal years 2002 and 2003 and the first three
> quarters of fiscal 2004 is required.**  As such, those financial statements and any
> related auditor reports should no longer be relied upon because of errors in such
> financial statements.
> Management continues to expect that 2004 earnings, as previously released on a
> preliminary basis in December, will be positively impacted by the restatement.
> Below, in more detail, are descriptions of the adjustments to be made to restate
> the company's financial statements.

*    *    *

Other Prior Period Adjustments

**During 2004, the company [Navistar) began incorporating certain truck
dealerships into its consolidated financial statements.  For the fiscal years**

**ended October 31, 2003 and 2002 and the first three quarters of fiscal 2004, the consolidation of these truck dealerships was not performed appropriately.** The company will fully consolidate these dealerships across the entire restatement period. This consolidation is expected to have a negligible impact on income. **The company identified certain other instances where adjustments were necessary to conform prior period financial statements with GAAP. These adjustments, which are not anticipated to have a significant impact on income for any of the restatement periods, will also be made to correct the financial statements for the periods under review.** (Emphasis added)

  **ANSWER:** Schwetschenau states that Navistar's January 31, 2005 press release and

Form 8-K speak for themselves, denies any characterizations of those documents, and denies the

remaining allegations of Paragraph 160.

  161. On February 1, 2005, Bear Stearns analyst Peter Nesvold issued a report concerning the Company's January 31, 2005 Form 8-K, in which he noted that due to the Company's announced restatement and accounting issues the Company's "credibility [was] at risk."

  **ANSWER:** Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 161 and on that basis denies the same.

  162. Prior to the opening of the financial markets, on February 15, 2005, Navistar issued its fourth quarter and fiscal year 2004 earnings release and filed its Form 10-K for the year ended October 31, 2004 (the "2004 10-K"). Importantly, the 2004 10-K included a disclosure that the SEC had initiated an investigation into the Company's accounting. According to the earnings release, Navistar's fourth quarter net income was $159 million, or $2.02 per diluted common share, above the preliminary results announced by the Company in December 2004 of net income of $148 million, or $1.88 per diluted share:

> Navistar ... today reported that fourth quarter earnings **totaled $159 million, equal to $2.02 per diluted common share. Consolidated sales and revenues for the quarter rose to $3.1 billion, from a restated $2.1 billion a year earlier.**

> The preliminary results were announced in December 2004. At that time, the company said earnings for the fourth quarter were expected to be at least $148 million, equal to $1.88 per diluted common share. Earnings for the full year were expected to be at least $236 million, or $3.07 per diluted common share. **Both fourth quarter and full year earnings and sales and revenues figures exceeded the preliminary figures released in December 2004.**

Earnings for the **full fiscal year ended October 31, 2004 totaled $247 million, or $3.20 per diluted common share, compared with a restated net loss of $21 million, equal to ($0.31) per diluted common share in fiscal 2003.**

Sales and revenues for the year ended October 31, 2004, rose to $9.7 billion from a restated $7.6 billion a year earlier, marking the first time in the company's history that sales and revenues topped S9 billion.

(Emphasis added)

**ANSWER:**    Schwetschenau states that admits Navistar's 2004 10-K and its February 15, 2005 earnings release speak for themselves, denies any characterizations of those documents, and denies the remaining allegations of Paragraph 162.

163.    Peter Nesvold of Bear Stearns published a report prior to the Company's February 16, 2006 conference call in which he discussed the 2004 Restatement and noted that even with the disclosure of the SEC investigation (discussed in the following section), the filing of Navistar's and NFL's 10-Ks was positive in that it put the concerns about Navistar's accounting to rest:

> ● NAV quantified the impact to earnings from its restatement.  When NAV first announced that it was delaying its F4Q:04 report, the company said it was reviewing past accounting for securitizations, and, most likely, the restatement would only be material to NAV's U.S.  financial services subsidiary, Navistar Financial Corporation (NFC), and that NAV (parent) would most likely not have to restate its financial statements.  **At the time of the NAV's last 10-K filing delay, on January 31, NAV announced that the restatement would be large enough to require NAV (parent) to restate: its financials, in addition to NFC. Additionally, because NAV's books were being opened up for review, all of the company's past accounting practices were also being reviewed, and the company would also restate its accounting for certain owned dealerships, and, potentially, other items as well.  As a result of its 10-K filing yesterday, its appears no other major accounting came up in the restatement process.** Additionally, NAV restated earnings downward **by a relatively modest $0.04 per share in 2003 and $0.04 per share in 2002** – primarily due changes in its accounting for securitizations (discussed in further detail below).

(Emphasis added)

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 163 and on that basis denies the same.

164.    On February 16, 2005, Navistar held its fourth quarter earnings call.  Defendant Schwetschenau discussed the 2004 Restatement items affecting Navistar's financial statements,

the restatement related to the securitization of receivables affecting NFC and Navistar, and the positive impact of the Company's efforts to reduce its operating and employee benefit costs and then (falsely) declared that all potential accounting issues had been resolved:

> Let me spend a few minutes discussing the restatement. As you know, in December, Navistar Financial, our finance subsidiary, determined it was necessary to restate its financial statements for the fiscal years 2002 and 2003, and the first 3 quarters of 2004. **As Navistar International Corporation, the parent company, reviewed the financial statements, it – it determined that it also needed to restate for the same periods.** In addition to impact of the NFC restatement, the parent company included additional adjustments in its restatement. We fully consolidated the fiscal – the financials for the Company-owned dealerships in transition for 2002 and 2003. In 2004, we had begun to fully consolidate these dealerships, so we have – so you've already seen some of that impact in our financials. The net income impact of this consolidation is not material, but there are adjustments that are important to the revenue, cost of goods sold and SG&A expense for the periods restated. **We identified certain other instances where adjustments were not – not necessary – were necessary, excuse me, to conform prior periods with GAAP.** The net impact of these items was approximately $5 million, a $5 million net increase to retained losses at the beginning of 2002. During the process of restatement, we also made adjustments for other items that did not materially impact the net income during the periods of the restatement.

> **We have significantly improved the operating cash flow of the Company through an improved cost structure that results in increased earnings, lower pension contributions** and continued use of our NOLs. This is consistent with our previous forecasts, and we expect to continue to generate significant cash balances throughout the period of increasing production and improving cost structure during this cycle....

> **In conclusion, by filing our Form 10-K we are now current with all required filings. All of the potential challenges that we identified previously are behind us.**

> (Emphasis added)

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 164.

165.    On February 17, 2005, Bear Stearns analyst Peter Nesvold published a report discussing the Company's conference call and 2004 10-K. Nesvold noted that the Defendants' statements, including Deloitte's "clean audit opinion," removed any uncertainty and satisfied investors' doubts about Navistar's accounting:

> **We don't think that investors are still concerned about the re-audit; an auditors' unqualified opinion after a re-audit, in this day and age, is probably as close as you're going to get to a thumbs up from the accountants.**

Based on the types of questions that we receive, investors appear to be more concerned about NAV's company-specific ability to deliver clean reports, or continued industry-wide pricing pressures weighing in on NAV's ability to pass through rising materials costs.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 165 and on that basis denies the same.

### E.    The 2004 Form 10-K

#### (i)    The 2004 Restatement

166.    The 2004 10-K disclosed the nature of the 2004 Restatement which affected Navistar's previously disclosed consolidated results for 2002, 2003 and the first three quarters of 2004.  As detailed below, the 2004 Restatement caused Navistar's previously reported net losses in 2002 and 2003 to increase by $2 million and $4 million, respectively.

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 166.

167.    In discussing the 2004 Restatement, the Company identified that it was caused by the misapplication of GAAP "in the accounting for retail note securitizations" by NFC, as consolidated onto Navistar's books for 2002, 2003 and the first three quarters of 2004.  This misapplication required both NFC and Navistar to restate their financial statements for those periods.

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 167.

168.    In its 2004 Form 10-K, filed with the SEC on February 15, 2005, Navistar Financial disclosed that the restated items were the result of certain internal control weaknesses, notably the lack of sufficient personnel with technical accounting expertise, which was identified as a material control weakness at Navistar in connection with the 2005 Restatement and Re-Audit:

The Corporation's [NFC] principal executive officer and principal financial officer, along with other management of the Corporation, reviewed and tested the Corporation's disclosure controls and procedures...  Based on that evaluation, [they] concluded that, as of October 31, 2004, **there were material weaknesses in the Corporation's disclosure controls and procedures** related to (1) a **misapplication of GAAP** related to securitization accounting and an associated lack of timely resolution of outstanding reconciling items in certain collection accounts; and **(2) the lack of sufficient specialized securitization accounting personnel.**  The material weakness related to the misapplication of GAAP and

resolution of outstanding reconciling items have been corrected in these statements.

* * *

Management has strengthened its controls and procedures over the application of accounting standards and is in the process of adding specialized securitization accounting personnel.  **Therefore management believes that the circumstances resulting in the misapplication of GAAP will not reoccur.**

(Emphasis added)

**ANSWER:**    Schwetschenau admits that Navistar Financial filed its 2004 Form 10-K with the SEC, states that the document speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 168.

169.    Importantly, Navistar disclosed that the restatement of NFC's results caused it to review certain of its own audited financial results, which it would also be restating.  The Company's disclosure indicated that these adjustments, which were known but "previously immaterial" were required to conform "prior periods' [fina]ncial statements with GAAP."  The 2004 Restatement items related to accounting matters that went unresolved and that affected items in the 2005 Restatement and Re-Audit.  These matters included adjustments from a $27 million overstated expense accrual related to "employee plans" (related to the "Employee Benefits" matters in the 2005 Restatement and Re-Audit) and a $22 million understatement of accounts payable at its Mexican operations (related to the "Unreconciled Accounts/Timing of Income or Expense Recognition" matters in the 2005 Restatement and Re-Audit) and the failure to appropriately consolidate majority owned truck dealerships (related to the "Consolidation Accounting" matters in the 2005 Restatement and Re-Audit):

In addition to the adjustments described above, certain other adjustments, previously deemed immaterial, were also recorded for the years ended October 31, 2003 and 2002.  **These adjustments are necessary to conform prior periods financial statements with GAAP.**  For amounts recorded prior to 2002, the company identified that it had **understated the amount of its trade payables at its Mexican truck assembly facility by approximately $22 million and that certain accruals relating to employee plans were overstated by approximately $27 million.**  These two adjustments resulted in a $5 million net increase to retained loss as of the beginning of fiscal 2002.

In addition, **accounting standards relating to the consolidation of majority owned truck dealerships were not previously applied appropriately.**  In fiscal 2002, such dealerships were accounted for under the equity method of accounting whereas consolidating these dealerships was the appropriate treatment.  The company has reviewed the timing of when it obtained a controlling interest of such dealerships and has incorporated their financial information within the

company's restated consolidated financial statements for the appropriate periods. **The consolidation of such dealership information had no impact on the company's overall results of operations or equity for any period.** However, it did significantly increase sales and revenues, costs of products and services sold and selling, general and administrative expense on the company's Statement of Income, while also increasing inventory and manufacturing debt on the company's Statement of Financial Condition. These increases are included in the restated financial information for the fiscal years ended October 31, 2003 and 2002.

(Emphasis added)

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 169.

### (ii)    The 2004 Audited Financial Statements and Substantive Disclosures

170.    The 2004 10-K included the Company's financial statements, as audited by Deloitte, and also included Deloitte's unqualified audit opinion. The 2004 10-K was signed by each of the Individual Defendants. Importantly, the 2004 10-K included the income statement set forth below (paragraph 185(C)), which was subsequently restated substantially. The 2004 10-K also included the balance sheet set forth below (paragraph 185(D)), which was subsequently restated substantially and included the impact of the 2004 Restatement.

**ANSWER:**    Schwetschenau admits that Navistar's 2004 10-K included Deloitte's

unqualified audit opinion, states that the 2004 10-K speaks for itself, denies any characterizations

of that document, and denies the remaining allegations of Paragraph 170.

171.    In the MD&A section of the 2004 10-K, Navistar discussed the results of its operations for the year, which included a discussion of the Company's cost structure, including the increase in warranty expense. These statements were false and misleading in that any expense reductions were the product of Defendants' improper manipulations of, *inter alia, its* accounting for employee benefits and restructuring charges, and even with the disclosure of an increase in product warranty expense, the Company's reported product warranty reserves and expenses were materially understated:

The company's improved earnings over fiscal 2003 are a result of improved pricing, **the company's cost reduction initiatives** and better performance from the manufacturing operations.

*    *    *

As stated earlier, gross margins from manufacturing operations in fiscal 2004 increased almost one percentage point over a year ago... **These improvements**

**were partially offset by margin pressures from additional warranty expense,** cost of emissions compliance and the impact of higher steel prices.

*   *   *

Total expenses for fiscal 2004 improved over the prior year due to the **positive effects of our cost reduction initiatives and lower postretirement benefits expense. The decrease in postretirement expense over prior year was due to greater than anticipated returns on invested assets... In fiscal 2004, the benefit from restructuring and other non-recurring charges was $1 million.** (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 171.

172.    In Note 10, "Other Liabilities," to the financial statements in the 2004 10-K, Navistar disclosed its grossly understated major classifications of other liabilities, several of which were restated, notably, product liability and warranty, post retirement benefits, and restructuring and other non-recurring charges:

<strong>Major classifications of other liabilities at October 31 are as follows:</strong>

| Millions of dollars | 2004 | 2003 |
|---|---|---|
| Product liability and warranty | $      358 | $      253 |
| Employee incentive programs | 63 | 6 |
| Payroll, commissions and employee-related benefits | 71 | 71 |
| Postretirement benefits liability | 183 | 294 |
| Dealer reserves | 25 | 22 |
| Taxes | 51 | 76 |
| Sales and marketing | 46 | 56 |
| Long-term disability and workers' compensation | 48 | 52 |
| Environmental | 10 | 8 |
| Interest | 29 | 30 |
| Restructuring and other non-recurring charges | 97 | 157 |
| Other | 368 | 286 |
| Total other liabilities | 1,349 | 1,311 |
| Less current portion | (965) | (905) |
| Other long-term liabilities | $      384 | $      406 |

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 172.

**(iii)    Employee Benefit Arrangements**

173.    Navistar's management also discussed Pension and Other Postretirement Benefits as they related to liquidity and capital resources in the MD&A section of the 2004 10-K, disclosing Navistar's pension expenses for 2004 and the funded status of the Company's pension

plans. Included in the discussion quoted below were the Company's pension expenses for 2004, which were grossly understated:

> The company contributed $231 million to its pension plans in 2004 and $164 million in 2003... The funded status of the pension benefits improved from $(994) million at the end of 2003 to $(805) million at the end of 2004. This improvement was primarily due to higher plan asset values at October 31, 2004. During 2004, positive returns on plan assets of $230 million and company contributions of $231 million, more than offset payments to plan beneficiaries of $323 million out of plan assets. The benefit obligation also decreased $34 million in fiscal 2004 as payments to beneficiaries offset the expenses and other increases to the obligation.

> **ANSWER:**     Schwetschenau denies the allegations of Paragraph 173.

174.     In the MD&A section of the 2004 10-K, the Company discussed its Accounting Policies, and Navistar explained how it established the discount rate used for its pension benefits. The following disclosure was materially false and misleading in that the Company acknowledged in the 2005 Restatement and Re-Audit that the assumptions for the return on plan assets and discount rates were "not supported":

> The company's employee pension and postretirement health care expenses are dependent on management's assumptions used in calculating such amounts. These assumptions include discount rates, health care cost trend rates, inflation, long-term expected rate of return on plan assets, retirement rates, mortality rates and other factors... The inflation assumption is based on an evaluation of external market indicators. Retirement and mortality rates are based primarily on actual plan experience.

> The company's approach to establishing the discount rate assumption reflects an investment strategy that effectively settles a portion of its pension liability by investing in a bond portfolio that generates monthly cash flows equal to a portion of the projected monthly pension benefit payments. This portion of the liability is weighted using a discount rate based on the October 31, 2004, effective yield on the dedicated bond investment portfolio. The remaining non-dedicated portion of the liability used the average of the October 31, 2004, yields on the Merrill Lynch Ten Year + High Quality Corporate Bond Index and Moody's AA Corporate Bond Index, both adjusted for an incremental yield of approximately 50 basis points that is to be achieved by active management of the bond portfolio. For the other postretirement benefits, the discount rate is based on the Merrill Lynch Ten Year + High Quality Corporate Bond Index and Moody's AA Corporate Bond Index with a similar provision for an incremental yield.

> **Based on this approach, at October 31, 2004, the company lowered the discount rate for pension plans to 5.8% from 6.2% at October 31, 2003. The discount rate for the other benefits was lowered from 6.6% at October 31, 2003 to 6.0% at October 31, 2004.**

*    *    *

The company's estimate of the long-term rate of return on assets for both its pension and postretirement health benefits was 9.0% at October 31, 2004 and 2003. The company's estimate of the long-term rate of return for its pension and postretirement health benefits was 10.1 % and 11.0%, respectively, at October 31, 2002. The company plans on utilizing a 9.0% long-term rate of return on plan assets for both pension and postretirement health benefits in 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 174.

### (iv)    SEC Investigation and Liability Reserves and Contingencies

175.    Under the "Item 15. Legal Proceedings and Environmental Matters," section of the 2004 10-K Navistar acknowledged the SEC's request for information about its pension accounting and disclosed that on February 9, 2005 Navistar was notified by the SEC that an "informal inquiry" would be made into the Company's 2004 Restatement:

On October 13, 2004, the company received a request from the staff of the SEC to voluntarily produce certain documents and information related to the company's accounting practices with respect to defined benefit pension plans and other postretirement benefits. The company is fully cooperating with this request. Given the preliminary nature of this matter, the company is not able to predict what, if any, impact this inquiry will have on the company.

On January 31, 2005, the company announced that it would restate its financial results for fiscal years 2002 and 2003 and the first three quarters of fiscal 2004. The SEC notified the company on February 9, 2005, that it was conducting an informal inquiry into the company's restatement. The company intends to fully cooperate with the SEC on the informal inquiry. Given the preliminary nature of the matter, the company is not able to predict what impact, if any, this inquiry will have on the company.

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 175.

176.    In the same section of the 2004 10-K Navistar falsely represented that despite being subject to various legal claims, none will "have a material adverse affect on the business or the financial condition of the [C]ompany" in light of "established reserves":

The company and its subsidiaries are subject to various claims arising in the ordinary course of business, and are parties to various legal proceedings that constitute ordinary routine litigation incidental to the business of the company and its subsidiaries. The majority of these claims and proceedings relate to commercial, product liability and warranty matters. In the opinion of the company's management, the disposition of these proceedings and claims,

including those discussed below, after taking into account established reserves and the availability and limits of the company's insurance coverage, will not have a material adverse affect on the business or the financial condition of the company.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 176.

177.    Under the Critical Accounting Policies heading in the MD&A of the 2004 10-K, Navistar explained how it established litigation and product liability reserves.  The following disclosure was materially false and misleading in that it is contradicted by the Company's acknowledgment in the 2005 Restatement and Re-Audit that, *inter alia,* it used an "arbitrary" process for determining reserves related to asbestos liabilities:

> The company is subject to product liability lawsuits and claims in the normal course of business.  To the extent permitted under applicable law, the company maintains insurance to reduce the risk to the company.  Most insurance coverage includes self-insured retention.  **The company records product liability reserves for the self-insured portion of any pending or threatened product liability actions.**  The reserve is based upon two estimates.  First, management determines an appropriate case specific reserve based upon management's best judgment and the advice of legal counsel.  These estimates are continually evaluated and adjusted based upon changes in facts or circumstances surrounding the case.  Second, management obtains a third party actuarial analysis to determine the amount of additional reserve required to cover certain known claims and all incurred but not reported product liability issues.  Based upon this process, management believes that the product liability reserve is appropriate; however, actual claims incurred and the actual settlement values of outstanding claims may differ from the original estimates, requiring adjustments to the reserve.  (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 177.

### (v)    Leases

178.    In Note 14 to the financial statements in the 2004 10-K, discussed leases, noting that the majority of its leases were "operating leases."  Navistar's expenses for operating leases were materially understated due to the Company's improper classification of operating leases as capital leases:

> The majority of the company's lease payments are for operating leases.  At October 31, 2004, future minimum lease payments under operating leases having lease terms in excess of one year, including the net lease payments accrued for in the restructuring and other non-recurring charges, are: 2005 - $121 million, 2006 - $80 million, 2007 - $80 million, 2008 - $127 million, 2009 - $242 million and 2010 and thereafter - $29 million.  Total operating lease expense was $181 million in 2004, $137 million in 2003 and $76 million in 2002.  Income received

from sublease rentals was $3 million in 2004, $1 million in 2003 and $5 million in 2002.

The company's remaining lease payments are for capital leases. These leases are generally for equipment used in the company's manufacturing operations. At October 31, 2004, future minimum lease payments under capital leases having lease terms in excess of one year are: 2005 - $20 million, 2006 - $20 million, 2007 - $20 million, 2008 - $20 million, 2009 - $20 million and 2010 and thereafter - $94 million.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 178.

### (vi)    Product Warranty Issues

179.    In Note 14 to the financial statements in the 2004 10-K, Navistar commented that management believed the Company's warranty reserve to be appropriate and discussed its methods for establishing product warranty reserves. The 2004 10-K disclosed that the Company's warranty reserve was $286 million. The following statement was materially false and misleading in that the Company's reserves were grossly understated because it was not reporting a significant portion of its actual warranty expenses:

> Provisions for estimated expenses related to product warranty are made at the time products are sold. These estimates are established using historical information about the nature, frequency, and average cost of warranty claims. Management actively studies trends of warranty claims and takes action to improve vehicle quality and minimize warranty claims. *Management believes that the warranty reserve is appropriate;* however, actual claims incurred could differ from the original estimates, requiring adjustments to the reserve.

(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 179.

### (vii)    Consolidation Accounting

180.    Under the heading New Accounting Pronouncements in the MD&A section of the 2004 10-K, Navistar falsely stated that FIN 46, the FASB pronouncement related to consolidation of VIEs, had no effect on the Company's accounting, because the Company had no interest in any VIEs:

> In January 2003, the Financial Accounting Standards Board (FASB) issued Interpretation No. 46, "Consolidation of Variable Interest Entities." This Interpretation addresses consolidation requirements of variable interest entities (VIEs). In December 2003, the FASB revised this Interpretation to clarify the application of Accounting Research Bulletin No. 51, "Consolidated Financial Statements", to certain entities in which equity investors do not have the characteristics of a controlling financial interest for the entity to finance its

activities without additional financial support.  This Interpretation, as revised, is effective for periods ending after December 15, 2003.  *The company analyzed its minority investments and determined that it does not have an interest in a VIE, as defined within this Interpretation.  Therefore, this Interpretation has no impact on the company's results* of *operations, financial condition and cashflows.* (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 180.

### (viii)    Disclosure and Internal Controls

181.    In Item 9A, "Controls and Procedures," of 2004 10-K the Company acknowledged that there were "weaknesses" in its internal controls that resulted in a misapplication of GAAP.  The statement also outlined what corrective actions had been taken to correct these weaknesses, and in doing so falsely represented that other than the material weaknesses identified below, the Company's internal controls were adequate, and that the necessary corrective actions were being taken:

> *The company's principal executive officer and principal financial officer... evaluated the effectiveness of the company's disclosure controls and procedures [and] concluded that, as of October 31, 2004, there were weaknesses in the disclosure controls and procedures within the company's finance subsidiary.  The weaknesses resulted in a misapplication of GAAP related to securitization accounting.*  The company's finance subsidiary restated its previously issued financial statements to correct the misapplication.  *Because of the weakness noted within the finance subsidiary, the principal executive officer and principal financial officer of the company concluded that the disclosure controls and procedures in place at the company were not effective.  Management has strengthened, as of October 31, 2004, its controls and procedures over the application of these accounting standards and believes that the circumstances resulting in the misapplication of GAAP will not reoccur.*

> Changes in internal controls over financial reporting

> The company has not made any changes to its internal control over financial reporting (as defined in rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal year ended October 31, 2004 that have materially affected, or are reasonably likely to materially affect, the company's internal control over financial reporting except for:
> (1)    the actions taken by the company's financial services subsidiary to correct the accounting associated with its retail note securitization program;
> (2)    *a reemphasis of reconciliation controls, relative to accounts payable, at the company's Mexican truck assembly facility;*
> (3)    the commencement of the consolidation of majority owned dealerships. (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 181.

182.    Defendant Ustian and Defendant Lannert signed the Statement of Financial Reporting Responsibility in the 2004 10-K acknowledging that (1) the financial statements were presented in accordance with GAAP, (ii) management was responsible for the establishment and maintenance of the Company's internal controls, and (iii) these controls were adequate:

STATEMENT OF FINANCIAL REPORTING RESPONSIBILITY

Management of Navistar International Corporation and its subsidiaries is responsible for the preparation and for the integrity and objectivity of the accompanying financial statements and other financial information in this report. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and include amounts that are based on management's estimates and judgments.

The accompanying financial statements have been audited by Deloitte & Touche LLP, an independent registered public accounting firm.  Management has made available to Deloitte & Touche LLP all the company's financial records and related data, as well as the minutes of the board of directors' meetings. Management believes that all representations made to Deloitte & Touche LLP during its audit were valid and appropriate.

Management is responsible for establishing and maintaining a system of internal controls throughout its operations that provides reasonable assurance as to the integrity and reliability of the financial statements, the protection of assets from unauthorized use and the execution and recording of transactions in accordance with management's authorization.  The company's system of internal controls, which provides for appropriate division of responsibility, is supported by written policies and procedures that are updated by management, as necessary. Management is responsible for the periodic evaluation of the system of' internal controls.  The system is tested and evaluated regularly by the company's internal auditors as well as by the independent registered public accounting firm in connection with its annual audit of the financial statements.  The independent registered public accounting firm conducts its audit in accordance with the standards of the Public Company Accounting Oversight Board (United States) and perform such tests of transactions and balances as they deem necessary.  The company's system of internal controls is improved or modified, in a manner that is cost-effective in the circumstances, in response to changes in business conditions and operations and recommendations made by internal auditors and independent registered public accounting firm.

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself and

denies any characterizations of that document.

183.    Defendants Ustian and Lannert signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, *inter alia,* that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this

report fairly presents in all material respects, the financial condition of the results of the Company." The certifications were substantially the same as those quoted above from the Q1 2003 10-Q

**ANSWER:**    Schwetschenau states that Navistar's 2004 10-K speaks for itself and

denies any characterizations of that document.

### (ix)    Deloitte's Audit Opinion

184.    Defendant Deloitte signed the Independent Auditor's Report expressing an unqualified opinion and falsely stating that Navistar's financials were presented in accordance with GAAP and that Deloitte had conducted an audit in conformity with GAAS:

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. *An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.* An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, *such consolidated financial statements present fairly, in all material respects, the financial position of Navistar International Corporation and Consolidated Subsidiaries at October 31, 2004 and 2003, and the results of their operations and their cash flow for each of the three years in the period ended October 31, 2004,* in conformity with accounting principles generally **a**ccepted in the United States of America.

(Emphasis added)

**ANSWER:**    Schwetschenau admits that Deloitte's Independent Auditor's Report

expressed an unqualified opinion and denies the remaining allegations of Paragraph 184.

