**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NORFOLK COUNTY RETIREMENT SYSTEM and PLUMBERS LOCAL UNION 519 PENSION TRUST, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| | ) | **Case No. 07-cv-07014** |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **Judge Robert W. Gettleman** |
| **DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP,** | ) ) ) ) ) | **Magistrate Judge Nan R. Nolan** |
| **Defendants.** | ) | |

**NAVISTAR DEFENDANTS' OPPOSITION**
**TO LEAD PLAINTIFFS' MOTION TO COMPEL**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ....................................................................................................3

III.  ARGUMENT ........................................................................................................5

     A.    The SEC Documents.................................................................................5

          1.    The SEC Documents Have No Bearing On Class Certification ..................5

          2.    The SEC Documents Would Be Highly Burdensome To Produce.............6

     B.    Non-Public Documents And Communications.......................................................9

          1.    The Non-Public Documents And Communications Have No
               Bearing On Class Certification ...................................................................9

          2.    Lead Plaintiffs Wrongly Characterize Navistar Defendants'
               Position On Loss Causation, And The Single Case Cited By Lead
               Plaintiffs In Support Of Their Argument Is Inapplicable .........................12

          3.    The Non-Public Documents And Communications Would Be
               Highly Burdensome To Produce.................................................................14

IV.   CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ......................................................................11

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ....................................................................................11

*Brenneman v. Knight*,
  297 Fed. Appx. 534 (7th Cir. 2008) ..............................................................6

*Dellwood Farms, Inc. v. Cargill, Inc.*,
  128 F.3d 1122 (7th Cir. 1997) ......................................................................8

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................10, 12, 14

*E.E.O.C. v. Harvey L. Walner & Assocs.*,
  91 F.3d 963 (7th Cir. 1996) ..........................................................................6

*Fener v. Operating Eng'rs Constr. Indus.*,
  579 F.3d 401 (5th Cir. 2009) ......................................................................10

*In re Bank of America Corp. Secs., Derivative, & ERISA Litig.*,
  2009 U.S. Dist. LEXIS 108322 (S.D.N.Y. November 16, 2009)......................9

*In re eSpeed, Inc. Secs. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..........................................................13

*In re Motorola Secs. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007)........................................................12-14

*In re Northfield Labs., Inc. Secs. Litig.*,
  527 F. Supp. 2d 769 (N.D. Ill. 2007)............................................................13

*In re Steinhardt Partners, L.P.*,
  9 F.3d 230 (2d Cir. 1993) ..............................................................................8

*In re Take-Two Interactive Secs. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........................................................13

*In re WorldCom, Inc. Secs. Litig.*,
  2005 WL 375314 (S.D.N.Y. Feb. 17, 2005) ................................................13

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
  244 F.R.D. 412 (N.D. Ill. 2006) ..........................................................3, 8, 9

*Private Equity Invs. v. Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) ..............................................................................11

*Ray v. Citigroup Global Mkts., Inc.*,
   482 F.3d 991 (7th Cir. 2007) .....................................................................9, 12-13

*Tricontinental Indus. Ltd. v. PricewaterhouseCoopers, LLP*,
   475 F.3d 824 (7th Cir. 2007) ..............................................................................14

*Waldman v. Wachovia Corp.*,
   2009 WL 86763 (S.D.N.Y. January 12, 2009) ...................................................9

*West v. Prudential Securities, Inc.*,
   282 F.3d 935 (7th Cir. 2002) ..............................................................................11


## OTHER AUTHORITIES

Def. Northfield's Mem., *In re Northfield Labs., Inc. Secs. Litig.*,
   No. 06 C 1493 (N.D. Ill. Jan. 21, 2009) .........................................................11-12

Minute Order, *In re Northfield Labs., Inc. Secs. Litig.*,
   No. 06 C 1493 (N.D. Ill. Feb. 5, 2009)...............................................................12

Minute Order, *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
   No. 02-5893 (N.D. Ill. Feb. 1, 2007) ...................................................................8

Defendants Navistar International Corporation ("Navistar" or the "Company"), Daniel C. Ustian and Robert C. Lannert ("Navistar Defendants") and defendant Mark T. Schwetschenau respond as follows to plaintiffs' motion to compel:

## I.      INTRODUCTION

In his September 10, 2009 order, Judge Gettleman instructed the parties "to structure discovery to avoid taking discovery related solely to the merits until the court decides the motion for class certification."  Lead Plaintiffs have made very little attempt to do so.  They served 61 requests for production on Navistar Defendants, most of which seek documents that have nothing to do with class certification and – if relevant to anything[1] – relate "solely to the merits."  For the few requests that do touch on class certification issues, Lead Plaintiffs already have the relevant documents, the information is otherwise publicly available, and/or Navistar Defendants have agreed to produce responsive information.

In their motion, Lead Plaintiffs seek to compel production of the following:

- Documents provided by Navistar to the Securities and Exchange Commission ("SEC" or the "Commission") in connection with the SEC's investigation into Navistar's restatement of its financial results for 2002 through the first three quarters of 2005 (the "Restatement") (Requests 37-38).

- Non-public documents "concerning" the 17 disclosures plaintiffs contend "revealed the truth" of the alleged fraud, the "reaction by the market and/or analysts" to these disclosures, internal Navistar communications discussing Navistar stock price movement, and non-public communications with analysts, banks, investors and rating agencies.  (Requests 3-36, 48, 52, 56 & 57).

These documents have no bearing on class certification.  *First*, as Navistar Defendants have repeatedly explained to Lead Plaintiffs, the SEC documents relate to technical accounting policies and accounting decisions made by the Company.  There is no class certification issue to

---

[1]      Even if Judge Gettleman had wanted the parties to engage in full-blown merits-discovery at this time, plaintiffs' requests as written are breathtakingly overbroad, as some call for virtually every document and bit of data at the Company.  For example, Request 50 seeks every document the Company has relating to the "value" of the Company.  Nearly every document the Company has could be tied to the Company's value.

which these documents would relate, and Navistar Defendants will gladly stipulate that they will

not use any such documents in their class certification briefing.  In their motion, Lead Plaintiffs

fail to provide any explanation why the SEC documents relate to class certification or otherwise

discuss how they reasonably could use such documents in connection with class certification.

Lead Plaintiffs, in fact, essentially acknowledged that the documents are not relevant, noting in a

letter that the "scope [of the SEC documents] exceeds those documents related to class

certification."

   *Second*, Lead Plaintiffs contend – again without any real explanation – that the

non-public documents "concerning" the 17 disclosures that purportedly "revealed the truth" (*i.e.*,

the alleged "corrective disclosures") and the other requested non-public information are relevant

to the issue of loss causation.  While the issue of loss causation is, in fact, critical to class

certification, it hinges on **public** information, not on the non-public information sought by Lead

Plaintiffs here.  Specifically, loss causation is based on (i) what the market was told (was the

"truth" about the alleged fraud revealed?) and (ii) how the market reacted in response (was there

a prompt, significant drop in the stock price?).  As their Complaint makes clear, Lead Plaintiffs

already possess the information that bears on these questions.

   This is not just a matter of technically violating the letter of Judge Gettleman's

order.  The documents requested would be highly burdensome to produce.  Navistar produced

over a million pages of documents to the SEC, as well as complete forensic images of the hard

drives of ten Navistar employees.  These documents and data would need to be reviewed for

relevance, as there are likely tens of thousands of documents that were responsive to the SEC's

broad requests but have no bearing on Lead Plaintiffs' case.  The SEC documents also would

need to be reviewed for privilege, as numerous privileged documents were produced to the

Commission pursuant to a confidentiality agreement, consistent with the selective waiver

doctrine as recognized by this Court in *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 433 (N.D. Ill. 2006) (Nolan, J.).

Similarly, producing documents "concerning" the "corrective" disclosures and the "market reaction" thereto (Requests 3-36) would also be a very expensive and time consuming endeavor. There are 17 total disclosures referenced by Lead Plaintiffs, and these disclosures broadly discuss the financial performance and reporting of the Company. There are innumerable documents that "concern" these disclosures or that relate to the "market reaction" thereto. There are also likely thousands of internal Navistar communications and documents – involving potentially hundreds of custodians – generally discussing "reasons for any increase or decline in the price of Navistar stock" during the three-and-a-half year proposed Class Period. (Requests 56-57.)

Lead Plaintiffs have, therefore, not only ignored Judge Gettleman's order, they have ignored the signature principle of the Seventh Circuit's E-Discovery Pilot Program – to which the parties agreed – that e-discovery obligations be "proportional" and not excessive. Lead Plaintiffs' requests go far beyond what is necessary at this stage of the litigation, will force the Navistar Defendants to dig into electronic discovery to a degree that will delay production for months if not a year or more, and will force Navistar to bear significant expenses before class certification is even briefed. Their motion to compel should be denied.

## II.    BACKGROUND

Lead Plaintiffs filed their Consolidated Amended Class Action Complaint on May 8, 2008. All defendants moved to dismiss the Complaint. On July 28, 2009, Judge Gettleman granted defendant Deloitte & Touche's motion to dismiss, but denied the other defendants' motions.

The parties then worked jointly on a proposed scheduling order, but disagreed on how discovery should proceed. The Navistar Defendants asked Judge Gettleman to bifurcate discovery, limiting discovery to the class certification issues until the class certification decision

was made.  The Navistar Defendants argued that bifurcation would better satisfy the mandate of

Rule 23 of the Federal Rules of Civil Procedure that a class certification determination be made

"[a]t an early practicable time" and that it would be an extraordinary burden on the Court and the

Navistar Defendants to engage in merits and class discovery in parallel.  Lead Plaintiffs argued

for full-blown discovery.

     Although Judge Gettleman did not formally grant Navistar Defendants'

bifurcation request, he instructed the parties "to structure discovery to avoid taking discovery

related solely to the merits until the court decides the motion for class certification."  (Sept. 10,

2009 Scheduling Order, Ex. 1 hereto, at ¶ 7.)  Judge Gettleman made clear at the hearing that the

purpose of his order was to avoid having to force expensive and burdensome merits discovery

that could be unnecessary depending on his class certification ruling:

> The parties are directed to avoid taking discovery that is not related
> to class certification . . .  [W]e are going to take discovery that
> overlaps both things, but we're not going to go into ultimate
> discovery that might not be ever taken.
>
> ***
>
> [T]the Court encourages and directs the parties to limit the
> discovery to issues that relate to class certification; and any overlap
> should be … inclusive of class certification issues … rather than
> taking discovery that relates only to merits.

(Sept. 10, 2009 Hrg. Tr., Ex. 2 hereto, at 8, 13.)

     Despite Judge Gettleman's order, Lead Plaintiffs served 61 document requests on

the Navistar Defendants, the vast majority of which relate only to the merits and not to class

certification.  Nonetheless, in the spirit of cooperation – and consistent with the Seventh Circuit's

E-Discovery Pilot Program to which the parties agreed – the Navistar Defendants have met and

conferred[2] with Lead Plaintiffs and agreed to produce certain categories of documents requested

---

[2]      The parties' correspondence is attached to plaintiffs' memorandum of law.

by Lead Plaintiffs, even though most of those requests have no real bearing on class certification issues.  This production is almost complete, with the Navistar Defendants having produced nearly 7,500 pages of documents to Lead Plaintiffs to date.[3]

## III.   ARGUMENT

### A.   The SEC Documents

#### 1.   The SEC Documents Have No Bearing On Class Certification

The documents provided to the SEC relate to the Company's accounting policies and decisions made on specific accounting issues.  The categories of documents produced to the Commission include:

- Over one million pages of electronic and hard copy documents from a number of data sources processed, hosted, reviewed and produced to the SEC, relating to the accounting issues in which the SEC was interested (*see* Declaration of Michael C. Weil ("Weil Decl."), Ex. 3 hereto, at ¶ 10);

- Hundreds of thousands of emails, many with voluminous spreadsheets and other attachments in various types of file formats, along with a myriad of transactional documents and drafts of transactional documents, relating to the accounting issues in which the SEC was interested;

- Tens of thousands of pages of internal and external work papers specifically related to accounting issues described in the Restatement;

- Hundreds of thousands of pages of documents relating to the Audit Committee's internal investigation into accounting issues in connection with the Restatement, including documents deemed relevant by the investigation team, reports generated by the team and over one hundred interview memoranda; and

- Complete forensic copies of the hard-drive images and user-drive files for ten Navistar employees,[4] totaling over 390 gigabytes and yielding over **3.3 million pages** to review (*see* Weil Decl., Ex. 3 hereto, at ¶¶ 11-13).

These documents have no bearing on the Rule 23 issues.  They are relevant – if at all – to scienter issues.  Scienter is not a Rule 23 issue.  Defendants will stipulate that they will not use

---

[3]     As such, that part of plaintiffs' motion to compel asking this Court to order production of documents that Navistar Defendants indicated they would produce is moot.

[4]     In other words, **all computer files** – not just those relating to accounting issues or Restatement issues – of these employees were produced.

these documents in connection with their class certification briefing, and Lead Plaintiffs have yet to identify how they reasonably could use the documents in support of their class certification arguments.

