**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM and BROCKTON CONTRIBUTORY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | Case No. 07-cv-07014 |
| Plaintiffs, | ) ) ) | Judge Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Nan R. Nolan |
| DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**LEAD PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION TO COMPEL PRODUCTION OF
<u>DOCUMENTS FROM DEFENDANTS</u>**

Lead Plaintiffs, Norfolk County Retirement System ("Norfolk") and Plumbers Local Union 519 Pension Trust ("Plumbers Local") (collectively, "Lead Plaintiffs"), by their attorneys, submit this Reply Memorandum in Support of their Motion to Compel Production of Documents from Defendants.[1]

## **INTRODUCTION**

At the hearing on the issue of bifurcation of discovery, Judge Gettleman made clear that the type of "complete" bifurcation of discovery advocated by Defendants was unworkable and inappropriate in this case. Hrg. Tr. at 9 ("[complete] bifurcation . . . [is] not going to work . . . [and] will create more disputes that it's going to solve."); *Id.* at 7 (stating that "bifurcation of discovery is not appropriate"). Judge Gettleman was unphased by Defendants' "parade of horribles" and instead chose to order a more nuanced structure that allowed for discovery where class and merits issues overlap. *Id*. at 5-6; *see* Scheduling Order at ¶2 (providing for "discovery related to class certification issues and those merits issues that inform the class certification decision"). At the hearing, Defendants represented to the District Court that "both sides will work hard to resolve [discovery disputes] among ourselves" so that "[w]e won't have to burden you or Judge Nolan." Hrg. Tr. at 10. Lead Plaintiffs have conducted discovery accordingly; we have prepared document requests tailored to class certification issues and sought documents that Defendants previously produced to the SEC. After several "meet and confer" sessions, Lead Plaintiffs provided Defendants with every additional document they asked for, drafted stipulations that would take certain contested issues "off the table" so that class certification discovery could proceed without dispute, and sent Defendants detailed correspondence explaining their positions. *See* Memorandum at 3-4, 10-11, Exs. B, D, F and H. In contrast, Defendants have rebuffed Lead Plaintiffs' attempts to conduct discovery in a cooperative manner.[2] Rather than cooperating, Defendants have used Judge Gettleman's Scheduling Order

---

[1] This Reply Memorandum adopts all definitions of terms set forth in Lead Plaintiffs' initial memorandum, dated December 9, 2009 [Docket No. 139], cited herein as "Memorandum." Defendants' opposition memorandum, dated December 21, 2009 [Docket No. 142], is cited herein as "Opposition." The September 10, 2009 Bifurcation Hearing Transcript is cited herein as "Hrg. Tr." Unless otherwise indicated, all emphasis is supplied and all internal citations and quotations are omitted.

[2] For example, Defendants agreed in their October 29, 2009 Objections and Responses to produce documents in response to eight of Lead Plaintiffs' sixty-one Document Requests. *See* Part III of Memorandum at 15. Lead Plaintiffs repeatedly sought information about the volume and timing of Defendants' intended production. Defendants ignored these questions and eventually produced a mere

1

as a shield and disingenuously claimed that nearly every single one of Lead Plaintiffs' Document Requests relates "solely to the merits" and is unduly burdensome.

As shown in Lead Plaintiffs' Memorandum in Support of their Motion to Compel and as reiterated below, the Document Requests that are the subject of this Motion are tailored to loss causation issues that Defendants fully intend to raise at class certification. In other words, these are class certification-related requests because they address arguments Defendants have repeatedly said they will advance at class certification.[3] In addition, the SEC document requests seek documents previously produced to a regulatory agency, which courts have ordered parties to provide even in cases where a statutory stay of discovery is in place. Since no such stay is in place here, the requested documents should be produced. Nor does the SEC production relate solely to the merits, although Defendants' refusal to provide information regarding the nature or content of the SEC production has kept Lead Plaintiffs from further narrowing those requests to eliminate certain of the issues raised in Defendants' brief.

