**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NORFOLK COUNTY RETIREMENT SYSTEM and BROCKTON CONTRIBUTORY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 07 C 7014** |
| **DANIEL C. USTIAN, ROBERT C. LANNERT, MARK T. SCHWETSCHENAU, NAVISTAR INTERNATIONAL CORPORATION, and DELOITTE & TOUCHE LLP,** | ) ) ) ) ) | **Judge Robert W. Gettleman Magistrate Judge Nan R. Nolan** |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Norfolk County Retirement System, Plumbers Local Union 519 Pension Trust and

Brockton Contributory Retirement System have filed this securities fraud class action lawsuit on

behalf of everyone who purchased Navistar International Corporation ("Navistar") securities from

February 14, 2003 through July 17, 2006 (the putative "Class Period").  Plaintiffs charge Navistar;

its President and Chief Executive Officer Daniel C. Ustian; its former Chief Financial Officer Robert

C. Lannert; its former Senior Vice President, Controller, and principal accounting officer Mark T.

Schwetschenau; and its former outside auditor Deloitte & Touche, LLP ("Deloitte"), with systemic

accounting fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,

15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

The district court has dismissed the complaint as to Deloitte, and referred the matter to this court

for discovery supervision.  *Norfolk County Retirement Sys. v. Ustian*, No. 07 C 7014, 2009 WL

2386156 (N.D. Ill. July 28, 2009).

Currently before the court is Lead Plaintiffs' motion to compel production of documents.

For the reasons set forth here, the motion is granted in part and denied in part.

## BACKGROUND

At all relevant times, Navistar was a publicly traded company specializing in the manufacture and distribution of trucks, buses, and diesel engines in the United States, Canada, Mexico and Brazil.  In October 2002, Navistar's stock reached a nearly ten-year low, prompting the company to attempt a restructuring plan designed to reduce operating costs and increase net income.  The plan proved a failure, but Plaintiffs claim that Navistar engaged in a scheme to inflate its reported financial results to disguise continuing losses.  From February 14, 2003 through July 17, 2006, Navistar allegedly overstated its net income by $677 million, reporting a net income of $361 million when the company had actually lost $316 million.  Navistar also reported positive stockholder equity when, in truth, there was an enormous deficit ($1.8 billion in 2003 and $1.85 billion in 2004).

The complaint identifies numerous misstatements Navistar allegedly made during the Class Period as part of its scheme to defraud.  According to Plaintiffs, "Navistar's publicly reported financial results created the impression that it was in a positive business cycle, marked by increasing profit and controlled operating costs."  In truth, "Navistar's ability to meet or exceed guidance and consensus estimates was predicated entirely on the Defendants' improper accounting manipulations." (Cmplt. ¶ 297.) By February 2005, Navistar was under informal inquiry from the Securities and Exchange Commission ("SEC").

Plaintiffs claim that beginning in December 2005, Defendants gradually started releasing information into the market regarding the alleged fraud.  Between December 14, 2005 and July 17, 2006, Navistar reported that there would be (1) delays in the filing of its 2005 Form 10-K; (2) restatements of its financial results from fiscal years 2003, 2004 and the first three quarters of 2005; and (3) no further reliance on the representations of Mr. Schwetschenau.  By the time

Defendants made their final partial corrective disclosure on July 17, 2006, Navistar common stock had fallen by $9.33 (30%).

On December 10, 2007, Navistar finally filed its 2005 Form 10-K, which described the results of the restatement and re-audit of Navistar's financial statements for 2003, 2004, and the first three quarters of 2005 (the "Restatement").  The Restatement disclosed that over that three-year period, Navistar had misstated its financial position and results of operations by billions of dollars.  Three days later, on December 13, 2007, Plaintiffs filed this class action securities lawsuit. The district court appointed Norfolk County Retirement System and Plumbers Local Union 519 Pension Trust to serve as lead plaintiffs in the case.  (Order of 3/18/08, Doc. 60.)

At a hearing on September 10, 2009, the district court denied Defendants' motion to bifurcate discovery, but directed the parties to "avoid taking discovery that is . . . related solely to non-class certification issues until the class motion is briefed and decided by the Court."  (Tr. of 9/10/09, at 8.)  The parties have agreed to participate in the Seventh Circuit's E-Discovery Pilot Program and are currently working on class discovery.  (Minute Order of 9/30/09, Doc. 119.)