### F.    Falsity of Navistar's 2004 Disclosures

185.    Defendants' foregoing statements made during fiscal 2004 or concerning the Company's fiscal 2004 financial results were materially false and misleading, as follows:

(A)    Despite Defendants' representations to the contrary, the Company's previously reported 2004 audited financial statements and results, including reported net income, EPS, and

shareholders' equity, were grossly and materially overstated in violation of GAAP, as those audited financial statements required subsequent restatement;

(B)    Despite Defendant Deloitte's representations to the contrary, Navistar's 2004 audited financial statements were not audited in conformity with GAAS, as they required subsequent restatement;

(C)    The overstatements contained in Navistar's 2004 audited financial statements are innumerable. Virtually every line of Navistar's audited 2004 income statement was restated in the 2005 Restatement and Re-Audit. The 2005 10-K included a restated consolidated income statement for 2004, which reflected the falsity of the Defendants' 2004 results – most importantly that the Company's reported 2004 audited net income was overstated by $291 million, or 117% -- as follows:

| | | 2004 | |
| | As Previously Reported | Restatement and Reclassification Adjustments | As Restated |
|---|---|---|---|
| **Sales and revenues** | | | |
| Sales of manufactured products, net | $    9,468 | $    (84) | $    9,384 |
| Finance revenue | 245 | 49 | 294 |
| Other income | 11 | (11) | — |
| Sales and revenues, net | 9,724 | (46) | 9,678 |
| **Costs and expenses** | | | |
| Cost of products sold | 8,159 | 109 | 8,268 |
| Selling, general and administrative expense | 656 | 283 | 939 |
| Postretirement benefits expense | 205 | (205) | — |
| Engineering and product development costs | 245 | 42 | 287 |
| Restructuring and program termination (credits) charges | (1) | 9 | 8 |
| Interest expense | 127 | 110 | 237 |
| Other expense (income), net | 22 | (12) | 10 |
| Total costs and expenses | 9,413 | 336 | 9,749 |
| Equity in income of non -consolidated affiliates | — | 36 | 36 |
| Income (loss) before income tax | 311 | (346) | (35) |
| Income tax expense | (64) | 55 | (9) |
| **Net income (loss)** | $    247 | $    (291) | $    (44) |
| **Basic earnings (loss) per share** | $    3.54 | $    (4.18) | $    (0.64) |
| **Diluted earnin gs (loss) per share** | $    3.20 | $    (3.84) | $    (0.64) |

(D)    Navistar was also forced to restate virtually every line of its audited 2004 balance sheet. The 2005 10-K included a restated consolidated balance sheet for 2004, which reflected the falsity of the Defendants' 2004 results – most importantly that the Company's reported 2004 Stockholder's equity a was overstated by $2.4 billion – as follows:

| | As Previously Reported | Restatement and Reclassification Adjustments | As Restated |
|---|---|---|---|
| **Assets:** | | | |
| Cash and cash equivalents | $ 605 | $ (2) | $ 603 |
| Marketable securities | 182 | — | 182 |
| Finance and other receivables, net | 1,215 | 729 | 1,944 |
| Inventories | 790 | 372 | 1,162 |
| Deferred taxes, net | 207 | (178) | 29 |
| Other current assets | 168 | (27) | 141 |
| Total current assets | 3,167 | 894 | 4,061 |
| Restricted cash and cash equivalents | — | 319 | 319 |
| Marketable securities | 73 | (73) | — |
| Finance and other receivables, net | 1,222 | 820 | 2,042 |
| Investments in and advances to non-consolidated affiliates | — | 150 | 150 |
| Investments and other assets | 374 | (374) | — |
| Property and equipment, net | 1,444 | 498 | 1,942 |
| Goodwill | — | 53 | 53 |
| Intangible assets, net | — | 23 | 23 |
| Prepaid and intangible pension assets | 73 | (7) | 66 |
| Deferred taxes, net | 1,239 | (1,209) | 30 |
| Other noncurrent assets | — | 64 | 64 |
| **Total assets** | $ 7,592 | $ 1,158 | $ 8,750 |
| **Liabilities and stockholders' equity (deficit):** | | | |
| Notes payable and current maturities of long-term debt | $ 823 | $ 839 | $ 1,662 |
| Accounts payable | 1,462 | 102 | 1,564 |
| Other current liabilities | 965 | 550 | 1,515 |
| Total current liabilities | 3,250 | 1,491 | 4,741 |
| Long-term debt | 2,045 | 1,575 | 3,620 |
| Postretirement benefits liabilities | 1,382 | 347 | 1,729 |
| Other noncurrent liabilities | 384 | 128 | 512 |
| Total liabilities | 7,061 | 3,541 | 10,602 |
| Stockholders' equity (deficit) | 531 | (2,383) | (1,852) |
| **Total liabilities and stockholders' equity (deficit)** | $ 7,592 | $ 1,158 | $ 8,750 |

(E)    In addition to the foregoing, Navistar's 2004 audited financial results were overstated as follows:

    i.    The 2005 Restatement and Re-audit resulted in a $2 million downward adjustment to the cash and cash equivalents originally reported in Navistar's consolidated statement of cash flows for 2004; and

    ii.    Navistar's 2004 audited financial statements were impacted by the 2005 Restatement and Re-audit, which required adjustments owing to the following matters (discussed in detail in the "Nature of the Restatement" section, below), each of which corrected a previous overstatement of Navistar's audited 2004 sales or income, before tax, (or both):

| Accounting Matter | Overstatement of Income | Overstatement of Sales |
|---|---|---|
| Product Warranty | $106 million | |
| Employee Benefit Arrangements | $57 million | |
| Unreconciled accounts and timing of income/expense recognition | $44 million | |
| Revenue Recognition | $43 million | $30 million |
| Restructuring activities | $42 million | |
| Consolidation Accounting | $28 million | $79 million |
| Leases | $25 million | |
| Liabilities related to contingencies | $11 million | |
| Property and equipment | $9 million | |
| Vendor Rebates and Tooling Costs | $8 million | $24 million |
| Financial reporting reclassifications | | $11 million |

    (F)    Navistar's and the Individual Defendants' substantive disclosures, as set forth above, concerning the Company's application of accounting policies and assumptions for accounting were materially false and misleading in light of the 2005 Restatement and Re-audit, as follows:

    i.    Defendants' statements concerning Navistar's obligations under the Company's employee benefit programs and the cost savings associated with those obligations were materially false and misleading because Defendants used improper assumptions in calculating those costs and obligations;

    ii.    Defendants' statements concerning the Company's Product Warranty policies and reserves were materially misleading because they improperly included expected future product improvements, failed to accrue properly for costs associated with non-warranty repairs and improperly accrued for anticipated vendor recoveries;

    iii.    Defendants' statements concerning lease accounting were materially false and misleading because they improperly applied sales accounting to lease transactions and improperly accounted for operating leases;

    iv.    Defendants' statements concerning the materiality of litigation and the adequacy of the Company's contingency reserves were materially false and misleading because Defendants had failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses; and

    v.    Defendants' statements concerning the Company's consolidation accounting policies were materially false and misleading because, contrary to their statements

that Navistar had "no VIES that were subject to consolidation under FIN 46," certain VIEs required consolidation on the Company's financial statements, which consolidation materially and adversely affected those financial statements;

(G)     Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy were materially false and misleading in light of the 2005 Restatement and Re-audit and the fifteen different material control weaknesses identified in connection with its re-audit of the 2004 financial statements;

(H)     Defendants' substantive disclosures concerning the adequacy of the Company's internal controls were materially false and misleading in light of the fact that the Company had no formal written policy of internal controls until at least October 2004;

(I)     Defendants' substantive disclosures concerning the improvements made to Navistar's internal controls at its Mexican operations were materially false and misleading in light of the fact that the Company's Mexican operation was recognizing revenue on sales even though there was no evidence of "a sales arrangement with the customers;" and

(J)     Defendant Schwetschenau's statements concerning the resolution of the Company's accounting issues (in the February 16, 2005 conference call) were materially false and misleading given the plethora of accounting issues that continued to plague the Company.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 185.

**G.     Fiscal Year 2005**

**(i)     First Fiscal Quarter 2005**

186.     After the market closed on March 14, 2005 Navistar issued a press release announcing that there would be a delay in the filing of its Form 10-Q for the first fiscal quarter ended January 31, 2005.  In the press release the Company advised investors that it expected to announce the first fiscal quarter results no later than mid-April.

**ANSWER:**     Schwetschenau states that Navistar's March 14, 2005 press release speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 186.

187.     In addition to the press release issued on March 14, 2005, Navistar also issued a Form 8-K disclosing that by failing to timely file its first quarter Form 10-Q it was in default under its revolving credit line of $820 million with IP Morgan Chase, but that it had "requested a waiver of the existing defaults under the credit agreement through April 15, 2005, which will permit NFC to incur additional borrowings under the credit agreement through that date."

**ANSWER:**    Schwetschenau states that Navistar's Form 8-K speaks for itself, denies

any characterizations of that document, and denies the remaining allegations of Paragraph 187.

188.    In a report by Bear Stearns analyst Peter Nesvold issued on March 15, 2005 commenting on the delayed first quarter 10-Q, Nesvold noted that while he did not believe that the delay was related to any new accounting issues, he did "believe, in order to avoid future reporting delays, NAV will have to beef-up its accounting systems to handle this new securitization accounting requirements."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 188 and on that basis denies the same.

189.    After the market closed on March 17, 2005, Navistar issued a press release reporting that the SEC had formalized its inquiry into the Company's 2004 Restatement. According to the press release, the newly formalized inquiry by the SEC was not a factor in delaying the first quarter Form 10-Q filing.  Navistar disclosed in the press release that the SEC changed the status of the investigation after the Company had informed the SEC that there was "information potentially relevant to the investigation that may be in the possession of one or more former employees outside the [C]ompany's control."

**ANSWER:**    Schwetschenau states that Navistar's March 17, 2005 press release speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 189.

190.    In response to this announcement, on March 18, 2005 Peter Nesvold, the Bear Stearns securities analyst, published a report addressing the formalization of the SEC inquiry,:

> *** OUR FRUSTRATION WITH THE STOCK HAS COMPOUNDED SHARPLY THIS WEEK.  To us, the delay of FIQ (which we believe was partly due to NAV's struggle with mark-to-market reporting), combined with the loss of control over reportedly relevant financial data, suggests that both the financial systems and controls are weak.  We view these as potentially ongoing issues.

> *** ARE THESE ISSUES MATERIAL?  It's impossible for us to know.  We previously placed a lot of weight on the auditors' recent unqualified opinion for the period in question.  Could the financial information be "relevant" to the SEC inquiry, but not "material" to the auditors? It may be possible, but our frustration turns into skepticism when we start asking ourselves these types of questions.

(Emphasis added)

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 190 and on that basis denies the same.

191.     Before the market opened on April 12, 2005, Navistar issued a press release announcing that it would issue its earnings results for the first quarter of 2005 on April 14, 2005. This removed significant uncertainty from the market concerning the delay in the Company's first quarter earnings results.  In response to this news Navistar's common stock price increased from a closing price on April 11, 2005 of $34.90 per share to a closing price on April 12, 2005 of' $35.58 per share.

**ANSWER:**     Schwetschenau states that Navistar's April 12, 2005 press release speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 191.

192.     On April 14, 2005 Navistar issued its first fiscal quarter 2005 earnings release. The Company reported net income of $20 million, or $0.27 per diluted share, for the quarter ended January 31, 2005, beating its EPS guidance of' $0.20 to $0.25 per diluted share and consensus EPS estimates of $0.23.

**ANSWER:**     Schwetschenau states that Navistar's April 14, 2005 earnings release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 192.

193.     Also on April 14, 2005 Navistar held its first quarter earnings call.  During the call Defendant Lannert gave guidance for the second quarter: "As far as guidance for the second quarter, we are currently expecting income to be in the $0.65 to $0.70 a share range."

**ANSWER:**     Schwetschenau states that Navistar's April 14, 2005 earnings call speaks

for itself, denies any characterizations of that call, and denies the remaining allegations of

Paragraph 193.

194.     At approximately 11:30 a.m. the trading of Navistar's common stock was halted as the Company was issuing another press release.  Navistar announced that it had added another military customer by winning "a five-year contract worth approximately $400 million U.S. for the delivery of up to 5,000 trucks to the Taiwan Ministry of National defense."  In this press release, Defendant Ustian "reiterated that based on the [C]ompany's current truck industry volume forecast of 389,500 units, earnings in 2005 should be in the range of at least $4.60 to $5.00 per diluted common share."

**ANSWER:**     Schwetschenau states that Navistar's April 14, 2005 press release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 194.

195.     Before the market opened on April 25, 2005, Navistar issued a press release adjusting its first quarter net income down to $18 million, or $0.24 per diluted share, compared to the $20 million of net income previously reported on April 14, 2005.  According to the press release the Company determined that a charge relating to Navistar's "engine foundry operations needed to be adjusted from $8 million to $12 million."  Despite the Company's representations that the problems related to expense accounting at its foundry operations had been resolved, the 2005 Restatement and Re-Audit would note that certain items required restatement relating to "foundry operations that involved the manipulation of reporting periods and expense balances."

**ANSWER:**     Schwetschenau states that Navistar's April 25, 2005 press release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 195.

196.     In response to the Company's announced revision of first quarter 2005 net income KeyBanc Capital Markets analyst Walter Liptak issued a report parroting management's assurances that the restatement of income was a non-recurring event:

> NAV announced that there was a larger charge in the 1Q than the Company had previously announced.  We would note that the expense is a one-time charge and although the charge is considered an ongoing operational item, **management notes that similar charges are not expected in the future.  The charge, which was related to one of its engine foundry operations, actually totaled $12 million vs.  previous estimates of $8 million.  We talked to management; however, they would only say that the charges were for a series of things that were not expected to recur.**

(Emphasis added)

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 196 and on that basis denies the same.

197.     Also on April 25, 2005 Navistar issued its Form 10-Q for the first fiscal quarter ended January 31, 2005.  (the "Q1 2005 10-Q"), with the SEC.  The Form 10-Q was signed by Defendant Schwetschenau and substantially reiterated the financial results disclosed on April 14, 2005, as adjusted by the restatement announced on April 25, 2005.  The Q 1 2005 10-Q included the following disclosures concerning the Company's revision of the results released on April 14:

On April 14, 2005, the company issued an earnings news release and filed a report on Form 8-K with preliminary financial information for the three months ended January 31, 2005.  The Form 8-K and earnings news release indicated that the company expected net income for the period to be $20 million or $0.27 per diluted share.  The company is now reporting in this Form 10-Q, net income for the period ended January 31, 2005, of $18 million or $0.24 per diluted share.  The decrease in net income is the result of a review which resulted in certain one-time charges at the company's engine foundry operations.  Based on the review, which was completed subsequent to the press release, costs of products and services sold increased by $4 million.  The increase in total expenses was partially offset by a favorable $2 million adjustment to tax expense.  (Emphasis added)

**ANSWER:**    Schwetschenau admits that Navistar filed its Q1 2005 10-Q with the SEC,

states that the document speaks for itself, denies any characterizations of that document, and

denies the remaining allegations of Paragraph 197.

198.    Importantly, the Q1 2005 10-Q included a consolidated income statement that was substantially affected by the 2005 Restatement and Re-Audit, as set forth below (paragraph 230).

**ANSWER:**    Schwetschenau states that Navistar's Q1 2005 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

198.

199.    In Note J of the Q1 2005 10-Q Navistar discussed Product Warranty, falsely representing that "[m]anagement believes that the warranty reserve is appropriate" and included a table reflecting the Company's grossly understated warranty reserves of $268 million, which decreased by $18 million during the first fiscal quarter of 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 199.

200.    In Note K, "Legal Proceedings and Environmental Matters," to the financial statements in the Q1 2005 10-Q, Navistar included a discussion that was substantially identical to that quoted above from the 2004 10-K, including the false statement that none of the claims or proceedings against the Company were material, after "taking into account established reserves."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 200.

201.    The 2005 Restatement and Re-Audit revealed that during 2005 Defendants had improperly manipulated their accounting for derivative instruments by accounting for derivative transactions as hedge transactions even though they "did not qualify for hedge accounting treatment."  These improper derivative accounting manipulations resulted in the Company's net income being overstated by $10 million during fiscal 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 201.

202.    In Note I, "Financial Instruments," to the financial statements in the Q1 2005 10-Q, Navistar made a substantive disclosure concerning the use of derivatives in its risk management strategy and included a table reflecting the values used for reporting derivatives, which values resulted in a material overstatement of the Company's income.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 202.

203.    In Note D, "Post Retirement Benefits," to the financial statements in the Q 1 2005 10-Q, Navistar made substantive disclosures concerning its employee benefit plans and obligations that were substantially the same as those quoted above from the 2004 10-K. The Company also disclosed that as of the end of the first quarter of 2005 it had made $6 million in contributions to Navistar's qualified pension plans. The Company reported first quarter 2005 post retirement employee benefits expense of $59 million, down from $61 million in the first quarter of 2004. These reported employee benefit expenses were grossly understated.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 203.

204.    In Note H, "Restructuring Charges," to the financial statements in the Q1 2005 10-Q, Navistar made substantive disclosures concerning its restructuring plans and accruals that were substantially the same as those quoted above from the 2004 10-K.

**ANSWER:**    Schwetschenau states that Navistar's Q1 2005 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

204.

205.    The Q1 2005 10-Q included certifications signed by Defendants Ustian and Lannert pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, *inter alia*, that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this report fairly presents in all material respects, the financial condition of the results of the Company." The text of these certifications was substantially the same as that quoted above from the Q 1 2003 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q1 2005 10-Q speaks for itself and

denies any characterizations of that document.

### (ii)    Falsity of The First Quarter 2005 Results and Statements

206.    Defendants' foregoing statements made during the first fiscal quarter of 2005 or concerning the Company's first fiscal quarter of 2005 financial results were materially false and misleading, as follows:

(A)     Despite representations to the contrary, one Company's previously reported fiscal 2005 first quarter financial statements and results, including reported net income and EPS, were grossly and materially overstated in violation of GAAP, as those financial statements required restatement;

(B)     The overstatements contained in Navistar's first quarter fiscal 2005 financial statements are innumerable.  Virtually every line of Navistar's first quarter 2005 income statement required restatement.  As set forth in paragraph 230, below, the 2005 Form 10-K included a restated consolidated income statement for the first quarter fiscal 2005, which reflected the falsity of the Defendants' first quarter fiscal 2005 results;

(C)     Navistar's first fiscal quarter :1005 financial results were overstated as follows:

i.      Navistar's first quarter 2005 audited net income was overstated by $11 million, the initially reported net income of $18 million was restated to net income of $7 million; that is, the Company's first quarter fiscal 2005 net income was overstated by 61 %;

ii.     Expressed in terms of EPS, the restatement reduced the previously reported first fiscal quarter 2005 diluted EPS of $0.24 to diluted EPS of $0.10;

iii.    Navistar's first fiscal quarter 2005 financial statements were impacted by the Restatement, which required adjustments owing to the following matters (discussed in detail below), each of which corrected a previous overstatement of Navistar's first quarter 2005 income, before tax:

| Accounting Matter | Overstatement of Income |
|---|---|
| Product Warranty | $27 million |
| Inventories | $9 million |
| Liabilities related to contingencies | $7 million |
| Leases | $5 million |
| Employee Benefit Arrangements | $4 million |
| Derivative Instruments | $4 million |
| Restructuring activities | $1 million |

(D)     Navistar's and the Individual Defendants'' substantive disclosures, as set forth above, concerning the Company's application of accounting policies and assumptions for accounting were materially false and misleading in tight of the Restatement, as follows:

i.      Defendants' statements concerning Navistar's obligations under the Company's employee benefit programs and the cost savings associated with those obligations

were materially false and misleading because Navistar and the Individual Defendants used improper assumptions in calculating those costs and obligations;

ii.    Defendants' statements concerning the substance and financial impact of the Company's restructuring activities, and in particular the expense reductions associated with those restructuring activities, were materially false and misleading because they failed to abide by the applicable GAAP provisions in accounting for those plans;

iii.    Defendants' statements concerning the Company's Product Warranty policies and reserves were materially false and misleading because Defendants improperly included expected future product improvements, failed to properly accrue for costs associated with non-warranty repairs, and improperly accrued for anticipated vendor recoveries;

iv.    Defendants' statements concerning the materiality of litigation and the adequacy of the Company's contingency reserves were materially false and misleading because Defendants had failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses; and

v.    Defendants' disclosures concerning the Company's accounting for and use of derivatives were materially false and misleading in that Navistar and the Individual Defendants did not properly establish that hedge accounting was appropriate;

(E)    Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy, and any improvements being made to those policies and controls, were materially false and misleading in light of the 2005 Restatement and Re-Audit and the fifteen different material control weaknesses admitted to by Navistar.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 206.

(iii)    **Second Fiscal Quarter 2005**

207.    On June 9, 2005, Navistar issued its second fiscal quarter 2005 earnings release. The Company reported earnings of $53 million, or $0.70 per diluted common share, for the second quarter ended April 30, 2005.  This was at the high end of its previous guidance of $0.65 to $0.70 per diluted share and slightly below analysts' consensus EPS estimate of $0.72.  In the earnings release Navistar increased its fiscal 2005 earnings guidance from $4.60 to $5.00 per diluted share to $4.80 to $5.10 per diluted share, and increased third fiscal quarter 2005 EPS guidance to $0.75 to $0.85 per diluted share.

**ANSWER:**    Schwetschenau states that Navistar's June 9, 2005 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 207.

208.    Navistar also held its second fiscal quarter earnings call on June 9, 2005.  Before the question and answer portion of the call, Defendant Ustian falsely reassured investors and securities analysts that the Company had resolved its accounting issues and that future SEC filings would be filed timely:

> One final note here, as I'm looking across there to our controller [Defendant Schwetschenau], is he is also committing to all of us that we're going to file 10-Qs on time, and **this is all behind us**.  And I guess we're all confident that we can do that.  We have the resources in place and the knowledge in place to do that, and this should help us all provide information on a timely basis.

(Emphasis added)

**ANSWER:**    Schwetschenau states that Navistar's June 9, 2005 earnings call speaks for

itself, denies any characterizations of that call, and denies the remaining allegations of Paragraph

208.

209.    Also on June 9, 2005, Navistar issued its Form 10-Q for the second fiscal quarter ended April 30, 2005.  (the "Q2 2005 10-Q"), with the SEC.  The Q2 2005 10-Q was signed by Defendant Schwetschenau and substantially reiterated the financial results disclosed on June 9, 2005.  Importantly, the Q2 2005 10-Q included a consolidated income statement that was substantially affected by the subsequent Restatement, as set forth below.

**ANSWER:**    Schwetschenau admits that Navistar filed its Q2 2005 10-Q with the SEC,

states that the document speaks for itself, denies any characterizations of that document, and

denies the remaining allegations of Paragraph 209.

210.    In Note J of the Q2 2005 10-Q Navistar discussed Product Warranty, falsely representing that "[m]anagement believes that the warranty reserve is appropriate" and included a table reflecting the Company's grossly understated warranty reserves of $279 million.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 210.

211.    In Note L, "Legal Proceedings and Environmental Matters," to the financial statements in the Q2 2005 10-Q, Navistar included a discussion that was substantially identical to that quoted above from the 2004 10-K, including the false statement that none of the claims or proceedings against the Company were material, after "taking into account established reserves."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 211.

212.    In Note J, "Financial Instruments," to the financial statements in the Q2 2005 10-Q, Navistar made substantive disclosures concerning; the use of derivatives in its risk

management strategy that were substantially the same as those quoted above from the Q1 2005 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q2 2005 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

212.

213.    The Q2 2005 10-Q included certifications signed by Defendants Ustian and Lannert pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, *inter alia*, that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this report fairly presents in all material respects, the financial condition of the results of the Company." The text of these certifications was substantially the same as that quoted above from the Q 1 2003 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q2 2005 10-Q speaks for itself and

denies any characterizations of that document.

214.    Navistar's common stock increased from a closing price of $32.21 per share on June 8, 2005 to a closing price of $33.06 per share on June 9, 2005.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 214 and on that basis denies the same.

### (iv)    Falsity of The Second Quarter 2005 Results and Statements

215.    Defendants' foregoing statements made during the second fiscal quarter 2005 or concerning the Company's second fiscal quarter 2005 financial results were materially false and misleading, as follows:

(A)    Despite representations to the contrary, the Company's previously reported second fiscal quarter 2005 financial statements and results, including reported net income and EPS, were grossly and materially overstated in violation of GAAP, as those audited financial statements required subsequent restatement;

(B)    The overstatements contained in Navistar's second quarter fiscal 2005 financial statements are innumerable. Virtually every line of Navistar's second quarter fiscal 2005 income statement required restatement. As set forth in paragraph 230, below, the 2005 10-K included a restated consolidated income statement for the second quarter fiscal 2005, which reflected the falsity of the Defendants' second quarter fiscal 2005 results;

(C)    Navistar's second quarter fiscal 2005 financial results were overstated as follows:

i.      Navistar's second quarter fiscal 2005 net income was overstated by $37 million, the initially reported net income of $53 million was restated to net income of $16 million; that is, the Company's second quarter fiscal 2005 net income was overstated by 69%;

ii.     Expressed in terms of EPS, the restatement reduced the previously reported second quarter fiscal 2005 diluted EPS of $0.70 to diluted EPS of $0.22;

iii.    Navistar's second fiscal quarter 2005 financial statements were impacted by the restatement, which required adjustments owing to the following matters (discussed in detail below), each of which corrected a previous overstatement of Navistar's second quarter fiscal 2005 income, before tax:

| Accounting Matter | Overstatement of Income |
| --- | --- |
| Product Warranty | $15 million |
| Restructuring activities | $21 million |
| Unreconciled accounts and timing of income/expense recognition | $15 million |
| Consolidation Accounting | $13 million |
| Functional Currency Designation | $11 million |
| Revenue Recognition | $8 million |
| Leases | $5 million |
| Liabilities related to contingencies | $2 million |
| Derivative Instruments | $2 million |

(D)    Navistar's and the Individual Defendants' substantive disclosures, as set forth above, concerning the Company's application of accounting policies and assumptions for accounting were materially false and misleading in light of the Restatement, as follows:

i.     Navistar and the Individual Defendants' statements concerning the substance and financial impact of the Company's restructuring activities, and in particular the expense reductions associated with those restructuring activities, were materially false and misleading because they failed to abide by the applicable GAAP provisions in accounting for those plans,

ii.     Navistar and the Individual Defendants' statements concerning the Company's Product Warranty policies and reserves were materially false and misleading because they improperly included expected future product improvements, failed to properly accrue costs associated with non-warranty repairs, and improperly accrued for anticipated vendor recoveries;

iii.   Defendants' statements concerning the materiality of litigation and the adequacy of its contingency reserves were materially false and misleading because Defendants had failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses; and

iv.   Defendants' disclosures concerning the Company's accounting for and use of derivatives were materially false and misleading in that Navistar and the Individual Defendants did not properly establish that the hedge accounting was appropriate;

(E)   Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy, and any improvements being made to those policies and controls, were materially false and misleading in light of the restatement and the fifteen different material control weaknesses identified in connection with the 2005 Restatement and Re-audit financial statements; and

(F)   Defendants Ustian's and Defendant Schwetschenau's statements that the Company was committed to making timely SEC filings falsely assured investors that the Company had adequate accounting capabilities and controls, when it did not.

**ANSWER:**   Schwetschenau denies the allegations of Paragraph 215.

### (v)   Third Fiscal Quarter 2005 Results

216.   Before the market opened on September 7, 2005, Navistar issued its third fiscal quarter earnings release, reporting net income of $64 million, or $0.83 per share, for the quarter ended July 31, 2005.  The results met analysts' consensus estimated $0.83 EPS and were at the high end of the Company's FPS guidance of $0.75 to $0.85.  Defendant Ustian commented that the Company continues to focus on reducing costs.

**ANSWER:**   Schwetschenau states that Navistar's September 7, 2005 earnings release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 216.

217.   Defendant Ustian also gave year end and fourth quarter guidance in the September 7, 2005 earnings release, reiterating previous guidance of earnings between $4.80 and $5.10 per diluted share for fiscal 2005: "Our stronger fourth quarter, historically driven by additional production days, also is expected to be positively impacted by stronger production, improved price realization, cost improvement initiatives that continue to compound as well as a significant tax benefit as previously reported."

**ANSWER:**     Schwetschenau states that Navistar's September 7, 2005 earnings release speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 217.

218.     Navistar also held its third fiscal quarter earnings call on September 7, 2005.  On the earnings call Defendant Lannert discussed inventory accounting and other accounting errors that caused an $11 million charge to correct the Company's inventory accounting for the first nine months of the fiscal year:

> In the engine group, revenue was $893 million, up 34% over last year's third quarter revenue.  Segment margins, however, were 1.5%, compared to 5.1 % last year.  Cost reductions continue to be critical in the engine group.  Higher steel costs and higher development costs relating to 2007 emissions compliance weighed negatively on profit margins in the quarter.  **However, the decrease in segment margin in the current quarter was largely a result of a one-time charge of $14 million that related to one of our foundry operations, including $11 million to correct inventory balances based on a physical count conducted during the third quarter plant shutdown.  This flowed through cost of goods sold in the engine group.**

> For the nine-month period the inventory charge described above **combined with a correction of certain other accounting errors, about $6 million and one-time adjustments**, $16 million for this location, came to approximately $33 million for the year.  **The errors primarily involved capitalizing costs that should have been expensed in the prior periods in which they occurred.  Expensive reviews, coupled with personnel changes and the reinforcement of policies and procedures, have been completed to assure that all of the locations' financial records have brought in -- been brought into alignment with the Company policy and with GAAP.**

> (Emphasis added)

**ANSWER:**     Schwetschenau states that Navistar's September 7, 2005 earnings call speaks for itself, denies any characterizations of that call, and denies the remaining allegations of Paragraph 218.

219.     During the Conference Call, in response to questions about the accounting misstatement related to inventory, Lannert reinforced that he had personally reviewed the issues and falsely stated that they had been completely resolved:

> GARY MCMANUS, ANALYST, JPMORGAN: Good morning, everyone.  Hey, Bob, I missed it on the one-time adjustments in the foundry.  It was 14 million for the quarter.  Did you say it was $33 million for the year?

BOB LANNERT: Yes, 1 did.

GARY MCMANUS: And that would be -- that's the same thing, right? That was, in other words, if we're looking at it, apples-to-apples, we should take these numbers out? We tax effected at a normal 34% tax rate?

BOB LANNERT: Yes.

GARY MCMANUS: And it's in the cost of sales?

BOB LANNERT: Yes.

ANDREW CASEY: Okay. Thanks. And, then, just a further clarification on Gary's first question, Bob, the $33 mil-lion is the incremental on top of the $14 million, is that on a go-forward basis, or is that behind us now?

BOB LANNERT: That's behind us. **We've changed a number of people in that foundry. We've reviewed all of their operating records. We've done a physical inventory of the operating inventory. And we've done a physical inventory of capital assets. So it's behind us totally**. The $14 million is part of the 33. The total is 33, and 14 is part of that.

(Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 219.

220.     Defendant Lannert also disclosed on the earnings call that the Company was in the process of searching for his replacement as CFO and that he had been previously diagnosed with lymphoma, which would prevent him from being in the office over the next several months.

**ANSWER:**     Schwetschenau states that Navistar's September 7, 2005 earnings call

speaks for itself, denies any characterizations of that call, and denies the remaining allegations of

Paragraph 220.

221.     As a result of the market's positive perception of Navistar's third quarter results and Defendant Lannert's false statements concerning; the resolution of the foundry accounting issues, Navistar's common stock increased from a closing price on September 6, 2005 of $32.61 per share, to a closing price on September 7, 2005 of $34.87 per share, a 7.24% increase.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 221.

222.     On September 8, 2005 Bear Stearns analyst, Peter Nesvold, issued a report on Navistar's earnings release. In his report, Mr. Nesvold called the third quarter earnings release "solid" commenting that it was Navistar's "second consecutive clean report, restoring some market confidence and giving credibility to its large [fiscal fourth quarter] guidance."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 222 and on that basis denies the same.

223.    On September 9, 2005 Navistar filed As Form 10-Q for the third fiscal quarter
ended July 31, 2005 (the "Q3 2005 10-Q"), with the SEC.  The Q2 2003 10-Q was signed by
Defendant Schwetschenau and substantially reiterated the financial results disclosed on
September 7, 2005.  Importantly, the Q3 2005 10-Q included a consolidated income statement,
which was substantially affected by the Restatement, as set forth below.

**ANSWER:**    Schwetschenau admits that Navistar filed its Q3 2005 10-Q with the SEC,

states that the document speaks for itself, denies any characterizations of that document, and

denies any remaining allegations of Paragraph 223.

224.    In Note K of the Q3 2005 10-Q Navistar discussed Product Warranty, noting that
"[m]anagement believes that the warranty reserve is appropriate," and including a table
reflecting the Company's grossly understated warranty reserves of $278 million.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 224.