Indeed, in the parties' multiple meet and confer meetings and exchange of letters, Lead Plaintiffs could not muster a **single** reason why the SEC documents were relevant to class certification.  (*See* Corresp., Exs. D–H to Pls.' Mem.)  In their November 5, 2009 letter to Navistar Defendants, Lead Plaintiffs essentially admitted that the SEC documents were not relevant to class certification issues, noting the "scope [of the SEC documents] exceeds those documents related to class certification."  (Ex. D to Pls.' Mem.)  Despite this admission, plaintiffs weakly speculate in their motion that "it is likely that some documents produced to the SEC would bear on class certification issues."  (Pls.' Mem. at 13.)  That is the sum and substance of Lead Plaintiffs' argument as to relevance.  Lead Plaintiffs' request for this information, therefore, amounts to nothing more than an impermissible fishing expedition.  *See Brenneman v. Knight,* 297 Fed. Appx. 534, 538 (7th Cir. 2008) ("requiring the staff to conduct a fishing expedition, particularly of the magnitude Brenneman requested, would have imposed too great a burden"); *E.E.O.C. v. Harvey L. Walner & Assocs.,* 91 F.3d 963, 971-972 (7th Cir. 1996) ("discovery is not to be used as a fishing expedition").

### 2.    The SEC Documents Would Be Highly Burdensome To Produce

While essentially ignoring the relevance issue – and Judge Gettleman's order in the process – Lead Plaintiffs contend that the SEC documents should be produced because it would not be burdensome for the Navistar Defendants to do so.  (Pls.' Mem. at 12-14.)  Even if Judge Gettleman's order could so easily be brushed aside, producing these documents would, in fact, be extremely burdensome.  Over one million total pages were produced to the SEC, and this does **not** include the over **3.3 million reviewable pages** from the ten hard drives produced.

(Weil Decl. (Ex. 3), at ¶¶ 10-13.)  Contrary to Lead Plaintiffs' assumptions, it is not just a matter of delivering what has already been "collected, reviewed and produced."  (Pls.' Mem. at 12.)

While some of the documents produced to the Commission may be relevant to the merits – but not class certification – there are likely thousands of documents that have no bearing whatsoever on this case.  For example, Lead Plaintiffs could not reasonably take the position that they are entitled to the ten complete, unaltered hard drives produced to the SEC.  More generally, the SEC investigation is by no means a mirror image of Lead Plaintiffs' Complaint.  The Commission requested documents based on the issues in which it was interested, and not all of the Commission's issues are relevant to this case.  The documents were reviewed by Navistar based on the broad scope of the SEC investigation at that time, not based on the issues in this lawsuit.  Thus, the Navistar Defendants would need to review the documents for relevance before they can be produced in this case.

Additionally, the Navistar Defendants produced privileged and work product documents to the SEC and, thus, would also need to review the SEC documents for privilege.  In this regard, all documents and information provided to the SEC were produced pursuant to a strict confidentiality agreement between the parties that limited distribution of disclosed documents and expressly provided that the disclosure did not constitute a waiver of attorney client privilege or work product protection.  (Confidentiality Agr., Ex. 4 hereto, at 1-2.) Specifically, the confidentiality agreement between Navistar and the SEC states:

> In connection with the previous or future production of Confidential Materials to the Staff, neither Skadden [Navistar's SEC counsel] nor the Company intends to waive the protection of the attorney-client privilege or the attorney work product doctrine or any other privilege or protection applicable as to third parties. ... The Company believes that the Confidential Materials warrant protection from disclosure.

(*Id*.)

Under the selective waiver doctrine, the Navistar Defendants' production of privileged and work product documents did not waive the privilege with respect to third parties. *See generally In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir. 1993) (selective waiver may be appropriate when "the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials").[5]

This Court has adopted the selective waiver doctrine in circumstances almost identical to the facts here.  In *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 433 (N.D. Ill. 2006) (Nolan, J.), defendants disclosed privileged documents to the SEC to assist the Staff's determination of whether there were any violations of federal securities laws.  Defendants, however, insisted on a confidentiality agreement to protect the information. Your Honor held that selective waiver was appropriate because defendants "took steps to preserve its privilege" by entering into the confidentiality agreement, which expressly stated that "neither the Committee nor Household intend to waive the protections of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties."  *Id.* Because defendants did not waive the privilege, this Court denied plaintiffs' motion to compel such documents.  *Id.*[6]  *See also Dellwood Farms*, *Inc. v. Cargill, Inc.*, 128 F.3d 1122 (7th Cir. 1997) (while not deciding the issue of selective waiver, the court left the door open for selective waiver by holding that government disclosure of tapes to corporate defense counsel in an effort to persuade the company to plead guilty did not operate as a waiver of privilege in subsequent litigation).

Similarly here, the Navistar Defendants "took steps to preserve its privilege" by entering into the confidentiality agreement.  Indeed, the language in Navistar's confidentiality

---

[5]      While there is a split of authority on the selective waiver issue, as discussed herein, this Court has previously recognized the principle in almost identical circumstances.

[6]      Your Honor's decision was affirmed by Judge Guzman.  *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02-5893, Minute Order at 3-4 (N.D. Ill. Feb. 1, 2007) (Ex. 5 hereto).

agreement is nearly **identical** to the language of the confidentiality agreement in *Jaffe*.

Accordingly, as with any standard document review and production, the Navistar Defendants

would need to conduct a full privilege review of the entire SEC production – a significant

burden, given the volume of documents that would need to be reviewed.[7]

     **B.**     **Non-Public Documents And Communications**

     **1.**     **The Non-Public Documents And Communications Have No Bearing On Class Certification**

Loss causation is an important class certification issue, which the Navistar

Defendants intend to raise in class certification briefing.  Lead Plaintiffs allege a "fraud-on-the-

market" or "corrective disclosure" theory of loss causation; specifically, that the "truth" about

Navistar's financial condition purportedly was released to the market through a series of

disclosures from December 14, 2005 through July 17, 2006.  (Compl. ¶¶ 233-76); *see generally*

*Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) ("Under [the fraud-on-

the-market] theory, plaintiffs must show both that the defendants' alleged misrepresentations

artificially inflated the price of the stock and that the value of the stock declined once the market

learned of the deception.").  As the Navistar Defendants will show by reference to publicly

---

[7]     The two cases plaintiffs cite are inapposite.  The respective plaintiffs in both *In re Bank of America Corp. Secs., Derivative, & ERISA Litig.*, 2009 U.S. Dist. LEXIS 108322 (S.D.N.Y. November 16, 2009), and *Waldman v. Wachovia Corp.*, 2009 WL 86763 (S.D.N.Y. January 12, 2009), moved to lift the PSLRA stay of discovery while motions to dismiss were pending and sought the production of documents which the respective defendants had previously produced to various government agencies.  In both cases, the Southern District of New York acknowledged it must weigh the potential prejudice to plaintiffs against the burden to defendants.  In both cases, the court found that plaintiffs would be unduly prejudiced if the documents were not produced.  In the *Bank of America* case, discovery was proceeding in parallel cases and plaintiffs argued that without access to the documents produced in the other proceedings, plaintiffs would be unable to make informed decisions re litigation strategy.  In *Waldman*, plaintiffs argued that they needed the documents to determine whether to continue the case despite a settlement between defendants and the SEC.  In the present case, Lead Plaintiffs do not even attempt to argue that they would be prejudiced if the SEC Documents were not produced at this moment.  Additionally, in neither case did the defendants even argue that the production to plaintiffs would be burdensome, nor was there a bifurcation issue in those cases.

available documents, there is no loss causation here and, thus, under Seventh Circuit precedent, the shareholders cannot bring a Rule 23 class action.

Lead Plaintiffs contend that their document requests 3-36, 48, 52, 56, and 57 are relevant to that analysis.  (Pls.' Mem. at 4-11.)  They are wrong.  Lead Plaintiffs' requests seek **non-public** information.  Specifically, requests 3-36 seek internal, non-public documents and communications "concerning" the 17 alleged corrective disclosures and the "reaction by the market and/or analysts" to such disclosures.  Requests 48, 52, 56 and 57 seek **non-public** communications with analysts, banks, investors and rating agencies, as well as internal Navistar communications discussing Navistar stock price movement.

These documents have no bearing on loss causation.  What matters for Lead Plaintiffs' theory of loss causation is (i) whether the market became aware of information that "corrected" a previous misrepresentation, and (ii) how the market reacted to that "disclosure." *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005) (no loss causation where no facts alleged that defendant's "share price fell significantly after the truth **became known**");[8] *Ray*, 482 F.3d at 995 (plaintiffs must allege that "the value of the stock declined once the market **learned** of the deception"); *see also Fener v. Operating Eng'rs Constr. Indus.*, 579 F.3d 401, 406-07 (5th Cir. 2009) (requiring plaintiff to demonstrate that the defendant made "public material misrepresentations").

Not surprisingly, the first inquiry (whether the disclosure "corrected" a previous misrepresentation) depends on **what the disclosure says**, not on non-public communications and documents "concerning" the disclosure.  Here, Lead Plaintiffs are well aware what the disclosures said – they cite the disclosures throughout their Complaint.  (*See, e.g.*, Compl. ¶¶ 233-76.)  As for the second inquiry (whether the disclosure caused a loss), plaintiffs obviously

---

[8]        Unless otherwise indicated, all emphasis is supplied and all internal citations are omitted.

know how the market reacted on the days when the disclosures were issued, again citing this

information throughout their Complaint.  (*Id*.)

        The case law is in accord.  Courts hold that whether a disclosure "corrected" a

previous misrepresentation is an "empirical judgment" that requires little or no discovery

because the analysis hinges on **public** documents and data.  *Private Equity Invs. v. Allegiance

Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007) ("Little discovery from defendants is demanded

by the fraud-on-the-market regimen.  **Its 'proof' is drawn from public data and public filings**,

as in this case.  It is largely an empirical judgment that can be made then as well as later in the

litigation."); *Alaska Elec. Pension Fund v. Flowserve Corp*., 572 F.3d 221 (5th Cir. 2009) ("The

court must make this empirical judgment [loss causation] drawing largely from publicly

available data thereby **leaving minimal need for discovery**.").[9]

        This Court recently faced an issue very similar to the present dispute in *In re

Northfield Labs, Inc. Secs. Litig.*, No. 06 C 1493, a securities class action in which there was a

bifurcation order separating class and merits discovery.  Plaintiffs in *Northfield* moved to compel

"non-public information" relating to an SEC investigation and Senate Finance Committee

investigation of defendants.  Plaintiffs claimed they required such documents in order to

establish loss causation at the class certification stage.  The defendants argued, like Navistar

Defendants here, that loss causation depends only on public information and that producing the

---

[9]      Lead Plaintiffs seem to miss entirely the unassailable foundation of fraud-on-the-market theory on
which they rely – stock price is determined only by **public** information. *See Basic Inc. v. Levinson*, 485 U.S.
224, 241-42 (1988) ("The fraud on the market theory is based on the hypothesis that, in an open and developed
securities market, the price of a company's stock is determined by the **available material information**
regarding the company and its business."); *West v. Prudential Securities, Inc.*, 282 F.3d 935, 938 (7th Cir.
2002) (*Basic* describes a mechanism [fraud-on-the-market] by which **public** information affects stock
prices, and thus may affect traders who did not know about that information. … No similar mechanism
explains how prices would respond to **non-public** information[, which does] not come to the attention of
professional investors or money managers, so the price-adjustment mechanism … does not operate. … Thus
it is hard to see how … non-public statements could have caused changes in the price of [the] stock.").

non-public information requested by plaintiffs would violate the district court's bifurcation order. (*See* Def. Northfield's Mem. (Jan. 21, 2009), Ex. 6 hereto, at 6-8.)

Your Honor denied the *Northfield* plaintiffs' motion to compel.  The ruling was based in large part on defendants' stipulation that they would not rely on the requested non-public information in support of their loss causation arguments in opposing plaintiffs' class certification motion.  (*See* Minute Order (Feb. 5, 2009), Ex. 7 hereto.)  Similarly here, Navistar Defendants will stipulate not to use such information to support any arguments opposing class certification.

> **2.**     **Lead Plaintiffs Wrongly Characterize Navistar Defendants' Position On Loss Causation, And The Single Case Cited By Lead Plaintiffs In Support Of Their Argument Is Inapplicable**

Noticeably absent from Lead Plaintiffs' memorandum is any real explanation of how the non-public information they seek is relevant to loss causation.  Lead Plaintiffs fail to answer the simple question of how information **not disclosed to the public** could inform **whether that same public learned of the "truth"** of an alleged misrepresentation or whether the stock price dropped as a result.  Instead, Lead Plaintiffs veer off on a tangent, ascribing to the Navistar Defendants a view of loss causation they do not hold.  Lead Plaintiffs claim that the Navistar Defendants' view of loss causation requires a "complete symmetry" between an alleged misstatement and a corrective disclosure.  (Pls.' Mem. at 6-8.)  Lead Plaintiffs create this straw man to invoke a case – *In re Motorola Secs. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007) – that is irrelevant to this dispute.