Contrary to Defendants' assertions in their Opposition, they have not acted "in the spirit of cooperation" nor "consistent with" the principles of cooperation set forth in the Seventh Circuit's Electronic Discovery Pilot Program. *See* Seventh Circuit Electronic Discovery Pilot Program, Principle 1.01 (Purpose) ("The purpose of these Principles is to . . . promote, whenever possible, the early resolution of disputes regarding the discovery of [ECI] without Court intervention"); Principle 1.02 (Cooperation) ("The failure of counsel or the parties to litigation to cooperate in facilitating . . . discovery requests and responses raises litigation costs and contributes to the risk of sanctions."). Moreover, Defendants' participation in the Seventh

---

thirty-three pages of documents. *See* Memorandum at 15; Exs. F and H. As a result, on December 9, 2009, Lead Plaintiffs moved to compel the production of the remaining documents. On December 18, 2009, nearly two months after agreeing to produce the documents, and one business day before Defendants filed their Opposition, they produced a large portion of the balance of the documents. Had Defendants simply provided Lead Plaintiffs with the information regarding the volume and timing of the agreed-to production in the first place, Lead Plaintiffs would not have had to waste time moving to compel the production of those documents.

[3] Defendants' claim that "most" of Lead Plaintiffs Document Requests "seek documents that have nothing to do with class certification" is unfounded. Opposition at 1. Lead Plaintiffs served sixty-one Document Requests. Of these, Defendants agreed to produce documents in response to eight requests. The "loss causation requests" comprise 37 of the remaining 53 Requests. That leaves 16 of the 61 Requests that Defendants could claim fall outside the permissible scope of discovery outlined by the Scheduling Order. Sixteen requests is hardly the "majority" of Lead Plaintiffs' requests. And of those 16 requests, Defendants' refusal to produce documents in response to many had nothing to do with irrelevance to class certification.

2

Circuit's Electronic Discovery Pilot Program cannot excuse their noncooperation in discovery in this case.

## ARGUMENT

### I. Defendants Must Produce the Loss Causation Documents

In a game of heads we win, tails you lose, Defendants have indicated that they will dispute loss causation at the class certification stage (by challenging, *inter alia*, the relationship between the partial disclosures identified in the Complaint and the underlying fraud) yet they refuse to provide Lead Plaintiffs with discovery related to the circumstances of those disclosures and refuse to stipulate to postpone this element of their loss causation challenge until after the class certification motion has been decided. Defendants' Motion to Dismiss was denied and the District Court has determined that Lead Plaintiffs prevail if after discovery they can prove the allegations in the Complaint, including those on loss causation. As demonstrated below, Lead Plaintiffs are entitled to discovery on loss causation. Judge Gettleman's September 10, 2009 Scheduling Order confirms that Lead Plaintiffs may take "[f]act discovery related to class certification issues and those merits issues that inform the class certification decision." Scheduling Order at ¶2. Thus, Defendants' refusal to provide Lead Plaintiffs with discovery related to the issue of loss causation – an issue that Defendants will make central to class certification – is a direct violation of the mandate of the District Court. Furthermore, Defendants' refusal is premised on their erroneous contention that Lead Plaintiffs' evidence of loss causation must be strictly limited to public materials. The standard for what a disclosure must say on its face, and whether non-public information connects the fraud with a disclosure, is an ***ultimate*** question to be addressed on summary judgment *after* the Parties have had pretrial discovery.

#### A. The Loss Causation Documents Are Relevant to Class Certification

In opposing class certification, Defendants will repeat an argument they advanced unsuccessfully in their motion to dismiss: they will seek to isolate each partial disclosure alleged in the Complaint and argue that there is no relationship between the text of the disclosure and the fraud. Lead Plaintiffs are entitled to discovery concerning the relationship between the fraud and these disclosures. This discovery could be used to rebut Defendants' contentions that the

3

disclosures are unrelated to the fraud.[4] The absence of discovery on these matters would allow Defendants to contest that a given disclosure relates to the fraud even if internal documents reflect otherwise.

Defendants seek to block such discovery and argue that a determination about whether a given disclosure is related to the fraud is entirely dependent upon whether the text of the disclosure specifically references the fraud ***on its face***.[5] *See* Opposition at 10, 13 (asserting that Lead Plaintiffs are already "well aware" "what the disclosure says"). Lead Plaintiffs' Memorandum demonstrates that Defendants' narrow construction of loss causation, which was rejected by the District Court, is supported by neither law nor reason.[6] *See* Memorandum at 6. As the District Court held, "[*Dura*] did not specify what form a disclosure must take, to what extent it must reveal misrepresentations, or how it must refer to the misstatements or omissions." MTD Order at 9. In addition, "'a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity.'" *Id*. at 10 (quoting *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007)). Finally, merely because a disclosure does not contain a "'*mea culpa* announcement'" revealing the fraud does not render such disclosure insufficiently related to the fraud. *Id*. at 11

---

[4] *See* Memorandum at 6-9 (citing cases in support of the conclusion that: "[c]onsequently, although a disclosure may not mention or refer to the subject of the fraud, if a plaintiff shows – e.g., by way of internal documents surrounding and reflecting the circumstances of the disclosure – that significant aspects of the still-concealed fraud in fact provided the catalyst for the disclosure, then the share price decline following the disclosure might indeed dissipate the fraudulent price inflation").