On December 9, 2009, Lead Plaintiffs filed a motion to compel the production of documents they claim are relevant to their impending motion for class certification.  The matter was stayed while the parties attempted to settle their dispute, but the court understands that the March 9, 2010 mediation was unsuccessful.  The court thus turns once again to the motion to compel.  Lead Plaintiffs seek (1) documents provided to the SEC; (2) non-public documents relating to loss causation; and (3) documents Defendants agreed to produce.  Defendants insist that they have now produced all documents as promised, and object that the other documents at issue are irrelevant and overly burdensome to produce.

**DISCUSSION**

The Federal Rules permit discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. FED. R. CIV. P. 26(b)(1). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *In re Thomas Consolidated Indus., Inc.*, No. 04 C 6185, 2005 WL 3776322, at *6 (N.D. Ill. May 19, 2005), *aff'd* 456 F.3d 719 (7th Cir. 2006) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)).

It appears that Defendants have now produced documents responsive to First Request for Production of Documents ("Request") Nos. 44, 45, 53-55, and 59-61. (Pl. Reply, at 1 n.2.) The court thus focuses on the SEC documents and the loss causation documents.

**A.   SEC Documents**

Request Nos. 37 and 38 seek documents Defendants produced to, or received from the SEC in connection with the agency's investigation into Navistar's financial restatement. According to Defendants, these include: (1) over one million pages of electronic and hard copy documents relating to the accounting issues under review by the SEC; (2) hundreds of thousands of emails, many with voluminous spreadsheets and other attachments in various types of file formats, along with transactional documents and drafts relating to the accounting issues under review by the SEC; (3) tens of thousands of pages of internal and external work papers related to accounting issues described in the Restatement; (4) hundreds of thousands of pages of documents relating to Navistar's Audit Committee's internal investigation into accounting issues in connection with the Restatement; and (5) complete forensic copies of the hard-drive images and user-drive files for ten Navistar employees, totaling over 390 gigabytes and yielding more than 3.3 million pages. (Def. Resp., at 5.)

Lead Plaintiffs argue, rather weakly, that these documents are relevant because "it is likely that some documents produced to the SEC would bear on class certification issues." (Pl. Mem., at 13.) Lead Plaintiffs then attempt to supplement this position with a general assertion that, because the SEC documents "relate to Navistar's accounting issues and restatement," they must "contain information that substantially overlaps with Lead Plaintiffs' loss causation allegations." (Pl. Reply, at 12.) Defendants counter that at most, the SEC documents may be relevant to the issue of scienter, which is not pertinent to a Rule 23 analysis. In that regard, Defendants are willing to "stipulate that they will not use these documents in connection with their class certification briefing." (Def. Resp., at 5-6.)

Lead Plaintiffs concede that "the scope of the SEC production documents exceeds those related to class certification." (Pl. Reply, at 12 n.15.) Even assuming that some of the documents may be relevant to the issue of loss causation, it would certainly be burdensome for Defendants to try and locate them from among the millions of pages of materials. In the court's view, the burden outweighs Lead Plaintiffs' minimal showing of relevance. *See Griffith v. Pepmeyer*, No. 07-cv-1130, 2009 WL 3837543, at *1 (C.D. Ill. Nov. 13, 2009) ("The discovery of relevant information can be limited if . . . the 'burden . . . outweighs its likely benefit.'") To get around this problem, Lead Plaintiffs posit that Defendants can just produce everything they gave to the SEC. In Lead Plaintiffs' view, the district court instructed the parties to focus on class discovery primarily because merits discovery is burdensome. Here, they speculate, the SEC documents "have already been collated, reviewed and organized" and, thus, will be easy to produce. In the absence of any production burden, Lead Plaintiffs reason, merits discovery is appropriate now. (Pl. Mem., at 14.) The court disagrees.

The district court made clear that the parties are not to take discovery relating solely to non-class certification issues. The district court carved out no exception for merits discovery that may be produced with minimal burden. To the extent that many of the SEC documents are concededly

5

unrelated to class certification and may also be irrelevant to this lawsuit, the court declines to order Defendants to produce all SEC documents at this time.  The court accepts Defendants' stipulation that they will not use those documents in connection with class certification, and denies this portion of Lead Plaintiffs' motion to compel.  In light of this determination, the court need not address the parties' additional arguments regarding privilege and selective waiver.