225.    In Note L, "Legal Proceedings and Environmental Matters," to the financial
statements in the Q3 2005 10-Q, Navistar included a discussion that was substantially identical
to that quoted above from the 2004 10-K, including the false statement that none of the claims or
proceedings against the Company were material, after "taking into account established reserves."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 225.

226.    In Note J, "Financial Instruments," to the financial statements in the Q3 2005 10-
Q, Navistar made substantive disclosures concerning the use of derivatives in its risk
management strategy that was substantially the same as the disclosure quoted about from the Q1
2005 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2005 10-Q speaks for itself,

denies any characterizations of that document, and denies the remaining allegations of Paragraph

226.

227.    In Note D, "Post Retirement Benefits," to the financial statements in the Q3 2005
10-Q, Navistar made substantive disclosures concerning its employee benefit plans and
obligations that were substantially the same as those quoted above from the 2004 10-K.  The
Company also disclosed that as of the end of the third fiscal quarter 2005, it had made $15
million in contributions to Navistar's qualified pension plans.  The Company reported third
quarter 2005 post retirement employee benefits expense of $59 million, up from $43 million in
the first quarter of 2004.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2005 10-Q speaks for itself, denies any characterizations of that document, and denies the remaining allegations of Paragraph 227.

228.    The Q3 2005 10-Q included certifications signed by Defendants Ustian and Lannert pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, providing, *inter alia*, that they were responsible for "maintaining disclosure controls and procedures" and that the information "contained in this report fairly presents in all material respects, the financial condition of the results of the Company."  The text of these certifications was substantially the same as those quoted above from the Q 1 2003 10-Q.

**ANSWER:**    Schwetschenau states that Navistar's Q3 2005 10-Q speaks for itself and denies any characterizations of that document.

### (vi)    Falsity of The Third Quarter 2005 Results and Statements

229.    Defendants' foregoing statements made during the third fiscal quarter 2005, or concerning the Company's third fiscal quarter 2005 financial results were materially false and misleading, as follows:

(A)    Despite representations to the contrary, the Company's previously reported fiscal 2005 third quarter financial statements and results, including reported net income and EPS, were grossly and materially overstated in violation of GAAP, as those audited financial statements required restatement;

(B)    The overstatements contained in Navistar's third fiscal quarter 2005 financial statements are innumerable.  Virtually every line of Navistar's third fiscal quarter 2005 income statement required restatement.  As set forth in paragraph 230, below, the 2005 10-K included a restated consolidated income statement for the third fiscal quarter 2005, which reflected the falsity of the Defendants' third fiscal quarter 2005 results;

(C)    Navistar's third fiscal quarter 2005 financial results were overstated as follows:

i.    Navistar's third fiscal quarter 2005 net income was overstated by $26 million, the initially reported net income of $64 million was restated to net income of $38 million; that is, the Company's third fiscal quarter 2005 net income was overstated by 40%;

ii.    Expressed in terms of EPS, the restatement reduced the previously reported third quarter fiscal 2005 diluted EPS of $0.83 to diluted EPS of $0.52;

iii.    Navistar's third fiscal quarter 2005 financial statements were impacted by the restatement, which required adjustments owing to the following matters

(discussed in detail below), each of which corrected a previous overstatement of Navistar's third fiscal quarter 2005 income, before tax:

| Accounting Matter | Overstatement of Income |
| --- | --- |
| Product Warranty | $15 million |
| Restructuring activities | $21 million |
| Unreconciled accounts and timing of income/expense recognition | $15 million |
| Consolidation Accounting | $13 million |
| Functional Currency Designation | $11 million |
| Revenue Recognition | $8 million |
| Leases | $5 million |
| Liabilities related to contingencies | $2 million |
| Derivative Instruments | $2 million |

(D)　　Navistar's and the Individual Defendants' substantive disclosures, as set forth above, concerning the Company's application of accounting policies and assumptions for accounting were materially false and misleading in light of the restatement, as follows:

i.　　Navistar and the Individual Defendants' statements concerning the Company's Product Warranty policies and reserves were materially false and misleading because they improperly included expected future product improvements, failed to properly accrue costs associated with non-warranty repairs and improperly accrued for anticipated vendor recoveries;

ii.　　Defendants' statements concerning the materiality of litigation and the adequacy of its contingency reserves were materially false and misleading because Defendants had failed to accrue for settlement offers made to resolve litigation and for incurred but unpaid product liability losses;

iii.　　Defendants' disclosures concerning the Company's accounting for and use of derivatives were materially false and misleading in that Navistar and the Individual Defendants did not properly establish that the hedge accounting was appropriate;

(E)　　Defendants' substantive disclosures concerning the Company's internal controls and disclosures policy, and any improvements being made to those policies and controls, were materially false and misleading in light of the restatement and the fifteen different material control weaknesses identified by KPMG in connection with its re-audit of the 2004 financial statements.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 229.

### H.    Restated 2005 Quarterly Financial Statements

230.    The impact of the 2005 Restatement and Re-audit items resulted in the following adjustments to Navistar's previously reported 2005 quarterly income statements for the first three quarters of 2005, as disclosed in the Company's 2005 10-K:

*2005 Quarterly Consolidated Statements of Operations*

| | For the Quarter Ended | | | | | | |
| | January 31, 2005 | | April 30, 2005 | | July 31, 2005 | | |
| (in millions, except per share amounts) | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated | October 31, 2005 |
|---|---|---|---|---|---|---|---|
| **Sales and revenues** | | | | | | | |
| Sales of manufactured products, net | $ 2,491 | $ 2,491 | $ 2,904 | $ 2,904 | $ 2,923 | $ 3,025 | $ 3,407 |
| Finance revenue | 62 | 71 | 58 | 70 | 60 | 76 | 80 |
| Other income | 5 | — | 8 | — | 11 | — | — |
| Sales and revenues, net | 2,558 | 2,562 | 2,970 | 2,974 | 2,994 | 3,101 | 3,487 |
| **Costs and expenses** | | | | | | | |
| Cost of products sold (exclusive of engineering and product development costs shown below) | 2,177 | 2,186 | 2,498 | 2,511 | 2,474 | 2,591 | 2,962 |
| Selling, general and administrative expense | 176 | 234 | 202 | 262 | 210 | 275 | 296 |
| Engineering and product development costs | 77 | 100 | 86 | 102 | 91 | 105 | 106 |
| Postretirement benefits expense | 59 | — | 60 | — | 59 | — | — |
| Restructuring and program termination (credits) charges | — | — | — | — | — | — | (2) |
| Interest expense | 33 | 68 | 38 | 70 | 51 | 83 | 87 |
| Other expense (income), net | 9 | (23) | 5 | 17 | 12 | (7) | 46 |
| Total costs and expenses | 2,531 | 2,565 | 2,889 | 2,962 | 2,897 | 3,047 | 3,495 |
| Equity in income of non-consolidated affiliates | — | 17 | — | 21 | — | 25 | 27 |
| Income before income tax | 27 | 14 | 81 | 33 | 97 | 79 | 19 |
| Income tax (expense) benefit | (9) | (7) | (28) | (17) | (33) | (41) | 59 |
| Net income (loss) | $ 18 | $ 7 | $ 53 | $ 16 | $ 64 | $ 38 | $ 78 |
| Basic earnings (loss) per share | $ 0.25 | $ 0.10 | $ 0.76 | $ 0.22 | $ 0.91 | $ 0.54 | $ 1.11 |
| Diluted earnings (loss) per share | $ 0.24 | $ 0.10 | $ 0.70 | $ 0.22 | $ 0.83 | $ 0.52 | $ 1.03 |

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 230 and on that basis denies the same.

### I.     Fourth Fiscal Quarter 2005 News

231.     On October 4, 2005, Navistar issued a press release announcing that Bill Caton had been appointed the Company's executive vice president of finance.

**ANSWER:**     Schwetschenau states that Navistar's October 4, 2005 press release speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 231.

232.     On December 12, 2005, Navistar issued a press release informing investors that it would "discuss fiscal 2005 earnings and operational metrics at a December 14 meeting for security analysts in New York City."

**ANSWER:**     Schwetschenau states that Navistar's December 12, 2005 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 232.

## VI.     THE TRUTH BEGINS TO EMERGE

233.     On December 14, 2005, at approximately 11:03 a.m. EST, Navistar issued a press release announcing that it had "postponed a scheduled meeting with security analysts and shareowners because the company's external audit for Fiscal 2005 is still in progress." Defendant Ustian commented that "[a]s a company, we have high standards and our audit process is taking longer than expected."   The press release stated that the Company planned to file its 2005 Form 10-K on time in January 2006.

**ANSWER:**     Schwetschenau states that Navistar's December 14, 2005 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 233.

234.     The market reacted to this announcement negatively, interpreting it as an indication of additional accounting problems at Navistar.  Bear Stearns analyst, Peter Nesvold, issued a report on December 14, 2005 commenting on the canceled analyst meeting: "Our sense is that NAV's new securitization accounting requirements may have played a major role in the delay...  We believe that NAV's accounting systems have been strained since the company had to change its accounting for securitizations early this year.  Previously, NAV said that its quarterly earnings reports would take place closer to its SEC filing deadlines, rather than closer to quarter-end."  He also noted that "we expect market skepticism to remain high on the name due to cont'd earnings delays."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 234 and on that basis denies the same.

235.    In response to this announcement, Navistar's stock dropped 6.97% on December 14, 2005, or $2.11 per share, to close at $28.17.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 235 and on that basis denies the same.

236.    After the close of the financial markets on January 17, 2006, Navistar issued a further press release announcing that it would not be filing its 2005 10-K by the January 17 filing deadline. The Company claimed to still be in discussions with Deloitte regarding "a number of open items." Navistar gave no guidance as to when to expect the 2005 10-K to be filed since it was unsure when discussions with Deloitte would be concluded:

> The [C]ompany and Deloitte are reviewing a number of open items including some complex and technical accounting issues and the [C]ompany cannot determine the impact the resolution of these issues may have, if any, on the per share earnings guidance issued last September. The [C]ompany's Form 10-K for fiscal 2005 will be filed with the Securities and Exchange Commission as soon as practical.

**ANSWER:**    Schwetschenau states that Navistar's January 17, 2006 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 236.

237.    The January 17, 2006 press release blamed the delay on a member of the Deloitte audit team becoming ill: "In mid December 2005, a key member of the Deloitte audit team went on an unexpected, extended medical leave." According to the press release, "a new audit team from Deloitte is now working to complete the year end audit for fiscal 2005."

**ANSWER:**    Schwetschenau states that Navistar's January 17, 2006 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 237.

238.    Despite the apparent severity of the situation with the Company's accounting, Navistar continued to try (with decreasing success) to mislead the market and mitigate the impact of the adverse disclosures, by falsely stating that the accounting review was not significant. In a Bloomberg News article issued after the market closed on January 17, 2006, Navistar's spokesman, Roy Wiley, commented on the delay, saying "it has to do with where you put words

in a financial statement.  It doesn't have anything to do with the strength or liquidity of the [C]ompany."

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 238.

239.    Moody's Investors Service ("Moody's") issued a statement after the market closed on January 17, 2005 reporting that it would maintain its long-term ratings of Navistar, "but changed the outlook to negative from stable."  Moody's went on to say that "[t]he negative outlook reflects the uncertainty surrounding the ultimate resolution of [the unresolved issues relating to Navistar's fiscal 2005 audit], and the attendant risks that Moody's believes Navistar could face."

> **ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 239 and on that basis denies the same.

240.    Standard & Poor's Ratings Service ("S&P") issued a statement before the market opened on January 18, 2005 announcing that it was placing Navistar and Navistar Financial on "CreditWatch with negative implications."  According to S&P analyst Eric Ballentine, "[t]he CreditWatch listing reflects our concern that Navistar's failure to file its financial statements could, over time, result in violation of reporting requirements within its bond agreements."

> **ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 240 and on that basis denies the same.

241.    Fitch Ratings issued a press release after the market closed on January 19, 2006 reporting that it had placed the debt ratings of Navistar and Navistar Financial on "Rating Watch Negative."  According to the press release, Fitch was specifically "concerned with the uncertainty regarding the duration of the delay, the scope of the issues under discussion and the eventual outcome of the audit, as well as possible measures creditors may take in a filing-default scenario and the potential for restricted access to financial markets that companies generally face when uncertainty arises from the lack of audited financial statements over a lengthy period of time."

> **ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 241 and on that basis denies the same.

242.    Owing to the delay in the Company's financial results and 10-K filing and the adverse news from the credit rating agencies, over the course of the four trading days from January 17, 2006 through January 20, 2006, Navistar's stock fell by $1.03 per share, from its Friday, January 13, 2007 closing price of $26.90 per share to close on January 20, 2007 at $25.87 per share.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 242 and on that basis denies the same.

243.    Before the market opened on February 3, 2006 Navistar issued a Form 8-K
informing investors that it was in default on its 4.75% Subordinated Exchangeable Notes due
2009:

> On January 25, 2006, Navistar International Corporation (the [C]ompany)
> received a notice from purported holders of more than 25% of the [C]ompany's
> $220 million 4.75% Subordinated Exchangeable Notes due 2009 (the
> Exchangeable Notes), alleging the company is in default of a financial reporting
> covenant under the indenture governing the Exchangeable Notes for failing to
> timely proved the trustee for the Exchangeable Notes an Annual Report on Form
> 10-K for the fiscal year ended October 31, 2005.

**ANSWER:**    Schwetschenau states that Navistar's February 3, 2006 Form 8-K speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 243.

244.    According to the Form 8-K, Navistar disputed the bondholders' interpretation,
stating the Company was required only to provide copies of the periodic reports filed with the
SEC upon the actual filing of the reports, not that the Company was required to timely file the
reports with the SEC.

**ANSWER:**    Schwetschenau states that Navistar's February 3, 2006 Form 8-K speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 244.

245.    The Form 8-K went on to explain that if the holders of the Exchangeable Notes
were successful in asserting their claim they could accelerate the payment of the principal and
accrued interest.  If the payment on the Notes was accelerated, then an event of default would
occur under Navistar Financial's revolving credit facility, which could prevent Navistar
Financial from incurring additional indebtedness under the revolving credit facility.  Further, the
lenders on the revolving credit facility would be able "to terminate the facility and demand
immediate payment of all outstanding amounts, which as of the date hereof is approximately
$841 million."

**ANSWER:**    Schwetschenau states that Navistar's February 3, 2006 Form 8-K speaks

for itself, denies any characterizations of that document, and denies the remaining allegations of

Paragraph 245.

246.    Midday on February 3, 2006, Moody's issued a statement that it was lowering its ratings of Navistar and "plac[ing] the ratings under review for further possible downgrade." Moody's commented that this downgrade was a reflection of "the heightened financial risk stemming from uncertainty as to Navistar's ability to file its financial statements in a timely manner given the number and complexity of various open items that the company continues to discuss with its auditors Deloitte and Touche."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 246 and on that basis denies the same.

247.    In an article issued on Bloomberg News, Navistar spokesman Roy Wiley commented that "he didn't know when the [Company will file the annual report with the SEC and that work continues with the outside accountants."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 247 and on that basis denies the same.

248.    As a result of the Company's 8-K and the ensuing Moody's downgrade Navistar's common stock declined from a closing price on February 2, 2006 of $27.79 per share, to a closing price of $27.13 per share on February 3, 2006.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 248 and on that basis denies the same.

249.    On February 6, 2006, Bear Stearns analyst Peter Nesvold issued a report in response to Navistar's February 3, 2006 disclosure that holders of the Exchangeable Notes had notified the Company that it was in default.  Mr.  Nesvold's report commented that the delay of Navistar's SEC filings was likely due to securitization accounting issues, but that there may be additional accounting issues delaying the filing:

What is delaying NAV's SEC filings? Our best sense remains that NAV's discussions with its auditor are primarily related to securitization accounting issues, similar to the primary issues that delayed NAV's F2004 filings.  However, it is impossible to know what other issues may be being discussed, or the magnitude of the issues being discussed.  Uncertainty increases as more time elapses.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 249 and on that basis denies the same.

250.    On February 10, 2006, Fitch issued a press release informing investors that it had downgraded the ratings of Navistar and Navistar Financial while keeping the ratings on "Rating Watch Negative."  According to the press release, "[t]he downgrade reflects the protracted

duration of Navistar's inability to file audited financial statements, the scale and uncertainty of any adjustments that may be required, uncertainties associated with the potential refinancing of Navistar International's debt, and the potential for limited access to external capital following the refinancing."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 250 and on that basis denies the same.

251.    On February 16, 2006 Navistar issued an update on the progress of its completion of the 2005 10-K.  Ustian commented that "We are committed to taking positive actions that move toward resolution of the complex and technical accounting items that are under review." In discussing the progress being made and the steps toward completing the 2005 financials, Ustian commented on the help being given by two of the Company's senior finance executives, Bill Caton and Defendant Lannert:

> Bill Caton, executive vice president of finance, who joined the [C]ompany last October and has extensive experience in dealing with complex and technical issues will take the lead in the working to complete the review of the accounting issues.  Robert Lannert, the [C]ompany's chief financial officer, will continue to provide financial leadership to the [C]ompany during this transition period.

**ANSWER:**    Schwetschenau states that Navistar's February 16, 2006 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 251.

252.    The February 16, 2006 press release went on to say that in order "to facilitate the completion of the audit, Mark T.  Schwetschenau, the [C]ompany's senior vice president and controller, has been reassigned to another position within the company."  Prior to this reassignment, Defendant Schwetschenau had been Navistar's principal accounting officer.

**ANSWER:**    Schwetschenau states that Navistar's February 16, 2006 press release

speaks for itself, denies any characterizations of that document, and denies the remaining

allegations of Paragraph 252.

253.    Midday on February 21, 2006 Navistar issued a press release that provided an update on its accounting review, noting that it was continuing "to work toward a resolution" of the items under review and that progress was being made.  It was in this press release that Navistar first mentioned the possibility of a restatement of previously issued financial statements: "The [C]ompany's review of the accounting matters may result in changes to its previously issued financial statements, including the possibility of a restatement."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 253 and on that basis denies the same.

254.     In the February 21, 2006 press release Navistar detailed the many items being
reviewed, including the accounting for operating leases, consolidation of subsidiaries, and
revenue and expense recognition.  The press release also informed investors that it had hired
external consultants to help with this process:

> Among the items being reviewed are whether certain leases should have been
> capitalized rather than accounted for as operating leases, whether certain affiliates
> should have been consolidated rather than reported on the equity method, and
> certain timing adjustments that would shift revenue and expense amounts between
> reporting periods.  Matters identified at this stage are necessarily preliminary and
> subject to change.  To assist in the ongoing efforts to complete the review of the
> [C]ompany's financial statements, the [C]ompany has retained external
> consultants, including Huron Consulting Group and Skadden, Arps, Slate,
> Meagher & Flom, LLP.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 254 and on that basis denies the same.

255.     Navistar's common stock decreased from a closing price on February 17, 2006 of
$28.91 per share to a closing price on February 21, 2006, of $28.40 per share.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 255 and on that basis denies the same.

256.     On March 17, 2006 Navistar issued a Form NT 10-Q Notice of Late Filing
notifying investors that it would not file its Form 10-Q for the quarter ended January 31, 2006 by
the March 17, 2006 deadline.  The Company stated that the delay was due to the fact that "the
Corporation has several unresolved and complex accounting issues under review by the
Corporation and its registered independent public accountants, Deloitte and Touche LLP for the
year ended October 31, 2005."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 256 and on that basis denies the same.

257.     Finally, midday on April 7, 2006, Navistar issued a press release announcing that
it would be restating its financial results for the fiscal years 2002 through 2004 and the first three
quarters of 2005.  The press release indicated that the restatement would cover more items than
Navistar had previously disclosed as being subject to review.  Those additional areas included
accounting for expected outside funding of various product development projects, timing of
recognition of certain collectible items such as rebates and warranty recoveries, accounting for

the Company's warranties outside of the terms of contractual agreements, and accounting at one of the Company's foundry operations that involved the manipulation of reporting periods and expense balances. The press release further informed investors that the Company would be replacing Deloitte as its external auditor with KPMG LLP ("KPMG"), and that KPMG would opine on the restated financials in the 2005 10-K:

> The need for the restatements has been identified in the ongoing review of accounting matters that have prevented the company from filing its fiscal 2005 annual report on Form 10-K and its first quarter 2006 quarterly report on Form 10-Q on time. With the change of independent auditors the timing of the filing of the 2005 Form 10-K, including the prior periods on a restated basis, cannot be determined at this time.

> According to Bill Caton, Navistar's executive vice president, finance, to date, the company has identified items requiring restatement to include accounting for anticipated external funding of product development programs; timing of recognition of amounts deemed to be collectible from certain suppliers, including rebates and warranty recoveries; accounting for warranty to be provided by the company outside of the terms of the contractual arrangements; and shifting balances and expense amounts between reporting periods at one of the company's foundry operations. The company's review process continues and will likely result in the identification of additional items requiring correction in the restated results.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 257 and on that basis denies the same.

258.    The April 7, 2006 press release also informed investors that Navistar had named James A. Blanda as interim corporate controller to replace Defendant Schwetschenau, who the Company disclosed on February 21, 2006, had been reassigned for the purpose of facilitating the completion of the 2005 audit.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 258 and on that basis denies the same.

259.    On April 10, 2006 Bear Stearns analyst Peter Nesvold issued a report on Navistar addressing the April 7, 2006 press release. In the report Mr. Nesvold commented that he still expected some uncertainty with the Company's financials: "While Friday's announcement wasn't completely unexpected, we expect continued uncertainty."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 259 and on that basis denies the same.

260.    On April 12, 2006 Navistar issued a Form 8-K addressing its change in auditors. In the Form 8-K Navistar disclosed that it had reassigned Defendant Schwetschenau because Deloitte had informed the Company's Audit Committee that it "was no longer willing to rely on the representations of the former Controller."  Navistar also reassigned Navistar Financial's treasurer at Deloitte's request: "Simultaneously with the reassignment of the [C]ompany's former Controller and principal accounting officer, the [C]ompany also reassigned the former Treasurer of the [C]ompany's finance subsidiary, Navistar Financial Corporation (NFC), to a position within the [C]ompany's treasury department in response to Deloitte's request that NFC's former Treasurer no longer serve as an officer of NFC or of the [C]ompany."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 260 and on that basis denies the same.

261.    In the April 12, 2006 Form 8-K Navistar made several disclosures about the state of the financial statements.  In the fifth paragraph Navistar disclosed that there were no "reportable events" for the fiscal years ending October 31, 2005 and 2004, or during the period through April 7, 2006.  In the eighth paragraph Navistar disclosed that "for the period ended July 31, 2005, the [C]ompany concluded, as of that date, that there were material weaknesses in its disclosure controls and procedures due to the lack of a sufficient quantity of specialized accounting personnel at NFC."  In the ninth paragraph Navistar disclosed that Deloitte "had identified a number of accounting issues that warranted further examination and review" and that "[t]he outcome of such examination might or might not have led Deloitte to expand the scope of its audit had it continued as the [C]ompany's independent registered public accounting firm." Navistar went on to say in the ninth paragraph that Deloitte had "requested that the [C]ompany's Audit Committee initiate an investigation into the propriety of accounting and auditing confirmation matters relating to vendor rebates in fiscal 2005" and that since this investigation was also ongoing, Navistar could not determine whether the results would have caused Deloitte to expand the scope of its audit.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 261 and on that basis denies the same.

262.    The April 12, 2006 Form 8-K also disclosed that Navistar had "requested that Deloitte furnish it with a letter addressed to the Securities and Exchange Commission stating whether Deloitte agrees with the above statements made by the [C]ompany."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 262 and on that basis denies the same.

263.    On April 28, 2006 Navistar issued a Form 8-K/A amending the Form 8-K it filed on April 12, 2006.  In this Form 8-K the Company disclosed the letter it had received from Deloitte in response to its April 12, 2006 8-K.  In its response Deloitte reported that it had found that there were significant deficiencies in Navistar's internal controls existing on October 31, 2004, as referenced above in the 2004 10-K.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 263 and on that basis denies the same.

264.     Attached as an exhibit to the Form 8-K/A issued on April 28, 2006, was a letter
from Deloitte to the SEC dated April 25, 2006, responding to Navistar's Form 8-K issued on
April 12, 2006.  In the letter Deloitte noted that it agreed with the statements made by Navistar
regarding the reassignments of Defendant Schwetschenau and NFC's treasurer:

SIXTH PARAGRAPH

We agree with the statements made in this paragraph.  For purposes of clarity, **in
January 2006 we informed the Audit Committee that, because we were no
longer willing to rely on the representations of the former Controller, we
would be unable to continue our audit unless the former Controller no longer
served in a direct or oversight role in accounting or financial reporting or as
an officer of the Company or any of its subsidiaries.**

SEVENTH PARAGRAPH

We agree with the statement made in this paragraph.  For purposes of clarity, **in
October 2005, we informed the Company and the Audit Committee that,
pending the outcome of an inquiry we requested that the Audit Committee
conduct related to Navistar Financial Corporation's (NFC's) vice president
and controller (later appointed treasurer) (referred to herein as "the former
treasurer"), we were unwilling to rely on the representations of the former
treasurer.**  In January 2006, following completion of an investigation by the
Audit Committee, we informed the Audit Committee that **we continued to be
unwilling to rely on the representations of the former treasurer and
requested that he no longer serve in a direct or oversight role in accounting
or financial reporting or as an officer of NFC or serve as an officer of the
Company or any subsidiary**.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 264 and on that basis denies the same.

265.     Deloitte also noted in its April 25, 2006 letter that it disagreed with three of the
paragraphs in Navistar's original Form 8-K issued on April 12, 2006:

FIFTH PARAGRAPH

We disagree with the statement made in this paragraph.  Our comments regarding
additional reportable events, as described in Item 304(a)(1)(v) of Regulation S-K,
and clarifications of the Company's disclosed reportable events are summarized
below.

EIGHTH PARAGRAPH

We disagree with the statement made in this paragraph because it is incomplete. In addition to the material weaknesses in its disclosure controls and procedures described by the Company in its July 31, 2005 Form 10-Q, in connection with our fiscal 2004 audit, we informed the Company and the Audit Committee that the following material weaknesses in internal controls existed as of October 31, 2004:

●    Due, in part, to a lack of availability of sufficient specialized accounting personnel at NFC:

     o    A misapplication of generally accepted accounting principles at NFC resulted in a restatement of the financial statements; and

     o    There was a lack of timely resolution of reconciling items noted in NFC's collection (suspense) account reconciliations,

●    There was a lack of sufficient controls at the Company to enable the Company to identify and reconcile in a timely fashion accounts payable recorded by its Mexican subsidiary.

NINTH PARAGRAPH

We disagree with the statements made in this paragraph because they are either inaccurate or incomplete descriptions of significant matters which had already led us to substantially expand our audit scope prior to our dismissal.  Such matters are summarized as follows:

**Accounting Matters** - The accounting matters that had been identified by us and discussed with the Company and the Audit Committee in connection with our incomplete audit of the Company's fiscal 2005 financial statements included, but were not limited to, the following:

●    Appropriateness of the deferral of startup costs and losses;

●    Appropriateness of sale accounting for certain transactions with leaseback terms, including certain transactions which also involved NFC;

●    Appropriateness of deferral of costs related to product development programs;

●    Reasonableness of warranty and other sales and marketing program accruals;

●    The amount and timing of required adjustments to inventory and deferred cost amounts at one of the Company's foundry operations;

●    Whether certain leases should have been accounted for as capital leases rather than as operating leases;

- Whether certain affiliates should have been consolidated rather than reported on the equity method and the amount of losses recognized from such arrangements;

- The adequacy of amounts recorded for asbestos liabilities;

- The appropriateness of revenue recognition and related implications, if any, to NFC;

- The adequacy of the valuation allowances for recorded deferred income tax assets;

- The propriety of amounts recorded as receivables for vendor rebates and warranty and other vendor and customer settlements;

- The accuracy of recorded depreciation expense;

- The existence of unreconciled differences in reconciliations of intercompany accounts;

- The adequacy of inventory shrink reserves and amounts recorded to value inventory at the lower of cost or market;

- The timing of recording of required adjustments to accounts payable recorded by the Company's Canadian and Mexican subsidiaries; and

- The Company's presentation of reportable business segments.

It is possible that the ultimate resolution of many of the above matters could also affect the Company's financial statements for fiscal years prior to 2005. None of these accounting matters were resolved to our satisfaction prior to our dismissal.

**Audit Committee Investigation Relating to Vendor Rebates** - We informed the Audit Committee in January 2006 that:

- Our fiscal 2005 audit work relating to vendor rebates had raised a number of significant concerns, including:

  o    Whether the Company's documentation and representations of Company personnel provided to us as support accurately reflected the underlying transactions negotia**ted with vendors;**

  o    **Whether the Company personnel inappropriately interfered with our audit confirmation process**; and

  o    Whether the **conduct of Company personnel was inappropriate or illegal and, if so, who had knowledge of or participated in such conduct**.

- We would not complete our audit or issue any reports until the Audit Committee completed an investigation, conducted by independent counsel, into these matters and we were satisfied with the investigation and the resolution of these matters.

As a result of these communications, the Audit committee agreed to initiate such an investigation.  Subsequently, **we became aware of similar vendor rebate documentation issues for periods prior to fiscal 200**5.  None of these matters were resolved to our satisfaction prior to our dismissal.

**Internal Controls Over Financial Reporting** - In our February 20, 2006 meeting with the Audit Committee and other independent members of the Board of Directors, we informed these individuals that we were concerned with the appropriateness of certain aspects of the Company's internal control environment, **including management's commitment to effective internal control and accurate financial reporting and the lack of personnel with appropriate qualifications and training within the financial reporting and closing process.**  We had not reached a final conclusion as to whether or not such concerns represented material weaknesses in internal control over financial reporting as we were dismissed prior to the completion of our audit.

**Other Matters** - Except as indicated above, we make no comment as to the accuracy or completeness of the Company's Item 4.02 disclosure referred to in this paragraph.

(Emphasis added)

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 265 and on that basis denies the same.

266.     On May 3, 2006 Credit Suisse analyst Jamie Cook downgraded Navistar from Outperform to Neutral, citing "confidence issues" related to the Company's accounting problems.  On May 3, 2006 and May 4, 2006 Navistar shares fell $0.75 and $0.63, respectively - a total drop of $1.38 per share (5.3%), from the $25.79 per share May 2, 2006 closing price.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 266 and on that basis denies the same.