As an initial matter, the Navistar Defendants' position is not based on an argument that a corrective disclosure requires "complete symmetry" with an alleged misstatement.  What a corrective disclosure must do, however, is "reveal the truth" to the market. *Dura*, 544 U.S. at 347 (no loss causation where no facts alleged showing "that Dura's share price fell significantly after the truth became known"); *Ray*, 482 F.3d at 995 (plaintiffs must allege that

"the value of the stock declined once the market learned of the deception"); *In re Northfield Labs., Inc. Secs. Litig.*, 527 F. Supp. 2d 769, 789 (N.D. Ill. 2007). ("[T]he 'fraud on the market' approach requires plaintiffs to allege '… that the value of the stock declined once the market learned of the deception.'").[10]  As the cases cited herein confirm, the determination about whether a given disclosure "reveals the truth" or "corrects" previously misstated information hinges, not surprisingly, on **what the disclosure says** and otherwise on public information available to the market, not the non-public information Lead Plaintiffs seek in their requests.

*Motorola* is inapposite.  Unlike Lead Plaintiffs' allegations here of affirmative misrepresentations that were then "corrected" by virtue of a series of partial corrective disclosures (Compl. ¶¶ 233-76), *Motorola* was primarily an "omissions" case – in which "[d]efendants allegedly failed to disclose the 'truth' about [certain] risks." 505 F. Supp. 2d at 546.  The plaintiffs in *Motorola* alleged that defendants concealed a risk that later materialized in the form of bad news (an earnings warning) released by the company.  *Id.* at 546-47.  The plaintiffs argued that while the bad news did not expressly "reveal any fraud," it was evidence of the concealed risk materializing and, thus, they were entitled to recover for the stock price drop associated with that bad news.  *Id.*  The *Motorola* plaintiffs' loss causation allegations, therefore, were more properly analyzed under the rubric of a "materialization of the risk" theory, not a fraud-on-the-market / corrective disclosure theory like plaintiffs assert here.[11]

---

[10]     *See also In re Take-Two Interactive Secs. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("[A] particular disclosure constitutes a sufficient foundation for loss causation allegations **only if it somehow reveals to the market** that a defendant's prior statements were not entirely true or accurate."); *In re eSpeed, Inc. Secs. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) ("*Dura* imposed no requirement that corrective disclosures emanate from the company itself, **so long as the truth is disclosed in some fashion**."); *In re WorldCom, Inc. Secs. Litig.,* 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment **is made public**.").

[11]     *See generally Ray*, 482 F.3d at 995 ("There are several ways in which a plaintiff might go about proving loss causation.  The first is sometimes called the 'materialization of risk' standard. *Caremark* takes that approach, requiring the plaintiff to prove that 'it was the very facts about which the defendant lied which caused its injuries.'  The second approach is the 'fraud-on-the-market' scenario, which the

In an extremely lengthy summary judgment opinion, the court in *Motorola* rejected defendants' "complete symmetry" argument. The court held that, in an omissions / materialization of the risk case, a recoverable loss results when the risk materializes – even though there may be no disclosure "specifically identify[ing], explicitly correct[ing], or expressly disclos[ing] the particular fraudulent theme the plaintiff alleges." 505 F. Supp. 2d at 546.[12] In other words, if the company imparts bad news, it could be the materialization of the risk that it previously concealed, even though the bad news does not specifically "disclose" that risk. *Id.* The court noted in passing that, in analyzing whether the concealed risk actually materialized in the form of a report of bad news issued by the company, it reviewed some internal emails to see if that bad news was really the concealed risk materializing. *Id.* at 546-47.

Putting aside the fact that the issue of whether non-public documents are relevant to loss causation **was not even in dispute** in *Motorola*, plaintiffs there were proceeding under an entirely different theory of loss causation. Thus, even if *Motorola* stood for the premise that non-public documents are always relevant for loss causation – it does not – its holding would be limited to a "materialization of the risk" theory of loss causation, which Lead Plaintiffs do not assert here.

3.    **The Non-Public Documents And Communications Would Be Highly Burdensome To Produce**

Documents and communications "concerning" the 17 alleged corrective disclosures and "market or analyst reaction" thereto (Requests 3-36) are practically innumerable. Many of the alleged corrective disclosures broadly reference the Company's financial reporting and operations,

---

Supreme Court discussed in *Dura*. Under that theory, plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception.").

[12]    *Motorola* does recognize that, in a fraud-on-the-market / corrective disclosure case, "a securities fraud plaintiff must show that it suffered a loss when the truth '**became generally known**.'" *Id.* at 542 (citing *Dura*, 544 U.S. at 343 and *Tricontinental Indus. Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 843 (7th Cir. 2007) (plaintiff failed to plead loss causation because it failed to allege that the truth about the misrepresentation ever made its way to the marketplace).)

and there are countless documents at the Company that touch on these subjects.  Similarly, there are likely thousands of communications and documents at the Company concerning "the reasons for any increase or decline" in Navistar share price during the three-and-a-half year proposed Class Period.

Lead Plaintiffs' vague attempt to "explain" the breadth of these requests does not change the result.  Lead Plaintiffs state that what they really want with these requests are "documents or communications related to or reflecting the process, circumstances and reaction to the alleged loss causation disclosures."  (Pls.' Mem. at 10.)  But demanding everything relating to the "process, circumstances and reaction" to the 17 disclosures is hardly more circumscribed – if at all – than simply asking for every document in Navistar's possession relating to its financial performance or reporting during this period.  These requests would cover years of documents, communications and other correspondence.  Even if Lead Plaintiffs are not asking for Navistar to **produce** "every piece of paper at Navistar over a multi-year period," Lead Plaintiffs' requests would require **collecting and reviewing** nearly "every piece of paper," a burden that is plainly inconsistent with Judge Gettleman's order.

Such an undertaking would also run afoul of the signature principle of the Seventh Circuit's E-Discovery Pilot Program, which seeks to make discovery proportional and less burdensome to the parties.  Lead Plaintiffs' requests are entirely out of proportion to their needs at the class certification stage, and would create a tremendous burden on the Navistar Defendants.  If the Navistar Defendants were compelled to produce all of the documents responsive to Lead Plaintiffs' requests, class certification discovery would be extended for months or more than a year, a result that benefits neither Lead Plaintiffs, the Navistar Defendants nor the Court.

## IV.    CONCLUSION

WHEREFORE, Navistar Defendants respectfully request that this Court deny plaintiffs' motion to compel.

Dated: December 21, 2009                         Respectfully submitted,


                                                 /s/Sean M. Berkowitz
                                                 One of the Attorneys for Defendants
                                                 Navistar International Corporation,
                                                 Daniel C. Ustian, and Robert C. Lannert


Laurence H. Levine                               Sean M. Berkowitz
Maaike S. Almeida                                Cary R. Perlman
LAURENCE H. LEVINE LAW OFFICES                   Mark S. Mester
190 South LaSalle Street, Suite 3120             Robin M. Hulshizer
Chicago, Illinois 60603                          B. John Casey
Phone: (312) 291-7000                            Matthew L. Kutcher
Fax: (312) 291-7015                              LATHAM & WATKINS LLP
                                                 233 South Wacker Drive
                                                 Suite 5800
                                                 Chicago, Illinois 60606
                                                 Phone: (312) 876-7700
                                                 Fax: (312) 993-9767


                                                 s/Patrick S. Coffey
                                                 One of the Attorneys for Defendant
                                                 Mark T. Schwetschenau

                                                 Patrick S. Coffey
                                                 Timothy M. Maggio
                                                 LOCKE LORD BISSELL & LIDDELL LLP
                                                 111 South Wacker Drive
                                                 Chicago, Illinois 60606
                                                 Phone: (312) 443-0700
                                                 Fax: (312) 896-6702

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM and PLUMBERS LOCAL UNION 519 PENSION TRUST, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. 07-cv-07014 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Robert W. Gettleman |
| DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP, | ) ) ) ) ) ) | Magistrate Judge Nan R. Nolan |
| Defendants. | ) | |

EXHIBITS TO NAVISTAR DEFENDANTS' OPPOSITION
TO LEAD PLAINTIFFS' MOTION TO COMPEL

Exhibit 1.     September 10, 2009 Scheduling Order

Exhibit 2.     September 10, 2009 Hearing Transcript

Exhibit 3.     Declaration of Michael C. Weil

Exhibit 4.     Confidentiality Agreement

Exhibit 5.     *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.,* No. 02-5893, Minute Order (N.D. Ill. Feb. 1, 2007)

Exhibit 6.     *Northfield Labs. Secs. Litig.,* No. 06 C 1493, Def. Northfield's Mem. (Jan. 21, 2009)

Exhibit 7.     *Northfield Labs. Secs. Litig.,* No. 06 C 1493, Minute Order (Feb. 5, 2009)

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORFOLK COUNTY RETIREMENT SYSTEM )
and BROCKTON CONTRIBUTORY )
RETIREMENT SYSTEM, individually and on )
behalf of all others similarly situated, )
)
                Plaintiffs, )     No. 07 C 7014
          v. )
)     Judge Robert W. Gettleman
DANIEL C. USTIAN, ROBERT C. LANNERT, )
MARK T. SCHWETSCHENAU, NAVISTAR )     Magistrate Judge Nan R. Nolan
INTERNATIONAL CORPORATION, and )
DELOITTE & TOUCHE LLP, )
)
           Defendants. )

## SCHEDULING ORDER

Pursuant to Federal Rule of Civil Procedure 26(f) and the Court's comments at the

hearing on August 27, 2009, the Parties to this action met and conferred on September 1, 2009

and jointly agreed to a schedule for class certification discovery and briefing. As outlined below

the parties have a disagreement about the proper staging of discovery. Lead Plaintiffs have taken

the position that discovery relating to both merits and class certification should proceed

simultaneously (reflected in paragraph 8 below); Defendants have taken the position that

discovery should be bifurcated and that merits discovery should not commence until after the

class certification motion has been resolved (reflected in paragraph 7 below).

The Court, having reviewed the schedule and heard from the Parties on September 10,

2009, hereby orders the following:

    1.     The parties shall exchange Rule 26(a)(1) disclosures no later than October 9,

          2009.  The parties will modify the disclosures provided under Rule 26(a)(1) by

identifying documents and electronically stored information in their possession, custody or control, and their locations and will subsequently produce such documents upon a request by a party.

2. Fact discovery related to class certification issues and those merits issues that inform the class certification decision shall be completed by December 11, 2009.[1]

   a. The parties intend to enter into a joint stipulation and to propose a protective order regarding production and disclosure of confidential materials. The proposed protective order will be presented to the Court for approval no later than September 25, 2009.

   b. The parties intend to address the issue of privileged materials through the timely exchange of privilege logs and a confidentiality agreement that would address procedures relating to the inadvertent production of privileged or protected materials.

3. Initial expert disclosures and all information specified in Fed. R. Civ. P. 26(a)(2) related to class certification shall be exchanged no later than January 15, 2010.

4. Rebuttal expert disclosures related to class certification issues shall be exchanged no later than February 5, 2010.

5. Expert depositions related to class certification issues shall be completed by February 26, 2010.

---

[1]Lead Plaintiffs intend to rely on the fraud-on-the-market theory to support their assertion of classwide reliance.

2

6.      Lead Plaintiffs shall file their motion for class certification no later than March 19, 2010.

7.      The Court determines that bifurcation of discovery is not appropriate, but encourages the parties to structure discovery to avoid taking discovery related solely to the merits until the court decides the motion for class certification. The court will refer this case to Magistrate Judge Nolan for discovery supervision and settlement matters.

**ENTER:**      **September 10, 2009**

_____

**Robert W. Gettleman**
**United States District Judge**

3

# Exhibit 2

1

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    NORFOLK COUNTY RETIREMENT         )
     SYSTEM and BROCKTON               )
4    CONTRIBUTION RETIREMENT           )
     SYSTEM,                           )
5                                      )
                         Plaintiffs,   )
6                                      )
                                       )  No. 07 C 7014
7               vs.                    )  Chicago, Illinois
                                       )  September 10, 2009
8    DANIEL C. USTIAN, ROBERT          )  9:15 a.m.
     LANNERT, MARK T.                  )
     SCHWETSCHENAU, NAVISTAR           )
9    INTERNATIONAL CORPORATION, and    )
     DELOITTE & TOUCHE, LLP,           )
10                                     )
                         Defendants.   )
11

12                TRANSCRIPT OF PROCEEDINGS - STATUS

13           BEFORE THE HONORABLE ROBERT W. GETTLEMAN

14   APPEARANCES:
     For the Plaintiff:        ROBINSON, CURLEY & CLAYTON, PC
15                             300 South Wacker Drive
                               Suite 1700
16                             Chicago, Illinois 60606
                               BY:  MS. FAY CLATYON
17                                  MS. ALEEZA M. STRUBEL

18   For Defendant Deloitte:  PERKINS COIE LLP
                              131 South Dearborn Street
19                            Suite 1700
                              Chicago, Illinois 60603
20                            BY:  MR. JONATHAN C. MEDOW

21   For Defendant            LOCKE LORD BISSELL & LIDDELL LLP
     Schwetschenau:           111 South Wacker Drive
22                            Chicago, Illinois 60606
                              BY:  MR. PATRICK S. COFFEY
23
     Official Reporter:       JENNIFER S. COSTALES, CRR, RMR
24                            219 South Dearborn Street
                              Room 1706
25                            Chicago, Illinois 60604
                              (312) 427-5351

2

1   APPEARANCES:   (Continued)

2   For Defendants Navistar          LATHAM & WATKINS LLP
    Ustian and Lannert:              233 South Wacker Drive
3                                    5800 Sears Tower
                                     Chicago, Illinois 60606
4                                    BY:  MR. SEAN M. BERKOWITZ

5
                                     LAURENCE H. LEVINE LAW OFFICES
6                                    190 South LaSalle Street
                                     Suite 3120
7                                    Chicago, Illinois 60603
                                     BY:  MR. LAURENCE H. LEVINE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1      (Proceedings in open court.)