[5] For example, in their Memorandum in Support of their Motion to Dismiss, Defendants argue that the December 14, 2005 disclosure announcing that the Company had "postponed a scheduled meeting with security analysts and shareowners because the company's external audit for Fiscal 2005 is still in progress" was not sufficiently "connect[ed]" to the Company's accounting problems to be related to the fraud. *See* Memorandum of Law in Support of Navistar Defendants' Motion to Dismiss ("Ds' MTD Memo."), at 18 [Docket No. 79]. Specifically, Defendants argue that the "fundamental failure" of the disclosure was that it did not, "on its face," "reveal to investors 'the existence of potential accounting problems at Navistar,'" and "even if it did, that would not be enough because 'potential accounting problems' are not [the ultimate] securities fraud'" "about which the defendant lied." *Id*. Internal documents reflecting the circumstances of that disclosure are clearly probative of the connection (or lack thereof) between the fraud and the disclosure.

[6] *See* July 28, 2009 Memorandum Opinion and Order ("MTD Order"), at 12 [Docket No. 92] (rejecting Defendants' arguments and finding that Lead Plaintiffs "have sufficiently pled a causal connection between . . . the[] partial disclosures and a reaction in the marketplace that resulted in the reduction in share price.").

(quoting *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966 (S.D. Ind. 2007)).[7] Thus, Defendants' current legal basis for withholding documents is inconsistent with Judge Gettleman's Opinion on the Motion to Dismiss.

Lead Plaintiffs also pointed out that Defendants' proposed rule "would provide an expedient mechanism for wrongdoers to avoid securities fraud liability." Memorandum at 8 (quoting *Motorola,* 505 F. Supp. 2d at 544). Under Defendants' narrow construction of loss causation, plaintiffs would only be able to prove damages based on explicit admissions that prior statements were false. Defendants could issue negative information unrelated to any fraudulent scheme in order to dissipate artificial share price inflation prior to the fraudulent scheme's ultimate revelation to the market. *Motorola,* 505 F. Supp. 2d at 544. "The plaintiff would be unable to tie its loss, *i.e.*, the share price decline, to the fraud, rather than to the apparently unrelated announcement," enabling securities fraud defendants "to immunize themselves with a protracted series of partial disclosures." *Id*.

Whether the discovery Lead Plaintiffs seek will establish a connection between the disclosures and the fraud sufficient to demonstrate loss causation is an ***ultimate*** question to be

---

[7] In support of their position, Defendants string together out-of-context quotations from numerous inapposite cases. For example, Defendants cite *Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) in an attempt to create a bright line distinction between cases alleging "fraud-on-the-market" theories of loss causation and those alleging "materialization of risk" theories. However, although *Ray* ***lists*** those theories, *Ray* does not discuss any such bright line distinction between them or hold that plaintiffs may rely only upon one loss causation theory to the exclusion of all others. *Id*. at 995-96 (finding neither the "materialization of risk" nor "fraud-on-the-market" approach applicable to its facts). Defendants then attempt to use their illusory bright line distinction to distinguish *Motorola*, a case which neither mentions such distinction nor relies upon it in support of its holding that "a securities fraud plaintiff is not . . . precluded from establishing loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges." 505 F. Supp. 2d at 546. Defendants contend that the allegations in *Motorola* are "[u]nlike Lead Plaintiffs' allegations here of affirmative misrepresentations that were then 'corrected' by virtue of a series of partial corrective disclosures, [because] *Motorola* was primarily an 'omissions' case." Opposition at 13. Defendants then conclude that, because it was an "omissions" case, "the *Motorola* plaintiffs' loss causation allegations . . . were more properly analyzed under the rubric of a 'materialization of the risk' theory, not a fraud-on-the-market / corrective disclosure theory like plaintiffs assert here." *Id*. Such a conclusion is legally and factually unsupported. Defendants do not, nor can they, cite any place in the text of *Motorola* where such a distinction is either mentioned or found dispositive by the court. *Motorola* nowhere characterizes itself as an "omissions" case versus a "misstatements" case, and there is no support in the text for drawing such a distinction. In fact, ***just like*** Lead Plaintiffs here, the plaintiff in *Motorola* alleged ***both*** misstatements and omissions and "identified [several] events, labeled 'partial corrective disclosures,'" which were allegedly corrected when "[fraud-related] information entered the market and caused significant declines in [the defendant company's] share price." *See Motorola*, 505 F. Supp. 2d at 536.