### B.    Loss Causation Documents

Request Nos. 3-36, 48, 52, 56 and 57 seek non-public documents related to loss causation. Lead Plaintiffs have identified 17 disclosures Defendants made between December 14, 2005 and July 17, 2006 that they claim revealed to the market the truth regarding Defendants' alleged fraud. Defendants intend to challenge loss causation at the class certification stage, but insist that both parties can address the issue with public documents.  Defendants also maintain that it will be highly burdensome to produce non-public documents at this stage of the proceedings.

### 1.    Relevance

Lead Plaintiffs have alleged a fraud-on-the-market theory of loss causation, which requires a showing "both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007).  In Defendants' view, the Fifth Circuit best described the scope of discovery in such cases:  "[l]ittle discovery from defendants is demanded by the fraud-on-the-market regimen.  Its 'proof' is drawn from public data and public filings." *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267 (5th Cir. 2007). *See also Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and

its business.")  Consistent with this theory, Defendants are willing to stipulate that they will not utilize any non-public documents in opposing class certification.  (Def. Resp., at 12.)

Lead Plaintiffs object that Defendants are construing loss causation too narrowly.  They direct the court to *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501 (N.D. Ill. 2007), in which the plaintiff alleged that the defendants concealed their risky business dealings with a Turkish vendor ("Telsim").  Specifically, the defendants extended Telsim approximately $2 billion in vendor financing, and recognized related revenues, despite the fact that Telsim was known to be a weak company with a "very bad public reputation for basic honesty and integrity."  *Id*. at 506, 508-09. The plaintiff argued that a February 23, 2001 earnings warning revealed the truth about the bad Telsim deal, even though it attributed the company's problems to economic conditions, inventory corrections, and weak order input, without ever mentioning Telsim.  *Id*. at 539.  In the plaintiff's view, the earnings warning "could have served as a vehicle by which Telsim-related information began to enter the market because Motorola's deteriorating business relationship with Telsim was allegedly the catalyst for Motorola's expected earnings shortfall."  *Id*. at 542.

The court discussed at length the parameters of loss causation, and ultimately concluded that "the truth a misrepresentation or omission conceals can make its way into the market, resulting in dissipation of a fraudulently inflated share price, long before a company issues a formal 'corrective' announcement."  *Id*. at 543.  In rejecting the defendants' argument that a corrective disclosure must identify the prior representation and reveal to the market the falsity of that representation, the court noted:

> Defendants' proposed rule would provide an expedient mechanism for wrongdoers to avoid securities fraud liability.  A company that has, for example, booked revenue from non-existent contracts could simply issue some damaging announcement that appears on its face unrelated to any fraudulent scheme, e.g., a significant earnings warning citing order weakness, wait for its share price to plummet, and then disclose the wrongdoing once the damage has been done.

*Id*. at 544.  In such circumstances, the plaintiff "would be unable to tie its loss, i.e., the share price decline, to the fraud, rather than to the apparently unrelated announcement."  *Id*.

The court agreed that "the loss causation requirement should not allow securities fraud defendants to 'immunize themselves with a protracted series of partial disclosures.'"  *Id*. (quoting *Freeland v. Iridium World Communications, Ltd.*, 233 F.R.D. 40, 47(D.D.C. 2006).  The court thus concluded that,

> if a plaintiff shows . . . that significant aspects of the still-concealed fraud in fact provided the catalyst for an anticipated failure to meet earnings forecasts, then the share price decline following an earnings warning might indeed dissipate the fraudulent price inflation; in such circumstances, there is no good reason why the earnings warning should not serve as a disclosure in which 'the relevant truth begins to leak out.'"

*Id*. at 546 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

In this case, Lead Plaintiffs have identified a series of 17 partial disclosures that allegedly revealed problems with previously reported financial statements, internal accounting practices, and an on-going audit investigation.  Lead Plaintiffs claim that, as in *Motorola*, Defendants intend to argue that there is no relationship between the text of those partial disclosures and the alleged fraud.  (Pl. Reply, at 3.)  In order to rebut that argument, Lead Plaintiffs want an opportunity to see if non-public documents reveal that the motivation for the disclosures was the accounting fraud, even if that is not specifically what the disclosures said.