267.     Owing to the disclosures from April 10, 2006 - the date of the Bear Stearns analyst report - to May 4, 2006 - the day after Navistar was downgraded by Credit Suisse - Navistar shares declined by a total of $3.70 (13%) from their April 10, 2006 closing price of $28.11, to close on May 4, 2006 at $24.41 per share.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 267 and on that basis denies the same.

268.     On May 10, 2006 Navistar issued a press release informing investors that the Company expected that its earnings for fiscal 2006 would "be higher than the current average estimate of Wall Street analysts of $5.38 per share."  The Company also noted in the press

release that due to the change of independent auditors, it was not able to determine when it would file the Form 10-K for fiscal 2005 or the Form 10-Q for the first quarter of fiscal 2006.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 268 and on that basis denies the same.

269.     On May 26, 2006 a Bloomberg News article reported that MAN AG, the third largest truck maker in Europe, was "interested in acquiring a stake in U.S. competitor Navistar International Corp. to cut costs while expanding across the Atlantic."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 269 and on that basis denies the same.

270.     On May 30, 2006 Bear Stearns analyst Peter Nesvold issued a report on Navistar, announcing that Bear Stearns was downgrading its rating of Navistar's common stock from "Peer Perform" to "Underperform." The report listed three reasons for this downgrade: "1) low accounting visibility; 2) expected spike in warranty costs; and 3) upcoming 16-18 month downturn in Class 8 orders." Expanding on "low accounting visibility" Mr. Nesvold stated:

Deloitte's recent 8-K outlined 16 accounting concerns the auditor raised prior to termination. D&T also broadly referenced potentially illegal conduct by NAV personnel. At a minimum, visibility into NAV's accounting remains extremely low.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 270 and on that basis denies the same.

271.     On May 30, 2006, Navistar shares declined by $2.37, or 8.2%, to close at $26.64. Bloomberg News attributed the decline to the Bear Stearns rating cut: "Navistar fell $2.37 or 8.2%, to $26.64. The world's fourth-biggest truckmaker was cut to 'underperform' from 'peer perform' by Bear Stearns."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 271 and on that basis denies the same.

272.     On June 2, 2006, after the close of the financial markets, Navistar issued a press release announcing a plan to file its Fiscal 2006 Form 1 0-K by mid-January 2007. The press release went on to say that the Company anticipated filing the Fiscal 2005 Form 10-K shortly before filing the Fiscal 2006 Form 10-K. Defendant Ustian commented that "the [C]ompany is working with KPMG, its new independent auditor, on its aggressive plan to get financial reporting back on track." Navistar also discussed the investigations by the audit committee into "the propriety of accounting and auditing confirmation matters":

As part of the review of accounting issues, the company's audit committee has completed an independent investigation into the propriety of accounting and auditing confirmation matters relating to vendor rebates in fiscal year 2005.  The investigation was conducted by an independent law firm and found no evidence of fraud or intentional misconduct.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 272 and on that basis denies the same.

273.    On June 6, 2006 Moody's issued a press release announcing that it might withdraw Navistar's ratings: "Moody's Investors Service said that it could withdraw its ratings for Navistar International Corporation (B1 senior unsecured and B3 subordinated) by July 15th 2006 due to the rating agency's belief that it may lack adequate financial information to maintain a rating."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 273 and on that basis denies the same.

274.    On June 7, 2006 Navistar held a conference call to discuss its financial result for the first six months of fiscal 2006.  On the call Bill Caton, Executive Vice President Finance, addressed the progress of the Restatement: "I want to assure all of you that we are working diligently to complete the restatement and audit process.  We have an outstanding team in place, both internally and externally, that is committed to meeting an aggressive plan to file our financials as soon as possible."  Mr.  Caton also reiterated the Company's previous goal of filing the Fiscal 2006 Form 10-K by mid-January 2007 and to have finished the Fiscal 2005 Form 10-K and the restated 2002 though July 2005 financial statements shortly before that time.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 274 and on that basis denies the same.

275.    On July 17, 2006 Moody's Investors Service issued a press release announcing its withdrawal of its ratings of Navistar's B 1 senior unsecured and B3 subordinate notes:

Moody's Investors Service withdrew its ratings of Navistar International Corporation (B 1 senior unsecured and B3 subordinate) due to its belief that it lacks adequate financial information to maintain a rating...

Navistar has been unable to file Form I OK for its fiscal year ending October 31, 2005.  In addition, on April [7]th the company announced that it had concluded that its financial statements for the years ended October 31, 2002 through 2004, and all quarterly financial statements for periods after November 1, 2002, should not be relied upon because of errors in these financial statements.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 275 and on that basis denies the same.

276.     As a result of the announced restatement, Defendant Lannert's comments on June 7, 2006, and the impact of equity analysts and credit rating downgrades, by July 17, 2006 shares of Navistar common stock had fallen to $20.95 per share.  This is an additional $3.65 (14.8%) per share drop from the Company's May 5, 2006 closing price of $24.60 per share.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 276 and on that basis denies the same.

A.     **Post Class Period Events**

277.     In the months following the April 7, 2006 announcement that the Company's 2002 through 2004, and first three quarters of 2005 financial statements would be restated, Navistar continued to update investors on the progress of the accounting review.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 277 and on that basis denies the same.

278.     On July 24, 2006 Navistar issued a press release announcing that "the New York Stock Exchange has granted the [C]ompany up to a six month additional trading period through February 1, 2007 to complete and file its fiscal 2005 annual report on Form 10-K with the Securities and Exchange Commission, subject to reassessment during this time frame."  The Company reiterated that it expected to file the Fiscal 2005 Form 10-K shortly before it filed the Fiscal 2006 Form 10-K in mid-January.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 278 and on that basis denies the same.

279.     On September 5, 2006 Navistar announced that Bill Caton had been elected Chief Financial Officer of the Company and that Defendant Lannert would "focus on future strategic initiatives" in a senior advising role.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 279 and on that basis denies the same.

280.     On September 13, 2006, Navistar issued a press release that included an update on the status of the restated financial results:

"We are working diligently with outside resources on our restatement and I want to stress that the accuracy of our financial statements is our number one priority,"

Caton said.  "The magnitude and volume of items under review makes completing the required work for both the restatements and 2006 quarterly financial statements a challenging task.  We are dedicating significant resources both internally and externally to this project.  There are areas ahead of schedule, some areas right on time and others behind schedule.  To keep our momentum going we have added more resources to the areas behind schedule."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 280 and on that basis denies the same.

281.     On September 21, 2006 Navistar issued a press release announcing that it had named John P.  Waldron as vice president and corporate controller of the Company.  Mr. Waldron was hired to replace James Blanda, who had been serving as the interim controller. According to the press release, Waldron would become the Company's principal accounting officer.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 281 and on that basis denies the same.

282.     On December 15, 2006 Navistar issued a press release providing an update on the restatement progress.  According to the press release, Navistar hired more than 50 new accounting personnel and the Huron Consulting Group continued to consult with the Company's accounting management:

"We have made significant progress on completing the restatement of our financial statements while at the same time strengthening accounting processes throughout the company," said Caton.  "The efforts to address our accounting issues and our commitment to accuracy will extend the completion of our 2005 financial statements beyond February 1, 2007, which will then be followed by the completion of our 2006 financial statements," Caton said.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 282 and on that basis denies the same.

283.     The December 15, 2006 press release also noted that the New York Stock Exchange had notified it "that it expects to suspend trading in Navistar's stock by December 20, 2006, and begin procedures to delist the [C]ompany from the exchange."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 283 and on that basis denies the same.

284.     On December 19, 2006 NYSE Regulation issued a press release announcing that it would allow Navistar's common stock to continue trading on the exchange while a review of

the previously announced suspension was in process.  According to the press release, the review would be heard on January 30, 2007.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 284 and on that basis denies the same.

285.    Navistar issued a press release on February 6, 2007 announcing that NYSE had "informed the [C]ompany that it plans to proceed with its previously announced delisting of the [C]ompany from the exchange and will suspend trading in [C]ompany stock at the end of trading on February 13 as part of this procedure."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 285 and on that basis denies the same.

286.    On February 13, 2007, Navistar announced in a press release that its stock had been suspended from trading on NYSE because it had been unable to file fiscal 2005 financial statements with the SEC.  According to the press release, Navistar would begin trading on "pink sheets" (the over-the-counter market) on February 14, 2007.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 286 and on that basis denies the same.

287.    On March 20, 2007 Navistar held an analyst conference call in which Bill Caton gave an update on the status of the restatement in which he noted that this was "not just a restatement" but that it was also a "re-audit":

First, I want to clarify that it[`]s not just a restatement; it's a restatement and a re-audit and it's due to the hiring of new auditors who are performing a complete re-audit of 2003, 2004, and 2005.  To this end, KPMG - who have been working with us since May - is currently staffed at levels that exceed normal audit requirements and they've been doing a great job keeping up with us as we complete our work, but overall, I feel good about our progress on the restatement. In the next 30 days, my internal accounting team plans on finally resolving all of the past accounting issues.

After a thorough review by our auditors of these resolutions, the accounting team will then begin to make corrections to the local ledgers throughout the [C]ompany.  This will be a timely project as the volume of transactions are significant.  After we make the corrected entries, we will move into the reconsolidation process which is also quite an undertaking as we are essentially closing the books for four years.  As those of you who are familiar with accounting know, this is an iterative process that requires a lot of discipline and verification.  In other word, we may need to rerun the closing of the books a number of times until we get it exactly right, and at the same time, we are drafting

up the 2005 10-K which we expect will be much larger and of course more informative than past 10-K's.

Throughout this, our auditors have been reviewing our work throughout the process and once management believes the restatement is complete, KPMG will have to finish their audit including their review of our SOX 404 work and reports. This is part of the re-audit process that the [C]ompany has very little control over and makes the projection of the complete date difficult to give.  However, I am confident that over the next 60 days we will know more about the timing and understand most of the financial impact of the restatement of prior years and I promise you that once we have this information we will keep you informed as soon as possible and through the proper disclosure channels.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 287 and on that basis denies the same.

288.    In a May 31, 2007 press release, Navistar again updated investors on the status of the Restatement announcing that "it expects to file its fiscal 2005 Form 10-K, which will include restated financial reporting for the fiscal years 2003, 2004 and the first three quarters of 2005, within the next four months."  In the press release, Bill Caton disclosed that "the [C]ompany has utilized more than two hundred outside consultants, including accountants from other public accounting firms, to help with the restatement process."  Mr.  Caton went on to note that the Controller's department had been restructured as well as other efforts to prevent such a massive accounting restatement from happening in the future.

"We have restructured the Corporate Controller's department, realigned our finance, accounting and internal audit resources throughout the company and continue to invest in control environment improvements," Caton said.  "While the accuracy of our restatement is our number one priority, our on-going objective is to strengthen our accounting and control environment to allow for timely and accurate financial filings going forward."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 288 and on that basis denies the same.

289.    The May 31, 2007 press release also gave an update as to the areas that would be restated:

In addition to the matters previously disclosed in an April 2006, filing with the Securities and Exchange Commission, the company's restatement review process has included the accounting and reporting for derivatives, restructuring related costs, post retirement benefits, the sale of receivables, acquisitions, income tax reserves and foreign currency matters related to its affiliates that operate outside of the United States.  Since the company's review process is not yet complete, any assessment of the nature or scope is preliminary and subject to change.  Navistar

intends to disclose the financial impact of the restatement on prior years when the information is definitive and audited.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 289 and on that basis denies the same.

290.     On September 21, 2007, Navistar issued a press release announcing its plans to release the unaudited restated financials for 2003 through 2005 on October 25, 2007.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 290 and on that basis denies the same.

291.     Finally, on October 25, 2007 Navistar released summary preliminary and unaudited results for fiscal years 2002 through 2005.  According to the press release, "[t]he [C]ompany's pre-tax restatement adjustments total negative $1.12 billion during the restatement period of 2003 and prior, 2004 and the first three quarters of 2005."  Of the $1.12 billion, $321 million was an increase to warranty reserve and "represented the largest change to operational results."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 291 and on that basis denies the same.

292.     Navistar's presentation for the analyst conference call also noted that in management's assessment, there were fifteen material weaknesses identified in Navistar's internal controls.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 292 and on that basis denies the same.

293.     The October 25, 2007 press release also addressed management's assessment of Navistar's financial reporting internal controls, finding a number of material weaknesses.

Management has assessed the effectiveness of Navistar's internal controls over financial reporting and identified a number of material weaknesses.  This assessment determined a need to establish stronger awareness regarding consistent application of highly ethical standards across all areas of the company, the importance of internal controls over financial reporting and strict adherence to generally accepted accounting principles (GAAP).

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 293 and on that basis denies the same.

294.    Navistar also informed investors in the October 25, 2007 press release that an independent law firm had completed its own review of the internal control environment at Navistar. This investigation "determined that most of the errors corrected in the restatement were due to *lack of proper accounting knowledge*, which resulted in misapplication of GAAP" but that it had "also identified instances of *intentional misconduct*" that resulted m some of the material restatement adjustments. (Emphasis added).

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 294 and on that basis denies the same.

295.    On October 31, 2007 Navistar issued a Form 8-K announcing that Defendant Lannert's employment as a senior advisor had been terminated.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 295 and on that basis denies the same.

296.    On December 10, 2007, Navistar announced in a press release that it had filed its Fiscal 2005 Form 10-K, which contained the restated financial results for 2003, 2004, and the first three quarters of 2005.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 296 and on that basis denies the same.

## VII.    NATURE OF THE MISSTATEMENTS

297.    During the Class Period, Navistar's publicly reported financial results created the impression that it was in a positive business cycle, marked by increasing profit and controlled operating costs. For the fiscal years ended October 31, 2003 and October 31, 2004, Navistar originally reported a net loss of $21 million, and net income of $247 million, respectively. For the first three quarters of 2005 the Company had reported, respectively, $18 million, $53 million and $64 million in net income. These results were also generally in line with or exceeded consensus analysts' estimates. However, when viewed in light of the effects of the Restatement it is apparent that Navistar's ability to meet or exceed guidance and consensus estimates was predicated entirely on the Defendants' improper accounting manipulations:

**Comparison of Diluted Earnings Per Share (EPS) (loss) Guidance
and Consensus Estimates with Originally Reported and Restated EPS**

| | Company Guidance | Consensus Estimates | Originally Reported Diluted EPS[5] | Restated Diluted EPS |
|---|---|---|---|---|
| **2003**[6] | ($0.66) to ($0.76) | ($0.70) | ($0.27)/($0.31) | **($4.86)** |
| **2004** | $2.95 | $3.03 | $3.20 | **($0.64)** |
| **Q1 2005** | $0.20 - $0.25 | $0.23 | $0.24 | **$0.10** |
| **Q2 2005** | $0.65 - $0.70 | $0.71 | $0.70 | **$0.22** |
| **Q3 2005** | $0.75 - $0.85 | $0.84 | $0.83 | **$0.52** |

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 297, including

footnotes 5 and 6.

298.    Fueled by these seemingly strong results, Navistar's share price increased from $21.93 per share, its closing price on February 13, 2003, the day before beginning of the Class Period, to as high as $52.03 per share, on January 20, 2004, an increase of more than 137% in only 11 months.  Navistar's share price continued to be inflated throughout the balance of the Class Period, trading at an average price of $37.20 per share from January 2004 through December 2005, when information about the Company's accounting manipulations began to be revealed to the market.

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 298.

299.    By all public appearances, Navistar's financial results during the Class Period were positive.  But the appearance was a sham masked by fraud, accounting manipulations, failed or nonexistent accounting procedures and policies, and an inadequate system of internal controls at the Company.

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 299.

300.    Despite devoting significant resources to the Restatement, it took Navistar *nearly two years*, until December 10, 2007, to file its 2005 10-K, which included Navistar's restated financial statements for 2003, 2004 and the first three quarters of 2005.  The restatement reflected changes resulting in sixteen different accounting matters, which affected virtually every line on the Company's restated income statements and balance sheets.

> **ANSWER:**    Schwetschenau denies the allegations of Paragraph 300.

A.    **The Misstatements and Their Impact**

301.    In the 2005 10-K, Navistar disclosed the following with respect to the process that led up to the announced restatement on April 6, 2006:

---

[5] Navistar did not provide restated results for the interim quarterly periods of 2003 and 2004.

[6] The fiscal 2003 EPS was originally reported as $0.27 loss; the $0.31 loss reflects the adjustments made as a result of the 2004 Restatement, as set forth in Navistar's 2004 10-K.

111

On April 6, 2006, the management of NIC [Navistar], with the concurrence of the audit committee of our Board of Directors, concluded that [Navistar]'s previously issued consolidated financial statements for the years ended October 31, 2002 through 2004, and all previously issued quarterly consolidated financial statements for periods after October 31, 2004, should be restated. In addition, in April 2006, the audit committee of our Board of Directors dismissed our independent registered public accounting firm, Deloitte & Touche LLP, and approved the engagement of KPMG LLP as our independent registered public accounting firm.

Since January 2006, we have undertaken a comprehensive review of our previously filed consolidated financial statements, after having identified a number of accounting issues during the 2005 year-end close.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 301 and on that basis denies the same.

302.    The 2005 10-K summarized the impact of the restatement on the previously audited financial results for 2004 and 2003, which adjustments caused a $2.4 billion reduction to the assets reported on the Company's 2004 balance sheet, and reductions of net income of $291 million and $312 million, in 2004 and 2003, respectively:

Previously reported stockholders' equity as of October 31, 2004 and 2003 have been reduced by $2.4 billion and $2.0 billion, respectively, as a result of the restatement adjustments. We have adjusted our November 1, 2002 accumulated deficit to recognize corrected items that related to prior periods, increasing the deficit by $1.7 billion.

For the year ended October 31, 2004, the effect of the restatement was to reduce previously reported net income of $247 million to a loss of $(44) million. For the year ended October 31, 2003, the previously reported net loss of $(21) million was increased to a net loss of $(333) million.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 302 and on that basis denies the same.

303.    The restated and re-audited financial results documented the following staggering reductions in net income for fiscal years 2003 and 2004 and the first three quarters of 2005 (in millions):

|       | As Originally Reported | As Restated | Difference | % Misstatement |
|-------|------------------------|-------------|------------|----------------|
| 2003  | ($21)                  | ($333)      | ($312)     | 1,485%         |
| 2004  | $247                   | ($-44)      | ($291)     | 118%           |
| 2005  | $135                   | $61         | ($74)      | 45%            |
| Total | $361                   | ($316)      | ($677)     | 188%           |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 303 and on that basis denies the same.

304.     Thus, Navistar had overstated net income in 2003 by $312 million, a misstatement
of 1,485%. Similarly, by reporting a profit of $247 million in 2004, Navistar avoided having to
report its fourth consecutive year of losses, and created the appearance that it had turned the
corner and had become profitable, when in truth the Company had continued operating at a loss
in 2004. During the entire Class Period, Navistar overstated its net income by $677 million, or
188%, falsely reporting net income of $361 million, when it had actually sustained losses of
$316 million.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 304.

305.     As already noted, the stockholders' equity reported by Navistar at fiscal years
ended October 31, 2003 and 2004, was revealed in December 2007 to have been overstated by
$2.0 billion and $2.4 billion, or by 701% and 449%, respectively. Thus, the *positive*
stockholders' equity of $292 million and $531 million as reported, were actually *negative*
shareholders' deficits of $1.8 billion and $1.85 billion in 2003 and 2004 respectively. Similarly,
the accumulated deficit at November 1, 2002, was revealed in December 2007 to have been $1.7
billion higher than reported, a misstatement of 231%.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 305.

306.     The misstatements during the Class Period affected *every line item* on the income
statements and *every line item except marketable securities* on the balance sheets issued by
Navistar from at least fiscal year 2002 to third quarter 2005. The misstatements included
violations of GAAP in areas involving almost every aspect of Navistar's operations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 306.

307.     The following table summarizes the total cumulative overstatement of income,
before tax, previously reported during fiscal years 2003 and 2004 and the first three quarters of
2005, by the principle areas requiring restatement:

| Area of Misstatement | (in millions) Amount of Misstatement |
|---|---|
| Product warranty | $190 |
| Employee benefit arrangements | $176 |
| Restructuring activities | $106 |
| Leases | $71 |
| Liabilities related to contingencies | $71 |
| Vendor rebates and tooling costs | $30 |
| Consolidation accounting | $25 |
| Revenue recognition | $16 |
| Functional currency designation | $13 |
| Unreconciled accounts and timing of Income/expense recognition | $11 |
| Property and equipment | $9 |
| Financial reporting reclassifications | $4 |

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 307.

### B.     Causes of the Misstatements

308.     The 2005 Restatement and Re-Audit was not the product of innocent errors or mistakes.  In an October 25, 2007, press release Navistar disclosed that an independent law firm had completed its own review of the internal control environment at Navistar and had "identified instances of *intentional misconduct*" that resulted in some of the material restatement adjustments.  (Emphasis added)  The misstatements related to sixteen separate accounting areas, and affected virtually every item of the Company's income statement for eleven straight quarters. Sorting out the Restatement items took nearly two full years of work and significant resources.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 308.

309.     In the Company's 2005 10-K, Navistar included a discussion of the findings of the Company's Audit Committee investigation.  In that discussion Defendants admitted that the accounting misstatements corrected by the 2005 Restatement and Re-Audit were the product of "intentional misconduct" that sought to artificially "improve" Navistar's reported financial results:

> On December 29, 2006, our Board of Directors formed an Investigatory Oversight Special Committee of independent directors to oversee and assist the Audit Committee in its investigation.  Independent counsel for the Audit Committee

provided regular updates on the status of the investigation to the staff of the Division of Enforcement of the SEC.

The Audit Committee's extensive investigation identified various accounting errors, *instances* of *intentional misconduct* and certain weaknesses in our internal controls. The Audit Committee's investigation found that we did not have the organizational accounting expertise during 2003 through 2005 to effectively determine whether our financial statements were accurate. The investigation found that we did not have such expertise *because we did not adequately support and invest in accounting functions,* did not sufficiently develop our own expertise in technical accounting, and as a result, we relied more heavily than appropriate on our then outside auditor. The investigation also found that during the financial restatement period, this environment of weak financial controls and under-supported accounting functions allowed accounting errors to occur, *some of which arose from certain instances of intentional misconduct to improve the financial results* of *specific business segments.*

(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 309.

310.    In addition, the 2005 10-K indicates that Defendants Lannert and Schwetschenau were removed from their position as a result of their participation in the accounting fraud at Navistar:

The Audit Committee has discussed its findings and various recommended remediation procedures with the Investigatory Oversight Special Committee of our Board of Directors, management, and KPMG. As discussed in detail below, as part of our commitment to strengthening our overall internal control over financial reporting, **we have implemented various personnel actions, including replacing our former Chief Financial Officer and Corporate Controller** and hiring additional accounting personnel throughout the company with appropriate levels of accounting knowledge, experience, and training, and numerous other remediation actions under the oversight of the Audit Committee.

(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 310.

311.    The Company reported in the 2005 10-K that it accrued expenses totaling $299 million for various professional fees that were in addition to "the costs of approximately 100 people we added to our internal staff in the U.S. since the restatement process began."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 311 and on that basis denies the same.

312.    The impact of the restated items on the Company's financial statements makes clear that the misstatements were not just random and cannot be explained as a mistake. Almost all of the misstatement matters impacted Navistar's income directly. Many of the adjustments to the previously issued results increased the Company's costs and expenses, key areas that securities analysts were focused on in assessing Navistar's growth. These manipulations, outlined in detail below, largely impacted the Company's efforts to reduce its cost structure and report earnings growth. The fraud perpetrated by Defendants through the accounting manipulations served to alleviate the pressure the Company and the Individual Defendants were under to report improved results and to inflate the Company's long-flagging stock price.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 312.

313.    The 2005 Restatement and Re-Audit also followed a steady stream of assurances from Defendants Ustian and Lannert, certifying the propriety and adequacy of the Company's internal controls. In each quarterly and annual SEC filing during the Class Period they signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), which provided, *inter alia,* (i) that the information contained in the report "fairly presents ... the financial condition and results of operations of the Company"; and (ii) that they "are responsible for establishing and maintaining disclosure controls and procedures." Despite these statements, over the course of seven consecutive quarters, the Company's later filings with the SEC disclosed that it had no formalized, written internal control policies and procedures -- specifically, disclosing that Navistar was in the process of "formalizing and documenting the procedures already in place."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 313 and on that basis denies the same.

314.    Defendants Ustian and Lannert's statements concerning the internal controls of Navistar, and their certifications pursuant to Sections 302 and 906 of Sarbanes-Oxley, were false because either (i) Ustian and Lannert had not taken responsibility to review these internal controls, or (ii) they had reviewed and them and falsely stated that they were adequate. In either case, by taking responsibility for the Company's internal controls Ustian and Lannert were uniquely aware of the Company's deficient accounting capabilities, undocumented and inadequate control processes, and overstated financial results. There is significant evidence, that despite these responsibilities, they ignored obvious and critical problems and deficiencies which resulted in the 2005 Restatement and Re-Audit.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 314.

315.    The Defendants were also fully aware that the Company had grossly inadequate accounting staff and accounting expertise. In the Company's Form 10-Q for the first quarter of 2005, dated April 25, 2005, Navistar disclosed that "there were weaknesses in the disclosure controls and procedures within the company's finance subsidiary related to the lack of sufficient quantity of specialized accounting personnel." This was identified as a material weakness in the Company's internal controls as of 2004. Yet, despite their certifications to the contrary, signed throughout the Class Period by Defendants Ustian and Lannert, the Company did nothing to fix

the its deficient accounting and finance capabilities. Moreover, the lack of personnel with accounting expertise is further evidenced by the fact that the Company has hired 100 additional people to staff its internal accounting departments. Despite specific representations to the contrary, as the principle executives of the Company, the Individual Defendants, particularly Lannert and Schwetschenau, had direct knowledge that the Company's internal accounting functions were severely understaffed and deficient.

  **ANSWER:** Schwetschenau denies the allegations of Paragraph 315.

  316. Weaknesses in the Company's internal accounting capabilities were confirmed by interviews with Confidential Witnesses (CWs)[7] who had knowledge of those facts.

  **ANSWER:** Schwetschenau denies the allegations of Paragraph 316, including

footnote 7.

  317. CW3, a Senior Auditor in Navistar's Corporate Audit department from 1994 through 2004, noted that the Corporate Audit team was severely understaffed during his tenure. During CW3's employment at Navistar the entire Corporate Audit department was made up of 11 people - for a global business with $9 billion in annual revenue - consisting of six Senior Auditors, four Audit Managers, and Vice President of Corporate Audit Bruce Patterson. During his ten years at Navistar, CW3 had "no contact" with Deloitte.

  **ANSWER:** Schwetschenau denies the allegations of Paragraph 317.

  318. CW2 was a former Financial Analyst at Navistar beginning in May 2006. CW2 learned through discussions with his peers that one issue leading to the 2005 Restatement and Re-Audit was the fact that Navistar's Corporate Controller's organization lacked sufficient manpower - and that the personnel within the Controller's organization lacked sufficient knowledge - to properly handle accounting for a $9 billion company.

  **ANSWER:** Schwetschenau denies the allegations of Paragraph 318.

  319. CW2 explained that up until a few months before joining Navistar in early 2006, Navistar's Controller's organization did not have anyone who had "technical accounting" knowledge and who could research accounting standards to interpret the appropriate application of such standards at the Company. CW2 acknowledged that Ted Guy was hired to fulfill this role in early 2006.

  **ANSWER:** Schwetschenau denies the allegations of Paragraph 319.

  320. CW2 also learned through discussions with his peers, that before Guy joined Navistar, the Navistar accountants inappropriately went to the "onsite" Deloitte personnel for advice on how to apply various accounting standards. CW2 emphasized that this practice

---

[7] All pronoun references to the Confidential Witnesses are expressed in the masculine form, without respect to whether that witness is male or female.

violated "ethical" accounting standards and that the Navistar internal accounting staff should have prepared "propositions" on how they believed the accounting standards should be applied, and the "propositions" should have then been passed through the chain of command at Deloitte.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 320.

321.    On April 12, 2006 Navistar issued a Form 8-K addressing its change in auditors. In the Form 8-K Navistar disclosed that it had reassigned Defendant Schwetschenau because Deloitte & Touche had informed the Company's Audit Committee "that Deloitte was no longer willing to rely on the representations of the former Controller."  Navistar also reassigned Navistar Financial's treasurer at Deloitte's request: "Simultaneously with the reassignment of the [C]ompany's former Controller and principal accounting officer, the [C]ompany also reassigned the former Treasurer of the [C]ompany's finance subsidiary, Navistar Financial Corporation (NFC), to a position within the [C]ompany's treasury department in response to Deloitte's request that NFC's former Treasurer no longer serve as an officer of NFC or of the [C]ompany."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 321 and on that basis denies the same.

### C.    Defendants' Class Period Accounting Violated GAAP

322.    At all relevant times during the Class Period as set forth herein, Navistar represented that its financial results were reported in accordance with GAAP.  These representations were materially false and misleading because, as reflected by the Company's Restatement, Navistar's financial reporting was materially misstated and violated numerous provisions of GAAP during the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 322.

323.    Defendants had the responsibility to present Navistar's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.    transactions are executed in accordance with management's general or specific authorization;

118

     ii.     transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

     iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

     iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**ANSWER:**    This paragraph states legal conclusions to which no response is required. To the extent an answer is required, Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 323 and on that basis denies the same.

324.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, a fundamental objective of financial reporting is to provide useful information about an entity's financial performance.  In addition, GAAP, in Concepts Statement No. 2, provides that financial reporting should be reliable in that it represents what it purports to represent with reliable financial information.

**ANSWER:**    Schwetschenau states that FASB Concepts Statements No. 1 and 2 speak for themselves, denies any characterizations of those concepts, and denies the remaining allegations of Paragraph 324.