2          THE CLERK:   07 C 7014, Norfolk County Retirement System

3   versus Daniel C. Ustian.

4          MR. MEDOW:   Good morning, Your Honor.

5          Jonathan Medow for Deloitte.

6          MS. CLAYTON:   Good morning, Judge Gettleman.

7          Fay Clayton and Aleeza Strubel for the plaintiffs.

8          MR. BERKOWITZ:   Good morning, Your Honor.

9          Sean Berkowitz and Larry Levine on behalf of Navistar,

10  defendants Ustian and Lannert.

11         MR. COFFEY:   Patrick Coffey, Your Honor, on behalf of

12  Mr. Schwetschenau.

13         THE COURT:   All right.   Let's take care of Deloitte's

14  motions.   Is there any objection to this?

15         MS. CLAYTON:   We do oppose it, Your Honor.   And we've

16  spoken with Mr. Medow and agreed to a briefing schedule.   They

17  want to stand on their current motion as --

18         THE COURT:   Why?   On what ground do you oppose it?

19         MS. CLAYTON:   Your Honor, plaintiffs' lawyers met

20  yesterday for the first time.   You know, we had problems with

21  getting together.   We had a conference call, and the decision was

22  made.   I as liaison counsel am not authorized to give all the

23  reasons, but the Seventh Circuit opposes piecemeal appeals.   And

24  we'd like to file our response.   And we can do so within three

25  weeks.

4

1        THE COURT:  Well, I can just tell you right now you have

2   an uphill battle.

3        MS. CLAYTON:  All right.  We understand that, Your

4   Honor.

5        THE COURT:  Because they're out entirely.  And it would

6   seem to me that that should go and get resolved, unlike

7   Mr. Berkowitz's attempt.

8        MR. BERKOWITZ:  Although, Your Honor, we don't have to

9   respond to the count as to Deloitte since it's gone, correct?

10       THE COURT:  As far as I'm concerned, yes, it's gone.

11  Deloitte is gone except for this.

12       All right.  Let's get this taken care of quickly though,

13  because I was inclined just to grant it today.  I'm being honest

14  with you --

15       MS. CLAYTON:  Okay.

16       THE COURT:  -- because I think it's the kind of -- this

17  is what 54(b) is all about in a sense.

18       MR. MEDOW:  We agree, Judge.

19       THE COURT:  You would have to really convince me that

20  there is a good reason not to let this become final.

21       MS. CLAYTON:  We'll see if we can do that.  And we'll

22  live with the result if we can't.

23       THE COURT:  Okay.  I'm sure you will.  You're all pros.

24  When do you want to file a response?

25       MS. CLAYTON:  Three weeks, Your Honor.

5

1        THE COURT:   The 30th.

2        MR. MEDOW:   Do you want a reply, Judge?

3        THE COURT:   Do you want to reply?

4        MR. MEDOW:   I don't know what they're going to say.

5        THE COURT:   Well, then you should keep the option.   I

6   hate to keep this thing dragging out, to be honest with you, but

7   October 14th.

8        MR. MEDOW:   That's fine.

9        THE COURT:   All right.   The second and more important

10  issue I think is this bifurcation issue.   I appreciate your

11  getting this to me in the fashion that you did, because I

12  understand your positions.   This is going to sound a little

13  wishy-washy maybe, but I am usually disinclined to bifurcate

14  discovery in the fashion that the defendant is advocating here

15  because of the very things you acknowledge, you know, the overlap

16  between class cert.   We have a huge class certification motion

17  pending right now which is so merits oriented that it's like a

18  summary judgment motion almost.

19       And I don't know how you, if I were to say, "Okay, we're

20  going to bifurcate," I don't know how you manage that.   You know,

21  I was going to get Judge Nolan and talk to her about this,

22  because she's going to get discovery supervision here.

23       What I thought -- and you all agree on a class

24  certification schedule.   So there must be ways, there must be

25  ways, and I know you're parading all these horribles before me,

6

1  Mr. Berkowitz, but there must be ways to say:  All right, we are

2  going to take discovery that overlaps both things, but we're not

3  going to go into ultimate discovery that might not be ever taken

4  if the class certification is denied.

5       And you probably have much more ability to make those

6  determinations as you go along, especially if you have a

7  magistrate judge like Judge Nolan helping you resolve any

8  disputes you might have without a formal bifurcation.

9       But, you know, just using good common sense and

10  professional judgment, you know, you may have witnesses that have

11  nothing to do with class certification, hold off on those.

12  That's fine with me.  I'm not going to set a discovery schedule

13  or discovery cut-off on the merits.

14       But if you all agree you're shooting for a goal of

15  getting that certification motion to me by March 19th, you know,

16  that's I think a doable thing.

17       MR. BERKOWITZ:  If I may, Your Honor?  I appreciate that

18  and appreciate that we're going to focus on the class discovery,

19  a couple of thoughts or observations and concerns.

20       First of all, this is a case unlike a lot of securities

21  fraud cases where we really think that there is a class

22  certification issue given the artificiality of the class as it's

23  constructed to maximize the drop in the stock price.  The

24  disclosures that have been, there is a disclosure about we're

25  going to restate and a disclosure that we did restate.  Only one

1  of those is in the class period.  Those are really the two

2  disclosures that we're talking about.

3         So we think that there are going to be some real meaty

4  issues that may cause this Court concern on the Rule 23

5  requirements.  If we proceed as you are suggesting, and we will

6  do our best, Your Honor, to maximize that, there is a real risk

7  of slippage in the date.  We were aggressive in the date we

8  suggested for class certification, because we want to get that

9  before you.  And if we start slipping too much into merits

10  discovery and having to focus and concentrate on that as opposed

11  to the true Rule 23 issues, we risk losing that date.

12         THE COURT:  Well, you know, that date is not carved in

13  stone.  It's a great date to shoot for.  And, you know, the

14  sooner the better, because, as you say, we're supposed to do this

15  as early as possible.

16         But in a case like this, I think you all understand what

17  the issues are here, and you all understand why it's so difficult

18  to be as categorical in discovery orders as we might otherwise

19  be.

20         This isn't a consumer, you know, truth in lending or one

21  of those types of cases where it's really easy to get class

22  discovery limited to just that.  Here we get into the merits no

23  matter what for the reasons you just articulated.

24         MR. BERKOWITZ:  If we have --

25         THE COURT:  I don't know how you would actually phrase

8

1  an order that would make the kind of sense that I think everybody

2  here would agree we should have other than to just say we're not

3  bifurcating it, but the parties are directed to avoid taking

4  discovery that is not related to class certification --

5       MR. LEVINE:  Your Honor, could --

6       THE COURT:  -- or that is related solely to non-class

7  certification issues until the class motion is briefed and

8  decided by the Court.  I think that that's probably as good a way

9  to state it as any.  And Judge Nolan is going to have the

10 wonderful opportunity to actually live with that as will you.

11      MS. CLAYTON:  Your Honor, if I could?  Maybe Mr. Levine

12 wants to finish, but I'd like to respond to what Mr. Berkowitz

13 said.

14      THE COURT:  Sure.

15      MS. CLAYTON:  I agree with Your Honor that in a case

16 like this where I think the defendant is going to raise the lost

17 causation issue in the class motion.  But, of course, our burden

18 there is only to show that the common issues predominate.  But

19 there is an enormous overlap, in fact, a complete overlap with

20 the merits.

21      THE COURT:  Well, and there is also the definition of

22 the class, which, you know, can sometimes take a very fluid form

23 as you get closer to briefing it or during briefing it or after

24 briefing it.

25      MS. CLAYTON:  Right.

9

1        THE COURT:  So I know what the problems are here, and

2    that's why I'm just afraid to make a definite bifurcation.  It's

3    not going to work.

4        MS. CLAYTON:  So what I was going to suggest --

5        THE COURT:  It will create more, it will create more

6    disputes.  Even though I know you guys are going to really try

7    not to do that, it will still create more disputes than it's

8    going to solve.

9        MS. CLAYTON:  Right.  And as I --

10       THE COURT:  Have I said everything you wanted to say?

11       MS. CLAYTON:  I think you said it right, Your Honor.

12   And we, of course, will do the -- we'll start with the document

13   discovery, which will relate to both issues, and we'll focus a

14   lot on the loss causation, which is one of the biggest issues in

15   the case anyway.  And if there is some witnesses that we don't

16   need earlier on, we'll leave them until later.  That will be our

17   preference anyway.

18       I think Judge Hamilton said it well in that case out of

19   the Southern District of Indiana, the Schlicher case, where he

20   pointed out the serious problems particularly on the court when

21   you do try to bifurcate.

22       I was a little surprised to see the defendant cite the

23   Ulta case, because we looked in the record and didn't see any

24   bifurcation order.  We talked to plaintiffs' lawyers, and they

25   said they had -- this was a case before Your Honor, Ulta Salon.

1          MR. BERKOWITZ:  It was my case.

2          MS. CLAYTON:  Yes, we were told -- there was nothing in

3    the record to suggest it had been bifurcated.  And our

4    plaintiffs' friends said that they had actually served merits

5    discovery.  Of course, it settled.  But we don't think this kind

6    of case is ever good for bifurcation, particularly one like this.

7          THE COURT:  But it is good for settlement.

8          MR. BERKOWITZ:  Correct.

9          MR. LEVINE:  Your Honor, if I could just make one run at

10   trying to change your mind about it?  The problem with this

11   particular case is, in terms of merits discovery, I was just

12   hearing Ms. Clayton refer to document discovery, it's going to

13   bog us down inevitably.  I understand what you are saying about

14   disputes and so forth.  And we'll have to work that out no matter

15   what.  Whether it is class discovery, merits discovery, that's

16   going to happen.  And hopefully, you know, both sides will work

17   hard to resolve that among ourselves.  We won't have to burden

18   you or Judge Nolan.

19          But if we get into -- the counterpart of what you are

20   talking about is enough discovery that will bog us down.  The

21   amount of documents, depending on exactly how they phrase it, how

22   much they request could take, and I'm not exaggerating, it's now

23   a parade of horribles, years.  And if we get into massive

24   document discovery, and I don't know how they're going to try to

25   limit it, right away, it's going to be very difficult for us to

1  even focus on class discovery.

2         So what I would suggest, if you would be willing to

3  consider it, is give us a period, a brief period even for class

4  discovery.  Let's report back to you, tell you what we are doing

5  and see if you think it's working out.

6         MS. CLAYTON:  Your Honor, that's totally unworkable,

7  especially in light of what the defendants said they intend to

8  raise on the class issue.  I disagree with Mr. Levine vehemently

9  about the discovery likely to take years.

10        In our conference last week, I know they took the

11 position that we shouldn't have any cut-off, because it might

12 take a long time.  We actually are optimistic about finishing it,

13 the fact discovery by the end of next year.  I think that's what

14 we had proposed, and we think that's really doable.

15        But if we try to bifurcate --

16        THE COURT:  If you have a class certification motion,

17 let's say you file it at the end of March.  Then you're going to

18 have a 30 day period, 45 day period until it is fully briefed,

19 everything works, all right.  That's the middle of May.  It's

20 going to take me a couple of months at least to rule on it, so

21 we're talking about at the earliest sometime in July.

22        MS. CLAYTON:  Exactly.

23        THE COURT:  Or maybe more likely August or September.

24 And at that point I think you should be holding off doing merits

25 discovery, because it can change markedly depending on how I rule

1 on class certification.

2         I don't want to see you or anybody else spending tons of

3 money and resources pursuing discovery that if I deny the class

4 certification is not going to be well spent.  It will be wasted.

5 And so my inclination is to hold off while the class

6 certification motion is pending.

7         I'll tell you, these motions on these big securities

8 cases or big major litigation have been so complicated that

9 they've really bogged me down.  They've bogged my chambers down

10 with voluminous submissions that are, you know, something that

11 you would never have thought about when you looked at Rule 23.