5

answered by the District Court at class certification, summary judgment, or trial. The question presently before this Court is whether Lead Plaintiffs are *entitled to obtain* that discovery. Lead Plaintiffs believe that we *are* entitled to obtain discovery of information that is potentially probative of class certification issues, especially in light of the District Court's Scheduling Order explicitly stating that discovery related to class certification and overlapping merits issues is permitted. *See* Scheduling Order at ¶2. Defendants' attempt to prevent Lead Plaintiffs from obtaining this discovery, in order to force us to respond to their loss causation challenge without the benefit of a complete factual record, is improper and fundamentally unfair. *Cf. In re Northfield Labs. Inc. Sec. Litig.*, No. 06 Civ. 1493, 2009 WL 4639678, at *3 (N.D. Ill. Dec. 8, 2009) (decision on the defendants' motion to compel) ("'Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession.'"); *Auto Meter Prods., Inc. v. Maxima Techs. & Sys., LLC*, 05 Civ. 4587, 2006 WL 3253636, at *3 (N.D. Ill. Nov. 6, 2006) ("The Federal Rules . . . 'are designed to promote liberal discovery in an effort to narrow the issues for trial and prevent unfair surprise.'").

Defendants' reliance on *Northfield Labs* (decision on the plaintiffs' motion to compel) is misplaced. Defendants disingenuously assert that the issue in *Northfield* was "very similar to the present dispute." Opposition at 11. Actually, as this Court is no doubt aware, the issue in *Northfield* was the *timing* of the disclosures and *not* their relationship to the fraud. The *Northfield* defendants argued that the "truth" had been revealed to the market *prior to* the issuance of the disclosures and therefore the disclosures were not relevant for loss causation purposes. Unlike the Defendants in this case, the *Northfield* defendants were *not* contesting the relationship between the disclosures and the fraud, and *stipulated* that they would not challenge the existence of that relationship at class certification. Defendants' discussion of *Northfield* entirely omits this fact.

The *Northfield* defendants' agreement not to challenge the relationship between the disclosures and the fraud was the primary basis of the Court's ruling:

> The court accepts Defendants' certification, as set forth in their Supplemental Submission [Doc. 203], that they will not argue for purposes of class certification:
>
> > (1) that the SEC and Senate Finance Committee investigations [the "disclosures" plaintiffs had identified in their complaint] were *unrelated to* the ANH elective surgery trial [the subject of the fraud]; or

6

> (2) that Plaintiffs have failed to satisfy their burden of proof regarding class certification because Plaintiffs have not provided evidence that the SEC and Senate Finance Committee investigations *related to*, among other things, the ANH elective surgery trial.
>
> \* \* \*
>
> With *these certifications* from Defendants, Plaintiffs' motion to compel is denied.

*See* Opposition, Ex. 7 (Feb. 5, 2009 Minute Order).

The Navistar Defendants' "generous" agreement not to use non-public information to support any of their arguments opposing class certification is therefore meaningless without an agreement not to dispute the relationship between the partial disclosures and the fraud. When given a chance to take such issues "off the table" by stipulation, the Navistar Defendants refused.

### B. Producing the Loss Causation Documents Is Not Unduly Burdensome

Defendants baldly assert that complying with Lead Plaintiffs' loss causation requests would be "highly burdensome." This is an unsupported argument that does not excuse Defendants from providing Lead Plaintiffs with the loss causation discovery to which they are entitled. Specifically, all of Lead Plaintiffs' loss causation requests seek a narrow set of documents related solely to the issue of loss causation. Not a single request asks for documents related to Navistar's accounting restatement or any other "merits-related" issues. As these requests seek documents within the scope of permissible discovery set forth in the District Court's Scheduling Order, there is no basis to argue burden of compliance.