Defendants respond that *Motorola* is inapposite to the extent it is primarily an "omissions" case, whereas Lead Plaintiffs here allege affirmative misrepresentations.  In cases of omissions, Defendants posit, the proper loss causation approach is "materialization of risk," which requires Lead Plaintiffs to prove that "it was the very facts about which the defendant lied which caused [their] injuries."  *Ray*, 482 F.3d at 995 (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)); *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 846 (N.D. Ill.

2008).  Defendants contend that to the extent Lead Plaintiffs allege only fraud-on-the-market loss causation, *Motorola* does nothing to support their quest for non-public documents.

Contrary to Defendants' assertion, it is not clear that Lead Plaintiffs' loss causation theory is limited to fraud-on-the-market.  Indeed, for purposes of the motion to dismiss, the district court declined to determine whether Lead Plaintiffs can proceed under a materialization of risk theory of loss causation in addition to the fraud-on-the-market theory highlighted in the complaint.  *Norfolk County Retirement Sys.*, 2009 WL 2386156, at *6 n.3.  *See also Schultz v. TomoTherapy Inc.*, ___ F. Supp. 2d ___, 2009 WL 5062402, at *10 (W.D. Wis. Dec. 15, 2009) ("[A] plaintiff is not required to plead legal theories" such as materialization of risk loss causation).  This remains a matter for the district court.

For purposes of discovery, however, the court finds that Lead Plaintiffs are entitled to explore whether significant aspects of the still-concealed accounting fraud provided a catalyst for reporting errors in Defendants' financial statements and for disclosing an on-going audit investigation.  *Motorola*, 505 F. Supp. 2d at 546.  Defendants argue that *In re Northfield Laboratories, Inc.*, No. 06 C 1462 (Minute Order of 2/5/09, Doc. 205), stands for the proposition that non-public information is not relevant where, as here, the defendants stipulate not to use such information in opposing class certification.  The court finds *Northfield* distinguishable, however, in that the defendants in that case not only agreed to refrain from using non-public documents, but also certified that they would not argue that the subjects of those documents (SEC and Senate Finance Committee investigations) were unrelated to the alleged fraud.  (*Id.*)  Here, conversely, Defendants make no such certification.

### 2.    Burden

Defendants argue that even if non-public documents are relevant to class certification, it will be unduly burdensome to produce them at this stage of the proceedings.  Lead Plaintiffs requested

9

all documents "concerning" the 17 partial disclosures and "market or analyst reaction" to them, but have now clarified that they seek only information relating to loss causation, as follows:

> documents or communications related to or reflecting the process, circumstances and reaction to the alleged loss causation disclosures. This would include certain documents identifying the contemporaneous context for the disclosure . . . as well as drafts and other documents related to the decision that caused the disclosure to occur.

(Pl. Mem., at 10 and Ex. H, Letter of 11/24/09.)  Defendants object that the documents potentially responsive to these requests are "practically innumerable."  They note, for example, that many of the alleged corrective disclosures broadly reference Navistar's financial reporting and operations, and claim that there are "countless" documents that "touch on" these subjects.  (Def. Resp., at 14-15.)   Defendants further contend that "there are likely thousands of communications and documents . . . concerning 'the reasons for any increase or decline' in Navistar share price."  (*Id*. at 15.)

The court acknowledges that Defendants may need to conduct a fairly extensive search in order to produce documents responsive to Lead Plaintiffs' requests.  To the extent Defendants intend to make loss causation a primary issue for purposes of class certification, however, their objections are unavailing.  Lead Plaintiffs have narrowed their requests to documents specifically relating to the 17 partial disclosures themselves, and excluding "'the underlying, technical accounting or restatement issues' referenced within the disclosures."  (Pl. Reply, at 8.)  The court is satisfied that Defendants can produce this information, and the motion to compel these documents is granted.

## **CONCLUSION**

For the reasons stated above, Plaintiffs' Motion to Compel Production of Documents from Defendants [Doc. 137] is granted in part and denied in part.

ENTER:

Dated: April 13, 2010

NAN R. NOLAN
United States Magistrate Judge