325.    In addition to those provisions of GAAP relating to specific misstatements discussed in greater detail below, other provisions of GAAP that the Defendants violated during the Class Period, are the following:

(A)    The principle that, in accounting for income taxes, a valuation allowance be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized, *see, e.g.,* Statement of Financial Accounting Standards ("SFAS") No. 109;

(B)    The principle that capital and operating leases are to be appropriately classified, *see, e.g.,* SFAS No. 13 and SFAS No. 98;

(C)    The principle that sale-leaseback arrangements are to be accounted for pursuant to SFAS No. 28;

(D)     The principle that the risks and rewards of ownership be relinquished before a gain on the sale of a financial instrument be recognized, *see, e.g.,* SFAS No. 140;

(E)     The principle that inter-company items and transactions be eliminated from consolidated financial statements, *see, e.g.,* Article 3A-04 of Regulation S-X;

(F)     The principle that variable interest entities under common control be consolidated; FASB Interpretation ("FIN") No. 46 and FIN No. 46R;

(G)     The principle that the functional currency is the currency of the primary economic environment in which a foreign entity operates, *see, e.g.,* SFAS No. 52;

(H)     The principle that the interest rate used in the calculation of capitalized interest be based on the rates applicable to outstanding borrowings, *see, e.g.,* SFAS No. 34;

(I)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements, *see, e.g.,* Accounting Principles Board ("APB") Opinion No. 28, X10;

(J)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources, *see, e.g.,* FASB Concepts Statement No. 1, ¶40;

(K)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general, *see, e.g.,* FASB Concepts Statement No. 1, ¶50;

(L)     The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting, *see, e.g.,* FASB Concepts Statement No. 2, ¶¶58-59;

(M)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, *see, e.g.,* FASB Concepts Statement No. 2, ¶79; and

(N)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent, *see, e.g.,* FASB Concepts Statement No. 2, ¶¶95, 97.

**<u>ANSWER:</u>**     Schwetschenau denies the allegations of Paragraph 325.

326.    In failing to file financial statements with the SEC that conformed to the requirements of GAAP, Navistar disseminated financial statements that were presumptively misleading and inaccurate.  The Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 326.

327.    Navistar's Restatement constitutes a concession that its Class Period financial reporting violated these and numerous other provisions of GAAP, which materially inflated the Company's true financial results during the Class Period.  These GAAP violations constitute materially false and misleading statements.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 327.

**D.    Individual Areas of Misstatement**

328.    In the 2005 10-K, Navistar described generally the individual matters causing the Restatement and allocated their income statement and balance sheet effects.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 328 and on that basis denies the same.

**(i)    Product Warranty - $190 mm Reduction to Income**

329.    The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's product warranty accounting.  The adjustments related to the Company's improper product warranty accounting resulted in a reduction of previously reported audited income, before tax, of $26 million in 2003, $106 million in 2004 and $58 million to the cumulative income, before tax, reported by the Company over the first three quarters of 2005. Understatement of the Company's product warranty reserves caused the greatest impact on income of any item in the 2005 Restatement and Re-Audit.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 329.

330.    The 2005 10-K described the 2005 Restatement and Re-Audit as being required, by the following GAAP violations relating to the Company's product warranty accounting:

*Product Warranty*

Our previously reported warranty accruals contained the following errors:

•    We reduced our estimates of product warranty cost by including expected future benefits of product improvements *prior to such improvements becoming reasonably assured.*

•       *We routinely performed repairs beyond the expressed terms of the warranty agreements, but did not accrue for these costs.*

•       *We reduced our estimate of future warranty costs and related accruals for anticipated vendor recovery amounts when such recoveries were not supported with vendor agreements* or were otherwise not reasonably assured of collection.

•       We included revenue related to extended warranty agreements as a component of cost of product sold rather than including it as a component of revenue.

(Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 330.

331.    The Company included the following table setting forth the adjustments related to the product warranty Restatement on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Product Warranty are as follows (in millions):

|  | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Sales of manufactured products, net | $ 14 | $ 14 |
| Cost of products sold | 120 | 39 |
| Other expense (income), net | — | 1 |
| Income (loss) before income tax | $ (106) | $ (26) |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 331 and on that basis denies the same.

332.    Navistar's product warranty accounting violated GAAP. SFAS No. 5, requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*e.g.,* likely) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated. SFAS No. 5 also expressly prohibits the recognition of contingent gains. In addition, Chapter 3 of Accounting Research Bulletin ("ARB") No. 43, provides that the objective of providing for reserves against receivables is to assure that, "[a]ccounts receivable net of allowances for uncollectible accounts ... are effectively stated as the amount of cash estimated as realizable." Navistar's Class Period accounting for product warranty reserves and expenses violated these provisions, as described in the 2005 10-K above. *See also,* FASB Concepts Statement No. 5 (¶67(d)).

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 332.

333.    As conceded in the 2005 Restatement and Re-Audit, during the Class Period, Navistar falsely represented in its SEC filings that it complied with these accounting rules, by stating that its reserves were "adequate."  These disclosures are quoted in detail above.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 333.

334.    In addition to the admissions conceded by Navistar, Plaintiffs' interview with CW1 revealed additional information about the nature of the Restatement related to product warranty expense.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 334.

335.    CW1 was employed at Navistar from September 1997 through May 2005 in the Dealer Support and Customer Service organizations.  From May 2002 until the witness left the Company in May 2005, CW1 served as the Customer Relations Manager.  As Customer Relations Manager CW1's responsibilities included "running" the toll-free telephone number used by dealers and end-users to complain about the quality of Navistar's vehicles.  CW1 worked with Defendant Ustian, including working closely with Ustian and his executive assistants to respond to complaint letters from dealers or customers that were directed to Ustian.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 335 and on that basis denies the same.

336.    From approximately 2002 until separating from the Company in May 225, CW1 was aware of the actual product warranty expenses the Company was incurring due to manufacturing defects and quality problems.  CW1 characterized Navistar's failure to disclose the underlying manufacturing and product quality problems and the resulting increases in product warranty expenses as a "colossal cover-up."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 336.

337.    CW1 identified that the root causes of the product warranty issues were manufacturing and design problems necessitating significant repairs to Navistar trucks and engines.  CW1 stated that beginning in approximately 2002, Navistar began new engine and truck production in an effort to improve the Company's product quality and reputation.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 337 and on that basis denies the same.

338.    CW1 emphasized that the new product introductions were unsuccessful. According to CW1, Navistar's quality problems were "across the board" and were well known within the Company due to the number of repairs for which Navistar was reimbursing dealers and large customers, such as Ryder, UPS, and Ford.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 338 and on that basis denies the same.

339.    CW1 stated that the quality issues pertained to a number of truck components, including "turn blinker switches," side mirrors, and "DT engines."  CW1 noted that Navistar had to repair certain truck's turn signals "25 times" and had to "pay through the nose" to fix side mirrors on the outside of trucks as they came loose from their brackets.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 339 and on that basis denies the same.

340.    From 2002 until the end of his tenure at Navistar, CW1 noticed no appreciable resolution of the product quality problems.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 340 and on that basis denies the same.

341.    To help respond to the customer complaints about product quality, in approximately 2003, Navistar established a Performance Service team under the direction of Service Performance Manager or Director Judy Boeding.  CW1 explained that the role of the Performance Service personnel was to "get a handle" on the rising warranty costs and interact with dealers regarding repair costs, including approving the repairs by the dealerships of Navistar's defective trucks.  CW1 was a member of the Performance Service team.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 341 and on that basis denies the same.

342.    CW1 noted that Defendant Ustian received daily letters from dealers and end-users emphasizing that the Company and its products "sucked."  CW1 was responsible for coordinating the responses to the complaints sent to Defendant Ustian.  These complaint letters were tracked in Navistar's *Magic Solution* database which detailed how CW1 responded to each complaint and what, if anything, was done to resolve the issues.  According to CW1, the actual product warranty costs were also tracked in Navistar's "ISIS" System.  CW1 stated his belief that Individual Defendants Ustian and Lannert had access to the ISIS System and therefore had actual knowledge of Navistar's product warranty expenses.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 342 and on that basis denies the same.

343.    CW1 provided that when Navistar truck owners had their vehicles serviced, the dealerships made such repairs and Navistar reimbursed the dealerships for such work, including labor time and the costs of parts.  Each repair had a defined cost, which included the volume of

labor needed for the repair and cost of the parts necessary. CW1 further noted that while the amount of labor and cost of parts that Navistar reimbursed the dealers for were fixed, but that the reimbursement rates for the hourly labor costs were variable among dealers.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 343 and on that basis denies the same.

344.     CW1's knowledge of the foregoing arises due to general responsibilities to track customer complaints and product repairs by running reports on the ISIS system. These reports provided CW1 with information about how long complaints had been "open" and what "action was taken" to resolve the complaints.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 344 and on that basis denies the same.

(ii)     **Employee Benefit Arrangements - $176 mm Reduction to Income**

345.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for employee benefit arrangements. The adjustments related to the Company's improper employee benefit accounting resulted in a reduction of previously reported audited income, before tax, of $130 million in 2003 and $57 million in 2004.[8]

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 345, including

footnote 8.

346.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for employee benefits arrangements:

*Employee Benefit Arrangements*

*Discount Rates*

The application of the methodology used to calculate discount rates relied on the use of benchmark indices with the inappropriate addition of 50 basis points for trading gains. It included a component based on a dedicated bond portfolio to which 50 basis points were added. *The previous adjustments to the benchmark indices were not supported and the dedicated portfolio approach was misapplied.*

---

[8] The adjustments owing to employee benefits arrangements effected by the 2005 Restatement and Re-Audit demonstrated that the Company's' cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $11 million.

*Amortization Periods*

For our Hourly and Salaried Pension plans, we began amortizing actuarial gains and losses over the retirees' remaining life expectancy in 2003. For our Retiree Health and Welfare Plan, we began amortizing actuarial gains and losses over the retirees' remaining life expectancy in 2001. *Previously, the average remaining service period of active employees was used which is a shorter period. However, the conditions required to switch from the remaining service period to the remaining life expectancy of retirees were not met for the Hourly Plan and Retiree Health and Welfare plans.*

*Plan Curtailments*

Our 2002 restructuring activities resulted in curtailments to our pension and other post-employment benefit plans. However, the curtailment calculations contained certain errors in assumptions as to the number and mix of eligible employees, and the timing of measurement and discounting used in calculating the curtailment.

*Enhanced Retirement Benefit Plan*

Since 1987, we have made enhanced benefit payments to certain retirees and their surviving spouses. These lump sum payments generally were paid on an annual or bi-annual basis and recognized as expense on a pay-as-you-go basis. *The arrangements under which the payments were made should have been accounted for as a defined benefit pension plan and, as a result, we should have recognized the pension liability in our consolidated balance sheets which would have changed the pattern of expense recognition in our consolidated statements of operations.*

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 346.

347.    The Company included the following table setting forth the adjustments related to the employee benefit arrangements Restatement on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Employee Benefit Arrangements are as follows (in millions):

| | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Cost of products sold | $ (93) | $ (136) |
| Selling, general and administrative expense | 140 | 226 |
| Restructuring and program termination (credits) charges | (1) | 32 |
| Other expense (income), net | 11 | 8 |
| | | |
| Income (loss) before income tax | $ (57) | $ (130) |

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 347 and on that basis denies the same.

348.    Pursuant to GAAP, significant changes in pension assets and obligations caused
by plan amendments, gains and losses on assets, and changes in assumptions are not recognized
immediately in income as part of net periodic pension cost, but recognized systematically over
future years. The discount rates selected to measure obligations for pension benefits and post
retirement benefits other than pensions are expected to reflect the current level of interest rates at
the measurement date. In addition, curtailments accelerate the recognition of the effects of plan
amendments and affect the measurement of pension obligations. *See e.g.,* SFAS No. 5, SFAS
No. 35, SFAS No. 87, SFAS No. 88 and SFAS No. 106.

**ANSWER:**    Schwetschenau states that the Statements cited in Paragraph 348 speak for

themselves, denies any characterizations of those Statements, and denies the remaining

allegations of Paragraph 348.

349.    As conceded in the 2005 Restatement and Re-Audit, during the Class Period,
Navistar's disclosures, set forth above, falsely represented that the assumptions used in
determining the discount rate, investment returns and amortizations were appropriate.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 349.

### (iii)    Restructuring Activities - $106 mm Reduction to Income

350.    The 2005 Restatement and Re-Audit highlighted the GAAP violations related to
the Company's accounting for its restructuring activities.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 350.

351.    The adjustments related to the Company's improper restructuring activities
accounting resulted in a reduction of previously reported audited income, before tax, of $43
million in 2003 and $42 million in 2004 and a reduction of $21 million to the cumulative
income, before tax, reported by the Company over the first three quarters of 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 351.

352.    The 2005 10-K described the 2005 Restatement and Re-Audit as being required
by the following misapplications of GAAP relating to the Company's improper accounting for
restructuring activities:

*Restructuring Activities*

We misapplied the then applicable accounting guidance as it related to certain exit costs,
as follows:

- *We did not use certain available information in estimating the costs to be incurred associated with terminating employees.*

- We did not reduce an accrual for future lease payments on abandoned office space for the portion of the space that we continued to use for the remaining term of the lease.

- We accrued for future lease payments on equipment that we did not abandon.

- We did not properly apply the impairment accounting standards.

- We prematurely accrued for costs that were likely to generate revenues in future periods.

- *We prematurely accrued for anticipated future settlements with suppliers prior to entering into contractual commitments.*

- We failed to adjust restructuring accruals in the periods in which information became available indicating adjustments were necessary.  (Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 352.

353.    The Company included the following table setting forth the adjustments related to the restructuring activities restatement on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Restructuring Activities are as follows (in millions):

|  | 2004 | 2003 |
|---|---|---|
| Increase (decrease): |  |  |
| Sales of manufactured products, net | $ — | $ (3) |
| Cost of products sold | 1 | 6 |
| Selling, general and administrative expense | — | 1 |
| Restructuring and program termination (credits) charges | 10 | 27 |
| Other expense (income), net | 59 | 6 |
| Equity in income of non-consolidated affiliates | 28 | — |
| Income (loss) before income tax | $ (42) | $ (43) |

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 353 and on that basis denies the same.

354.    Defendants' improper restructuring activities accounting violated GAAP, specifically SFAS No. 5, SEC Staff Accounting Bulletins ("SAB") 101/104[9], FASB Concepts Statement No. I and FASB Concepts Statements No. 5.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 354.

---

[9] In December 2003, SAB No. 101 was superseded by SAB No. 104.

### (iv)     Leases - $71 mm Reduction to Income

355.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for leases.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 355.

356.     The adjustments related to the Company's improper lease accounting resulted in a reduction of previously reported audited income, before tax, of $31 million in 2003 and $25 million in 2004.  The adjustments related to the Company's improper lease accounting resulted in a reduction of $15 million to the cumulative income, before tax, reported by the Company over the first three quarters of 2005.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 356.

357.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for leases:

***Leases***

<u>*Sale-Leaseback Arrangements*</u>

Certain arrangements entered into *between 1995 and 2002* were accounted for as sales and subsequent leasebacks of the assets, but did not meet the requirements for sale-leaseback accounting.  Accordingly, the arrangements have been restated as financing arrangements.

*Lease Classification*

Certain transactions were improperly accounted for as operating leases.  In addition, we did not properly evaluate whether lease characteristics were embedded in certain contractual arrangements at the inception of the arrangements.

We also corrected the classification of a lease financing transaction entered into by our financing subsidiary (NFC) in fiscal 2000.  This correction resulted in the recognition of finance revenue and depreciation and interest expenses during 2004 and 2003.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 357.

358.     The Company included the following table setting forth the adjustments related to the lease accounting restatement on the Company's 2003 and 2004 income statements:

For assets recorded as *Property and equipment, net* due to corrections of the accounting for the sale-leaseback arrangements and capital lease classification, depreciation expense is included in *Cost of products sold* from which previously recognized rental expense has been eliminated.

The impacts on our consolidated statements of operations to correct the errors related to Leases are as follows (in millions):

|  | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Finance revenue | $  5 | $  6 |
| Cost of products sold | (17) | (16) |
| Selling, general and administrative expense | 1 | 1 |
| Interest expense | 41 | 48 |
| Other expense (income), net | 5 | 4 |
| Income (loss) before income tax | $  (25) | $  (31) |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 358 and on that basis denies the same.

359.     The Defendants' improper lease accounting violated GAAP, specifically SFAS No. 13, SFAS No. 28 and SFAS No. 98.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 359.

(v)     **Liabilities Related to Contingencies - $71 mm Reduction to Income**

360.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for liabilities related to contingencies.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 360.

361.     The adjustments related to the Company's improper accounting for liabilities related to contingencies resulted in a reduction of previously reported audited income, before tax, of $49 million in 2003 and $11 million in 2004.  The adjustments related to the Company's improper accounting for liabilities related to contingencies resulted in a reduction of $11 million to the cumulative income, before tax, reported by the Company over the first three quarters of 2005.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 361.

362.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for liabilities related to contingencies:

***Liabilities Related to Contingencies***

<u>*Litigation Accruals*</u>

We *did not properly account for settlement offers* made in certain litigation cases. We should have recorded or adjusted our litigation accruals in the periods in which we made the offers. In connection with a litigation settlement in 2003, we *incorrectly recognized a gain before all significant contingencies were resolved.*

<u>*Asbestos Matters*</u>

*An asbestos reserve for existing and incurred but not reported ("IBNR") claims was based on an arbitrary estimation process.* During the restatement process, we used an actuarial study to estimate the IBNR reserve using our then existing data to estimate the required reserves.

<u>*Product Liability*</u>

*We did not properly account for all unpaid losses and loss expense obligations* associated with product liability issues under the terms of our agreements. We now use an actuarial study to estimate the required reserves. (Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 362.

363.     The Company included the following table setting forth the adjustments related to the accounting for liabilities related to contingencies restatement on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Liabilities Related to Contingencies are as follows (in millions):

|  | 2004 | 2003 |
|---|---|---|
| Increase (decrease): |  |  |
| Cost of products sold | $ 16 | $ 33 |
| Selling, general and administrative expense | — | 5 |
| Other expense (income), net | (5) | 11 |
| Income (loss) before income tax | $ (11) | $ (49) |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 363 and on that basis denies the same.

364.     Defendants' improper accounting for contingencies violated GAAP, specifically SFAS No. 5 and Chapter 3 of ARB No 43. SFAS No. 5 requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (e.g., likely) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated. SFAS No. 5 also expressly prohibits the recognition of contingent gains. In addition, Chapter 3 of ARB No. 43,

provides that the objective of providing for reserves against receivables is to assure that, "[a]ccounts receivable net of allowances for uncollectible accounts ...  are effectively stated as the amount of cash estimated as realizable."  *See also,* FASB Concepts Statement No. 5.

> **ANSWER:**     Schwetschenau denies the allegations of Paragraph 364.

365.     As conceded in the 2005 Restatement and Re-Audit, during the Class Period Navistar falsely represented in its SEC filings, as quoted above, that its reserves were sufficient to ensure that outstanding litigation or product liability related costs would not "have a material adverse affect" on the Company.  Given the significant impact of the Company's failure to properly establish those reserves, such statements were materially false and misleading.

> **ANSWER:**     Schwetschenau denies the allegations of Paragraph 365.

> ### (vi)     Vendor Rebates and Tooling Costs - $30 mm Reduction to Income

366.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for vendor rebates and tooling costs.

> **ANSWER:**     Schwetschenau denies the allegations of Paragraph 366.

367.     The adjustments related to the Company's improper accounting for vendor rebates and tooling costs resulted in a reduction of previously reported audited income, before tax, of $31 million in 2003 and $8 million in 2004.[10]

> **ANSWER:**     Schwetschenau denies the allegations of Paragraph 367, including

footnote 10.

368.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for vendor rebates and tooling costs:

> ***Vendor Rebates and Tooling Costs***

> *Vendor Rebates*

> Historically, we recorded a vendor rebate as revenue or as a reduction of cost of sales when we received the payment or entered into an agreement with the supplier, even though in many cases the retention or receipt of the rebate payment was contingent upon future events.  We have made adjustments to defer upfront consideration from vendors when *the retention or receipt of that consideration was contingent* upon future events and now recognize the consideration as a

---

[10] The adjustments owing to vendor rebate and tooling costs effected by the 2005 Restatement and Re-Audit demonstrated that the Company's' cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $9 million.

reduction of Cost of products sold over the terms of the supply agreements with the vendors.

<u>Tooling Costs</u>

We occasionally enter into tooling amortization agreements with suppliers. Under these agreements, the supplier pays for the equipment and we repay the supplier through amortization payments. We terminated certain of these tooling agreements early and acquired the equipment. In some cases, the transactions involved a rebate paid to us equal to our prior amortization payments. We *incorrectly recognized as income the amount of these rebates and we did not amortize the cost of* the acquired tooling over the appropriate useful life of the asset. As a result, we have reduced the capitalized tooling costs by the amount of any rebates previously recognized as income and depreciated the tooling costs over the remaining estimated useful life.
(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 368.

369.    The Company included the following table setting forth the adjustments related to the accounting for vendor rebates and tooling costs restatement on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Vendor Rebates and Tooling Costs are as follows (in millions):

| | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Sales of manufactured products, net | $ (24) | $ (13) |
| Cost of products sold | (19) | 13 |
| Selling, general and administrative expense | 4 | 6 |
| Other expense (income), net | (1) | (1) |
| Income (loss) before income tax | $ (8) | $ (31) |

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 369 and on that basis denies the same.

370.    As discussed further below, the Defendants' improper accounting for vendor rebates and tooling costs violated GAAP, specifically SFAS No. *140. See also,* FASB Concepts Statement No. 5; SFAS No. 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; SAB 101; SAB *104;* and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 370.

### (vii)    Consolidation Accounting - $25 mm Reduction to Income

371.    The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's consolidation accounting.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 371.

372.    The adjustments related to the Company's improper consolidation accounting resulted in a reduction of previously reported audited income, before tax, of $2 million in 2003 and $28 million in 2004.[11]

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 372, including

footnote 11.

373.    The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper consolidation accounting:

### *Consolidation Accounting*

#### *Consolidation of Variable Interest Entities*

We did not properly identify all VIEs with which we were involved.  Certain VIES were identified for which we are the primary beneficiary and thus should have been consolidated.

#### *Inter/Intra-Company Account Issues*

Our intercompany accounts were not properly reconciled.
(Emphasis added)

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 373.

374.    The Company included the following table setting forth the adjustments related to the consolidation accounting restatement on the Company's 2003 and 2004 income statements:

---

[11] The adjustments owing to consolidation accounting effected by the 2005 Restatement and Re-Audit demonstrated that the Company's' cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $5 million.

The impacts on our consolidated statements of operations to correct the errors related to Consolidation Accounting are as follows (in millions):

| | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Sales of manufactured products, net | $ (50) | $ (33) |
| Finance revenue | (29) | (10) |
| Cost of products sold | (69) | (9) |
| Selling, general and administrative expense | 59 | 18 |
| Engineering and product development costs | 17 | 1 |
| Interest expense | (6) | (3) |
| Other expense (income), net | (56) | — |
| Equity in income of non-consolidated affiliates | (4) | 48 |
| Income (loss) before income tax | $ (28) | $ (2) |

**ANSWER:** Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 374 and on that basis denies the same.

375. Defendants' improper consolidation accounting violated GAAP, specifically FIN No. 46 and FIN No. 46R, Article 3A-04 of Regulation S-X and SFAS No. 140. In addition, Defendants' improper accounting under FIN 46 made Defendants' Class Period statements that FIN 46 would have no effect on its accounting, materially false and misleading.

**ANSWER:** Schwetschenau denies the allegations of Paragraph 375.

### (viii) Revenue Recognition - $16 mm Reduction to Income

376. The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's revenue recognition accounting.

**ANSWER:** Schwetschenau denies the allegations of Paragraph 376.

377. The adjustments related to the Company's improper revenue recognition accounting resulted in a reduction of previously reported audited income, before tax, in the amount of $43 million in 2004; the Restatement owing to improper revenue recognition increase reported 2003 income, before tax, by $20 million.[12]

**ANSWER:** Schwetschenau denies the allegations of Paragraph 377, including

footnote 12.

378. The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper revenue recognition accounting:

---

[12] The adjustments owing to revenue recognition effected by the 2005 Restatement and Re-Audit demonstrated that the Company's' cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $7 million.

### Revenue Recognition

We entered into numerous transactions that contained terms and conditions that would have required unique accounting consideration such as: guaranteed buy back provisions, guaranteed residual values, bill and hold programs, product customization programs and unique delivery terms under agreements with third-party carriers. Related to these programs *we recognized revenue before the risk and rewards of ownership transferred. We also failed to eliminate certain intercompany sales. In our Mexican operations we recognized revenues when there was no evidence of a sales arrangement with the customers.* (Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 378.

379.     The Company included the following table setting forth the adjustments related to revenue recognition restatement on the Company's 2003 and 2004 income statements:

|  | 2004 | 2003 |
|---|---|---|
| Increase (decrease): |  |  |
| Sales of manufactured products, net | $ (31) | $ 140 |
| Finance revenue | 1 | — |
| Cost of products sold | 22 | 129 |
| Selling, general and administrative expense | (5) | (4) |
| Engineering and product development costs | (1) | 1 |
| Interest expense | 1 | 1 |
| Other expense (income), net | (4) | (7) |
| Income (loss) before income tax | $ (43) | $ 20 |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 379 and on that basis denies the same.

380.     Defendants' improper revenue recognition accounting violated GAAP, specifically SFAS No. 140, SAB 101, SAB 104 and SOP 97-2. GAAP provides that revenue should not be recognized until it is realized or realizable and earned. Concepts Statement No. 5, ¶83. The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. *See, e.g., SAB* Nos. 101 and 104; FASB Concept Statement Nos. 2 and 5; SFAS No. 48; ARB No. 43; APB Opinion No. 10; Article 3A-04 of Regulation S-X; and SOP 97-2.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 380.

381.     During the Class Period, Navistar falsely represented that it complied with these accounting rules. Each of its Form 10-K filings for those years stated as follows with respect to

the Company's revenue recognition policies, which violated GAAP as acknowledged by the 2005 Restatement and Re-Audit:

> Truck operations recognize shipments of new trucks and service parts to dealers and retail customers as sales at the time of shipment to the customer. Price allowances, expected in the normal course of business, and the cost of special incentive programs are recorded at the time of sale. This estimate is based upon the assumption that a certain number of vehicles in dealer inventory will have a specific incentive applied against them. Engine sales are recognized at the time of shipment to original equipment manufacturers (OEMs). An allowance for losses on receivables is maintained at an amount that management considers appropriate in relation to the outstanding receivables portfolio and other business conditions, and is charged to selling, general and administrative expense when receivables are determined to be uncollectible.

> Financial services operations recognize finance charges on finance receivables as income over the term of the receivables utilizing the interest method. Operating lease revenues are recognized on a straight-line basis over the life of the lease. Recognition of revenue is suspended when management determines the collection of future income is not probable. Selected receivables are securitized and sold to public and private investors with limited recourse. Financial services operations continue to service the sold receivables and receive a fee for such services. Gains or losses on sales of receivables are credited or charged to revenue in the period in which the sale occurs. Discount accretion is recognized on an effective yield basis. An allowance for losses is maintained at a level deemed appropriate based on such factors as overall portfolio quality, historical loss experience and current economic conditions. Receivables are charged off to the allowance for losses when the receivable is determined to be uncollectible.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 381.

### (ix)     Unreconciled Accounts/Timing of Income/Expense Recognition $11 mm Reduction to Income

382.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting related to account reconciliations and timing of expense or income recognition.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 382.

383.     The adjustments related to the Company's accounting related to account reconciliations and timing of expense or income recognition resulted in a reduction of previously

reported audited income, before tax, in the amount of $44 million in 2004; they resulted in an increase to reported 2003 income, before tax, by $26 million.[13]

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 383, including

footnote 13.

384.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting related to account reconciliations and timing of expense or income recognition:

### *Unreconciled Accounts and Timing of Income/Expense Recognition*

Certain transactions had been recorded to the wrong accounts, wrong periods, or could not be supported.  Some accounts could not be reconciled or had been classified inconsistently for reporting purposes.  Various corrections and reclassifications were required to report balances at the correct amounts, in the correct periods, or within the correct financial statement captions.

We improperly recognized as other assets items such as unreconciled amounts recorded in suspense accounts, disputed vendor invoices, and costs expected to be recovered from others, including certain product development costs.  Adjustments were required to reclassify these assets to either the appropriate consolidated balance sheet accounts or to the appropriate expense category in the consolidated statement of operations in the appropriate period.

In addition, at one of our foundries we inappropriately capitalized costs into inventory that we should have expensed when incurred.  We also did not properly recognize accounts payable in the proper accounting period or establish allowances for billing disputes with customers in the proper periods. (Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 384.

385.     The Company included the following table setting forth the adjustments related to account reconciliations and timing of expense or income recognition on the Company's 2003 and 2004 income statements:

---

[13] The adjustments owing to unreconciled accounts effected by the 2005 Restatement and Re-Audit demonstrated that the Company's' cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $7 million.

The impacts on our consolidated statements of operations to correct the errors related to Unreconciled Accounts and Timing of Income/Expense Recognition are as follows (in millions):

| | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Sales of manufactured products, net | $ 5 | $ (19) |
| Finance revenue | 2 | (1) |
| Cost of products sold | 52 | 41 |
| Selling, general and administrative expense | 5 | (16) |
| Engineering and product development costs | 2 | (1) |
| Interest expense | 6 | — |
| Other expense (income), net | (14) | (69) |
| Equity in income of non-consolidated affiliates | — | 1 |
| Income (loss) before income tax | $ (44) | $ 26 |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 385 and on that basis denies the same.

386.     Defendants' improper accounting related to account reconciliations and timing of expense or income recognition violated GAAP, specifically Article 3A-04 of Regulation S-X.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 386.

### (x)     Property & Equipment - $9 mm Reduction to Income

387.     The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for property and equipment.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 387.

388.     The adjustments related to the Company's improper accounting for property and equipment resulted in a reduction of previously reported audited income, before tax, of $8 million in 2003 and $9 million in 2004.[14]

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 388, including

footnote 14.

389.     The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for property and equipment:

---

[14] The adjustments owing to property and equipment effected by the 2005 Restatement and Re-Audit demonstrated that the Company's cumulative income, before tax, reported over the first three quarters of 2005 had been understated by an aggregate $8 million.