12 But that's what the PSLRA has given us and everything else.  But

13 it's not just in securities cases.  It's in other cases as well.

14         So I don't think you're going to make that goal,

15 Ms. Clayton, given your intention to seek class certification,

16 which, of course, is crucial to your case.

17         MS. CLAYTON:  Well, I think Your Honor's inclination is

18 correct.  If there were a bifurcation order, we would be before

19 Judge Nolan I predict every week, if not every day on is this

20 limited, is this class, or is it merits?

21         THE COURT:  Well, there is not going to be a bifurcation

22 order today, all right?

23         MS. CLAYTON:  Thank you.

24         THE COURT:  But I am going to massage your draft, I've

25 got it so we can take it and massage it a little bit to say that

13

1    something like, and I haven't really figured out the language, in

2    paragraph 8, that bifurcation is not appropriate, but the Court

3    encourages and directs the parties to limit the discovery to

4    issues that relate to class certification; and any overlap should

5    be -- I'll figure out some language -- any overlap should be

6    inclusive of class certification issues rather than discovery or

7    rather than taking discovery that relates only to merits.

8            I know that's going to be hard.  I know you're going to

9    have disagreements.  And the magistrate judge is going to have to

10   work with you on that.  But I also trust you to be as

11   professional as possible about it.  You don't want to waste your

12   time, Ms. Clayton --

13           MS. CLAYTON:  No.

14           THE COURT:  -- or your colleagues' time chasing

15   something you may never have to chase.

16           I will say this though, if I do certify the class, we're

17   going get a very strict schedule to finish this up.  You know,

18   this endless discovery that you posit is something that I don't

19   intend to engage or have you engage in.

20           MR. BERKOWITZ:  Understood, Your Honor.

21           MS. CLAYTON:  Your Honor, given the scope of what we

22   understand their response to class certification to be, we

23   imagine that that overlap would be pretty substantial.  So by the

24   time Your Honor rules on the class certification, we hope that a

25   lot of that merits discovery will be done.  There will be a few

14

1  things left obviously, damages --

2        THE COURT:  What I don't want to see happen here, and

3  this has happened too often, it happened when I was in practice,

4  and it's happened since, you'll be at a deposition and you'll ask

5  Mr. X a question that probably relates only to a merits issue,

6  let's say, and really doesn't, at least arguably doesn't relate

7  to class issues.  And there will be an objection and an

8  instruction not to answer.  I mean, you should try to take one

9  deposition, anybody's deposition once.

10        MR. BERKOWITZ:  We understand, Your Honor.  You know, it

11  may be that that person's deposition gets put off because it has

12  nothing to do with class discovery.  And we can raise those with

13  Judge Nolan.

14        THE COURT:  Right.  But that's easy.

15        MR. BERKOWITZ:  Yeah.

16        THE COURT:  You shouldn't even have to raise that with a

17  judge.

18        MR. BERKOWITZ:  Agreed.

19        THE COURT:  You should be able to figure that one out

20  yourself.  But there is going to be people who have things to say

21  about both.  Let them say it once so you don't have to, I mean,

22  it's for the defendant's benefit too, so you don't have to submit

23  your witnesses over and over again.

24        MS. CLAYTON:  Thank you, Your Honor.

25        THE COURT:  If Judge Nolan says, "No.  Let's break the

15

1 | deposition up.  Stay away from that issue," whatever, you know,

2 | you'll just have to do it that way.  But, you know, it will be

3 | years from now before some of these people would be redeposed,

4 | and things get pretty stale.  This is stale already.  I mean,

5 | these events took place in 2002, 2004.

6 | MS. CLAYTON:  Correct, yes.  So some memories are

7 | probably fading, and there may be some depositions which have

8 | overlap on class.  We'll wait.

9 | THE COURT:  I can't remember what I did last week.

10 | MR. LEVINE:  Same here.

11 | THE COURT:  You know, you'd be in trouble with me.

12 | MR. LEVINE:  I think you have it.  We'll have to rely on

13 | the good faith of each other.  But I am concerned about just even

14 | documents, before we get to witnesses.  I will tell you this,

15 | conceivably, and I can't imagine they'd want to do this, but

16 | these are the things we worry about always, but there are

17 | terabytes of data.  If they wanted every single accounting issue,

18 | every single document relating to it, it's billions of pieces of

19 | paper.  That's why I said we'd get bogged down.  And similarly

20 | with witnesses, if they wanted to do that.  I can't imagine they

21 | would, but you never know until you get the request.

22 | THE COURT:  Sometimes they never know until they get the

23 | response.

24 | MR. LEVINE:  That's right, that's right.  So hopefully

25 | we can work all that out.  But I wanted to at least put a stake

16

1 in the ground on that.

2         And similarly with regard to witnesses, good lawyers can

3 make arguments, as you know, that it's class and arguments that

4 it's really merits.  And we could wind up seeing all the

5 witnesses in the case, which -- and I will say it alarms me a

6 little bit to hear Ms. Clayton say that she thinks that most of

7 the merits discovery will be done in the course of doing the

8 class discovery.  I don't mean that critically, but I am

9 concerned about it.

10         But I think we'll take it, as you've articulated.  Maybe

11 that's the best way.

12         THE COURT:  I think that's the best we can do at this

13 point.

14         MR. LEVINE:  Yes.  Then we'll try to deal with each

15 other, and if we can't, then we'll have to burden Judge Nolan.

16         THE COURT:  All right.

17         MS. CLAYTON:  The defendants have tried to scare us with

18 the quantity of data, but we've had a few of these cases before,

19 and we think we'll be able to manage it just fine.

20         THE COURT:  All right.  Let me give you a date for

21 ruling on this 54(b), which is not going to be a long date.  The

22 last date is the 14th, did I say?  I'm going to give you a date

23 of November 17th, although I suspect you'll get an order before

24 then.

25         MR. MEDOW:  Judge, if we on reading the opposition feel

17

1   no reply is necessary, we'll advise your chambers.

2         THE COURT:  Please do so I won't be waiting for a reply.

3         All right.  So that's a status date which we may never

4   have to keep.  All right.  I will give you a March date with me

5   so you'll have a date.  I'll give you, let me see if that's a

6   real date, March 19th is a Friday, we'll keep that date in the

7   order for filing, but you can present it on the 24th of March.

8   That's vacation time, I know.  I expect to be here right now, but

9   we'll see.

10         MR. BERKOWITZ:  So the status, Your Honor, you're

11  talking about the 24th will be filing date?

12         THE COURT:  Yes.  If you do actually file your motion on

13  time, notice it up for the 24th.

14         MS. CLAYTON:  Okay.  We'll do that.

15         THE COURT:  Then we'll set up a briefing schedule at

16  that point.  If you still need more time, I'll understand.

17         MS. CLAYTON:  Okay.  Thank you, Your Honor.

18         THE COURT:  Good luck.

19         MR. BERKOWITZ:  Thank you, Your Honor.

20         MR. MEDOW:  Thank you, Judge.

21         MR. BERKOWITZ:  9:00 o'clock on the 24th?

22         THE COURT:  9:00 o'clock.  Well, let's make it, let's

23  make it 9:30.

24         MR. BERKOWITZ:  There may be some criminal matters

25  before us?

18

1      THE COURT:  You never know.  Your old friends keep me

2  busy.

3      MR. BERKOWITZ:  I saw that.

4      MS. CLAYTON:  Thank you.

5    (Proceedings concluded.)

6              C E R T I F I C A T E

7      I, Jennifer S. Costales, do hereby certify that the

8  foregoing is a complete, true, and accurate transcript of the

9  proceedings had in the above-entitled case before the Honorable

10 ROBERT W. GETTLEMAN, one of the judges of said Court, at Chicago,

11 Illinois, on September 10, 2009.

12

13              _/s/ Jennifer Costales, CRR, RMR_

14              Official Court Reporter

15              United States District Court

16              Northern District of Illinois

17              Eastern Division

18

19

20

21

22

23

24

25

# Exhibit 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM and PLUMBERS LOCAL UNION 519 PENSION TRUST, individually and on behalf of all others similarly situated, | Case No. 07-cv-07014 |
| Plaintiffs, | Judge Robert W. Gettleman |
| | Magistrate Judge Nan R. Nolan |
| v. | |
| DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP, | |
| Defendants. | |

## DECLARATION OF MICHAEL C. WEIL

1.     I am a Director in the Legal Consulting Digital Evidence practice of Huron Consulting Group ("Huron") employed in Huron's Chicago, Illinois office. I am over the age of 18 years, and if called as a witness will testify to the following based on my personal knowledge.

2.     My employment with Huron began over five years ago. My duties at Huron include managing and executing digital evidence and electronic discovery identification, preservation, collection, processing, hosting, review, production, examination, and project management. Prior to joining Huron, I was a Computer Forensic Examiner with the United States Department of Defense Computer Forensics  Laboratory for approximately four years. As a Computer Forensic Examiner, I examined digital evidence seized or obtained in the course of counterintelligence, homicide, suicide, robbery, theft, and other criminal matters.

3.     Prior to my employment at the Department of Defense Computer Forensics Laboratory, I was employed at the Illinois Office of Attorney General as the Senior Forensic Analyst for approximately two years.   As the Senior Forensic Analyst, I examined digital evidence seized or obtained in the course of criminal investigations.

4.     I have conducted over 200 computer forensic cases over the course of the past ten years.  I received a Bachelor of Science in Mathematics from Loyola University Chicago in 1998 and a Masters of Business Administration with a concentration in Management Information Systems in 2003 from the University of Baltimore.

5.     I was previously the Vice Chairman of the Forensics Subcommittee of the Scientific Working Group on Digital Evidence and a member of the National Institute of Justice's Technical Working Group for the Examination of Digital Evidence, Technical Working Group for Education in Digital Evidence, Technical Working Group for High Technology Investigations, and Technical Working Group for the Investigative Uses of High Technology.

6.     I have trained over 2,000 law enforcement officers in the State of Illinois on computer investigations and computer forensics and provided training to military special agents in computer investigations and computer forensics.

7.     I have provided expert testimony on behalf of the United States government in a criminal case and on behalf of clients in four civil matters.

8.     Huron was retained by Navistar, Inc. to provide electronic discovery project management services in connection with Navistar's financial restatement activities.  I have been leading Huron's electronic discovery services to Navistar since September 2006.  Huron was asked to provide metrics on documents and data produced by Navistar in response to document

requests of the Securities and Exchange Commission ("SEC") for Navistar's financial restatement.

9.    Navistar produced two categories of documents and data to the SEC. The first category involved electronic and hard copy documents from a number of data sources processed, hosted, reviewed, and produced to the SEC by counsel for Navistar. The second category involved the production to the SEC of forensic hard drive images from ten custodians.

10.    To date, Navistar has produced 46,930 documents in 1,170,932 pages to the SEC in the first category relating to the accounting issues in which the SEC had requested.

11.    To date, Navistar has produced ten forensic hard drive images to the SEC from the following custodians with the indicated hard drive size in gigabytes ("GB") and associated estimated page count[1] of the entire hard drive:

- Custodian 1 – 40 GB in 2,400,000 pages
- Custodian 2 – 60 GB in 3,600,000 pages
- Custodian 3 – 30 GB in 1,800,000 pages
- Custodian 4 – 40 GB in 2,400,000 pages
- Custodian 5 – 40 GB in 2,400,000 pages
- Custodian 6 – 40 GB in 2,400,000 pages
- Custodian 7 – 40 GB in 2,400,000 pages
- Custodian 8 – 30 GB in 1,800,000 pages
- Custodian 9 – 40 GB in 2,400,000 pages
- Custodian 10– 30 GB in 1,800,000 pages

The ten hard drives, totaling 390 GBs, would yield approximately 23,400,000 pages for review.

12.    Typically, the active, non-deleted files that are reviewable in a document review platform are made available in electronic discovery for review and production. Reviewable file types are files such as email, word processing, spreadsheet, and presentation documents. Non-

---

[1] In the course of electronic discovery engagements, Huron estimates that one GB of files will be printed as 60,000 pages on average. The estimate is helpful in understanding the potential review or production population that will be yielded by a given file population.

reviewable file types include program files, hard disk file system structures, system files, and other file types not consistent with user-created content.

13.    Each hard drive image Navistar produced to the SEC had the following number of reviewable active file document types in the indicated size in bytes and estimated page count:

| Custodian | Reviewable Document Count | Reviewable Document Size in Bytes | Reviewable Document Page Count |
|---|---|---|---|
| Custodian 1 | 28,934 | 2,733,451,304 | 164,007 |
| Custodian 2 | 13,151 | 219,650,691 | 13,179 |
| Custodian 3 | 49,759 | 6,380,995,290 | 382,860 |
| Custodian 4 | 15,714 | 285,357,637 | 17,121 |
| Custodian 5 | 26,690 | 2,122,997,701 | 127,380 |
| Custodian 6 | 51,194 | 2,315,938,924 | 138,956 |
| Custodian 7 | 42,039 | 629,410,093 | 37,765 |
| Custodian 8 | 84,819 | 14,818,719,942 | 889,123 |
| Custodian 9 | 149,739 | 23,590,822,208 | 1,415,449 |
| Custodian 10 | 22,038 | 2,539,675,439 | 152,381 |
| **Total** | **484,077** | **55,637,019,229** | **3,338,221** |

14.    I declare under penalty of perjury under the laws of the state of Illinois that the foregoing is true and correct, and that this declaration was executed in Chicago, Illinois on the 21st day of December, 2009.