Defendants have chosen to interpret the loss causation requests in the broadest possible manner – even where Lead Plaintiffs have offered a more narrow understanding of those requests – so they can argue burden and attempt to further delay production. For example, Defendants contend that some of the loss causation disclosures that are the subject of Lead Plaintiffs' loss causation requests "broadly reference the Company's financial reporting and operations." Opposition at 14. Then, Defendants reach the circular conclusion that the loss causation requests seek "virtually every document relating to Navistar's financial reporting and operations." Memorandum, Ex. E. Once that has been "established," Defendants make the unsupported claim that "there are countless documents at the Company that touch on these subjects," and therefore, complying with such requests is "highly burdensome" and would be "plainly inconsistent with

Judge Gettleman's order" and the Seventh Circuit's Electronic Discovery Pilot Program.[8] Opposition at 15. It is the rejected parade of horribles all over again.

The problem with Defendants' "analysis" is that Lead Plaintiffs' loss causation requests *nowhere seek* the production of such "burdensome" information. Defendants' assertion to the contrary is illogical – merely because the subject of a document request "broadly references" other topics does not mean that the request seeks any documents concerning those other topics.[9] This assertion is disingenuous. As Lead Plaintiffs have explained to Defendants, the loss causation requests seek documents concerning the "circumstances and reaction *to the alleged loss causation disclosures*" themselves, and "should not be interpreted as seeking every conceivable document related to any of the underlying, technical accounting or restatement issues" referenced within the disclosures. Memorandum at 9-18, Exs. D and H ("Contrary to defendants' contentions otherwise, these requests cannot be interpreted as an overbroad or burdensome request for every piece of paper at Navistar over a multi-year period.").

Even in the face of Lead Plaintiffs' *explicit* rejection of Defendants' unsupported interpretation of the scope of the requests – which Defendants mischaracterize as "vague" – Defendants continue to purposely exaggerate the scope of the loss causation requests in an attempt to create their own burden of production. Opposition at 15 (stating that the Requests, even after Lead Plaintiffs' explanation of their more limited scope, are "hardly more circumscribed – if at all – than simply asking for every document in Navistar's possession relating to its financial performance or reporting during this period.").[10]

---

[8] *See id.* ("If the Navistar Defendants were compelled to produce all of the documents responsive to Lead Plaintiffs' requests, class certification discovery would be extended for months or more than a year.").

[9] A comparably illogical interpretation would be if one interpreted a request for "all documents related to Navistar's 2007 financial restatement" – which happened to have been audited by KPMG – as a request for "all documents related to KPMG."

[10] Similarly, Defendants state in their opposition memorandum that Document Request No. 50 (which is not a loss causation request) is "breathtakingly overbroad" and seeks production of "[n]early every document the Company has." D's Response at 1, n.1. Although Lead Plaintiffs disagree with this interpretation of Document Request No. 50, Defendants' point is irrelevant because Lead Plaintiffs clarified to Defendants (well before filing the Motion to Compel) that Request No. 50 has a much more limited scope than Defendants' interpretation allows. See Memorandum, Ex. G at 1 (explaining that Request No. 50 seeks only documents "regarding the value of [Navistar's] common stock," and not "virtually every piece of paper and bit of data at the Company."). Defendants knew this yet continued to

8

Defendants' other arguments, which are purely related to the volume of documents Defendants possess and would be properly required to produce, are irrelevant. Just because there may be a lot of properly discoverable documents – a claim based on Defendants' speculation and conjecture about *what could* exist, but not upon what they have identified as actually existing – does not mean Lead Plaintiffs should receive **nothing**. *Cf. Boyer v. Gildea*, 05 Civ. 129, 2008 WL 4911267, at *4 (N.D. Ind. Nov. 13, 2008) ("if a party is to resist discovery as unduly burdensome, it must adequately demonstrate . . . the claimed burden by making a *specific showing* as to how disclosure . . . would be particularly burdensome." It cannot rely on "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."). Nowhere does Judge Gettleman's Order limit the scope of otherwise discoverable material based on the volume of that material possessed by Defendants. Doing so would be akin to punishing Lead Plaintiffs for asking the right questions in an attempt to support their case. Such a result would be untenable.