*Property and Equipment*

*Depreciation Methods*

At the beginning of 2002, we changed our depreciation method for all non-production assets acquired after October 31, 2001, from straight-line half- year ("SL Half-year") convention to the straight-line modified half-year ("SL Modified Half-year") convention.  Under the SL Half-year convention, we recognized a half year of depreciation expense on all assets placed in service any time during the year, regardless of the month we placed the assets into service.  Under the SL Modified Half-year convention, we recognized a full year of depreciation on all assets placed into service any time during the first half of the year and we recognized no depreciation on assets placed into service any time during the second half of the year.  Neither of these depreciation conventions were appropriate.

At the end of 2002, we changed our depreciation method for all production assets acquired after October 31, 2001, from the SL Modified Half-year convention, to an activity based method of depreciation, the units of production ("UOP") convention.  The preferability of changing depreciation methods from SL Half-year to UOP convention was not supportable.  Therefore, we have now changed our depreciation method for all production assets back to the straight-line method with a convention to begin depreciation in the middle of the month when an asset is placed in service.

*Capitalized Interest*

We made errors relating to the calculation of capitalized interest.    These errors related to both the way in which we developed the interest rate used for calculating capitalized interest and the way in which we applied the rate to determine the amount of interest to capitalize.  As a result, we revised the rate and recalculated the appropriate amount of interest to capitalize.
(Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 389.

390.    The Company included the following table setting forth the adjustments related to the accounting for property and equipment on the Company's 2003 and 2004 income statements:

The impacts on our consolidated statements of operations to correct the errors related to Property and Equipment are as follows (in millions):

| | 2004 | 2003 |
|---|---|---|
| Increase (decrease): | | |
| Cost of products sold | $ 1 | $ 14 |
| Selling, general and administrative expense | 39 | 47 |
| Engineering and product development costs | — | 1 |
| Interest expense | 4 | 1 |
| Other expense (income), net | (35) | (55) |
| Income (loss) before income tax | $ (9) | $ (8) |

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 390 and on that basis denies the same.

391.     Defendants' improper accounting for property and equipment violated GAAP, specifically ARB No. 43, APB Opinion No. 6, SFAS No. 93.  Pursuant to GAAP, two basic types of depreciation methods are acceptable - straight line (based on periods of time or usage) and accelerated (decreasing charge).  An accelerated method (e.g., declining balance or sum-of-the-years digits) is desirable if evidence indicates that the decline in value of the property is greater in the earlier years of its life or maintenance costs increase significantly as the asset ages.  When these factors are absent, the straight-line method is more desirable.  Depreciation based on units of production or hours of use should not be used when the units or hours are difficult to forecast or the risk of obsolescence is great.  *See e.g.,* ARB No. 43; APB Opinion No. 6; SFAS No. 34; SFAS No. 93; and FASB Concepts Statement No. 2.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 391.

392.     As conceded in the 2005 Restatement and Re-Audit, during the Class Period, Navistar's disclosures falsely represented that it complied with these accounting rules in its financial statements for the years ended October 31, 2002, 2003 and 2004, in which it stated as follows:

Significant expenditures for replacement of equipment, tooling and pattern equipment and major rebuilding of machine tools are capitalized.  Manufacturing production assets placed in service after November 1, 2001, are depreciated on a units-of-production basis.  Prior to November 1, 2001, manufacturing production assets were depreciated on a straight-line basis over the estimated useful lives of the assets.  The impact of the change in depreciation on the net loss in fiscal 2002 was not material.  The estimated depreciable lives of manufacturing production assets range from five to 12 years.  Non-production related assets are depreciated on a straight-line basis over the estimated useful lives of the assets, which average 35 years for buildings and improvements and 12 years for all other assets.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 392.

### (xi)    Functional Currency Designation - $13 mm Reduction to Income

393.    The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for its functional currency designations.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 393.

394.    The adjustments related to the Company's improper functional currency designation accounting resulted in a reduction of $16 million to the cumulative income, before tax, reported by the Company over the first three quarters of 2005.[15]

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 394, including

footnote 15.

395.    The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for functional currency designations:

### *Functional Currency Designation*

Previously, certain of our significant subsidiaries used their local currency as their functional currency.  These subsidiaries should have utilized the U.S. dollar as their functional currency.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 395.

396.    Defendants' improper functional currency designation violated GAAP, specifically SFAS No. 52.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 396.

### (xii)    Derivative Instruments - $10mm Reduction to Income in 2005

397.    The 2005 Restatement and Re-Audit highlighted the GAAP violations related to the Company's accounting for derivative instruments.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 397.

398.    The adjustments related to the Company's improper accounting for derivative instruments resulted in a reduction of $10 million to the cumulative income, before tax, reported by the Company over the first three quarters of 2005.[16]

---

[15] The adjustments owing to functional currency designation effected by the 2005 Restatement and Re-audit demonstrated that the Company's cumulative income, before tax, reported during fiscal 2003 and 2004 had been understated by an aggregate $3 million.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 398, including

footnote 16.

399.    The 2005 10-K described the 2005 Restatement and Re-Audit as being required by the following misapplications of GAAP relating to the Company's improper accounting for derivative instruments:

*Derivative Instruments*

Certain derivative transactions did not quarry for hedge accounting treatment for one or more of the following reasons:

- Incomplete documentation of the hedging relationship at transaction inception

- Improper application of the "short cut" method

- Inadequate assessments of hedge effectiveness and measurements of hedge ineffectiveness at transaction inception and at each subsequent reporting period

We also did not properly account for a forward purchase contract that originated in 2000 involving the purchase of our common stock. We should have accounted for the transaction as a derivative instrument.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 399.

400.    Defendants' improper derivative securities accounting violated GAAP, specifically SFAS No. 133 and SFAS No. 138. Pursuant to GAAP, gains and losses on derivatives that are qualifying hedge transactions may be deferred and recognized in earnings in a pattern that matches the hedged item. To qualify for hedge accounting, the hedging transactions must be designated and documented at the inception of the transaction and the entity must expect the derivative to be highly effective in offsetting the fluctuations in price or cash flow of the hedged item. In addition, the shortcut method is limited to certain cash flow and fair value hedging relationships. *See, e.g., SFAS* No. 133 and SFAS No. 138.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 400.

401.    As conceded in the 2005 Restatement and Re-Audit, during the Class Period, Navistar's disclosures, quoted above, falsely represented that it had appropriately applied those policies and procedures, which conformed with GAAP, when in fact Navistar had not done so.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 401.

---

[16] The adjustments owing to derivative instruments effected by the 2005 Restatement and Re-audit demonstrated that the Company's cumulative income, before tax, reported during fiscal 2003 and 2004 had been understated by an aggregate $18 million.

### E.     Material Control Weaknesses Contributing to the Misstatements

402.     The following fifteen material control weaknesses were identified by Navistar and set forth in the Company's 2005 10-K:

The following material weaknesses were identified in our incomplete 2005 assessment:

1. Accounting Personnel:     We did not have a sufficient number of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP as it relates to accounting for receivable securitization transactions.  **This resulted in inadequate segregation of duties and insufficient review of the information pertaining to securitization accounting.  Additionally, because of the lack of internal accounting personnel, we relied heavily on our prior independent registered public accounting firm to help us develop conclusions related to application of GAAP.**

2. Account Reconciliations:  Our Mexican manufacturing operation did not properly perform, review and approve accounts payable reconciliations.

Specifically, we identified the following material weaknesses to date in our ongoing 2006 assessment:

1. Control Environment: **As of October 31, 2005, management was unsuccessful in establishing an adequately strong consciousness regarding the consistent application of ethics across all areas of the company and the importance of internal controls over financial reporting, including adherence to GAAP.  This weakness in the overall control environment likely contributed to many of the other material weaknesses disclosed herein.**  As identified by the Board of Directors' independent investigation, **certain members of management and other employees, in place at that time, were involved in instances of intentional misconduct** that resulted in some of the company's smaller, but material, restatement adjustments.  With respect to these instances, most of these individuals are no longer employed by the company.  In other instances, the Investigatory Oversight Special Committee of our Board of Directors has implemented appropriate remediation plans.

2. Accounting Personnel: We did not have a sufficient number of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP.

3. Accounting Policies and Procedures: **We did not have a formalized process for monitoring, updating, disseminating, and implementing GAAP-compliant accounting policies and procedures.**

4. Internal Audit: Our internal audit department was not an effective monitoring control over financial reporting.

5. Segregation of Duties: We did not maintain effective controls to ensure adequate segregation of duties. Specifically, we did not have appropriate controls in place to adequately segregate the job responsibilities and system user access for initiating, authorizing and recording transactions.

6. Information Technology ("IT"): Our IT general controls over computer program development, computer program changes, computer operations and system user access to programs and data were ineffectively designed. Additionally, we concluded that computer application controls were unreliable and ineffective.

7. Journal Entries: We did not maintain effective controls over the preparation, support, review and approval of journal entries. Specifically, effective controls were not in place to verify that journal entries were prepared with sufficient supporting documentation, support was properly retained, and journal entries were reviewed and approved by an appropriate level of management to ensure the completeness, accuracy and appropriateness of the entries recorded.

8. Account Reconciliations: We did not maintain effective controls over account reconciliations and financial analysis and review. Specifically, we did not consistently perform account reconciliations, ensure sufficient support was retained, and approve the reconciliations performed to ensure the balances were complete and accurate. Also, our financial analysis and reviews were not consistently applied across the organization to allow for detection of potential misstatements.

9. Period End Close: We did not maintain effective controls over the period end close process. Specifically, we lacked controls to verify the account closing and consolidation process was performed consistently and completely from period to period, we lacked evidence to verify that data transfers from local books of record up through corporate consolidation were complete and accurate, we lacked controls to verify that our charts of accounts mapped correctly up through consolidated accounts, we lacked sufficient evidence of review of the financial reports to verify complete and accurate balances, and our management certification process was not effective in verifying that items requiring disclosure were identified.

10. Pension Accounting: We did not maintain effective controls to accurately estimate our pension and OPEB obligations. **Specifically, the application of the methodology used to determine historical discount rates was not properly documented and reviewed and we lacked proper support for other assumptions used in accounting for the obligations.**

11. Warranty Accounting: We did not have appropriate warranty cost accounting models and methodologies in place to adequately estimate our warranty accruals and we did not perform appropriate financial analyses of the warranty cost estimates on a periodic basis.

12. Income Tax Accounting: We did not have sufficient modeling tools in place or a process to validate the positive and negative evidence necessary to determine whether valuation allowances were required to reduce the carrying values of deferred tax assets. Additionally, we did not retain detailed supporting documentation for our tax contingency liabilities.

13. Inventory Accounting: We did not maintain effective controls over our inventory accounting process. Specifically, we lacked evidence of the performance of controls for reviewing inventory count adjustments and reviewing cost accounting reports and updates to standard costs. Additionally, we did not consistently analyze significant cost variances, analyze lower of cost or market value, or record allowances for inventory obsolescence.

14. Revenue Accounting: We did not maintain effective controls over the revenue accounting process. Specifically, we lacked controls to ensure that revenue transactions were recorded in the proper accounting period and our monitoring controls over the revenue transactions were not operating effectively.

15. Contracts and Agreements: We did not perform effective reviews of contracts and agreements, including customer agreements, supplier agreements, agreements related to variable interest entities, derivatives, debt, and leases to assess the accounting implications related to the contracts and agreements. A formal process was not in place to require personnel with sufficient technical accounting knowledge to review the contracts and agreements for accounting and disclosure implications.
(Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 402.

## VIII.  ADDITIONAL FACTS RELATING TO THE SCIENTER OF THE NAVISTAR DEFENDANTS

403.    In the 2005 10-K, the Company admitted that the 2005 Restatement and Re-Audit was the product of "intentional misconduct," aimed at inflating the Company's financial results. This admission indicates that the Company's prior financial results were knowingly and intentionally misstated.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 403.

404.    Each of the Individual Defendants acted with scienter in that, as set forth herein, each knew or recklessly disregarded that Navistar's publicly reported financial results issued during the Class Period were materially false and misleading. The Individual Defendants were the senior management of the Company, and thus at all times had principal responsibility for ensuring that the Company's financial statements were accurate, truthful and prepared in accordance with GAAP. Yet the myriad accounting improprieties occurred in large part because senior management established goals of costs savings and earnings growth that required the Company to meet external and internal financial expectations at any cost. These Defendants also

knew that the Company had inadequate accounting staff and material weaknesses in its internal controls and disclosure policies. The combination of the focus on achieving income growth, inadequate accounting capabilities and severe material control weaknesses, demonstrate that the Individual Defendants acted with scienter, by knowingly or recklessly issuing materially inflated financial results over eleven quarterly periods.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 404.

### A.    "Red Flags"

405.     Defendants' knowledge or grossly reckless ignorance of Navistar's accounting problems is demonstrated by the following "red flags," which should have alerted the Individual Defendants, even in the absence of their actual knowledge or reckless ignorance of the accounting manipulations, to the problems leading to the 2005 Restatement and Re-Audit. The red flags should have, or did, alert the Individual Defendants to the problems inherent in the Company's accounting and internal controls and caused them to investigate and correct those problems. Instead, the Individual Defendants at least willfully ignored the red flags and continued to issue false and misleading statements. The following "red flags" indicate that the Individual Defendants' Class Period false and misleading statements were the product of at least gross recklessness:

(A)     The Company was required to restate both its own and Navistar Financial's results in February 2005 for fiscal years 2002, 2003 and the first three quarters of 2004. As stated in the 2004 10-K, the 2004 Restatement related to the following accounting errors: (i) Navistar's understatement of "the amount of its trade payables at its Mexican truck assembly facility by approximately $22 million," (ii) certain of the Company's "accruals relating to employee plans were overstated by approximately $27 million," (iii) "accounting standards relating to the consolidation of majority owned truck dealerships were not previously applied appropriately," and (iv) the misapplication of GAAP "in the accounting for retail note securitizations" by NFC.

(B)     Defendants had knowledge of certain of the GAAP misstatements corrected by the 2004 Restatement during prior periods. With respect to the first three items above, the accounting misstatements were known to have existed prior to the 2004 audit but were not restated or corrected until other adjustments owing to the 2004 Restatement caused them to become material. (From the 2004 10-K: "In addition to the adjustments described above, certain other adjustments, previously deemed immaterial, were also recorded for the years ended October 31, 2003 and 2002. These adjustments are necessary to conform prior periods financial statements with GAAP." (Emphasis added))

(C)     Defendants were aware of Navistar's material internal control weaknesses. The 2004 Restatement revealed several material weaknesses in the Company's internal and disclosure controls:

    i.     In the 2004 10-K, Navistar noted that it had taken the following actions to correct weaknesses in its internal controls: "(1) the actions taken by the company's financial services subsidiary to correct the accounting

associated with its retail note securitization program; (2) a reemphasis of reconciliation controls, relative to accounts payable, at the company's Mexican truck assembly facility; (3) the commencement of the consolidation of majority owned dealerships."

ii.   The 2004 10-K elaborated on the control weaknesses identified above at Navistar Financial: "As of October 31, 2004, there were material weaknesses in the [NFC's] disclosure controls and procedures related to (1) a misapplication of GAAP related to securitization accounting and an associated lack of timely resolution of outstanding reconciling items in certain collection accounts; and (2) the lack of sufficient specialized securitization accounting personnel." (Emphasis added)

(D)   The Company's inadequate accounting personnel and inadequate accounting capabilities resulted in the 2004 Restatement, several delays in Navistar's SEC filings and adjustments to correct previously released earnings results, including:

i.   The January 7, 2005 announcement that the Company would not be able to file its 2004 10-K by the January 14, 2005 filing deadline and that it would seek to file the 10-K "on or about January 29, 2005."

ii.   The January 31, 2005 announcement that the 2004 10-K filing would be further delayed.

iii.   The announcement on March 14, 2005 that the filing of the Company's 2005 first fiscal quarter 10-Q would be delayed until "mid-April."

iv.   On April 25, 2005 Navistar was forced to adjust the financial results issued on April 14, 2005 by reducing its previously reported first quarter 2005 net income down to $18 million, or $0.24 per diluted share, compared to the $20 million of net income previously reported. This adjustment was purportedly related to accounting problems at Navistar's "engine foundry operations [that] needed to be adjusted from $8 million to $12 million."

v.   On September 7, 2005, Navistar's third quarter 2005 financial results were released and during the conference call on that date Defendant Lannert announced that those results included a "a one-time charge of $14 million that related to one of our foundry operations, including $11 million to correct inventory balances based on a physical count conducted during the third quarter plant shutdown." The Company disclosed that this error was the result of noncompliance with GAAP: "The errors primarily involved capitalizing costs that should have been expensed in the prior periods in which they occurred. Expensive reviews, coupled with personnel changes and the reinforcement of policies and procedures, have been completed to assure that all of the locations' financial records have brought in -- been brought into alignment with the Company policy and with GAAP."

148

(E)    On October 21, 2004, Navistar and the Individual Defendants learned that the Company had received a "request from the staff of the U.S. Securities and Exchange Commission to voluntarily produce certain documents and information related to our accounting practices with respect to defined benefit pension plans and other postretirement benefits."

(F)    On February 9, 2005, Navistar and the Individual Defendants learned that the SEC was "was conducting an informal inquiry into the company's [2004] restatement."

(G)    As of March 17, 2005, Navistar and the Individual Defendants learned that the SEC inquiry into the Company's 2004 Restatement had been formalized.

(H)    On March 18, 2005, Bear Stearns analyst Peter Nesvold commented on Navistar's potential financial reporting and control problems: "OUR FRUSTRATION WITH THE STOCK HAS COMPOUNDED SHARPLY THIS WEEK. To us, the delay of F 1 Q (which we believe was partly due to NAV's struggle with mark-to-market reporting), **combined with the loss of control over reportedly relevant financial data, suggests that both the financial systems and controls are weak**. We view these as potentially ongoing issues." (emphasis added)

(I)    Delays in the Company's SEC filings caused the Company to default on certain covenants in its bank loans and debt securities. These covenant violations further impacted Navistar and NFC's credit ratings.

(J)    Defendants' own acknowledgments in each of Navistar's SEC filings from its March 14, 2003 Form 10-Q through its September 10, 2004 Form 10-Q, that Navistar was still in the process of formalizing and documenting its internal control policies and procedures.

(K)    Defendants' own acknowledgments in each of Navistar's Form 10-Q filings during fiscal 2005, that the Company's internal controls were not adequate.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 405.

406.    Many of the items identified above, were later revealed to be causes of or contributing factors in the 2005 Restatement and Re-Audit, including the internal control and disclosure policy weaknesses, Navistar's employee benefits, securitization, consolidation and product warranty accounting, the cost accounting at the Company's foundry operations (including improper capitalization of expenses), the Company's controls at its Mexican operations and, critically, Navistar's lack of sufficient accounting personnel. Had the Individual Defendants promptly investigated and corrected the issues presented by these red flags, they could have earlier corrected or refrained from making the materially false and misleading statements quoted herein.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 406.

**B.    Defendants' Statements
Indicate Knowledge or Recklessness**

407.    The Individual Defendants were quoted in the Company's earnings releases, spoke on Company conference calls, prepared and issued the Company's financial results and

financial statements, signed the Company's 10-Q and 10-K filings with the SEC, and signed certifications attesting to the conformity of the Company's financial results with GAAP and the adequacy of the Company's internal and disclosure controls. These statements, results and certifications were shown to be materially false and misleading by the 2005 Restatement and Re-Audit. In addition to the materially false and misleading disclosures and misstated financial results quoted above from Company SEC filings, earnings releases and conference calls that Individual Defendants were responsible for they repeatedly spoke about many of the specific matters addressed in the 2005 Restatement and Re-Audit and were either aware that their statements did not represent the true facts or were recklessly ignorant of the true facts. Among the statements made by the Defendants on the topics affected by the 2005 Restatement and Re-Audit are the following:

(A)    Defendant Ustian's comments in the May 15, 2003 earnings release concerning the cost savings achieved by reduced pension expense resulting from a "change in the way pension costs were amortized."

(B)    Defendant Lannert's comments on the May 15, 2003 conference call that "90% of the participants in the existing defined benefit plans are inactive... requires us to change the accounting to amortize unrecognized gains and losses over the life expectancy of the participants... as a result of that post retirement expense was reduced by $10 million."

(C)    Defendant Lannert's comments during the December 2, 2003 conference call that Navistar had "strengthened warranty accruals... our warranty reserves are now pretty conservative."

(D)    Defendant Lannert's comments during the August 19, 2004 conference call concerning "turning current pension costs into a small profit over the next few years."

(E)    Defendant Schwetschenau's knowing or recklessly false assurances to investors during the February 15, 2005 conference call that any accounting misstatements or issues had been resolved: **"In conclusion, by filing our Form 10-K we are now current with all required filings. All of the potential challenges that we identified previously are behind us**."

(F)    Defendant Ustian's similarly reckless or knowingly false assurances to investors during the June 9, 2005 conference call that the Company had adequate resources and controls to issue timely and accurate quarterly results and SEC filings: "I'm looking across there to our controller [Defendant Schwetschenau], is he is also committing to all of us that we're going to file 10-Qs on time, and this is all behind us. And I guess we're all confident that we can do that. We have the resources in place and the knowledge in place to do that, and this should help us all provide information on a timely basis."

(G)    Defendant Lannert's reckless or knowingly false assurances to investors during the September 7, 2005 conference call that problems relating to the improper capitalization of costs that should have been expensed at the Company's foundry operations, had been fully resolved: "Expensive reviews, coupled with personnel changes and the reinforcement of policies and procedures, have been completed to assure that all of the locations' financial records have brought in -- been brought into alignment with the Company policy and with GAAP." During

that same conference call, in response to a question, Lannert reinforced his assurances: "That's behind us. We've changed a number of people in that foundry. We've reviewed all of their operating records. We've done a physical inventory of the operating inventory. And we've done a physical inventory of capital assets. So it's behind us totally."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 407.

408.    By addressing the issues related to the Restatement in their public statements, Defendants are presumed either to have knowledge of those topics, such as the adequacy of the Company's accounting personnel, Navistar's employee benefits or product warranty accounting, its internal controls and GAAP compliance, or to have addressed those issues in their public statements and earnings reports in a grossly reckless manner.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 408.

409.    Defendants Ustian and Lannert also signed certifications attesting to their responsibility for and personal knowledge of the Company's internal and disclosure controls. In seven of the SEC flings made during the Class Period (for the first quarter of 2003 through the third quarter of 2004) Lannert and Ustian included a statement that there were no weaknesses in the Company's controls, while admitting that the controls had not been "formalized" or "documented." Those same seven SEC flings included certifications, pursuant to the Sarbanes-Oxley Act of 2002, signed by Defendants Ustian and Lannert, in which stated that they had reviewed Navistar's internal controls and which required them to disclose any material control weaknesses. In light of the 15 separate control weaknesses identified by KPMG and the material control weaknesses the Company did disclose beginning in the 2004 Form 10-K, these certifications were materially false and misleading. Given Ustian and Lannert's sworn responsibility for those internal controls and the severity of the control weaknesses at Navistar, such representations were at least recklessly false.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 409.

410.    The 2005 Restatement and Re-Audit was directly linked to Navistar's inadequate internal and disclosure controls. In the process of re-auditing the Company's financial results for 2003, 2004 and 2005 the Company admitted to the existence of 15 separate material weaknesses in its internal and disclosure controls. These control weaknesses existed over the course of the Class Period and were a direct cause of the 2005 Restatement and Re-Audit.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 410.

411.    In the 2005 10-K, the Company disclosed the impact of Navistar's inadequate internal controls and linked several of these weaknesses to specific misstatements, (as quoted above more fully):

1. Control Environment:    [M]anagement was unsuccessful in establishing an adequately strong consciousness regarding the consistent application of ethics across all areas of the company and the importance of internal controls over financial reporting, including adherence to GAAP. This weakness in the overall

control environment likely contributed to many of the other material weaknesses disclosed herein.  As identified by the Board of Directors' independent investigation, certain members of management and other employees, in place at that time, were involved in instances of intentional misconduct that resulted in some of the company's smaller, but material, restatement adjustments.

\*            \*            \*

10.  Pension Accounting:      [T]he application of the methodology used to determine historical discount rates was not properly documented and reviewed and we lacked proper support for other assumptions used in accounting for the obligations.

\*            \*            \*

11.  Warranty Accounting:     ...[W]e did not perform appropriate financial analyses of the warranty cost estimates on a periodic basis.

13.  Inventory Accounting: ...  [W]e lacked evidence of the performance of controls for reviewing inventory count adjustments and reviewing cost accounting reports and updates to standard costs.

14.  Revenue Accounting: ...  [W]e lacked controls to ensure that revenue transactions were recorded in the proper accounting period and our monitoring controls over the revenue transactions were not operating effectively.  (Emphasis added)

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 411.

412.     These control weaknesses, among others, allowed the Company to engage in the GAAP violations discussed above and for the Company and the Individual Defendants to use such GAAP violations to achieve purported earnings growth during the Class Period.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 412.

**C.     Misstatements' Impact on Earnings**

413.     Beginning in the first quarter of 2003, Navistar set aggressive guidance that was premised on cost-cutting with the goal of increasing reported net income.  Navistar provided quarterly and annual EPS guidance to investors.  Securities analysts following the stock incorporated the Company's reported earnings and guidance into their own estimates of the Company's EPS and revenue.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 413 and on that basis denies the same.

414.    During the Class Period, in its annual results for 2003 and 2004 and its quarterly results for the first three quarters of 2005, the Company was able to achieve or better its own guidance for EPS.  Navistar's earnings in each of these periods would have been significantly lower but for the Defendants' accounting fraud:

**Comparison of EPS (loss) Guidance and Consensus Estimates with Originally Reported and Restated EPS**

|  | Company Guidance | Consensus Estimates | Originally Reported Diluted EPS | Restated Diluted EPS |
|---|---|---|---|---|
| **2003** | ($0.66) to ($0.76) | ($0.70) | ($0.27)/($0.31) | **($4.86)** |
| **2004** | $2.95 | $3.03 | $3.20 | **($0.64)** |
| **Q1 2005** | $0.20 - $0.25 | $0.23 | $0.24 | **$0.10** |
| **Q2 2005** | $0.65 - $0.70 | $0.71 | $0.70 | **$0.22** |
| **Q3 2005** | $0.75 - $0.85 | $0.84 | $0.83 | **$0.52** |

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 414.

415.    Achievement of the Company's guidance and the consensus analysts' estimates was predicated on the Company's ability to cut costs, including its employee benefits, post-retirement and product warranty expenses, its accruals for litigation reserves, and its ability to report sufficient revenue.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 415 and on that basis denies the same.

416.    Defendants were well aware that investors and analysts were following and tracking the Company's costs and that these costs were a key driver of investors' perception of Navistar's performance and future prospects, as referenced in Defendants' own statements, the analyst reports and news stories quoted above.  These disclosures, analyst reports and news stories note, among other things, that the Company's results and future growth were predicated significantly on (i) reduction of the Company's pension and post-retirement costs *(see ¶¶ 75,76, 78(A), 78(B), 87, 115, 138, 140, 141(A), 141(B) and 148)*, (ii) the reduction in product warranty expenses owing to product improvements *(see ¶¶ 96, 152 and 155)*; and (iii) increased operating income as a result of the Company's restructuring plans *(see ¶¶ 114, 130, 141 and 217)*.  As reflected in the 2005 Restatement and Re-Audit, each of these items was substantially manipulated to increase the Company's profits directly, or reduce the Company's expenses, which indirectly increased the Company's profits.

**ANSWER:**     Schwetschenau denies the allegations in the last sentence of Paragraph 416 and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 416 and on that basis denies the same.

417.    The Individual Defendants also knew that failing to meet analysts' expectations or Company guidance would call into question their management performance and cause Navistar's stock price to decline.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 417.

418.    The Individual Defendants, particularly Ustian and Lannert, who provided analysts with guidance and announced Navistar's earnings to investors, knew or were recklessly ignorant of the fact that Navistar was only able to achieve its reported EPS, cost reductions and net income over the Class Period as a product of the Company's widespread accounting manipulations. Absent these manipulations, the Company's results, guidance and expectations would have been significantly lower. Moreover, as Defendants were financially and professionally motivates to achieve these performance results, they has an incentive to engage in the accounting manipulations resulting in the 2005 Restatement and Re-Audit.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 418.

419.    Navistar and the Individual Defendants' scienter is also evidenced by the magnitude and pervasiveness of the misstatement. Owing to accounting manipulations across sixteen separate accounting matters, the Company's Class Period financial results were enormously overstated. The 2005 Restatement and Re-Audit wiped out 187% of the Company's previously reported net income for fiscal years 2003 and 2004 and the first three quarters of 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 419.

420.    Similarly, because the 2005 Restatement and Re-Audit had the net effect of wiping out a total of $677 million in previously reported net income over the course of 2003, 2004 and the first three quarters of 2005, it cannot be explained as the product of innocent mistakes or technical errors, as such errors would not have been accretive to earnings on a net basis.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 420.

421.    Defendants' scienter is also made clear by their receipt of incentive compensation based, in part, on the attainment of certain performance goals, including the Company's gross and total revenues and its share price. Indeed, in Navistar's 2005 Proxy Statement, the Company states that "[t]he annual cash incentive payments earned in fiscal 2004 . . . are awarded based on the achievement of a challenging return on equity goal ....." Return on equity is a financial ratio that compares net income to average shareholder equity. Due to Defendants' fraud as detailed herein, among other things, net income was materially overstated resulting in an overstated return on equity ratio. Consequently, in fiscal year 2004 Ustian and Lannert were paid $2,000,000 and $828,555 in incentive compensation, respectively. Had Ustian and Lannert reported Navistar's financial results as restated, they would not have received these bonuses. Thus, a compelling and cogent inference of scienter exists as Defendants had the motivation to falsify key financial figures to obtain their incentive compensation.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 421.

D.    **Defendant Schwetschenau's "Reassignment" and Defendant Lannert's Termination**

422.    As disclosed in the Company's 2005 10-K, and as announced in February 2006, Defendant Schwetschenau, who signed each of the Company's Class Period filings with the SEC and who was the Company's principle accounting officer, was "reassigned" by the Company in February 2006:

> On February 16, 2006, our Board of Directors reassigned our former Controller, who was also our principal accounting officer. The reassignment of the former Controller was in response to Deloitte having advised the Audit Committee that Deloitte was no longer willing to rely on the representations of the former Controller.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 422 and on that basis denies the same.