_____
Michael C. Weil

# Exhibit 4

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 333 WEST WACKER DRIVE
### CHICAGO, ILLINOIS 60606-1285

(312) 407-0700
Fax: (312) 407-0411
http://www.skadden.com

DIRECT DIAL
(312) 407-0728
DIRECT FAX
(312) 407-0411
EMAIL ADDRESS
MKIPP@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

June 15, 2006

**Via Overnight Mail**

C. Joshua Felker, Esq.
Assistant Director
Division of Enforcement
**U.S. Securities and Exchange Commission**
100 F Street NE
Washington, D.C. 20549-5631

RE:     *In the Matter of Navistar International Corporation*
        <u>MHO-10152</u>

Dear Mr. Felker:

This letter agreement sets forth the terms under which Navistar International Corporation and Navistar Financial Corporation (the "Company") will provide the Staff of the Securities and Exchange Commission (the "Commission") with confidential materials, as described below, in connection with the above referenced matter.

In February 2005, the Company retained Skadden, Arps, Slate, Meagher, & Flom, LLP to assist with its response to the investigation initiated by the Commission on February 9, 2005. In light of the Staff's investigation, the Company may provide certain confidential materials, including internal investigation reports and other documents related to the Commission's investigation. ("Confidential Materials"). In connection with the previous or future production of Confidential Materials to the Staff, neither Skadden nor the Company intends to waive the

C. Joshua Felker, Esq.
June 15, 2006
Page 2

protection of the attorney-client privilege or the attorney work product doctrine or any other privilege or protection applicable as to third parties. The Company believes that the Confidential Materials are protected by, at a minimum, the attorney work product doctrine and the attorney-client privilege. The Company believes that the Confidential Materials warrant protection from disclosure.

The Staff agrees to maintain the confidentiality of Confidential Materials it receives and further agrees not to disclose such materials to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities.

The Staff further agrees that it will not assert that the production of any Confidential Materials to the Staff constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party.

If the Staff agrees to the terms of this letter, please sign the letter on the line provided below.

Very truly yours,

Matthew R. Kipp, Esq.

Counsel to Navistar International
Corporation and Navistar Financial
Corporation.

AGREED AND ACCEPTED:
United States Securities and Exchange Commission

By: _____
C. Joshua Felker, Esq.

# **<u>Exhibit 5</u>**

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5893 | **DATE** | 2/1/2007 |
| **CASE TITLE** | Jaffe vs. Household Int'l, Inc. et al. | | |

### DOCKET ENTRY TEXT

For the reasons provided in this Minute Order, the Court overrules the Household defendants ("Household") and the class' objections to Magistrate Judge Nolan's December 6, 2006 Order and adopts the ruling in full. The Court grants the class' Motion to Compel Documents Pertaining to Household's Consultations with Ernst & Young LLP ("E&Y") [doc. no. 708] and denies the class' Motion to Compel Further Responses to the Class' Questions for Per Eckholdt Concerning Exhibit 13 and the Production of Documents Underlying Wilmer, Cutler & Pickering Reports [doc. no. 712].

■[ For further details see text below.]                                    Docketing to mail notices.

---

### STATEMENT

Under Federal Rule of Civil Procedure 72(a) a magistrate judge "to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written Order setting forth the disposition of the matter." Fed. R. Civ. P. 72(a). Routine discovery motions are not dispositive. *Adkins v. Mid-Am. Growers, Inc.*, 143 F.R.D. 171, 175 n.3 (N.D. Ill. 1992). The Federal Rules of Civil Procedure grant magistrate judges broad discretion in resolving discovery disputes. *Heyman v. Beatrice Co.*, No. 89 C 7381, 1992 WL 245682, at *2 (N.D. Ill. Sept. 23, 1992). A magistrate judge's ruling on a nondispositive matter may only be reversed on a finding that the ruling is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1). Although Household argues that issues of law referred to and decided by a magistrate judge are reviewed *de novo*, the two cases cited do not support the proposition because one case cited does not address the issue and in the other case cited, the parties had consented to proceed before the magistrate judge and thus the appellate court was reviewing the magistrate judge's rulings as if the magistrate judge were the district court judge in that instance.

The Court notes that neither party has fully complied with LR5.2(b) with regard to line spacing or font size requirements of text and footnotes. The Court orders both parties to comply with the Local Rule in all future filings in this case.

### I. Household's Objections

Household objects to Magistrate Judge Nolan's December 6, 2006 Order to the extent that it grants the class' Motion to Compel Documents Pertaining to Household's Consultations with E&Y. Household argues that Magistrate Judge Nolan's rulings that the E&Y documents fit within the attorney-client privilege

---

Case 1:02-cv-05893    Document 940    Filed 02/01/07    Page 2 of 4

## STATEMENT

exception enunciated in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), and that the class has established "substantial need" to rebut the work product protection afforded the E&Y documents were clearly erroneous. The Court disagrees.

Household argues that the magistrate judge should not have applied the *Garner* exception in this nonderivative suit because two post-*Garner* Supreme Court decisions, *Upjohn Co. v. United States*, 449 U.S. 383, 392-93 (1981), and *Swidler & Berlin v. United States*, 524 U.S. 399, 409 (1998), denote a preference for bright line rules when it comes to the attorney-client privilege so that corporations may order their affairs without unpredictability. However, neither case mentions *Garner* or addresses the facts presented in *Garner*. Household also points to several district court cases that have rejected the *Garner* exception. However, as Magistrate Judge Nolan noted, the Seventh Circuit recognizes a fiduciary exception to the attorney-client privilege, *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787 (7th Cir. 2005), and other circuits have held *Garner* applies even in nonderivative suits, *Fausek v. White*, 965 F.2d 126, 130-31 (6th Cir. 1992), *Ward v. Succession of Freeman*, 854 F.2d 780, 786 (5th Cir. 1988). Further, the Seventh Circuit has mentioned *Garner* with approval in *In Re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 294 (7th Cir. 2002), stating that "a corporate attorney has no right or obligation to keep otherwise confidential information from shareholders." Given that there is no binding authority that *Garner* is not good law or is inapplicable in a nonderivative suit and there is no indication that this circuit is hostile to the particular privilege exception, the Court holds that Magistrate Judge Nolan's application of *Garner* was not clearly erroneous.

Household also argues that it was clear error for Magistrate Nolan to hold that there was mutuality of interest when the E&Y documents were created. Household argues that it was inappropriate for Magistrate Judge Nolan to consider the evidence that the class represents a substantial majority of shareholders who owned stock at the time of the communications at issue because the class presented such evidence in its reply brief. However, the issue was broached in plaintiffs' opening brief when the class argued that the *Garner* exception should apply because the action is being brought on behalf of a large percentage of shareholders and Household did not contest or address this assertion in its response brief. Further, given Magistrate Judge Nolan's experience with the defendants and their willingness to file sur-replies and supplements to briefing during discovery in this case, the Court holds that it was not clear error for her to exercise her discretion and consider the evidence raised in the class' reply brief. Thus, the Court agrees with Magistrate Judge Nolan that Household did not contest the issue.

Household also argues that the evidence that the class represents a substantial majority of shareholders who owned stock at the time of the communications at issue was unreliable and thus Magistrate Judge Nolan's reliance on that evidence was clearly erroneous. As stated above, however, the issue whether a large percentage or a substantial majority of shareholders is/are represented by the class was uncontested, and it was not clear error for Magistrate Judge Nolan to concentrate her efforts on the contested issues before the court. In addition, Magistrate Judge Nolan considered a host of other factors that contributed to her determination that plaintiffs had established good cause, *see Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970) (listing indicia of good cause): (1) the class' claim of illegal conduct (securities fraud) was colorable and had survived motions to dismiss; (2) there are no trade secrets involved; (3) a protective order exists; (4) the requested information concerns past actions that are the subject of the instant litigation; (5) E&Y is not a law firm and was not acting as an agent of in-house counsel; (6) E&Y's investigation did not require a separate legal analysis or expertise; and (7) it does not appear that the class could obtain from another source the underlying data E&Y used in conducting the investigation. Based on the facts and arguments before her, the magistrate judge properly found that plaintiffs had established good cause to invoke the *Garner* exception to the attorney-client privilege.

Case 1:02-cv-05893   Document 940   Filed 02/01/07   Page 3 of 4

## STATEMENT

Further, Magistrate Judge Nolan did not err in holding that the class had overcome the work product protection in relation to the E&Y documents. Magistrate Judge Nolan properly rejected Household's broad argument that the E&Y documents were opinion work product merely because they would reveal to the class the nature and focus of the work being conducted by E&Y at the request of Household's attorneys. Simply put, all E&Y documents did not automatically become attorney opinions or mental impressions merely because they were created at the behest of an attorney. Household has not met its burden in showing that the E&Y documents are opinion work product. In addition, this Court agrees with Magistrate Judge Nolan that the plaintiffs have shown substantial need and undue hardship with regard to the E&Y documents. The documents shed great light on a number of issues in this case, *e.g.*, the falsity of Household's statements regarding predatory lending practices, as well as scienter and materiality. It would be nearly impossible for plaintiffs to obtain all of the specific data provided to E&Y or to re-create the investigation from depositions and other documents.

## II.  The Class' Objections

The class objects to Magistrate Judge Nolan's December 6, 2006 Order to the extent that it denies the class' Motion to Compel Further Responses to the Class' Questions for Per Eckholdt Concerning Exhibit 13 and the Production of Documents Underlying Wilmer, Cutler & Pickering Reports (collectively "WilmerHale documents"). The class argues that Magistrate Judge Nolan committed clear error when she ruled that the WilmerHale documents were protected by the attorney-client and work product privileges and that Household's production of the WilmerHale documents to the SEC did not waive the privileges because the selective waiver doctrine applied.

The class argues that the WilmerHale documents are not protected by the attorney-client or work product privilege. Having read the restructuring report, the engagement letter and related documents (including but not limited to Eckholdt's responses to questions regarding Exhibit 13), this Court agrees with Magistrate Judge Nolan that all communications and documents relating to the WilmerHale investigation are privileged because they clearly involve what the law firm considered to be legally relevant facts to form the attorneys' opinions regarding materiality under the SEC laws and were created because of the *Markell* case against Household and the SEC's investigation of Household. The Court agrees that the documents were created for the benefit of Household and not just Household's Audit Committee as shown by the engagement letter. Magistrate Judge Nolan also properly found that the class had not overcome the work product privilege to the extent that it sought to compel fact work product because there is no substantial need for the underlying documents for cross-examination purposes if Household does not introduce the restructuring report at trial and no undue hardship because the class has the underlying data KPMG used to test the accuracy of the restructuring report as well as the report itself.

Next, the class argues that Magistrate Judge Nolan's application of the selective waiver theory to the WilmerHale documents that Household produced to the SEC under a confidentiality agreement constituted clear error. The Seventh Circuit has not yet determined whether to adopt the selective waiver theory and the Supreme Court has chosen not to resolve the issue, *see Qwest Communications International Inc. v. New England Health Care Employees Pension Fund*, 127 S. Ct. 584 (2006) (denying writ of certiorari). Thus, Magistrate Judge Nolan was not bound by any authority to reject the theory.

Further, Magistrate Judge Nolan's ruling is well-reasoned. In support of her ruling, she relied on the sound rationale provided in *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993), a case decided in

Case 1:02-cv-05893   Document 940   Filed 02/01/07   Page 4 of 4

# STATEMENT

the Second Circuit, which adjudicates a large volume of securities cases. That courts in other circuits disagree with the Second Circuit does not necessarily mean that Magistrate Judge Nolan's reliance on *In re Steinhardt Partners* was clear error.

In *In re Steinhardt Partners*, the court declined to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection. *Id.* The Second Circuit stated that "[c]rafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis." *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981)). In doing so, the Second Circuit recognized that "[e]stablishing a rigid rule would fail to anticipate situations in which the disclosing party and the government may share a common interest in developing legal theories and analyzing information, or *situations in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials.*" *Id.* (emphasis added). This Court finds, as did Magistrate Judge Nolan, this reasoning persuasive as it strikes a proper balance between all of the countervailing policy considerations.

Magistrate Judge Nolan found, and this Court agrees, that the confidentiality agreement between Household and the SEC precludes waiver of privilege in this case. The agreement stated that: (1) Household did not "waive the protections of the attorney work product doctrine, attorney-client privilege or any other privilege applicable as to third parties" and (2) the SEC agreed that it would maintain the confidentiality of the disclosed materials "to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities." (Order of 12/6/06 34; Beer Decl., Ex. H at 1-2.)