## II. Defendants Must Produce the SEC Production Documents

Lead Plaintiffs are entitled to the SEC production documents[11] and Defendants have failed to provide a reasonable justification as to why this discovery should be withheld. Rather, they support their blanket refusal to produce these documents by arguing that the SEC production documents: (1) are highly burdensome to produce; and (2) have no bearing on class certification issues. These arguments are meritless.

### A. Producing the SEC Production Documents Is Not Unduly Burdensome

Defendants' argument that the SEC production documents would be highly burdensome to produce is unavailing. Opposition at 6-9. The SEC production documents have already been collected, reviewed and produced. The burden imposed on Defendants in providing these documents to Lead Plaintiffs is minimal at best. Such a non-burdensome production of

---

interpret the Request in the broadest possible manner so that they could make their exaggerated claim about its "breathtaking overbreadth."

[11] The SEC production documents are those documents that are responsive to Lead Plaintiffs' Document Request Nos. 37 and 38, and are defined in the Memorandum and hereinafter, as materials Defendants previously produced to the SEC or received from the SEC in connection with any SEC investigations into Navistar's restatement of its financial results for 2002 through the first three quarters of 2005. Memorandum at 12.

documents is not contemplated by the District Court's Scheduling Order and operates as an exception to that Order. Similarly, numerous courts have required defendants to produce documents previously provided to regulators even in cases where the PSLRA discovery stay is still in place. *See* Memorandum at 14.

Despite this, Defendants argue that they should not be required to produce ***any*** of the SEC production documents because they would have to review this production for relevancy and privilege, which would be burdensome. Opposition at 6-9. In particular, Defendants argue that many of the SEC production documents are protected by the attorney-client and work-product privileges. *Id*. at 7. Defendants further contend that although they have produced these documents to the SEC – a third-party – they remain privileged under the "selective waiver doctrine," because Defendants only produced documents to the SEC pursuant to a "strict confidentiality agreement," which protected disclosure of these documents and ensured that production to the SEC did not constitute a waiver of these privileges. *Id*. at 7-8.

As an initial matter, Defendants' privileges with respect to the SEC production documents are not clearly protected by the selective waiver doctrine. As this Court acknowledged, the Seventh Circuit has not adopted the selective waiver doctrine and several district courts in this Circuit have rejected it. *Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 244 F.R.D. 412, 432 (N.D. Ill. 2006) ("The Seventh Circuit has not yet determined whether it endorses the concept of selective waiver, though courts in this district have not viewed it with particular favor"). Moreover, Defendants' reliance on *Household* is misplaced. While this Court applied the selective waiver doctrine in *Household* based on the facts at issue in that action, it specifically stated that "[t]his court cannot say with any certainty whether the Seventh Circuit would apply selective waiver in this context, and the court declines to adopt a per se rule regarding waiver with respect to government disclosures." 244 F.R.D. at 433. Indeed, the facts of *Household* do not support selective waiver as Defendants invoke it in this case. In *Household*, the defendants ***produced*** a report to plaintiffs based on an investigation by an outside law firm pursuant to a detailed non-waiver agreement between the parties. *Id.* at 418. Plaintiffs then attempted to obtain discovery with respect to the report including production of the documents underlying the report. *Id.* at 418-19. The defendants in *Household* argued that these documents were protected by privilege. *Id.* Plaintiffs argued that the privilege had been waived in many respects, including defendants' production of the documents to the SEC. *Id.* at 430. The Court

found that defendants had not waived the privilege based on the confidentiality agreement in that case, as there was "'no evidence that 'any restrictions on [the documents'] use were loose in practice.'" *Id.* at 433.

Here, even if the Court were to find that the language of the confidentiality agreement protects Defendants' privileges with respect to the SEC production documents, it is quite possible that the SEC may have failed to comply with the provisions of the agreement and waived these privileges. *See In re Qwest Commc'ns. Int'l*, 450 F.3d 1179, 1194 (10th Cir. 2006) (holding that selective waiver did not apply where it was unknown how many or which of the waiver documents the SEC or DOJ used or disclosed, how those uses or disclosures occurred, who might have had access to the documents, and the extent of continuing disclosures). Thus, at this time, it is not evident that the privileges asserted by Defendants remain.[12]