423.    The declaration by Deloitte that they were unwilling to rely on Defendant Schwetschenau's representations and the Company's acquiescence to that by reassigning Schwetschenau, when coupled with Schwetschenau's responsibility for the Company's financial statements and SEC filings, evidences that Schwetschenau's materially false and misleading public statements, including his release of overstated financial results throughout the Class Period, were made knowingly or recklessly.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 423.

424.    As disclosed in the Company's 2005 10-K, Defendant Lannert "experienced an `Involuntary Not-For-Cause Termination' on October 31, 2007." The 2005 10-K acknowledged that as "part of [Navistar's] commitment to strengthening our overall internal control over financial reporting, we have" ... replaced Defendants Lannert and Schwetschenau.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 424 and on that basis denies the same.

IX.    **DELOITTE'S FRAUD, GAAS VIOLATIONS AND SCIENTER**

425.    Deloitte issued unqualified audit opinions on the Navistar 2003 and 2004 annual consolidated financial statements, representing that it had conducted its audits of Navistar in accordance with generally accepted auditing standards (GAAS), and certifying that those financial statements "present fairly, in all material respects the financial position of Navistar ... and the results of [its] operations ... in conformity with" GAAP. Deloitte knew or recklessly disregarded, however, that its audits were not conducted in accordance with GAAS, that Navistar's financial statements materially misstated the Company's true financial position and

results of operations and were misleading, and that the financial statements did not conform with GAAP.

**ANSWER:**    Schwetschenau admits that Deloitte issued unqualified audit opinions for Navistar's 2003 and 2004 annual consolidated financial statements, states that those opinions speak for themselves, denies any characterizations of those opinions, and denies the remaining allegations of Paragraph 425.

426.    In fact, Deloitte's purported "audits" amounted to no audits at all, as confirmed by the magnitude and nature of the misstatements; Deloitte's egregious failures to see the obvious and to investigate the doubtful; and the accounting judgments Deloitte made that no reasonable accountant would have made if confronted with the same facts. In addition, Deloitte deliberately or recklessly ignored (1) warning signs that the financial statements did not present the financial position of Navistar and its results of operations in conformity with GAAP, including warning signs of management's motive and opportunity to misstate Navistar's financial statements, and (2) significant and obvious red flags of Navistar's specific misstatements and GAAP violations.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 426.

427.    Deloitte's departure from the standards of ordinary care were so extreme that the risk that Navistar's financial statements materially misstated the Company's true financial position and results of operations and were misleading was either known to Deloitte, or so obvious that Deloitte must have been aware of it. That Deloitte's audits amounted to no audits at all is confirmed by the admission of Navistar on March 20, 2007, that when KPMG replaced Deloitte as Navistar's auditor, it performed "a complete re-audit of 2003, 2004, and 2005."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 427.

428.    Deloitte earned significant non-audit fees owing to its client relationship with Navistar and sought to maintain the lucrative client relationship by acting in complicity with the Company's accounting manipulations. The audit and non-audit fees for Deloitte in 2002 through 2005 were as follows (dollar amounts in millions):

| Fees | 2002 | 2003 | 2004 | 2005[17] |
|---|---|---|---|---|
| Audit Fees | 1.8 | 2.1 | 3.3 | 4.2 |
| Audit Related Fees | .5 | 0.6 | 0.2 | 0.8 |
| Other Fees | .9 | 0.5 | 0.4 | 0.3 |
| Tax Fees | 1.0 | 1.2 | 0.4 | 0.3 |
| Total Non-Audit Fees | 2.4 | 2.3 | 1.0 | 1.4 |
| % of Total Fees From Audit | 43% | 47% | 76% | 64% |

---

[17] Deloitte was dismissed prior to completing the 2005 audit.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 428, including

footnote 17.

## A.    Magnitude and Nature of the Misstatements

429.    As a result of the re-audit, it is now beyond dispute that Navistar's true financial position was materially misstated by an order of magnitude in the billions of dollars.  For example, the stockholders' equity included as part of Deloitte's audits as of October 31, 2004 and 2003, was revealed in December 2007 to have been overstated by $2.4 billion and $2.0 billion, or by 449% and 701 %, respectively.  Thus, the reported *positive* stockholders' equity of $292 million and $531 million, was actually a *negative* $1.8 billion and $1.85 billion in 2003 and 2004 respectively.  Similarly, the accumulated deficit at November 1, 2002, was revealed in December 2007 to have been $1.7 billion higher than reported on by Deloitte, a misstatement of 231 %.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 429.

430.    Also as a result of the re-audit, for the year ended October 31, 2004, the net income of $247 million included as part of Deloitte's audit was revealed in December 2007 to have been a loss of $44 million, reflecting a misstatement of 118%; and for the year ended October 31, 2003, the loss of $21 million included as part of Deloitte's audit was revealed in December 2007 to have been a loss of $333 million, reflecting a misstatement of 1,485%.  The earnings (loss) per share at each fiscal year end were also misstated by approximately the same percentages.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 430 and on that basis denies the same.

431.    The magnitude of the misstatements is also reflected by the fact that, as announced by Navistar, over 250 outside accountants and consultants were retained in connection with the 2005 Restatement and Re-audit.  Navistar has also announced that it has incurred approximately $300 million in costs and expenses in connection with the 2005 Restatement and Re-audit.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 431 and on that basis denies the same.

432.    With regard to the nature of the misstatements, all or almost every line item on both Navistar's statement of operations and balance sheet was materially misstated for three years or more.  The pervasiveness of the misstatements further confirms that Deloitte's purported "audits" were no audits at all.  The misstatements had the result of artificially and significantly improving Navistar's reported financial position and results of operations, thereby enabling Navistar consistently to meet or exceed its own guidance and analysts' expectations.

**ANSWER:**      Schwetschenau denies the allegations of Paragraph 432.

**B.      Warning Signs Of Navistar's Financial Misstatements**

433.      The American Institute of Certified Public Accountants (AICPA) publishes an annual Audit Risk Alert to provide auditors and other CPAs with timely guidance on issues of importance warranting special attention in audits.  Deloitte knew of the Audit Risk Alerts during the Class Period.

**ANSWER:**      Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 433 and on that basis denies the same.

434.      The annual Audit Risk Alerts applicable here begin with a review of "attention grabbers" drawn from past accounting scandals and audit failures, to assist auditors such as Deloitte in the detection of financial manipulation and accounting fraud.  The AICPA 2002/03 Audit Risk Alert included an "attention grabber" that warned about "[c]ompensation plans geared toward enriching executives rather than generating profits."  Another "attention grabber" in the same Audit Risk Alert is that "[a]ccounting policies that rely heavily on management's judgment or seem to aggressive" help auditors in "spotting the early warning signs" of fraud.  This "attention grabber" warned auditors specifically that:

> If the accounting methodology for a transaction or event involves different alternatives or a good degree of estimating and judgment ...  or is unclear, unusual, or not fully supportable, then management has the tools and the temptation to manipulate financial reporting.  These tools, stemming from the selection and application of accounting principles, can be used to tweak earnings and manipulate other accounts and transactions to report the results desired by management and conceal critical information.

**ANSWER:**      Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 434 and on that basis denies the same.

435.      The AICPA 2003/04 Audit Risk Alert repeated these "attention grabbers" and added "[o]bsession with meeting earnings targets and expectations" as an additional warning sign of accounting fraud:

> In today's business reality, failing to meet the earnings expectations of Wall Street, creditors, and others, even by a small amount, can create serious repercussions, including a nose-dive in a company's stock price.  Faced with such pressure, management may attempt to meet those earnings targets at all costs and commit fraud, stretch accounting rules, or follow inappropriate accounting methodologies.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 435 and on that basis denies the same.

436.    In addition to these "attention grabbers" publicized by the AICPA, the Audit Risk Alerts also identify other red flags pertaining to particular areas of accounting especially susceptible to manipulation and fraud, including, as discussed further below, several pertaining to specific areas of misstatement in the Navistar financial statements.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 436 and on that basis denies the same.

437.    Deloitte deliberately or recklessly ignored the "attention grabbers" in the Audit Risk Alerts and the following additional significant and obvious warning signs that Navistar's financial statements did not present the Company's true financial position and results of operations in conformity with GAAP, including warning signs of management's motive and opportunity to manipulate Navistar's financial statements and results.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 437.

438.    On October 21, 2004, Navistar disclosed in a Form 8-K that the SEC had made an informal inquiry into its accounting practices concerning pension plans and post-retirement benefits.  Just a few months later, Deloitte rendered an unqualified audit opinion on the 2004 financial statements, including the cost of employee benefit arrangements.  The unqualified opinion assured investors and the market that the matters raised by the SEC inquiry had been fully resolved, and that the financial statements were free of material misstatement.  It was later revealed in December 2007, however, notwithstanding Deloitte's unqualified opinion, that the cost of employee benefit arrangements had been misstated by $130 million for 2003 and $57 million for 2004.

**ANSWER:**    Schwetschenau states that Navistar's October 21, 2004 Form 8-K and

Deloitte unqualified audit opinion on the 2004 financial statements speak for themselves, denies

any characterizations of those documents, and denies the remaining allegations of Paragraph 438.

439.    In December 2004, Navistar announced that it was considering whether to restate certain of its prior financial statements.  In January 2005, Navistar announced that, in fact, it would be restating the first three quarters of 2004 and the fiscal years ended October 31, 2003 and 2002, due to failures to comply with GAAP, that were later described as involving the areas of retail note securitizations, finance lease receivables, deferred taxes, operating leases, repurchase of equipment, trade payables, accruals for employee benefit plans, and consolidation accounting ("2004 Restatement").  As Navistar's auditor, Deloitte was fully aware of the need for the 2004 Restatement and Navistar's three-year failure to adhere to GAAP in these areas. Just a few weeks later, Deloitte rendered an unqualified audit opinion on the 2004 and the restated 2003 financial statements.  The unqualified opinion assured investors and the market

that the matters raised by the 2004 Restatement had been fully resolved, and that the financial statements were free of material misstatement. It was later revealed in December 2007, however, notwithstanding Deloitte's unqualified opinion, that Navistar's 2003 and 2004 financial statements were misstated by an order of magnitude in the billions of dollars.

**ANSWER:** Schwetschenau states that Navistar's December 2004 and January 2005 press releases and Deloitte unqualified audit opinion on the restated 2003 and the 2004 financial statements speak for themselves, denies any characterizations of those documents, and denies the remaining allegations Paragraph 439.

440. Deloitte knew that Navistar's accounting and internal audit functions were severely understaffed. For example, CW3 a former Senior Auditor and Consultant in Navistar's Corporate Audit Department, has reported that the department was inadequately staffed from 1994 through 2004. As a result, the internal audit department was not an effective monitoring control over financial reporting. The inadequate staffing is confirmed by the fact that between October 31, 2005 and October 31, 2007, Navistar added over 100 new employees to its accounting and internal audit functions.

**ANSWER:** Schwetschenau denies the allegations of Paragraph 440.

441. Deloitte also knew that Navistar's accounting personnel lacked the necessary expertise in technical accounting matters applicable to its financial statements. Navistar later announced it had "enhanced" its Financial Reporting Group with the addition of experienced, technical accounting personnel to ensure that in the future the company adhered to GAAP and conformed its financial reporting to all other applicable standards.

**ANSWER:** Schwetschenau denies the allegations of Paragraph 441.

442. Navistar failed to follow the most basic and necessary of accounting procedures. For example, it did not consistently perform account reconciliations or ensure that account balances were complete and accurate. Intercompany accounts were not properly reconciled. Journal entries were made without sufficient supporting documentation. Transactions were recorded in the wrong amounts, to the wrong accounts, in the wrong periods, or could not be supported. There were classification errors in the financial reporting process involving the manner in which certain account balances were transferred from Navistar's accounting books and records to the income statement and balance sheet. These failures were all either immediately apparent to Deloitte as Navistar's auditor, or Deloitte deliberately or recklessly ignored them.

**ANSWER:** Schwetschenau denies the allegations of Paragraph 442.

443. Navistar lacked adequate internal controls over financial reporting and adherence to GAAP. This included a lack of formal, written accounting policies and procedures; lack of segregated job responsibilities for initiating, authorizing and recording transactions; unreliable

and ineffective computer application controls; lack of procedures to detect potential misstatements in the Company's financial statements; and staffing deficiencies during the period end close. Navistar's failure to maintain even minimum adequate internal controls prevented it from meeting its accounting obligations under GAAP and was a clear red flag to Deloitte. Further, the lack of formal, written accounting policies and procedures created an environment conducive to fraud in the preparation of the financial statements, and was a warning to Deloitte to expand its audit tests and procedures to ensure that Navistar was not manipulating its financial statements. Navistar later admitted that its lack of internal controls over financial reporting allowed "instances of intentional misconduct to improve reported financial results."

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 443.

444.    On December 15, 2003, Navistar management publicly announced its intent to grow the Company by causing it to "double in size and become a solidly profitable $15 billion company by the end of the next business cycle." Deloitte knew that Navistar had been unprofitable since 2001, and had suffered an unprecedented loss of $536 million in 2002. Notwithstanding this and the AICPA 2003/04 Audit Risk Alert "attention grabber" alerting Deloitte to the risk that Navistar's "obsession with meeting earnings targets and expectations" might cause the Company "to commit fraud," Deloitte deliberately or recklessly failed to consider the risk Navistar would manipulate its financial statements and results in order to make it appear the Company was on the way to achieving management's publicly announced goal.

**ANSWER:**    Schwetschenau states that Navistar's December 15, 2003 press release

speaks for itself, denies any characterizations of that document, and is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

444 and on that basis denies the same.

445.    To create the appearance the Company was on track to meet this goal, Navistar management gave regular guidance to investors and analysts that reflected aggressive and unwarranted optimism. As detailed herein, the false and misleading financial statements that are the subject of this litigation allowed Navistar to consistently report results that met or exceeded its own guidance and analysts' expectations. Deloitte deliberately or recklessly failed to consider the risk that Navistar would manipulate its financial statements and results in order to meet or exceed its own guidance and analysts' expectations.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 445.

446.    Deloitte knew or recklessly ignored that the employment agreements of Navistar's senior management provided for substantial amounts of compensation based on the Company's reported performance, and that these agreements gave senior management an incentive to manipulate its financial results.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 446 and on that basis denies the same.

### C.     Deloitte's False Representation That Its Audits Complied With GARS

447.     The AICPA has developed Statements on Auditing Standards ("SAS"), which
serve as interpretations of GRAS.  SAS No. 1 at AU § 110.01 states:

> The objective of the ordinary audit of financial statements by the independent
> auditor is the expression of an opinion on the fairness with which they present, in
> all material respects, financial position, results of operations, and its cash flows in
> conformity with generally accepted accounting principles.  The auditor's report is
> the medium through which he expresses his opinion or, if circumstances require,
> disclaims an opinion.  In either case, he states whether his audit has been made in
> accordance with generally accepted auditing standards.  These standards require
> him to state whether, in his opinion, the financial statements are presented in
> conformity with generally accepted accounting principles and to identify those
> circumstances in which such principles have not been consistently observed in the
> preparation of the financial statements of the current period in relation to those of
> the preceding period.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 447 and on that basis denies the same.

448.     When an auditor represents that a company's financial statements conform in all
material respects with GAAP, the auditor "indicates [his] belief that the financial statements
taken as a whole are not materially misstated."  AU § 312A.03.  Indeed, "[f]inancial statements
are materially misstated when they contain misstatements whose effect, individually or in the
aggregate, is important enough to cause them not to be presented fairly, in all material respects,
in conformity with [GAAP]."  AU § 312A.04.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 448 and on that basis denies the same.

449.     Deloitte's representations that it conducted its audits in accordance with GAAS
were materially false and misleading because, in fact, Deloitte's audits represented an extreme
departure from GAAS, and Deloitte had no reasonable basis to support its opinions that the
financial statements presented Navistar's true financial position and results of operations in
conformity with GAAP.  In issuing unqualified audit opinions on Navistar's financial statements
throughout the Class Period, Deloitte acted with knowledge that its audits were not conducted in
accordance with GAAS or recklessly failed to comply with GAAS, despite its representations to
the contrary.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 449 and on that basis denies the same.

450.    Deloitte's audits were not in accordance with at least the following auditing standards, found at SAS No. 1 at AU § 150A.02:

(A)    General Standard No. 2, which required Deloitte to possess an independence in mental attitude in all matters related to the audits;

(B)    General Standard No. 3, which required Deloitte to exercise due professional care in the performance of the audits and the preparation of the reports;

(C)    Standard of Field Work No. 2, which required Deloitte to gain a sufficient understanding of Navistar's internal controls;

(D)    Standard of Field Work No. 3, which required Deloitte to obtain sufficient competent evidential matter to afford a reasonable basis for its opinions regarding the financial statements under audit; and

(E)    Standard of Reporting No. 1, which required Deloitte to state whether the financial statements were, in fact, presented in conformity with GAAP.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 450 and on that basis denies the same.

451.    Deloitte did not possess the independence as required by General Standard No. 2, SAS No. 1 at AU § 150A, because it assisted in the preparation of the very financial statements that it audited by helping Navistar develop conclusions related to GAAP. Navistar did not have the necessary expertise in technical accounting matters applicable to its own financial statements, and as a result relied heavily on Deloitte. Deloitte knew Navistar was relying on Deloitte in this way in preparing the financial statements, yet Deloitte nonetheless continued to act as auditor with respect to those same financial statements. SAS No. 1 at AU § 220.02 requires that an auditor "be without bias with respect to the client otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be." Deloitte was not without bias with regard to the financial statements that Deloitte itself had assisted in preparing.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 451 and on that basis denies the same.

452.    Deloitte did not exercise due professional care as required by General Standard No. 3, SAS No. 1 at AU § 150A, because, among other things, it deliberately or recklessly failed, as required by SAS No. 1 at AU § 230A.10, to obtain reasonable assurance "that the financial

statements are free of material misstatement." Especially in light of the many significant and obvious warning signs and red flags detailed herein, Deloitte deliberately or recklessly ignored that the financial statements contained material misstatements, and did not present Navistar's true financial position and results of operations in conformity with GAAP.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 452 and on that basis denies the same.

453.    Deloitte did not gain a sufficient understanding of Navistar's internal controls as required by Standard of Field Work No. 2, SAS No. l at AU § 150A, because it either deliberately or recklessly failed to assess the control risk in order to determine the nature, timing, and extent of substantive tests for the financial statements under audit, or it did obtain an understanding of the control risk and deliberately or recklessly failed to design the nature, timing, and extent of its substantive tests to obtain reasonable assurance that the financial statements were free of material misstatement. Deloitte's audits violated not only SAS No. l at AU § 150A in this regard, but, as detailed further below, also violated AU §§ 312A and 319.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 453 and on that basis denies the same.

454.    Deloitte did not obtain sufficient competent evidential matter as required by Standard of Field Work No. 3, SAS No. 1 at AU § 150A, because the underlying accounting data and other information available to Deloitte was not sufficient for it to form its conclusions that the financial statements fairly presented Navistar's financial position and results of operations in conformity with GAAP, as detailed further below. Deloitte deliberately or recklessly rendered unqualified opinions even though it did not have a reasonable basis for those opinions regarding the financial statements under audit. Deloitte's audits violated not only SAS No. l at AU § 150A in this regard, but, as detailed further below, also violated AU §§ 316A, 326A, 339 and 342.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 454 and on that basis denies the same.

455.    Deloitte did not comply with Standard of Reporting No. 1, SAS No. 1 at § 150A, because the Navistar 2003 and 2004 financial statements were not presented in conformity with GAAP, despite Deloitte's representations to the contrary. Deloitte's audits violated not only SAS No. 1 at § 150A in this regard, but, as detailed further below, also violated AU § § 410 and 411.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 455 and on that basis denies the same.

**D.      Red Flags of Navistar's Specific Misstatements and GAAP Violations**

456.    Deloitte deliberately or recklessly ignored the following significant and obvious red flags of Navistar's specific GAAP violations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 456.

**(i)      Product Warranty**

457.    During the Class Period, Navistar inappropriately reduced estimates of product warranty cost by including expected future benefits of product improvements, inappropriately reduced its estimate of future warranty costs for anticipated vendor recovery amounts, and improperly included revenue related to extended warranty agreements as a component of cost of product sold.  These actions had the effect of artificially improving Navistar's reported financial position and results of operations.  They also violated *GAAP*.  *See* FASB Concepts Statement No. 5, SFAS No. 5.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 457.

458.    Significant and obvious red flags of Navistar's *GAAP* violations included: the unsupported reductions to product warranty estimates by Navistar; the magnitude of the reductions; Navistar's inappropriate cost accounting models and methodologies; the positive impact on Navistar's reported financial position and results of operations; and the fact that losses for contingencies such as future product warranty costs is a recognized area of financial statement manipulation.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 458.

459.    Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, as well as an exercise of accounting judgment that no reasonable accountant would have made if confronted with the same facts, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 326A, 339, 342, 410, and 411.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 459.

**(ii)      Employee Benefit Arrangements**

460.    During the Class Period, Navistar added 50 basis points to the benchmark indices used to calculate discount rates, even though the adjustments were unwarranted and unsupported.  It also changed the methodology for calculating actuarial gains and losses for certain benefit plans by lengthening the amortization periods, despite the fact the conditions to switch the amortization periods were not met.  Navistar also made erroneous assumptions as to number of employees, timing, and discounting in calculating curtailments to benefit plans as a result of the 2002 restructuring.  Finally, Navistar expensed enhanced benefit payments to certain retirees on a "pay as you go" basis rather than recognizing the obligations as a pension liability on the balance sheet.  These actions had the effect of artificially improving Navistar's reported financial

position and results of operations. Each also violated GAAP pertaining to employee benefit arrangements. *See* SFAS No. 5, SFAS No. 35, SFAS No. 87, SFAS No. 88, and SFAS No. 106.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 460.

461.    Significant and obvious red flags of Navistar's GAAP violations in the area of employment benefit arrangements included: the SEC informal inquiry in this same area; the 2004 Restatement; the unsupported adjustment to the benchmark indices; the changes to accounting estimates by Navistar, including changes to existing methodology; the failure to document properly the application of the methodology used; the magnitude of the impact of the changes in the estimates and methodology; the scope and magnitude of the 2002 restructuring; the "pay as you go" payments to certain retirees reflected on Navistar's accounting records that had been made over periods as long as twenty years without recognizing a pension liability; the positive impact on Navistar's reported financial position and results of operations; and the fact that employee benefit plans is a recognized area of financial statement manipulation.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 461.

462.    Auditors, including Deloitte, knew they needed to pay close audit attention to employee benefit arrangements because the AICPA 2002/03 Audit Risk Alert also warned that: "Unrealistic Pension and Other Postretirement Plan Assumptions" "may be lurking as potential future risks at certain entities." The following year, the AICPA 2003/04 Audit Risk Alert further warned that: "Auditors should be aware of [the] growing problem in the nation's pension plans and may need to consider the financial health of their client's defined benefit plans and determine whether business and audit risks exist."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 462 and on that basis denies the same.

463.    Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, as well as an exercise of accounting judgment that no reasonable accountant would have made if confronted with the same facts, and violated GAAS. *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 326A, 339, 342, 410, and 411.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 463 and on that basis denies the same.

(iii)    **Restructuring Activities**

464.    During the Class Period, Navistar improperly accounted for the impact of the results of corporate restructurings, including in the areas of employees, leases, cost accruals, suppliers, and restructuring accruals. These actions had the effect of artificially improving Navistar's reported financial position and results of operations. They also violated GAAP. *See* FA SB Concepts Statement No. 5, SFAS No. 5, SAB 101, and SAB 104.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 464.

465.     Significant and obvious red flags of Navistar's GAAP violations included: the magnitude of the restructurings and their financial statement impact in the hundreds of millions of dollars; Navistar's failure to apply impairment accounting standards; and the positive impact on Navistar's reported financial position and results of operations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 465.

466.     Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 319, 326A, 339, 410, and 411.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 466 and on that basis denies the same.

### (iv)     Leases

467.     During the Class Period, Navistar accounted for certain transactions as sales and subsequent leasebacks, even though the requirements for sale-leaseback treatment were not met; and inappropriately accounted for other transactions as operating leases.  These actions had the effect of artificially improving Navistar's reported financial position and results of operations.  It also violated GAAP pertaining to leases.  *See* SFAS No. 13, SFAS No. 28, and SFAS No. 98.
468.     Significant and obvious red flags of Navistar's GAAP violations included: the 2004 Restatement; the failure of the transactions to meet the threshold sale-leaseback and operating lease requirements; the size of the transactions; and the positive impact on Navistar's reported financial position and results of operations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 467.

468.     Significant and obvious red flags of Navistar's GAAP violations included: the 2004 Restatement; the failure of the transactions to meet the threshold sale-leaseback and operating lease requirements; the size of the transactions; and the positive impact on Navistar's reported financial position and results of operations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 468.

469.     Deloitte's deliberate or reckless refusal to act on these red flags constituted an egregious failure to see the obvious, and violated GAAS.  *See* SAS No. I at § 150A.02, and AU §§ 312A, 319, 326A, 339, 410, and 411.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 469 and on that basis denies the same.

(v)      **Liabilities Related to Contingencies**

470.     During the Class Period, Navistar improperly accounted for liabilities related to contingencies by failing to account for settlement offers with regard to litigation accruals; by using an arbitrary estimation process to reserve for existing and incurred but not reported asbestos claims; and by not accounting for unpaid losses for product liability claims consistent with the terms of its agreements.  Each of these actions had the effect of artificially improving Navistar's reported financial position and results of operations.  Each also violated GAAP pertaining to liabilities related to loss contingencies.  *See* FASB Concepts Statement No. 5, SFAS No. 5.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 470.

471.     Significant and obvious red flags of Navistar's GAAP violations in the area of liabilities related to loss contingencies included: the arbitrary estimation process used by Navistar for asbestos claims; the well-known high cost of asbestos claims and product liability claims; the failure to use an actuarial study to estimate the required reserves for the asbestos claims and product liability claims; the positive impact on Navistar's reported financial position and results of operations; and the fact that losses for contingencies such as litigation, asbestos, and product liability costs are a recognized area of financial statement manipulation.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 471.

472.     Auditors, including Deloitte, knew they needed to pay close audit attention to liabilities related to loss contingencies because the AICPA 2002/03 Audit Risk Alert also warned that:

> Accounting estimates and accruals, by their nature, are easily subject to aggressive accounting practices and therefore are a means to manage earnings ... Auditors may need to pay special attention to this risk on their engagements ... Auditors may need to review changes in estimates to determine that they are appropriate, timely and adequately supported with sufficient competent evidential matter...  When auditing accounting estimates, auditors should give close attention to the underlying assumptions used by management ... there should be a preponderance of information to support each significant assumption ... a preponderance of information exists when the weight of available information tends to support the assumption.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 472 and on that basis denies the same.

473.     Deloitte's deliberate or reckless refusal to act upon these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, as well as an exercise of accounting judgment that no reasonable accountant would have made if confronted with the same facts, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 319, 326A, 339,     342, 410, and 411.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 473 and on that basis denies the same.

### (vi)    Vendor Rebates and Retooling Costs

474.    During the Class Period, Navistar recorded future vendor rebates as revenue or a reduction of cost of sales, even though payment was contingent upon uncertain future events; inappropriately recognized as income amounts received as a result of early terminations of tooling amortization agreements and acquisition of the subject equipment; and failed to amortize the cost of the acquired tooling.  These actions had the effect of artificially improving Navistar's reported financial position and results of operations.  They also violated GAAP.  *See* FASB Concepts Statement No. 5, SFAS No. 5, SFAS No. 48, ARB No. 43, APB Opinion No. 10, SAB 101, SAB 104, SOP 97-2.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 474.

475.    Significant and obvious red flags of Navistar's GAAP violations included: the contingent nature of the vendor rebates; the early terminations of the tooling amortization agreements; the effect on revenues; the positive impact on Navistar's reported financial position and results of operations; and the fact that contingencies such as vendor rebates and revenue recognition in general are recognized areas of financial statement manipulation.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 475.

476.    Auditors, including Deloitte, knew they needed to pay close audit attention to vendor rebates because the AICPA 2003/04 Audit Risk Alert also warned that "information related to vendor rebates is often easily manipulable, Management can utilize vendor rebates to inflate sales and manage earnings and financial results."  The same Audit Risk Alert also noted that accounting for vendor rebates at times relies on "management estimates" that "are easily subject to aggressive accounting practices and, therefore, are a means to manage earnings.  Auditors may need to pay special attention to accounting estimates developed in connection with vendor rebates."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 476 and on that basis denies the same.

477.    Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 319, 326A, 339, 410, and 411.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 477  and on that basis denies the same.

(vii)    **Consolidation Accounting**

478.    During the Class Period, Navistar did not consolidate certain Variable Interest Entities (VIE) that should have been consolidated.  This had the effect of keeping losses and liabilities off Navistar's financial statements and artificially improving Navistar's reported financial position and results of operations.  It also violated GAAP.  *See* FIN No. 46, and FIN No. 46R.

    **ANSWER:**    Schwetschenau denies the allegations of Paragraph 478.

479.    Significant and obvious red flags of Navistar's GAAP violation included: the 2004 Restatement; the highly publicized accounting scandals and audit failures of Enron and other companies related to "off balance sheet" losses and liabilities; the failure to meet the threshold requirements that would have allowed the VIEs to be accounted for "off balance sheet" of Navistar; the failure to reconcile intercompany accounts properly; the positive impact on Navistar's reported financial position and results of operations; and the fact that this was a recognized area of financial statement manipulation.