The class is not put at a disadvantage by the court's permitting privileged information to be disclosed to the SEC because Household presumably would not have revealed confidential information to it without the confidentiality agreement or the privilege. *See Upjohn*, 449 U.S. at 395. Thus, the class is not in a worse position now than if the privileged communication had never occurred in the first place. Without the protection of such confidentiality, corporate clients will be less apt to root out problems, openly discuss potential liability with their attorneys or cooperate with government investigations.

The Court agrees with the reasoning of the court in *Saito v. McKesson HBOC, Inc.*, which states that "[t]he SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society." No. Civ. A. 18553, 2002 WL 31657622, at *8 (Del. Ch. Nov. 13, 2002), *aff'd*, 870 A.2d 1192 (Del. 2005). The *Saito* court explained that "[w]hen the SEC more efficiently protects the integrity of capital markets, shareholders benefit." *Id.*

In sum, the Court agrees with Magistrate Judge Nolan that the selective waiver exception is applicable based on the particular facts of this case. Accordingly, the Court rejects the class' objections. For the reasons stated above, the Court also rejects Household's objections. The Court adopts Magistrate Judge Nolan's December 6, 2006 Memorandum Opinion and Order in full and grants the class' Motion to Compel Documents Pertaining to Household's Consultations with E&Y and denies the class' Motion to Compel Further Responses to the Class' Questions for Per Eckholdt Concerning Exhibit 13 and the Production of Documents Underlying Wilmer, Cutler & Pickering Reports.

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | No. 06CV1493 |
| IN RE NORTHFIELD LABORATORIES | ) | Honorable Judge George M. Marovich |
| INC. SECURITIES LITIGATION | ) | Magistrate Nan R. Nolan |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT NORTHFIELD'S MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION TO COMPEL**

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
330 N. Wabash
Chicago, IL   60611
(312) 222-9350

Dated: January 21, 2009

# Contents

Introduction ........................................................................................................ 1

Background ......................................................................................................... 3

Argument ........................................................................................................... 6

  I.  Plaintiffs Should Not Be Permitted To Obtain Merits Discovery Through The
     Back Door .................................................................................................... 6

 II.  Plaintiffs' Ostensible Justification For Seeking To Discover Non-Public Information Is
     Based On A Misapprehension Of Northfield's Contentions ................................ 8

Conclusion ....................................................................................................... 12

### Introduction

As shown below, this Court should deny plaintiffs' motion to compel for two basic reasons.

First, the motion constitutes an end run around Judge Marovich's October 14, 2008 discovery Order, which requires that discovery be bifurcated and that class discovery proceed before merits discovery.  Judge Marovich stated that he was requiring bifurcation to focus discovery on the central class-certification question presented here:  whether plaintiffs can establish the "fraud on the market" presumption of reliance.  Judge Marovich held (Ex. A, 10/14/08 Tr. 3):

> I am going to bifurcate the discovery in this case for two reasons:  One is the legal one, and my reading of Seventh Circuit law indicates to me that before I as a District Judge can certify a class, it has to be determined whether or not the so-called fraud in the marketplace presumption prevails, and that gives you enough stuff to discover without going into the merits of the case.

The point of Judge Marovich's bifurcation Order is to concentrate discovery on the issues relevant to the fraud-on-the-market presumption — namely, what information was disclosed to the market and when.  In light of the Order, plaintiffs are free to seek documents and other discovery about what information was actually communicated to the public via press statements, presentations to securities analysts, and so forth.  Northfield is producing that information.  But plaintiffs cannot seek non-public information that is effectively merits discovery, such as information about Northfield's non-public communications with government regulators and Northfield's internal discussions about those communications.  What matters for fraud-on-the-market purposes is what information was available to the market and when, and whether the market reacted "efficiently" to it.  Everything else is merits discovery, which is off limits.  *See* Part I below.

Second, as Northfield expressly stated in its discovery objections, the supposed "contention" upon which plaintiffs predicate their request to discover non-public information is incorrect.  *See* Northfield Interrog. Resp. Nos. 5 & 6 (objecting because request "misstates Northfield's contention").  Plaintiffs argue that they are entitled to discovery of non-public

information regarding government investigations — investigations that closed without any enforcement action against Northfield.  According to plaintiffs (Pls. Mem. 2-3), Northfield supposedly contends "that the news disclosures about the Senate Finance Committee's and the SEC's investigations of Northfield were not related to the alleged misstatements about the Company's ANH clinical trials of Polyheme, and thus, do not establish loss causation." *See also* Pls. Mem. 3 ("Defendants contend that the disclosure of the SEC's and Senator Grassley's inquiries was . . . unrelated to the disclosure or materialization of the alleged fraud").[1]

Plaintiffs misapprehend Northfield's point.  With regard to the SEC and Senate investigations, Northfield's contention does not rest on any non-public information concerning the subject matter of the investigations.  By definition, the fraud-on-the-market theory cannot be based on non-public information.  Northfield contends that, based upon public information, plaintiffs cannot satisfy their burden of proving loss causation because the central information that Northfield allegedly concealed <u>already had been disclosed</u> to the market long before the investigations began and long before the stock drops upon which plaintiffs base their claims. The market already had received correct information many months, and in some instances years, before the post-investigation stock drops that supposedly caused plaintiffs' loss.  In addition, to establish loss causation, plaintiffs must disaggregate stock declines attributable to the alleged misstatements from stock declines attributable to other factors, including the mere existence of government investigations which can affect stock prices independent of the investigations' subject matter or their ultimate outcome.  Because those issues will turn exclusively on publicly disclosed information — as they must under the fraud-on-the-market theory — plaintiffs have no basis for discovering the non-public information that they seek.  *See* Part II below.

---

[1] "Loss causation" is the statutory requirement that securities plaintiffs must prove a causal link between their claimed loss and the challenged misstatements.  15 U.S.C. § 78u-4(b)(4) ("In any private action arising under this title, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages").

2

### Background

Defendant Northfield is seeking to gain FDA approval to sell Northfield's sole product, an artificial blood substitute named "PolyHeme." Plaintiffs allege that Northfield inflated the price of its stock by making misstatements about an elective surgery study (the "ANH Trial") involving PolyHeme. The gist of plaintiffs' allegations is that Northfield purportedly concealed that heart attacks were observed in the ANH Trial and that Northfield supposedly terminated the study as a result — even though no one involved in the study (including the FDA) thought that the heart attacks were caused by PolyHeme, as opposed to by other factors unique to certain smaller test sites. After multiple complaint amendments by plaintiffs and two rounds of briefing on motions to dismiss, Judge Marovich has narrowed the case to five alleged misstatements by Northfield:

1.  The August 2001 statements that "[we] intend to terminate our current elective surgery protocol after the BLA [Biologics License Application] is filed" and that "final-stage, clinical trials, involving elective surgery patients and trauma patients are ongoing." (9/23/08 Opinion on Mtn. to Dismiss at 6-7.)

2.  The August 9, 2002 statement that "[d]ue to the complexity of the clinical protocol, however, patient accrual progressed slowly. As a result, we closed the elective surgery protocol after our BLA was submitted." *Id.* at 7.

3.  The October 11, 2001 statement that there was "no evidence of blood vessel constriction, or renal, pancreatic, gastrointestinal or cardiac dysfunction" in the study discussed there. *Id.* at 7-8.

4.  The September 4, 2001 statement that "Our trial results document a very compelling clinical benefit that we believe provides the substantial evidence of safety and efficacy required by the FDA." *Id.* at 8.

5.  The August 3, 2001 statement that "none of the adverse effects historically associated with other hemoglobin solutions have been identified by our clinical studies." *Id.* at 9.

The reason why fraud-on-the-market issues loom large in this case is because those purported misstatements were made in the 2001 to 2002 time frame. However, according to their certifications, plaintiffs did not purchase any shares until two years later (in 2004), and the stock drops on which plaintiffs premise their securities claims did not happen until two years

3

after that (in January to March 2006). (2d Am. Cmplt. ¶¶ 26-27; 106-19.) Thus, in order for plaintiffs to demonstrate their supposed entitlement to the fraud-on-the-market presumption of reliance, plaintiffs must demonstrate that correct information was not disclosed to the market at any time before the 2006 stock drops, and plaintiffs must tie the 2006 stock drops to the purported misstatements made in 2001 and 2002 (as opposed to any other factors that caused the stock to decline).

Because the fraud-on-the-market issue is central to class certification, and because merits discovery is expensive and time consuming for a small company such as Northfield, defendants asked Judge Marovich to bifurcate class discovery and merits discovery. *See* Ex. B, 10/10/08 Mem. at 1. Northfield argued that "bifurcation of class discovery makes particular sense because the key certification issue is relatively simple: whether plaintiffs can establish the fraud-on-the-market presumption of reliance, including the loss causation component." *Id.* at 2. Northfield further argued that the fraud-on-the-market "issue will not require substantial discovery" because "the inquiry focuses on information in the public domain and on the market's reaction to that information." *Id.* at 2-3 (citing *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007) ("Little discovery from defendants is demanded by the fraud-on-the-market regimen. Its 'proof' is drawn from public data and public filings, as in this case. It is largely an empirical judgment that can be made then [*i.e.*, pre-class certification] as well as later in the litigation.")). Northfield also contended that "there is no such thing as quick and easy merits discovery," especially where "Northfield is a tiny company with only a small number of personnel and limited resources." (Ex. B, 10/10/08 Mem. at 6.) The whole point of requiring discovery to be conducted in phases is to avoid the "extraordinary and unnecessary expense and burden" of merits discovery. *Manual for Complex Litigation* (Fourth) § 21.14.[2]

---

[2]  Northfield further argued in the bifurcation briefing before Judge Marovich that the fraud-on-the-market presumption is critical to class certification because, when put to their proofs, plaintiffs' assertions on those points will fail. For example, although plaintiffs' entire case turns on stock drops occurring in January to March 2006, the facts will show that the central information about the heart attacks was disclosed many months earlier, including on Northfields' website and the websites of multiple hospitals. *See* 9/23/08 Opinion on Mtn. to Dismiss at 11

4

In response, plaintiffs maintained that bifurcation would cause "substantial duplication of [e]fforts" because "discovery of matters relevant to class certification may be so intertwined with the merits that targeting discovery would be inefficient." (Ex. C, Pls. 10/13/08 Mem. at 2-3.) As a fall back, plaintiffs argued that merits-related documents "already produced to the U.S. government" should be produced no matter what because doing so supposedly is "inexpensive and easy." *Id.* at 4.

Judge Marovich rejected plaintiffs' arguments. Judge Marovich held that he was "going to bifurcate the discovery in this case for two reasons." (Ex. A, 10/14/08 Tr. 3.) First, given that Seventh Circuit precedent requires district courts to make factual findings regarding the satisfaction of each Rule 23 requirement, "it has to be determined whether or not the so-called fraud in the marketplace presumption prevails." *Id.* Judge Marovich noted that discovery into the fraud-on-the-market presumption "gives you enough stuff to discover without going into the merits of the case." *Id.* Second, Judge Marovich identified a "practical reason" for bifurcation — that class certification "in many instances is dispositive" of the entire case. *Id.* at 4. He concluded that he would "not burden any of you with the additional discovery until we decide whether or not we have a class." *Id.*[3]

Despite the bifurcation Order, plaintiffs have served discovery requests on Northfield seeking information that, because it was non-public, could not have affected the market. In

---

(observing that plaintiffs' newest complaint deletes prior references to the website disclosures: "While this omission may cause plaintiffs problems at the summary judgment stage, it will not be used against them here."). *See generally* Ex. B, 10/10/08 Mem. at 5-6.

[3] In reaching that result, Judge Marovich applied the Seventh Circuit's *Szabo* principle, which requires district courts to determine specifically whether plaintiffs have presented sufficient evidence to establish all of Rule 23's requirements. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (holding that district courts no longer can accept plaintiffs' factual allegations as true for purposes of class certification while leaving factual disputes for a later day). At least three Courts of Appeals — the Second, Fourth, and Fifth Circuits — have applied the *Szabo* principle in federal securities actions, holding that district courts must make findings that loss causation and other requirements of the fraud-on-the-market presumption are met before a class can be certified. *See, e.g., Oscar*, 487 F.3d at 269 (5th Cir. 2007); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 485 (2d Cir. 2008).

substance, the requests seek all information and documents in Northfield's possession that "evidence, refer, or relate to" the now-closed investigations of Northfield by the SEC and Senator Grassley's Senate Finance Committee — investigations that were initiated and publicly announced in March 2006.  (Pls. Doc Req. Nos. 17-20.)  Plaintiffs also have propounded interrogatories asking for all information and documents relating to Northfield's supposed "contention . . . that the [SEC and Senate] inquiry and/or investigation . . . was not the result of or caused by the results, conclusions, or observations from the Company's ANH (Acute Normovolemic Hemodilution) clinical trial."  (Pls. Interrogs. Nos. 4, 5.)