Moreover, even if the Court were to apply the selective waiver doctrine here, Defendants' categorical refusal to produce *any* of the SEC production documents because they have to conduct a privilege and relevancy review is untenable in light of the liberal policy of discovery imposed by Federal Rules of Civil Procedure. *See Smith v. Aon Corp.*, No. 04-6875, 2007 WL 495306, at *3 (N.D. Ill. Feb. 14, 2007) ("Discovery is to be freely and liberally granted in federal civil litigation."). Defendants have not attempted to reach any agreement with Lead Plaintiffs with respect to the SEC production documents, such as production of the documents subject to a claw-back agreement or other provisions that might enable them to comply with their discovery obligations while protecting the privileges they assert.[13]

Additionally, courts have found that having to conduct a privilege review does not create a burden sufficient to void a party's discovery obligations. *See, e.g.*, *Phalp v. City of Overland Park*, No. 00-2354-JAR, 2002 WL 1162449, at *2 n.2 (D. Kan. May 8, 2002) (finding that the compilation of a privilege log is not unduly burdensome); *Christofferson v. United States*, 78

---

[12] Plaintiffs have not yet had an opportunity to inquire into or conduct discovery on Defendants' confidentiality agreement with the SEC, and the SEC's compliance with this agreement.

[13] In an attempt to demonstrate the burden that production of the SEC production documents would on impose on them, Defendants highlight the ten hard drives produced to the SEC, which contain 3.3 million reviewable pages. Opposition at 6-7. Lead Plaintiffs first learned of these hard drives in Defendants' Opposition and are willing to work with Defendants to limit their requests with respect to these hard drives. Thus, the fact that the production contains these hard drives is not a sufficient reason for Defendants to categorically refuse to produce the SEC production documents. Despite this, as with the entire SEC production, rather than reach a mutually agreeable solution as to these document requests, Defendants have refused to produce anything.

Fed. Cl. 810, 817 (2007) (finding that conducting a privilege review was not unduly burdensome). Thus, the mere fact that Defendants may be required to review the SEC production documents for privilege and relevance does not justify Defendants' refusal to comply with Lead Plaintiffs' legitimate document requests.

### B. The SEC Production Documents Relate To Class Certification Issues

The SEC production documents, which relate to Navistar's accounting issues and restatement, contain information that substantially overlaps with Lead Plaintiffs' loss causation allegations. *See*, *e.g.*, Complaint at ¶502 (the Company's stock dropped *as a result of disclosure* by Navistar that the Company's external audit for Fiscal 2005 is still in progress); Complaint at ¶503 (the Company's stock dropped *as a result of several disclosures*, including the announcement that the Company would be delayed in filing its Form 10-K for 2005 as a result of continued unresolved accounting items); Complaint at ¶505 (the Company's stock dropped *as a result of a Bear Stearns report downgrading Navistar*, which highlighted the various accounting issues identified by Deloitte & Touche LLP); Complaint at ¶506 (the Company's stock dropped *as a result of Navistar's disclosure* that the Company had conducted an investigation into the "propriety of accounting and auditing confirmation matters relating to vendor rebates.").[14] Therefore, Lead Plaintiffs' requests for these documents are entirely appropriate in light of the District Court's Scheduling Order. *See* Scheduling Order at ¶2.

Defendants have provided no support for their conclusory statement that the SEC production documents are unrelated to class certification issues.[15] Opposition at 5. In their Opposition, Defendants identify for the first time five broad categories of documents that they produced to the SEC. *Id.* These categories are labeled with self-serving descriptions but provide

---

[14] These documents also bear on the other requirements of Rule 23, although the Parties have stipulated that for the purposes of class certification there will be no factual issues as to many of these requirements. *See* Parties' Stipulation Regarding Class Certification [Docket. No. 139].

[15] Lead Plaintiffs have not "admitted that the SEC documents were not relevant to class certification issues," as Defendants contend. Opposition at 6. While Lead Plaintiffs' November 5, 2009 letter recognized that the scope of the SEC production documents exceeds those related to class certification, it did not state that all of the SEC production documents were irrelevant to class certification issues. Memorandum, Ex. D at 2. Rather, it noted that Defendants refused to produce any of the responsive documents from this production. *Id*.