    **ANSWER:**    Schwetschenau denies the allegations of Paragraph 479.

480.    Auditors, including Deloitte, knew they needed to pay close audit attention to consolidation accounting for VIEs because the AICPA 2002/03 Audit Risk Alert also warned of the risks associated with accounting for VIE's, particularly the risk that a sponsoring entity such as Navistar might fail "to consolidate the results of the operations, assets, and liabilities of an SPE [Special Purpose Entity] when the conditions required for nonconsolidation are not met." The Audit Risk Alert specifically warned that:

> [A]uditors should be alert to the existence or creation of [Special Purpose Entities ("SPE"), or Variable Interest Entities] ... particularly in view of recent events and the risk of material misstatement of the financial statements due to fraud, auditors should consider conducting further procedures with respect to the books of the SPE, particularly focusing on whether the requisite outside investment in the SPE existed at the time of the transaction and continues to exist in subsequent periods ... the auditor should consider tailoring the management representation letter to include specific representations on critical issues and assumptions related to SPE transactions and confirming that all relevant information and documents have been provided.

    **ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 480 and on that basis denies the same.

481.    The following year, the AICPA Audit Risk Alert also informed auditors, including Deloitte, that they needed to pay heightened audit attention to accounting issues related to VIES.  Specifically, the AICPA 2003/04 Audit Risk Alert noted that since "FASB Interpretation (FIN) No. 46, *Consolidation of Variable Interest Entities* was issued ... many entities will be implementing the provisions of this Interpretation and auditors may need to

ensure that they understand the requirements of FIN No. 46 and determine whether management is complying with those requirements."

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 481 and on that basis denies the same.

482.    Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, and violated GAAS. *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 319, 326A, 339, 410, and 411.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 482 and on that basis denies the same.

### (viii)    Revenue Recognition

483.    During the Class Period, Navistar improperly recognized revenue for numerous transactions and programs; inappropriately recognized revenue by failing to eliminate inter-company sales; and recognized revenue when there was no evidence of a sales arrangement. These actions had the effect of artificially improving Navistar's reported financial position and results of operations. They also violated GAAP. *See* FASB Concepts Statement No. 5, SFAS No. 5, SFAS No. 48, ARB No. 43, APB Opinion No. 10, SAB 101, SAB 104, Article 3A-04 of Regulation S-X, and SOP 97-2.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 483.

484.    Significant and obvious red flags of Navistar's GAAP violations included: the unique accounting considerations required for many of the transactions and programs entered by Navistar; the recognition of revenue before the risk and rewards of ownership transferred; the recording of revenue transactions in the wrong periods; the failure to reconcile intercompany accounts properly; the positive impact on Navistar's reported financial position and results of operations; and the fact that revenue recognition is one of the most recognized areas of financial statement manipulation.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 484.

485.    Auditors, including Deloitte, knew they needed to pay close audit attention to revenue recognition because the AICPA 2002/03 Audit Risk Alert also reported the growing risk that when "[f]aced with an uncertain economic and business climate, management at some companies will be hard-pressed to generate profits and report favorable financial results" and that as a result "auditors need to pay attention to warning signals that may indicate increased audit risk with respect to revenue recognition." The AICPA 2003/04 Audit Risk Alert further warned of the need to "pay careful attention to how revenue is recognized" and that "revenue recognition problems are usually the primary reason for financial misstatements." The AICPA 2003/04 Audit Risk Alert also cautioned that "[i]mproper accounting related to revenue

recognition ranges from stretching the accounting rules (for example, recognizing revenues before they are earned) to falsifying sales in an effort to manage earnings."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 485 and on that basis denies the same.

486.     Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, as well as an exercise of accounting judgment that no reasonable accountant would have made if confronted with the same facts, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 316A, 319, 326A,  339,     342, 410, and 411.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 486 and on that basis denies the same.

### (ix)     Property and Equipment

487.     During the Class Period, Navistar changed its depreciation method for non-production assets, even though the new method it used was inappropriate; changed its depreciation method for production assets, even though the change was not supportable; and improperly calculated capitalized interest.  These actions had the effect of artificially improving Navistar's reported financial position and results of operations.  They also violated GAAP.  *See* FASB Concepts Statement No. 2, SFAS No. 34, SFAS No. 93, ARB No. 43, and APB Opinion No. 6.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 487.

488.     Significant and obvious red flags of Navistar's GAAP violations included: the changes to existing methodology for calculating depreciation; errors in developing the capitalized interest rate and in applying the rate; and the positive impact on Navistar's reported financial position and results of operations.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 488.

489.     Auditors, including Deloitte, knew they needed to pay close audit attention to accounting for property and equipment to the extent such accounting involved "changes in accounting principles and methods," because the AICPA 2002/03 Audit Risk Alert also warned of the need to "determine whether the changes are appropriate and contribute to the accuracy, quality and transparency of the financial reporting."

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 489 and on that basis denies the same.

490.     Deloitte's deliberate or reckless refusal to act on these red flags constituted both an egregious failure to see the obvious and to investigate the doubtful, as well as an exercise of accounting judgment that no reasonable accountant would have made if confronted with the same facts, and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU §§ 312A, 319, 326A, 339, 342, 410, and 411.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 490 and on that basis denies the same.

### (x)     Securitization of Financial Instruments

491.     During the Class Period, Navistar improperly accounted for certain securitizations as sales even though the requirements for sales accounting were not met.  This had the effect of artificially improving Navistar's reported financial position and results of operations.  1t also violated GAAP.  *See* SFAS No. 140.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 491.

492.     Significant and obvious red flags of Navistar's GAAP violation included: the 2004 Restatement in this same area; the failure to meet the threshold sales accounting requirements; and the fact that accounting for Securitization of financial instruments is a recognized area of financial statement manipulation.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 492.

493.     Deloitte's deliberate or reckless refusal to act on these red flags constituted an egregious failure to see the obvious and violated GAAS.  *See* SAS No. 1 at § 150A.02, and AU § § 312A, 316A, 319, 326A, 339, 410, and 411.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 493 and on that basis denies the same.

### E.     Deloitte's Purported "Audits" Were No Audits At All

494.     Deloitte's purported "audits" of Navistar's 2003 and 2004 financial statements, for all of the reasons discussed above, constituted no audits at all.  Deloitte nonetheless rendered unqualified audit opinions, even though it knew or recklessly disregarded that its audits were not conducted in accordance with GAAS, that Navistar's financial statements materially misstated the company's true financial position and results of operations and were misleading, and that the financial statements did not did not conform with GAAP.  Deloitte had no reasonable bases to issue its unqualified audit opinions, upon which it knew investors and the market would rely.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 494.

495.    In conducting the 2003 and 2004 audits, Deloitte at all relevant times had access to the books, records, files, and key employees of the Company.  Deloitte personnel were present at Navistar's offices throughout each year, and had continual access to and knowledge of Navistar's confidential internal corporate, financial, operating, and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal accounting information and publicly-reported financial statements as well as the Company's internal controls and structures.

**ANSWER:**    Schwetschenau admits that Deloitte had access to certain of Navistar's

books, records, files, employees, and confidential information, but is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations of Paragraph

495 and on that basis denies the same.

496.    Deloitte deliberately or recklessly disregarded its duty to perform its purported "audits" in accordance with GAAS, and also deliberately or recklessly failed to take reasonable steps required to ensure that the financial statements presented Navistar's true financial position and results of operations in conformity with GAAP and were free of material misstatements. The warning signs and red flags detailed above, including Navistar's lack of adequate internal controls, insufficient staff, lack of necessary technical expertise, and failure to follow even the most basic accounting procedures, were either known Deloitte, or so obvious that Deloitte must have been aware of them.  Similarly, the danger that Navistar's financial statements materially misstated the company's financial position and results of operations was also either known to Deloitte, or so obvious that Deloitte must have been aware of it.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 496.

## X.    LOSS CAUSATION

497.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  As Plaintiffs will establish by expert opinion, the market prices of Navistar securities were inflated by the false and misleading statements made by Defendants, as identified above, and, as a result, Plaintiffs and the Class purchased Navistar securities at artificially inflated prices during the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 497.

498.    The corrective information disclosed to the market concerning the Individual Defendants', Navistar's and Deloitte's fraudulent acts, as described herein, revealed to the market the fraudulent nature of these disclosures and financial statements and the extent of the misrepresentations contained in Navistar' financial statements that form the primary basis of this action.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 498.

499.    The discussion of the following disclosures and market impacts incorporates by reference the complete discussion of these events above.

**ANSWER:**    This paragraph does not allege facts so as to require a response.  To the extent an answer is required, Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 499 and on that basis denies the same.

500.    In fact, when the misrepresentations and omissions that Navistar concealed from the market were revealed through the series of partial disclosures beginning at least by December 14, 2005 and continuing through the close of the market on July 17, 2006, the prices of Navistar securities fell dramatically, causing substantial losses to investors.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 500.

501.    Over the course of the Class Period, the average daily trading volume of Navistar's common stock on the New York Stock Exchange was approximately 929,000 shares traded.  Many of the declines discussed below occurred in conjunction with unusually high volume.  The combination of unusually high volume in concert with the disclosure of the Company-specific information outlined below establishes that the information disclosed on those days caused those declines and that the information was particularly material to investors.

**ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 501 and on that basis denies the same.

502.    At approximately 11:03 a.m. on December 14, 2005, Navistar issued a press release announcing that it had "postponed a scheduled meeting with security analysts and shareowners because the company's external audit for Fiscal 2005 is still in progress."  This disclosure revealed to investors the existence of potential accounting problems at Navistar.  As a result of this disclosure, Navistar's common stock declined by $2.11 per share, or 6.97%, on extremely high volume of 3.17 million shares traded, to close at $28.17 on December 14, 2005.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 502.

503.    Beginning after the closing of the financial markets on Tuesday, January 17, 2006, and continuing until after the closing of the financial markets on Thursday, January 19, 2006, a series of corrective information was disclosed to investors, including Navistar's announcement on January 17, 2006 that the filing of its Form 10-K for 2005 would be further delayed as result of continuing unresolved accounting items, and releases by Moody's (after the market closed on January 17), S&P (before the market opened on January 18) and Fitch (after the market closed on January 19) each putting Navistar's credit ratings on negative credit watch (as described above).  These disclosures continued to reveal to the market the severity of Navistar's accounting problems and the regulatory and credit rating implications created by the Company's continued inability to issue audited financial statements and make timely SEC filings.  The total impact of this information was incorporated into Navistar's stock price over the

course of the three trading days from January 18, 2006 through January 20, 2006, causing Navistar's stock to decline by $0.75 per share from its Tuesday, January 17, 2006 closing price of $26.62 per share, to close on January 20, 2006 at $25.87 per share.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 503.

504.     On February 3, 2006, prior to the opening of the financial markets, Navistar disclosed that it had been notified of a default by certain of its bondholders for failing to timely file its Form 10-K for 2005. During the trading day on February 3, 2006, Moody's announced a downgrade of Navistar's credit ratings along with the proviso that they remained on credit watch with risk of further downgrades. These disclosures continued to reveal to investors the severity of Navistar's accounting problems and the credit rating implications created by the Company's continued inability to issue audited financial statements and make timely SEC filings. As a result of this disclosure, Navistar's common stock declined by $0.66 per share, on high volume of 2.5 million shares traded, to close at $27.13 per share on February 3, 2006.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 504 and on that basis denies the same.

505.     Prior to the opening of the financial markets on May 30, 2006, Bear Stearns analyst Peter Nesvold downgraded Navistar and highlighted the various accounting issues identified by Deloitte. This report and interpretation of the Company's accounting problems revealed to investors the severity and impact of the Company's accounting problems. As a result of this disclosure, Navistar's common stock declined by $2.17 per share, on high volume of 2.15 million shares traded, to close at $26.64 per share on May 30, 2006.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 505 and on that basis denies the same.

506.     On Friday, June 2, 2006, after the close of the financial markets, Navistar issued a press release announcing a plan to file its Fiscal 2006 Form 10-K by mid-January 2007 and disclosing that the Company had conducted an investigation into "the propriety of accounting and auditing confirmation matters relating to vendor rebates." This disclosure revealed to investors that the accounting problems at Navistar required investigation by outside resources aimed at uncovering the nature and scope of fraudulent and improper activities at the Company. As a result of this disclosure, Navistar's common stock declined by $0.87 per share to close at $26.48 per share on June 5, 2006.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 506 and on that basis denies the same.

507.     During trading on July 17, 2006, Moody's issued a press release announcing the withdrawal of its ratings of Navistar's debt. This disclosure revealed to investors the severity of Navistar's accounting problems and the credit rating implications created by the Company's

continued inability to issue audited financial statements and make timely SEC filings.  As a result of this disclosure, Navistar's common stock declined by $0.06 per share, to close on July 17, 2006 at $20.95 per share.

      **ANSWER:**    Schwetschenau is without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 507 and on that basis denies the same.

      508.    The decline in the price of Navistar's common stock to $20.95 per share registered the effect of investors' incorporation of the corrective disclosures, detailed above, from June 7, 2006, through July 17, 2006.  These disclosures revealed to investors the severity, scope and impact of the Defendants' accounting manipulations and false statements during the Class Period.  The aggregate effect of this information caused an additional $5.59 (21%) per share drop from the Company's June 6, 2006 closing price of $26.54 per share.

      **ANSWER:**    Schwetschenau denies the allegations of Paragraph 508.

      509.    All told, from the day prior to the first corrective disclosure - December 13, 2005 - when Navistar common stock closed at $30.28 per share, to the day after the last corrective disclosure - July 17, 2006 - when Navistar shares closed at $20.95 each, Navistar common shares declined by $9.33 each, or 30%, owing to investors' incorporation of the information correcting Defendants' prior false and misleading statements.

      **ANSWER:**    Schwetschenau denies the allegations of Paragraph 509.

## XI.    INAPPLICABILITY OF SAFE HARBOR

      510.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, even if the statutory safe harbor were to otherwise apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Navistar who knew that those statements were false when made.

      **ANSWER:**    Schwetschenau denies the allegations of Paragraph 510.

511.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 511.

## XII.    CLASS ACTION ALLEGATIONS

512.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") of all persons and entities who purchased publicly traded securities of Navistar on the open market during the Class Period, February 14, 2003 through July 17, 2006.  Excluded from the Class are defendants herein, members of defendants' immediate families, any entity in which any of the defendants has a controlling interest, any person or entity affiliated with any of the defendants, and the legal representatives, heirs, successors or assigns of any of the defendants.

**ANSWER:**    Schwetschenau denies that this case is properly maintainable as a class

action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, that class

certification is proper, or that Plaintiffs are entitled to any relief as a class.  Schwetschenau

denies the remaining allegations of Paragraph 512.

513.    This action is properly maintainable as a class action for the following reasons:

(A)    The Class is so numerous that joinder of all members is impracticable.  Navistar common stock was actively traded on the NYSE during the Class Period.  While the exact number of Class members is unknown to plaintiffs at this time, and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of Class members located throughout the United States.

(B)    Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Among the common questions of law and fact are:

i.    Whether the federal securities laws were violated by defendants acts as alleged herein;

ii.    Whether defendants acted with scienter;

iii.    Whether defendants made materially false and misleading statements concerning Navistar;

iv.    Whether defendants participated in the course of conduct complained of herein;

v.      Whether plaintiffs and the other members of the Class sustained damages because of defendants' conduct; and

vi.     The appropriate measure of damages suffered by plaintiffs and the Class.

(C)     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the other Class members have sustained damages that arise from and were caused by defendants' unlawful activities alleged herein.  Plaintiffs do not have interests antagonistic to, or in conflict with, the other members of the Class.

(D)     Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained competent counsel experienced in class and securities litigation to prosecute this action vigorously.

(E)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

(F)     Furthermore, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class to seek redress individually for the wrongs they have suffered.

**ANSWER:**    Schwetschenau denies that this case is properly maintainable as a class action, that class certification is proper, or that Plaintiffs are entitled to any relief as a class.

Schwetschenau denies the remaining allegations of Paragraph 513.

## XIII.  FRAUD-ON-THE-MARKET PRESUMPTION

514.    At all relevant times, the market for Navistar common stock was an efficient market for the following reasons, among others:

(A)     Navistar common stock met the requirements for listing, and was listed and actively traded, on the NYSE;

(B)     As a regulated issuer, Navistar filed periodic public reports with the SEC and the NYSE;

(C)     The common stock of Navistar was followed by analysts, who wrote research reports that were distributed to the sales force and customers of investment firms.  Each of these reports was publicly available and entered the public marketplace; and

(D)     Plaintiffs and the other members of the Class purchased Navistar common stock from the time of defendants' false and misleading statements or omissions until the time the truth was revealed without knowledge of the falsity.

**ANSWER:**     Schwetschenau admits that Navistar common stock was traded on the NYSE during the relevant times of the Class Period and that Navistar filed periodic public reports with the SEC and NYSE.  Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 514 and on that basis denies the same.

515.     As a result, the market for Navistar common stock promptly digested current information with respect to Navistar common stock from all publicly-available sources and all such information was reflected in market prices of Navistar common stock.  Under these circumstances, all those who purchased Navistar common stock during the Class Period suffered similar injury through their acquisition of such securities at artificially inflated prices and a presumption of reliance applies.

**ANSWER:**     Schwetschenau is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 515 and on that basis denies the same.

### COUNT I
### Against Navistar and the Individual
### Defendants Pursuant to Section 10(b)
### of The Exchange Act and Rule 10b-5 Thereunder

516.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations.

**ANSWER:**     Schwetschenau incorporates herein as his answer to this Paragraph his answers to each of the foregoing allegations.

517.     During the Class Period, Navistar and the Individual Defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon plaintiffs and other members of the Class, and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and other Class members as set forth above.  The purpose and effect of this scheme was to induce plaintiffs and the Class to purchase Navistar securities at artificially inflated prices.

**ANSWER:**     Schwetschenau denies the allegations of Paragraph 517.

518.     During the Class Period, Navistar and the Individual Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 518.

519.    Navistar and the Individual Defendants knew and/or recklessly disregarded the falsity of the foregoing statements.  As senior officers and/or directors of the Company, involved in its operations, the Individual Defendants had access to the non-public information detailed above.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 519.

520.    Throughout the Class Period, Navistar acted through the Individual Defendants, whom it portrayed and represented to the press and public as its valid representatives.  The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Navistar, which is primarily responsible for the securities law violations of the Individual Defendants while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondeat superior.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 520.

521.    Each of Navistar and the Individual Defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in Navistar securities.  Had the adverse facts Navistar and the Individual Defendants concealed been properly disclosed, Navistar's securities would not have sold at the artificially inflated prices at which they sold during the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 521.

522.    As a result of the foregoing, the market price of Navistar securities was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations, plaintiffs and other members of the Class relied, to their detriment, on the integrity of the market as to the price of Navistar securities.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 522.

523.    Had plaintiffs and the other members of the Class and the marketplace known of the true operating and financial results of Navistar, which, due to the actions of defendants were not disclosed, plaintiffs and the Class would not have purchased or otherwise acquired their Navistar securities during the Class Period or, if they had acquired Navistar securities during the Class Period, they would not have done so at the artificially inflated prices at which they purchased their stock during the Class Period.  Hence, plaintiffs and the Class were damaged by said defendants' violations of Section 10(b) and Rule 10b-5.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 523.

524.    Plaintiffs and the Class were injured because the risks that materialized were risks of which they were unaware as a result of defendants' misrepresentations, omissions and other fraudulent conduct alleged herein.  The decline in the price of Navistar's securities was caused

by the public dissemination of the true facts, which were previously concealed or hidden. Absent Navistar and the Individual Defendants' wrongful conduct, plaintiffs and the Class would not have been injured.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 524.

525.    The price of Navistar securities declined materially upon public disclosure of the true facts which had been misrepresented or concealed, as alleged in this complaint.  Plaintiffs and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 525.

526.    By reason of the foregoing, Navistar and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 1 0b-5 promulgated thereunder.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 526.

## COUNT II
### Against Defendant Deloitte
### & Touche LLP Pursuant to Section 10(b)
### of The Exchange Act and Rule 10b-5 Thereunder

527.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations.

**ANSWER:**    As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

528.    During the Class Period, Deloitte engaged in a plan, scheme, and course of conduct, pursuant to which it knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon plaintiffs and other members of the Class, and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and other Class members as set forth above.  The purpose and effect of this scheme was to induce plaintiffs and the Class to purchase Navistar securities at artificially inflated prices.

**ANSWER:**    As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

529.    During the Class Period, Deloitte, pursuant to its plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above.

**ANSWER:**     As this Count is not brought against him, Schwetschenau provides no response to this allegation.

530.     Deloitte knew and/or recklessly disregarded the falsity of the foregoing statements.  As the Company's auditing firm throughout the Class Period, Deloitte had access to the non-public information detailed above.

**ANSWER:**     As this Count is not brought against him, Schwetschenau provides no response to this allegation.

531.     Throughout the Class Period, Deloitte issued audit opinions and other statements through its partners, employees and agents.  The willfulness, motive, knowledge, and recklessness of these persons is therefore imputed to Deloitte, which is liable for the acts of its partners, employees and agents under the doctrine of respondeat superior.

**ANSWER:**     As this Count is not brought against him, Schwetschenau provides no response to this allegation.

532.     Deloitte knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in Navistar securities.  Had the adverse facts Deloitte concealed been properly disclosed, Navistar's securities would not have sold at the artificially inflated prices at which they did during the Class Period.

**ANSWER:**     As this Count is not brought against him, Schwetschenau provides no response to this allegation.

533.     As a result of the foregoing, the market price of Navistar securities was artificially inflated during the Class Period.  In ignorance of the false and misleading nature of the representations, plaintiffs and other members of the Class relied, to their detriment, on the integrity of the market as to the price of Navistar securities.

**ANSWER:**     As this Count is not brought against him, Schwetschenau provides no response to this allegation.

534.     Had plaintiffs and the other members of the Class and the marketplace known of the true operating and financial results of Navistar, which, due to the actions of Deloitte were not disclosed, plaintiffs and the Class would not have purchased or otherwise acquired their Navistar securities during the Class Period or, if they had acquired Navistar securities during the Class Period, they would not have done so at the artificially inflated paces at which they purchased their stock during the Class Period.  Hence, plaintiffs and the Class were damaged by Deloitte's violations of Section 10(b) and Rule 10b-5.

**ANSWER:**   As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

535.   Plaintiffs and the Class were injured because the risks that materialized were risks of which they were unaware as a result of Deloitte's misrepresentations, omissions and other fraudulent conduct alleged herein.  The decline in the price of Navistar's securities was caused by the public dissemination of the true facts, which were previously concealed or hidden.  Absent Deloitte's wrongful conduct, plaintiffs and the Class would not have been injured.

**ANSWER:**   As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

536.   The price of Navistar securities declined materially upon public disclosure of the true facts which had been misrepresented or concealed, as alleged in this complaint.  Plaintiffs and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

**ANSWER:**   As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

537.   By reason of the foregoing, Deloitte violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER:**   As this Count is not brought against him, Schwetschenau provides no

response to this allegation.

### COUNT III
### Against The Individual Defendants
### Pursuant to Section 20(a) of the Exchange Act

538.   Plaintiffs incorporate by reference and reallege each of the foregoing allegations.

**ANSWER:**   Schwetschenau incorporates herein as his answer to this Paragraph his

answers to each of the foregoing allegations.

539.   By reason of their status as officers, members of senior management and/or directors of Navistar, the Individual Defendants were "controlling persons" of Navistar within the meaning of Section 20 of the Exchange Act and had the power and influence to cause Navistar to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Navistar's business, the information contained in its filings with the SEC and public statements about its business.  The Individual Defendants were provided with or had unlimited

access to copies of the Companies' internal reports, and press releases and public filings alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Navistar was controlled by the Individual Defendants and all of its employees.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 539.

540.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 540.

541.    As set forth above in Count I, Navistar violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Navistar, the Individual Defendants are liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 541.

542.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**ANSWER:**    Schwetschenau denies the allegations of Paragraph 542.

## PRAYER FOR RELIEF

Schwetschenau denies that Plaintiffs or the putative class are entitled to judgment or any

other relief requested in their Prayer for Relief.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim against Schwetschenau upon which relief can be

granted.

## SECOND AFFIRMATIVE DEFENSE

Assuming without conceding that the Complaint states a claim against Schwetschenau, Plaintiffs and the putative class have failed to mitigate any damages they may have suffered.

## THIRD AFFIRMATIVE DEFENSE

Assuming without conceding that the Complaint states a claim against Schwetschenau, Plaintiffs and the putative class' claims are untimely and are barred by the doctrine of laches.

## FOURTH AFFIRMATIVE DEFENSE

Assuming without conceding that the Complaint states a claim against Schwetschenau, the claims of wrongdoing in the Complaint have been waived by Plaintiffs and the putative class, in whole or in part, and are, to that extent, barred.

## FIFTH AFFIRMATIVE DEFENSE

Assuming without conceding that the Complaint states a claim against Schwetschenau, Plaintiffs and the putative class' claims are barred, in whole or in part, by the doctrine of unclean hands.

## SIXTH AFFIRMATIVE DEFENSE

Assuming without conceding that the Complaint states a claim against Schwetschenau, Plaintiffs and the putative class' claims are barred, in whole or in part, by the doctrine of equitable estoppel or other related equitable doctrines.

## SEVENTH AFFIRMATIVE DEFENSE

The Complaint fails to plead its claims with the particularity required by Federal Rule of Civil Procedure 9 and the Private Securities Litigation Reform Act of 1995 (15 U.S.C. §§ 78u-4, *et seq.*) ("PSLRA").

## EIGHTH AFFIRMATIVE DEFENSE

Schwetschenau had no duty to disclose any of the facts allegedly not disclosed.

186

## NINTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part to the extent that they seek to impose upon Schwetschenau disclosure obligations that are inconsistent with or exceed those imposed pursuant to the federal securities laws, including the Securities Act of 1933, the Securities Exchange Act of 1934, and the rules and regulations promulgated thereunder by the Securities and Exchange Commission.

## TENTH AFFIRMATIVE DEFENSE

The Complaint and each claim asserted therein are barred in whole or in part because Plaintiffs and the putative class lack standing.

## ELEVENTH AFFIRMATIVE DEFENSE

The allegedly untrue statements of material fact, omissions of material fact, misleading statements or other challenged statements allegedly made by Schwetschenau are rendered nonactionable by the Safe Harbor provisions of the PSLRA, adding Section 21E to the Securities Exchange Act of 1934, as codified at 15 U.S.C. § 78u-5(c).

## TWELFTH AFFIRMATIVE DEFENSE

The allegedly untrue statements of material fact, omissions of material fact, misleading statements or other challenged statements allegedly made by Schwetschenau are rendered nonactionable by the bespeaks caution doctrine.

## THIRTEENTH AFFIRMATIVE DEFENSE

The allegedly untrue statements of material fact, omissions of material fact, misleading statements or other challenged statements allegedly made by Schwetschenau are rendered nonactionable by the Rule 3b-6 Safe Harbor, 17 C.F.R. § 240.3b-6.

## FOURTEENTH AFFIRMATIVE DEFENSE

The Complaint and each claim therein are barred in whole or in part because Schwetschenau acted at all times in good faith and had no knowledge, and was not reckless in not knowing, that any alleged statement or omission was false or misleading.

## FIFTEENTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part because any alleged loss was not actually or proximately caused by Schwetschenau.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part because the conduct of persons and/or entities other than Schwetschenau was a superseding or intervening cause of any damage, loss, or injury sustained by Plaintiffs or putative class.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole, or in part, because the depreciation in the market price of Navistar common stock resulted from factors other than any misrepresentation, misleading statement, or omission alleged in the Complaint.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part to the extent they seek to hold Schwetschenau liable for any losses allegedly incurred, if any, in excess of the total price at which Navistar common stock was distributed to the public.

## NINETEENTH AFFIRMATIVE DEFENSE

Any recovery for damages allegedly incurred by Plaintiffs or the putative class, if any, is subject to offset in an amount including, but not limited to, any tax benefits actually received by Plaintiffs and the putative class throughout their investments.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs and the putative class would have acquired Navistar common stock even if, when acquired, each such plaintiff had known of the allegedly untrue statements of material fact, omissions of material fact, or misleading statements or other wrongful conduct upon which Schwetschenau's purported liability rests.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part because of the lack of transaction causation.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part because Plaintiffs and the putative class did not reasonably rely on the statements and/or omissions alleged in the Complaint to be materially false and misleading.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred in whole or in part because of the contribution of or the comparative fault and contributory negligence of other persons or entities.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The alleged damages in this case, if any, are speculative and thus not recoverable.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs are not entitled to recover attorneys' fees, experts' fees, or other costs and disbursements.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred because neither the fraud-on-the-market presumption of reliance nor any other presumption of reliance is applicable.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

The Complaint and each claim raised therein are barred to the extent that they were not brought within the statute of limitations.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

The claims in the Complaint are not properly maintainable as a class action.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Recovery for the claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 in the Complaint is limited to the percentage of responsibility of Schwetschenau, individually, in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to the alleged damages, pursuant to the proportionate liability provisions of the PSLRA, as codified at 15 U.S.C. § 78u-4(f)(3)(A).

## THIRTIETH AFFIRMATIVE DEFENSE

Schwetschenau is not liable as a "control person" under Section 20(a) of the Securities Exchange Act of 1934 because, among other things, there is no primary securities law violation and Schwetschenau was not a culpable participant in the underlying actions or omissions.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Schwetschenau reasonably relied on Deloitte to review Navistar's accounting and to audit Navistar's financial statements.

**WHEREFORE,** defendant Schwetschenau prays as follows:

1.      That judgment is entered in favor of Schwetschenau dismissing each and every count and cause of action in the Complaint, with prejudice;

2.      That Schwetschenau recover his costs and fees in this action; and

3.      For such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Schwetschenau hereby demands a trial

by jury on all issues so triable.

Dated:  September 28, 2009                    MARK T. SCHWETSCHENAU


                                             By:  ___*/s/ Patrick S. Coffey*___
                                                  One of his Attorneys

Patrick S. Coffey
Timothy M. Maggio
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606
(312) 443-0700

## <u>CERTIFICATE OF SERVICE</u>

I, Timothy M. Maggio, an attorney, do hereby certify that on September 28, 2009, I electronically filed the foregoing DEFENDANT SCHWETSCHENAU'S ANSWER AND AFFIRMATIVE DEFENSES TO CONSOLIDATED CLASS ACTION COMPLAINT with the Clerk of the Court using the electronic case filing system, which caused the foregoing document to be served upon counsel of record via the Court's ECF system.

By:   */s/ Timothy M. Maggio*
      Timothy M. Maggio

192