## Argument

### I.   Plaintiffs Should Not Be Permitted To Obtain Merits Discovery Through The Back Door.

By seeking non-public information that could not have affected the market, plaintiffs are violating the whole point of Judge Marovich's bifurcation Order.  The key class-certification question here is whether plaintiffs can satisfy the requirements for the fraud-on-the-market presumption.  Those requirements center on whether an "efficient market" incorporating public information about Northfield's stock exists and whether plaintiffs traded in that market before "the truth was revealed":

> Reliance is presumed if the plaintiffs can show that "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed."

*Oscar*, 487 F.3d at 264 (5th Cir. 2007); *see Gariety*, 368 F.3d at 364 (4th Cir. 2004) (containing essentially identical list).

The entire focus of the fraud-on-the-market theory is the market — what the market knew and how it reacted.  The theory holds that in a well-developed "efficient" market, publicly available information is incorporated into the company's stock price:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . .

Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

Therefore, by definition, the fraud-on-the-market theory centers on what information actually was "available" to the market. *Basic, id.* The inquiry essentially is fourfold:

1.    Is the market for Northfield stock efficient?

2.    What information was disclosed to the market?

3.    When was that information disclosed?

4.    How did the stock price react to the information when it was disclosed?

As noted above, discovery on fraud-on-the-market issues should be relatively simple because "the inquiry focuses on information in the public domain and on the market's reaction to that information." (Ex. B, 10/10/08 Mem. at 2-3.) Before Judge Marovich, Northfield cited the Fifth Circuit's decision in *Oscar*, which made that exact point in concluding that fraud-on-the-market issues must be examined at the class certification stage. The Fifth Circuit stressed that discovery regarding fraud-on-the-market issues is comparatively easy because the analysis is based on public disclosures — what was publicly disclosed and when:

> Little discovery from defendants is demanded by the fraud-on-the-market regimen. Its "proof" is drawn from public data and public filings, as in this case. It is largely an empirical judgment that can be made then [*i.e.,* pre-class certification] as well as later in the litigation.

*Oscar*, 487 F.3d at 267 (5th Cir. 2007).

Under Judge Marovich's bifurcation decision, discovery is focused on those four questions: was the market efficient, what information was publicly available, when was it available, and how did the market react. As a practical matter, discovery actually concentrates on the second and third questions, given that stock price reactions are matters of public record and market efficiency generally is determined through expert testimony.

Nevertheless, despite the bifurcation Order, plaintiffs have not limited their discovery requests to publicly disclosed documents and information (which Northfield is producing). Rather, plaintiffs have served discovery requests seeking non-public documents and

7

communications with the SEC and the Senate Finance Committee. In particular, plaintiffs seek documents that relate to the "request for information and documents made by" those government entities. (Pls. Doc Req. Nos. 17, 20.) Plaintiffs also seek documents that relate to the "purpose of, and reasons for" the investigations by those entities. (Pls. Doc Req. Nos. 18, 19.) Plaintiffs' interrogatories effectively ask for the same information. (Pls. Interrogs. Nos. 4, 5.)

Some portion of the requested information was released to the public — and that information is fair game for discovery and is being produced. But non-public information is merits information, not class certification information. Non-public information does not matter to the fraud-on-the-market theory. The only information that can affect the market is information actually communicated to the public. Because the materials sought here were not communicated to the public, they cannot support plaintiffs' class certification efforts. Therefore, they are off limits under the bifurcation Order.

## II.   Plaintiffs' Ostensible Justification For Seeking To Discover Non-Public Information Is Based On A Misapprehension Of Northfield's Contentions.

As Northfield expressly stated in its discovery objections, the supposed "contention" upon which plaintiffs predicate their request to discover non-public information regarding the (now closed) government investigations is incorrect. *See* Northfield Interrog. Resp. Nos. 5 & 6 (objecting because the request "misstates Northfield's contention"). According to their interrogatories, plaintiffs seek information and documents relating to Northfield's supposed "contention" that each of the investigations "was not the result of or caused by the results, conclusions, or observations from the Company's ANH . . . clinical trial." (Pls. Interrogs. Nos. 4, 5.) Plaintiffs make the same assertion — about Northfield's supposed "contention" — throughout their memorandum. *See, e.g.,* Pls. Mem. 2-3 ("Defendants steadfastly have maintained that the news disclosures about the Senate Finance Committee's and the SEC's investigations of Northfield were not related to the alleged misstatements about the Company's ANH clinical trials of Polyheme, and thus, do not establish loss causation"); Pls. Mem. 3 ("Defendants contend

8

that the disclosure of the SEC's and Senator Grassley's inquiries was . . . unrelated to the disclosure or materialization of the alleged fraud").

As Northfield has explained to plaintiffs, they misapprehend Northfield's point. Northfield's contention does not rest on any non-public information. Rather, the fraud-on-the-market analysis must be based on publicly disclosed information. Based upon plaintiffs' arguments to date, Northfield expects to argue that the content and timing of the public disclosures concerning the heart attacks observed in the ANH Trial and the content and timing of the public disclosures concerning the government investigations defeat class certification.

Plaintiffs allege that information about the ANH Trial was concealed from the market until January to March 2006, when its disclosure purportedly precipitated government investigations and stock drops. In reality, the allegedly concealed information already had been disclosed to the market long before the government investigations began — and long before the stock drops upon which plaintiffs base their claims. For example, although plaintiffs' entire case turns on stock drops occurring in January to March 2006, the key information about the heart attacks observed in the ANH Trial was disclosed publicly many months earlier, including on Northfield's website and the websites of multiple hospitals. Indeed, the existence of the heart attacks, and their effect on Northfield's long-term prospects, was discussed by investors at length on internet "chat" boards concerning Northfield starting at least by June 2005 — over six months before the stock drops that plaintiffs contend caused their loss. *See, e.g.,* Yahoo message board, ticker symbol NFLD (June 24, 2005 discussion thread entitled "Update FAQ on Polyheme-Utah").

It is elementary that plaintiffs cannot rely on the fraud-on-the-market theory if the market "already has become aware" of the supposedly concealed information:

> In a fraud-on-the-market case, an omission is actionable under section 10(b) and Rule 10b-5 only if the allegedly undisclosed information has not already entered the market. If the market has become aware of the allegedly concealed information, the facts allegedly omitted by the defendant would already be reflected in the stock's prices and the market will not be misled.

9

*Heliotrope Gen'l, Inc. v. Ford Motor Co.*, 189 F.3d 971, 975-76 (9th Cir. 1999) (citations and internal quotation marks omitted).  The Seventh Circuit has expressed the same point this way:

> [Plaintiff] Roots has failed to allege such loss causation, however, because the fraud-on-the-market theory under which Roots proceeds presumes that news is promptly incorporated into stock price.  Accordingly, Roots cannot ask us to presume that the market reacted to the allegedly fraudulent prediction but ignored later information of [defendant] Lands' End's actual earnings results, which information was announced months before plaintiffs purchased.

*Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1499 (7th Cir. 1992) (citations omitted); *accord Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory . . . is that these facts had already been disclosed in public filings, so their revelation in Hunter's 2003 complaint could not have caused Cree's stock price to decline"); *The Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co*, No. 02-1152, 2008 WL 4791492, at *10 (N.D. Tex. Nov. 4, 2008) (denying motion for class certification:  "Information already known to the market cannot actually affect the stock price because an efficient market will not respond to information that is already known.").

That is why the authorities cited by plaintiffs regarding disclosure of government investigations are beside the point.  (Pls. Mem. 6.)  Those authorities deal with situations where corrective disclosures do not occur until after or at the same time as the announcement of the investigations.  *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (disclosure of the alleged fraud occurred after announcement of SEC investigation); *In re Imax Sec. Litig.*, No.06-6128, 2008 WL 4307981, at *11 (S.D.N.Y. Sept. 16, 2008) (disclosure of the alleged fraud coincided with announcement of SEC investigation); *see also In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 547-48 (N.D. Ill. 2007) (case cited by plaintiffs but not involving any government investigation; apparently cited because it discusses (and distinguishes) *Bradley*).

Here, the fact that information concerning the observed heart attacks was disclosed to the market long before the investigations and the stock drops upon which plaintiffs rely means one of two things, both of which are bad for plaintiffs.  First, it could mean that, when information concerning the heart attacks was disclosed, the market did not assimilate "available material

10

information regarding the company." *Basic*, 485 U.S. at 241 (1988). In that event, the market for Northfield stock was not "efficient," and plaintiffs cannot rely on the fraud-on-the-market theory for class certification. Second, it could mean that, if the market for Northfield stock was efficient, plaintiffs cannot show a causal link between their claimed loss and the misstatements upon which their case rests — given that the stock drops did not occur until long after the market knew about the allegedly concealed heart attacks and incorporated that information into the stock price. That scenario likewise eliminates any chance of class certification because loss causation is an essential element of plaintiffs' securities claim and must be proved on a class-wide basis. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338, 342 (2005) ("A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss. . . . Normally, in cases such as this one (*i.e.*, fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.").

Under either scenario, the class certification inquiry will depend entirely on publicly disclosed information. Therefore, plaintiffs do not have any need or justification for non-public information about the government investigations. Northfield's point is that corrective disclosures about the purported misstatements already had been made to the market months earlier. *See, e.g., Teachers' Retirement*, 477 F.3d at 187-188 (4th Cir. 2007) ("Because no such [new] facts were disclosed, the drop in Cree's share price on June 13, 2003, more logically occurred because the market feared that a lawsuit launched by a founder and former CEO of the corporation portended a period of instability and discord that could disrupt the corporation's operations. That loss, however, is not one for which the plaintiffs in this case are entitled to compensation.").

That is why all of this will be the subject of expert testimony based upon public information. To show loss causation, plaintiffs' expert presumably will attempt to disaggregate stock declines supposedly attributable to the alleged misstatements from stock declines attributable to other factors, including the mere existence of government investigations which can affect stock prices independent of the subject matter of the investigations or their ultimate

outcome. Because that expert testimony will turn exclusively on publicly disclosed information — as it must under the fraud-on-the-market theory — plaintiffs have no basis for discovering the non-public information that they seek.

## Conclusion

For the foregoing reasons, plaintiffs' motion to compel should be denied.

Dated: January 21, 2009                    Respectfully submitted,

NORTHFIELD LABORATORIES INC.

s/ Ronald L. Marmer
One of Its Attorneys

Ronald L. Marmer
J. Kevin McCall
C. John Koch
Suzanne J. Prysak
JENNER & BLOCK LLP
330 N. Wabash
Chicago, IL  60611
(312) 222-9350

## CERTIFICATE OF SERVICE

I, SUZANNE J. PRYSAK, an attorney, hereby certify that on this 21st day of January, 2009, I caused the foregoing **DEFENDANT NORTHFIELD'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL** to be served with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the counsel in Case No. 06-1493 on the attached service list at their e-mail addresses on file with the Court.


_____/s/Suzanne J. Prysak_____
        SUZANNE J. PRYSAK

13

# **Exhibit 7**

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George M. Marovich | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 06 C 1493 | **DATE** | 02/05/06 |
| **CASE TITLE** | In Re: In Re: Northfield Laboratories, Inc | | |

**DOCKET ENTRY TEXT**

Status hearing held and continued to 03/10/09 at 9:30 a.m.   Motion hearing held regarding Plaintiffs' Motion to Compel [190].

■[ For further details see text below.]

Notices mailed by Judicial staff.

---

### STATEMENT

This matter is before the court on Plaintiffs' Motion to Compel [Doc. 190]. Defendants have taken the position that Plaintiffs must prove "loss causation" at the class certification stage. As noted before, this is a matter for Judge Marovich to resolve. For discovery purposes, however, the motion seeks non-public information relating to an SEC investigation and a Senate Finance Committee investigation occurring in 2006 which, Plaintiffs say, will help it establish loss causation. The parties were before the court on February 3, 2009, at which time the court suggested that they enter into a stipulation to resolve the matter. The parties have been unable to agree on language for a stipulation.

The motion is fully briefed and the court has reviewed the briefs as well as the supplemental submissions filed this afternoon. The court disagrees with Plaintiffs' argument that in order to prove loss causation relating to the five alleged misrepresentations in 2001 and 2002, they must establish that the SEC and Senate Finance Committee investigations were in fact related to the ANH elective surgery trial.

The court accepts Defendants' certification, as set forth in their Supplemental Submission [Doc. 203], that they will not argue for purposes of class certification:

(1)   that the SEC and Senate Finance Committee investigations were unrelated to the ANH elective surgery trial; or

(2)   that Plaintiffs have failed to satisfy their burden of proof regarding class certification because Plaintiffs have not provided evidence that the SEC and Senate Finance Committee investigations related to, among other things, the ANH elective surgery trial.

Defendants also certify that their contentions regarding Plaintiffs' inability to establish loss causation and

Case 1:06-cv-01493   Document 205   Filed 02/05/2009   Page 2 of 2

**STATEMENT**

the other requirements for application of the fraud-on-the-market presumption of reliance will not be based upon non-public information concerning the SEC and Senate Finance Committee investigations.

   With these certifications from Defendants, Plaintiffs' motion to compel is denied.