12

...

little detail as to what Defendants actually produced to the SEC.[16] *Id.* As such, it is simply not credible for Defendants to argue that none of the SEC production documents are relevant to the issue of loss causation, which is an issue that Defendants intend to introduce at class certification. Memorandum at 6. *See Smith v. Aon Corp.*, No. 04-6875, 2007 WL 495306, at *3 (N.D. Ill. Feb. 14, 2007) ("the concept of 'relevance' in the context of discovery 'has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, *any issue that is or may be in the case*.'") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350 (1978)). Moreover, simply because Defendants have offered to refrain from using these documents in connection with their class certification briefing, does not mean that the SEC production documents are irrelevant to Lead Plaintiffs' loss causation allegations or motion for class certification. Opposition at 6. Accordingly, Defendants are still required to produce these documents.

## CONCLUSION

For all the foregoing reasons and the reasons set forth in Lead Plaintiffs' initial Memorandum, Lead Plaintiffs respectfully request that the Court grant their Motion to Compel.

Respectfully submitted,

**NORFOLK COUNTY RETIREMENT SYSTEM AND PLUMBERS LOCAL UNION 519 PENSION TRUST**

Dated: January 12, 2010     */s/*James A. Harrod
One of Their Attorneys

ROBINSON CURLEY & CLAYTON, P.C.
C. PHILIP CURLEY
FAY CLAYTON
ALEEZA M. STRUBEL
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
Telephone: 312/663-3100
312/663-0303 (fax)

*Plaintiffs' Liaison Counsel*

---

[16] Defendants' attacks on Lead Plaintiffs for failing to provide a detailed explanation of the relevancy of the SEC production documents in the parties' meet and confer sessions are belied by Defendants' failure to provide any information concerning the production to Lead Plaintiffs such as the SEC's document requests, scope, volume and general content of the production. Memorandum at 13.

WOLF POPPER LLP
LESTER L. LEVY
JAMES A. HARROD
ROBERT S. PLOSKY
845 Third Avenue
New York, NY  10022
Telephone:  212/759-4600
212/486-2093 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JACK REISE
DOUGLAS WILENS
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

*Co-Lead Counsel for Plaintiffs*

14

## CERTIFICATE OF SERVICE

  I, Robert Plosky, an attorney, hereby certify that on January 12, 2010, I caused to be served on the following parties a copy of the attached **Reply Memorandum in Support of Lead Plaintiffs' Motion To Compel Production of Documents**, through the Court's ECF system:

| | |
|---|---|
| Sean M. Berkowitz<br>Cary R. Perlman<br>Mark S. Mester<br>Robin M. Hulshizer<br>B. John Casey<br>Matthew L. Kutcher<br>**LATHAM & WATKINS LLP**<br>Sears Tower, Suite 5800<br>233 South Wacker Drive<br>Chicago, Illinois 60606<br>(312) 876-7700 – Telephone<br>(312) 993-9767 – Facsimile<br>sean.berkowitz@lw.com<br>cary.perlman@lw.com<br>mark.mester@lw.com<br>robin.hulshizer@lw.com<br>john.casey@lw.com<br>matthew.kutcher@lw.com<br><br>*Counsel for Defendants Daniel C. Ustian, Robert C. Lannert, Navistar International Corporation* | Patrick S. Coffey<br>Timothy Maggio<br>**LOCKE LORD BISSELL & LIDDELL LLP**<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>(312) 443-0700 – Telephone<br>(312) 896-6702 – Facsimile<br>pcoffey@lordbissell.com<br>tmaggio@lordbissell.com<br><br>*Counsel for Defendant Mark T. Schwetschenau* |
| Laurence H. Levine<br>Maaike S. Almeida<br>**LAW OFFICES OF LAURENCE H. LEVINE**<br>190 South LaSalle Street, Suite 3120<br>Chicago, Illinois 60603<br>(312) 291-7000 – Telephone<br>(312) 291-7015 – Facsimile<br>laurence.levine@lhlevine.com<br>maaike.almeida@lhlevine.com<br><br>*Counsel for Defendants Daniel C. Ustian, Robert C. Lannert, Navistar International Corporation* | Jonathan C. Medow<br>James E. Barz<br>**MAYER BROWN ROWE & MAW LLP**<br>71 South Wacker Drive<br>Chicago, Illinois 60606<br>(312) 782-0060 – Telephone<br>(312) 701-7711 – Facsimile<br>jmeadow@mayerbrownrowe.com<br>jbarz@mayerbrownrowe.com<br><br>*Counsel for Defendant Deloitte & Touche USA LLP* |

                 */s/*Robert Plosky